## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>     Plaintiffs,<br><br>vs.<br><br>TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,<br><br>    Defendants. | Case No.: |

### ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("Rare Breed") (collectively, "Plaintiffs") accuse HOFFMAN TACTICAL LLC ("HT") and TIMOTHY HOFFMAN ("Hoffman") (collectively, "Defendants"), of infringing U.S. Patent No. 12,038,247 ("the '247 Patent"), U.S. Patent No. 12,031,784 ("the '784 Patent") and U.S. Patent No. 7,398,723 ("the '723 Patent") as follows:

### PARTIES

1.    ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, Delaware 19901.

2.    Rare Breed is a corporation organized under the laws of Texas with an address of 2710 Central Freeway, Suite 150-151, Wichita Falls, TX 76306.

3.    Upon information and belief, Defendant Hoffman Tactical LLC is a limited liability company existing under the laws of the state of Tennessee with an address of 211 Shoal Creek Road, Englewood, Tennessee, 37329.

4.    HT conducts business operating via a website at www.hoffmantactical.com (last visited December 23, 2025) with a stated address of "P.O. Box 541 37385," which is located in the same general area as the listed business above.

5.    Upon information and belief, Timothy Hoffman is an individual residing at 211 Shoal Creek Road, Englewood, Tennessee, 37329 and is the sole member of and operates HT.

6.    Hoffman's residence is the same as that of HT.

## JURISDICTION AND VENUE

7.    This is an action for patent infringement arising under 35 U.S.C. §§ 271(a)-(c), 281, and 284-85.

8.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338, which directs that United States District Courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents; and pursuant to 28 U.S.C. § 1331, which pertains to civil actions arising under the laws of the United States.

9.    Personal jurisdiction and venue over Defendants are proper in this District because the Defendants reside in and/or have a place of business in this district.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). Defendants reside in this district and/or have a regular and established place of business in this District.

## BACKGROUND

11.    This lawsuit relates to direct and indirect infringement of the '247 Patent, '784 Patent, and '723 Patent (collectively, the "Patents-in-Suit"). True and correct copies of the '247, '784, and '723 Patents are attached hereto as Exhibits A, B, and C, respectively.

12.     The '247 Patent was lawfully and properly issued by the United States Patent and Trademark Office ("USPTO") on July 16, 2024. The application from which the '247 Patent issued claimed a priority date of September 8, 2022.

13.     The '784 Patent was lawfully and properly issued by the USPTO on July 9, 2024. The application from which the '784 Patent issued claimed a priority date of November 5, 2021.

14.     The '723 Patent was lawfully and properly issued by the USPTO on July 15, 2008. The application from which the '723 Patent issued has a priority date of April 25, 2003.

15.     ABC is the current assignee and owner of all right, title and interest in and to the '247 and '784 Patents. These assignments have been recorded at the USPTO.

16.     The '723 Patent expired on September 22, 2024.

17.     ABC is the assignee of the '723 Patent.

18.     Defendants have committed acts of direct, contributory, and induced patent infringement of the '247, '784, and '723 Patents which will be described in more detail below. These acts are in violation of 35 U.S.C. § 271 and should be considered willful.

19.     On August 15, 2025, Defendants posted a video on YouTube discussing Hoffman's purported knowledge of infringement claims brought in *ABC IP, LLC, et al. v. DNT, LLC, et al.*, Case No. 25-cv-289, in the District of Idaho, which discusses the claims in detail as they apply to Defendants' infringing design, demonstrating Hoffman's knowledge of the claims of the '247 and '723 Patents and the claims of Plaintiffs as applied to Defendants' infringing design, though Hoffman applies the claims incorrectly.

20.     On March 3, 2025, Defendants posted a file on Odysee with a download file for a lever for use in a forced reset trigger for a .308 caliber AR platform. Hoffman's Infringing ".308 super safety" Device is designed for use in an AR-10/.308 Win/7.62x51 platform. Defendants' release of the Infringing Design of the .308 Super Safety was almost a year after the issuance of the '784 Patent and more than three years after the November 5, 2021, priority date of the '784 Patent. The download is available at   https://odysee.com/@hoffmantactical:3/LR-308-Lever-V4.4.E:f:



21.     Additionally, Defendants committed direct and indirect infringement of the '723 Patent prior to its expiration.

22.     Defendants have known about Rare Breed and ABC's patent portfolio for years. Although Plaintiffs have not asserted U.S. Patent No. 10,514,223 (the "'223 Patent") in this action, Defendants' prior infringement of that patent is directly relevant to their knowledge of Plaintiffs' forced-reset trigger patent portfolio, their intent, and their willful disregard of Plaintiffs' patent

rights. Plaintiff ABC is the assignee of the '223 Patent. Rare Breed is the exclusive licensee of the '223 Patent.

23. Plaintiffs discovered in early 2022 that Defendants were offering and distributing a downloadable 3D-printable modification to a standard AR-pattern trigger that effectively converted such trigger to a forced reset trigger. When made and assembled as instructed, Defendants' 3D-printable download infringes at least one claim of the '223 Patent.

24. Plaintiffs sent Defendants a cease-and-desist letter regarding Defendants' actively inducing infringement of the '223 on February 9, 2022. After negotiations with Defendants, Plaintiffs entered into an agreement to resolve the dispute on February 24, 2022, a copy of which is attached as Exhibit D. At that time, Plaintiffs explicitly warned Hoffman that if he intended to remain active in the forced-reset trigger space, he must consult qualified patent counsel to review Plaintiffs' patents to avoid further infringement. Plaintiffs further advised Hoffman that he could reach out at any time and Plaintiffs would provide him copies of their patents, including issued patents and published applications, to assist him in avoiding future infringement.

25. During negotiations prior to the settlement agreement, Hoffman said he had ideas "to get around [Plaintiffs'] patents," or words to that effect. Thus, on the date of Defendants' release of the Infringing Design, they knew or should have known about the '723 Patent, which had been revived and assigned to ABC for more than a year before the release, in addition to Plaintiffs' pending applications, including both the '247 Patent (with an application publication date of March 14, 2024) and the '784 Patent.

26. On March 6, 2022, Defendants posted a video on YouTube at https://www.youtube.com/watch?v=NxSFNreG_Ec, titled "Rare Breed C & D Letter, What Happened and Moving Forward." In this video, Defendants actually inform viewers that the files

that they admit to removing from their download site are "still available if you know where to look," and attempted to subvert the patent system by instructing viewers to search out the files from which they removed download links so that they could continue to make and use infringing forced reset triggers according to Defendants' design that infringe the '223 Patent. *See* "*Rare Breed C & D Letter, What Happened and Moving Forward*," March 6, 2022, at 11:15 – 11:30 and 14:54 – 15:15, available at https://www.youtube.com/watch?v=NxSFNreG_Ec (last visited December 15, 2025).

27.     Defendants' infringement of the '223 Patent, their receipt of formal notice, the settlement agreement, and Plaintiffs' explicit warnings about additional patents and pending applications all establish that Defendants have been on clear and unambiguous notice of Plaintiffs' intellectual-property rights since at least February 2022. Defendants' efforts to instruct their viewers to search out the infringing files while, on information and belief, having awareness of the '723 Patent further demonstrate willful infringement through continued efforts to make, use, and provide 3D files for the Infringing Devices and Infringing Designs (defined *infra*). Certainly, any reasonable search for patents owned and/or assigned to either ABC or Rare Breed would have identified the '723 Patent more than a year before Defendants released the 3D print and STEP files for the Super Safety (the "Infringing Design") or publicly displayed their use of the Super Safety (the "Infringing Device"). Defendants' conduct thereby demonstrated, at a minimum, reckless disregard for Plaintiffs' constitutional right of intellectual property protection, if not blatant willful infringement, and is a breach of the settlement agreement, in which Hoffman agreed not to "make, have made, offer for sale, or sell any product or device that directly or indirectly infringes any claim of the '223 Patent or to make, release, distribute, or provide any 3D CAD file that induces others to make or have made parts that directly or indirectly infringe any claim of the '223 Patent."

This history is highly probative of Defendants' knowledge, intent, and willfulness regarding the '247 and '723 Patents asserted in this case.

28.    On or about April 6, 2025, representatives of Plaintiffs had a telephone call with Defendant Hoffman. During that call, Defendant Hoffman *admitted* that the Infringing Devices infringe the claims of the '723 and '247 Patents. Plaintiffs allege that Hoffman, *at a minimum*, made a statement regarding his thoughts on the infringement of the '723 Patent and '247 Patent by the Super Safety Infringing Device, as evidenced by the screenshot below from HT's "X" social media account:



29.    Later this year, on August 9, 2025, representatives of Plaintiffs approached Defendant Hoffman at the HT booth during the Gun Owners of America ("GOA") Gun Owners Advocacy and Leadership Summit ("GOALS") in Knoxville, Tennessee. During this in-person discussion, Defendant Hoffman made a series of statements that further confirm his long-standing knowledge of Plaintiffs' patent rights and his deliberate decision to subvert the patent system and infringe those rights.

30.     Hoffman stated unequivocally that he "does not believe in patents," that "no one should have a patent," and that it is his view that no company should be permitted to exclude others from a market, regardless of patent rights. He further explained that, in his personal philosophy, a company's success or failure should depend solely on its business model and marketing practices, not on the lawful protections afforded by the United States patent system.

31.     Hoffman also admitted that he had intentionally released the Super Safety design files to the public because he intended to use "the masses as guinea pigs." Hoffman stated that he wanted widespread copying, distribution, experimentation, and sale of the design by numerous individuals and companies to overwhelm the market and make enforcement of Plaintiffs' patent rights "difficult, if not impossible." According to Hoffman, this strategy was designed to cause rapid market saturation, thereby impairing Plaintiffs' ability to pursue infringers or protect the exclusivity and limited monopoly granted by their patents. Hoffman has further stated that in releasing his 3D print files for the Infringing Device, he is "more comfortable working near the edge" and "realizing that the Federal Government does not have unlimited power to just crush you if it's a lot of people kind of working together to say 'no, this is legal and we can do it.'"

32.     Hoffman further represented that he had already arranged for the Super Safety to be manufactured using Metal Injection Molding ("MIM") and that, once the market had become sufficiently saturated with unlicensed copies and subpar derivative works, he planned to "swoop in" and dominate the market. He further acknowledged that many of the people selling the Infringing Devices were involved in importing Infringing Devices from China (made using his 3D files), offered no warranty, or failed to deliver products to customers. Hoffman stated that his strategy involved leveraging his personal popularity and public following, combined with his ability to offer the lowest-priced Super Safety product available, to seize control of the market

after intentionally encouraging widespread infringement. These statements confirm that Hoffman's infringement was not accidental or uninformed, but instead part of a calculated plan to disregard Plaintiffs' patent rights, distort the competitive landscape, subvert Article I, Section 8 of the United States Constitution, and profit from a market he had intentionally destabilized.

33.     These admissions provide direct evidence of Defendants' deliberate intent to infringe, to induce infringement by others, and to undermine Plaintiffs' patent rights, and thus restrain legal commerce by attempting to dilute Plaintiffs' lawful monopolies granted under the authority of Article I, Section 8 of the United States Constitution. They further demonstrate that Defendants' infringement of the '247 Patent and the '723 Patent is willful under 35 U.S.C. § 284 and supports the imposition of enhanced damages.

<u>**The Inventions**</u>

34.     The '723 Patent discloses a semiautomatic trigger mechanism that forces the trigger to reset via a cam and claims a method of accelerating the firing cycle using such a trigger mechanism.

35.     The '247 Patent provides a novel device for accelerating the firing sequence of any semiautomatic firearm, in contrast to a standard semiautomatic trigger or other prior art devices that allow an accelerated rate of semiautomatic firing. The device can be selected to operate in either a standard semiautomatic mode or a forced reset semiautomatic mode and uses a cam, rotated by cycling of the action, to force the trigger member to reset and prevent the trigger member from being pulled again until the action has returned to the in-battery position. While the '247 Patent may be adapted to many types of firearms, the '247 Patent shows one embodiment designed as a drop-in replacement particularly to fit AR15-pattern firearms. The scope of the claimed invention, however, is defined by the claims of the '247 Patent.

36.     Typical AR15 and AR10-pattern firearms, for example, are considered semiautomatic firearms. The operation of a *standard disconnector* AR-pattern trigger mechanism is commenced by the trigger member being pulled by the user. The trigger member releases the hammer from the trigger sear and allows the hammer to strike the firing pin. A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm. The rearward movement of the bolt carrier cocks the hammer on the disconnector and then the bolt is allowed to return forward into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger member in a pulled (i.e., fired) state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer in a cocked position. When the user reduces pressure on the trigger member to allow the trigger spring to reset the trigger member, the disconnector releases the hammer to engage the trigger sear.

37.     In the standard AR-pattern trigger assembly, the purpose of the disconnector is to hold the hammer in a cocked position until the trigger member is reset by a trigger spring when the user allows the trigger to reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to manually reset the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, leaving the hammer un-cocked.

38.     In contrast, in a forced reset trigger mechanism, cycling of the bolt carrier or bolt causes the trigger member to be forced to the reset position and locks the trigger member in this

position until the bolt or bolt carrier is back in battery, when it is safe for the user to pull the trigger again, without the need for a disconnector.

39. The '723 Patent teaches a trigger mechanism in which the cycling action of a semiautomatic firearm causes a cam to forcibly reset the trigger member and locks it there until the action has reached the end of its cycle and is ready to fire again.

40. The '723 Patent claims a method of accelerating the firing cycle of a semi-automatic firearm. According to the method, a firearm trigger is depressed with a finger to discharge the firearm. This activates a reciprocating mechanism within the firearm (such as a bolt or bolt carrier) which causes a cam, in a single rotational motion of the cam, to simultaneously push the trigger forward into a ready to fire position and hold the trigger forward in the ready to fire position until the reciprocating mechanism has reached an approximately closed, ready to fire position.

41. The '784 Patent provides a device that works in a forced reset trigger system as an extended trigger member locking mechanism for use with a semi-automatic firearm that employs a "deflectable extension of the locking member that is actuated by forward movement of the bolt carrier," among other innovations as explicitly claimed. The invention of the '784 Patent overcomes the geometric limitations of prior art designs for use in multiple and varied semi-automatic firearm designs by allowing a locking member to deflect or fold separately from the body portion of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear.

42. The '247 Patent relates to a semi-automatic trigger mechanism that represents an improvement on the above-described technologies because it has two modes of operation: one that

operates as a standard disconnector trigger mechanism described above and another that allows the user to fire more rapidly by forcibly returning the trigger to the reset state.

43.    The '247 Patent invention teaches a forced reset mode of the trigger by a cam while the bolt cycles to the rear and then returns forward to the in-battery position. The cam also limits movement of the trigger member. The cam acts to prevent the trigger member from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position.

## The Infringing Devices

44.    On information and belief, Defendants have and are currently making, importing, using, selling, and/or offering for sale one or more versions of the Infringing Devices, which embodies the technology claimed in the '247, '784, and '723 Patents. Additionally, Defendants overtly and intentionally, with knowledge of the '247 and '784 Patents, have offered and continue to offer the Infringing Design for free download in a deliberate effort to undermine the limited monopoly conferred by virtue of the valid and enforceable '247 and '784 Patents.

45.    On information and belief, Defendants made, imported, used, sold, and/or offered for sale the Infringing Device, which embodies the technology claimed in the '723 Patent prior to its expiration.

46.    On information and belief, Defendants have made or had made for them, imported, used, sold or offered for sale the Infringing Devices via Defendants' website (https://hoffmantactical.com/designs/super-safety/), and have further offered free downloads of the design of the Infringing Devices via Defendants' website:



SUPER SAFETY

The Super Safety is a 3D printable active trigger system for the AR-15. An active trigger is one which actively resets, allowing faster more efficient follow up shots.

The Super Safety is a push button safety that replaces the standard safety on an AR-15. Two and three position versions are included.

The Super Safety is compatible with any AR-15 that uses a mil-spec fire control group and bolt carrier. Modification to the trigger and detent is required.

**DOWNLOAD ON ODYSEE**

Torrent: **37b78d35f20ce606ef4a782551095e128fca41be**

The LR-308 specific Super Safety lever is an additional download that includes a lever designed specifically for the LR-308 platform. It is longer and features a split tail to accommodate the geometry of the LR-308 carrier.

The primary release is still required, so be sure to grab that as well.

**DOWNLOAD LR-308 LEVER ON ODYSEE**

For those who would like to use another manufacturing method, such as machining or metal printing, to make the Super Safety, a dev pack has been released which contains all of the STEP files for the Super Safety, triggers, and detent.

SolidWorks files are also included for those who would like to make modifications to the original.

Be sure to grab the main release as well, to get all the needed documentation and vector files.

**DOWNLOAD DEV PACK ON ODYSEE**

47.    Defendants provide the design for a cam and cam lever that replaces a standard AR-pattern safety selector, both for 3D printing and for machining of metal parts via Odysee. When Infringing Devices are installed in combination with a standard AR-pattern hammer and disconnector, with standard springs, the combination creates the invention of the '247, '784 and '723 Patents (*see, e.g.,* https://odysee.com/@hoffmantactical:3/Super-Safety-V4.4-Developers-Pack:5):



48.    Whoever actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b).

49.    Defendants instruct download customers and purchasers to assemble the Infringing Devices in a way that induces infringement of the '247, '784 and '723 Patents.

50.     The Infringing Devices also can operate in a "disconnector mode," which is much like that of a standard AR15 trigger.  The user can switch between safe, standard semiautomatic with disconnector, and forced reset semiautomatic with cam modes by moving the safety selector laterally between positions.

51.     The user can slide the cam between safe, standard semi-automatic, and forced reset semi-automatic modes.

52.     For the reasons explained in more specificity below, Defendants' Infringing Devices each infringe at least one claim of the '247, '784, and '723 Patents, and, thus, Defendants are liable for patent infringement pursuant to 35 U.S.C. § 271(a), (b) and (c).

53.     In view of the Defendants' continued infringement after posting their August 15, 2025, YouTube video in which they incorrectly compare devices made according to the design they published to the '247 and '723 Patents, the infringement is willful.

### **Defendants' Unfair Competition, Defamation, and Tortious Interference**

54.     A person commits or engages in Unfair Competition under 15 U.S.C. §1125 (Lanham Act § 43) when the person, "(a)(1) in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which— (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. . . ."

55.     Defendants have posted numerous online videos and comments relating to the purported noninfringement of the Infringing Devices, using factually and legally incorrect application of patent law to compare their accused product to the '247 Patent.

56.     Upon information and belief, Defendants have further supported, incited, and posted comments relating to Plaintiffs' '247 and '723 Patents and their applicability to their Infringing Device that were false. Such comments were published on YouTube, as well as on the http://hoffmantactical.com website:



57.     The statements were false and defamatory, and have injured the Plaintiffs' character and reputation, constituting a serious threat to the Plaintiffs' reputation.

58.     Defendants published these false statements with knowledge that the statements were false and defamatory, with reckless disregard for the truth of the statements, or through negligence in failing to ascertain the truth of the statements.

59.     Defendants' statements have caused actual damages in the form of injury to Plaintiffs' character and reputation and/or standing in the community.

60.     Defendants have further attempted to affect the relationship between Plaintiff Rare Breed and the relevant market – the consumers of forced reset triggers – by offering their infringing designs at less than cost (*i.e.,* for free), in an effort to divert customers from Plaintiffs' legitimate products in favor of Defendants' infringing products.

## COUNT I – INFRINGEMENT OF THE '247 PATENT

61.     The allegations set forth in paragraphs 1-60 are fully incorporated into this First Count for Relief.

62.     Upon information and belief, Defendants have and continue to willfully directly infringe and/or willfully induce infringement of at least Claim 15 of the '247 Patent by making, using, selling, offering for sale, importing and/or providing and causing to be used without authority within the United States, the Infringing Devices and Infringing Designs.

63.     Upon information and belief, Defendants have imported Infringing Devices that infringe the '247 Patent. On further information and belief, Defendants have imported metal injection molded versions of the Infringing Device that are themselves a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, constituting contributory

infringement of the '247 Patent in violation of 35 U.S.C. § 271(c). A copy of the video shown below in Count III, and available at http://www.youtube.com/watch?v=i1ADTvaYhY4 shows at least a portion of the Infringing Device that appears to be metal injection molded:



64.     An exemplary comparison of the Infringing Device with claim 15 of the '247 Patent when assembled and use as intended is illustrated in the chart below:

'247 Super Safety Claim Chart

| Claim Language | Infringing Device (Super Safety) |
|---|---|
| 15. A firearm trigger mechanism comprising: | When installed and used as directed, the Super Safety is part of a forced reset trigger mechanism and functions as a cam that in at least one mode, both forces the reset of the trigger and locks the trigger during the cycle of operation.  **Super Safety** Super Safety 3D Printed Active Trigger System v4.4, Hoffman Tactical (July 19, 2023) ("Super Safety Guide") at 12 |
| a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver | The Super Safety (Yellow) is installed in a fire control mechanism pocket of a receiver along with a hammer (Red) that has a sear catch and a hook for engaging a disconnector (Orange).  (Plaintiff-generated renderings of Super Safety here and below) |

to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

The hammer (Red) pivots on a transverse hammer pivot axis between set and released positions, depicted below. The hammer is adapted to be pivoted rearward by rearward movement of a bolt carrier.



**(Hammer Set Position Above)**

**(Hammer Released Position Above)**

| | |
|---|---|
| a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, | The Super Safety (Yellow) is installed with a trigger member (Brown) in the fire control mechanism pocket and the trigger member pivots on a transverse trigger member pivot axis between set and released positions. The trigger member (Brown) has a sear.  |
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear of the trigger member (Brown) and sear catch of the hammer (Red) are in engagement when the hammer and trigger member are in their set positions.  **(Trigger Member Set Position Above)** |

| and are out of engagement in said released positions of said hammer and trigger member, | The sear of the trigger member (Brown) and sear catch of the hammer (Red) are out of engagement in the released position. |
|---|---|
| |  |
| | **(Trigger Member Released Position Above)** |
| said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, | The disconnector (Orange) is adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis. The disconnector has a hook for engaging the hammer (Red). |
| |  |
| | **(Disconnector Hook Engaged Above)** |

| | |
|---|---|
| and a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, | The Super Safety has a cam with a cam lobe and lever that is adapted to be movably mounted in the fire control mechanism pocket. (*See* Image above depicting Super Safety, shown in yellow, in fire control mechanism pocket)<br><br><br><br>**(Super Safety Cam with Lobe and Lever)** |
| said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member towards said set position, | The cam is movable between a first position and a second position.<br><br><br><br>**(Cam and Lobe First Position Above)**<br>In the second position, the cam lobe forces the trigger member (Brown) toward the set position when the cam is in the forced reset semi-automatic mode. |

| | |
|---|---|
| | <br>**(Cam and Lobe Second Position Above)** |
| whereupon in a standard semi-automatic mode, | During at least part of the cycle in the standard semi-automatic mode,<br><br>the cam is in the first position. |
| said cam is in said first position, | |
| rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, | Rearward movement of the bolt carrier causes rearward pivoting of the hammer (Red) such that the disconnector (Orange) hook catches the hammer hook. |

and thereafter the bolt carrier moves forward into battery,



Thereafter, the bolt carrier moves forward into battery,

at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user



at which time a user must manually release the trigger member (Brown) to free said hammer (Red) from the disconnector (Orange) to permit the hammer and trigger member to pivot to

| can pull said trigger member to fire the firearm, and | the set positions so that the user can pull the trigger member to fire the firearm. <br><br>  |
|---|---|
| whereupon in a forced reset semi-automatic mode, <br><br><br> Said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, | When in the forced reset semi-automatic mode, <br><br>  <br><br> the cam is in the second position during at least part of the cycle and forces the trigger member toward the set position. Rearward movement of the bolt carrier causes rearward pivoting of the hammer (Red) such that the disconnector (Orange) hook is prevented from catching the hammer hook. |



| | Thereafter, the bolt carrier moves forward into battery, |
|---|---|
| and thereafter the bolt carrier moves forward into battery, | |
| at which time the user can pull said trigger member to fire the firearm. | at which time the user can pull the trigger member (Brown) to fire the firearm. |



65.     Defendants use the Infringing Device as evidenced by numerous videos posted by Defendants, an example of which is shown here: https://youtu.be/M4ZktUXY-Qs?si=QtF5Z90wv8nTbP9C, which constitutes direct infringement under 35 U.S.C. § 271(a).

66.     The Defendants instruct their customers, their followers—indeed anyone who will listen and/or watch their videos—to assemble the components they sell into an infringing combination of parts. Thus, Defendants actively induce infringement of the '247 Patent in violation of 35 U.S.C. § 271(b).

67.     Accordingly, when a user installs and uses Defendants' Infringing Devices as instructed, there is direct infringement of the '247 Patent.

68.     Defendants' provision of the 3D printer files and "Dev Pack" file bundles and instructions on how to install and use the Infringing Device is infringement under 35 U.S.C. § 271(b).

69.     Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, reputation, and good-will.

70.     Plaintiffs have been substantially harmed by Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

## COUNT II – INFRINGEMENT OF THE '784 PATENT

71.     The allegations set forth in paragraphs 1-70 are fully incorporated into this Second Count for Relief.

72.     Upon information and belief, Defendants have and continue to willfully directly infringe and/or willfully induce infringement of at least Claim 1 of the '784 Patent by making, using, selling, offering for sale, importing and/or providing and causing to be used without authority within the United States, the Infringing Devices and Infringing Designs.

73.     Upon information and belief, Defendants have imported Infringing Devices that infringe the '784 Patent. On further information and belief, Defendants have imported MIM versions of the Infringing Device that are themselves a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, constituting contributory infringement of the '784 Patent in violation of 35 U.S.C. § 271(c).

74.     An exemplary comparison of the Infringing Device with claim 1 of the '784 Patent when assembled and use as intended is illustrated in the chart below:

'784 Super Safety Claim Chart

| Claim 1: Language | Infringing Device (Super Safety) |
|---|---|

| 1. In a forced reset trigger mechanism, an extended trigger member locking device, comprising: | When installed and used as directed, the Super Safety is part of a forced reset trigger mechanism and functions as an extended trigger member locking device. |
|---|---|
| |  |
| | **Super Safety** Super Safety 3D Printed Active Trigger System v4.4, Hoffman Tactical (July 19, 2023) ("Super Safety Guide") at 12 |
| |  |
| | **Super Safety Installed** (Plaintiff-generated renderings of Super Safety here and below; Locking member and bolt carrier shown here and below in section view for clarity) |
| | "The Super Safety is a mechanism that actively resets the trigger of a firearm to allow the operator to fire |

| | |
|---|---|
| | again, quickly, and efficiently. The Super Safety has been designed to operate with AR-15 pattern firearms that use a mil-spec bolt carrier and fire control group." Super Safety Guide at 1. |
| a locking member that is movable between a first position in which it locks a trigger against pulling movement | The Super Safety operates as a locking member and has a first position in which the Super Safety locks the trigger member against pulling movement.<br><br><br><br>**Locked First Position** |
| and a second position where it does not restrict movement of the trigger member, | The Super Safety is moveable from the first position to a second position where it does not restrict movement of the trigger member.<br><br><br><br>**Unlocked Second Position** |
| the locking member configured to be movably supported by a frame | The Super Safety is movably (pivotally about the axis depicted below) supported by a frame (the lower receiver). |

| | |
|---|---|
| |  |
| and including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier, | The Super Safety has an upward extending portion (lever arm) configured to make actuating contact with a surface of the bolt carrier.<br><br> |
| such actuating contact causing the locking member to move from the first position to the second position, | The actuating contact causes the locking member to move from the first position to the second position. |

Original Complaint for Patent Infringement      Page 32
DM#802237 v.1
Case 1:25-cv-00389     Document 1     Filed 12/23/25     Page 32 of 60     PageID #: 32

| | |
|---|---|
| | <br>**Unlocked Second Position** |
| the locking member having a body portion that is movably supported | The Super Safety has a body portion that is movably supported by the lower receiver. |
| and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position | The Super Safety has an upwardly extending deflectable portion (lever arm). The dovetail connection is designed to allow separate movement of the lever arm relative to the body portion between one position (depicted in red) where it is extended and another position where it is deflected (depicted in green). |



Below illustrates the upward extending deflectable portion's (lever arm) total separate travel with an overlay of the lever in both positions without the body portion moving.



"The dovetail joint does not immediately transfer torque from the lever to the cam. The lever pivots in the cam until the void is filled. Once the void is filled the hammer can transfer torque to the cam via the upper and lower contact surfaces and. Note that the void, the lower contact surface, and the upper contact surface, are shown on arbitrary sides of the dovetail, these features may be on either side of the dovetail

| | |
|---|---|
| | depending on which direction the lever is moving. The amount that the lever rotates in the dovetail before transferring torque to the cam is such that as the bolt carrier completes its forward movement, the cam rotates the neutral surface away from the cam follower and to a point where the cam follower begins to slide against the cam surface." (referenced numerals removed for clarity). Super Safety Guide at 4. https://www.scribd.com/document/843484122/Super-Safety-Documentation |
| and a deflected position. | The lever is now shown deflected independent of the body. |

76.     In addition to the infringement of Claim 1 as shown above, Defendants' devices also infringe, at a minimum, Claim 4 of the '784 Patent, which recites "wherein the locking member deflectable portion pivots relative to the body portion."

77.     Defendants use the Infringing Device as evidenced by the numerous videos referenced herein throughout this Original Complaint, which use includes each of the devices available as posted by Defendants on Odysee.

78.     The Defendants instruct their customers, their followers—indeed anyone who will listen and/or watch their videos—to assemble the components they sell into an infringing combination of parts. Thus, Defendants actively induce infringement of the '784 Patent in violation of 35 U.S.C. § 271(b).

79.     Accordingly, when a user installs and uses Defendants' Infringing Devices as instructed, there is direct infringement of the '784 Patent.

80.     Defendants' provision of the 3D printer files and "Dev Pack" file bundles and instructions on how to install and use the Infringing Device is infringement under 35 U.S.C. § 271(b).

81.     Defendants' acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, reputation, and good-will.

82.     Plaintiffs have been substantially harmed by Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

## COUNT III – INFRINGEMENT OF THE '723 PATENT

83.      The allegations set forth in paragraphs 1-82 are fully incorporated into this Third Count for Relief.

84.     Upon recently learned information and belief, Defendants have made, used, sold, offered for sale, and/or imported Infringing Devices made using the Infringing Designs that infringed at least Claim 1 of the '723 Patent prior to its expiration by providing the design files for the Infringing Device and instructing persons who download the device in how to use the Infringing Device to infringe the '723 Patent.

85.     Defendants have continuously provided the 3D Print files and "Dev Pack" bundle including STEP files and Solidworks files for the Infringing Device for download since it was "introduced" at least as early as July 21, 2023:




Search



Play K

## Introducing the Super Safety

 **Hoffman Tactical**
143K subscribers     Subscribe          👍 25K    👎     ↱ Share    ···

910,266 views   Premiered Jul 21, 2023
The information contained in this video is for educational purposes only. It is not intended to be a substitute for professional firearms training or instruction. Safety is paramount when handling firearms. Always follow the four rules of firearms safety:
Additionally, it is important to be a law-abiding citizen when owning and using firearms. This includes understanding and complying with all applicable laws and regulations. If you are considering purchasing or using a firearm, please seek out qualified instruction from a reputable firearms instructor. BY WATCHING THIS VIDEO, YOU AGREE TO THE FOLLOWING: You are of legal age to own and use firearms in your jurisdiction. You understand and will follow all applicable laws and regulations related to firearms.



86.    Additionally, Defendants have used Infringing Devices as described and shown in videos, an example of which is here:



87.    An exemplary comparison of the Infringing Device with claim 1 of the '723 Patent when assembled and used as intended and instructed is illustrated in the chart below:

'723 Super Safety Claim Chart

| Claim Language | Infringing Device (Super Safety) |
| --- | --- |
| 1. A method of accelerating the firing cycle of a semi-automatic firearm comprising the steps of: | When installed and used as directed, the Super Safety is part of a forced reset trigger mechanism.<br><br><br>**Super Safety**<br>Super Safety 3D Printed Active Trigger System v4.4, |

Hoffman Tactical (July 19, 2023) ("Super Safety Guide") at 12



The Super Safety functions as a cam that, in at least one mode, forces the reset of the trigger and locks the trigger during the cycle of operation.



**(Super Safety Cam with Lobe and Lever)**

This accelerates the firing cycle by allowing the user to pull the trigger without a required release of pressure to allow the reset. "The Super Safety is a mechanism that actively resets the trigger of a firearm to allow the operator to fire again, quickly, and efficiently. The Super Safety has been designed to operate with AR-15 pattern firearms that use a mil-spec bolt carrier and

| | |
|---|---|
| | fire control group." Super Safety Guide at 1. https://www.scribd.com/document/843484122/Super-Safety-Documentation When installed and operated as directed by a user, a method of accelerating the firing cycle of a semi-automatic firearm is achieved. |
| depressing a firearm trigger with a finger to discharge the firearm; | The trigger (Brown) is depressed by the user's finger to discharge the firearm.<br> |
| activating a reciprocating mechanism within the firearm that causes a cam, | A reciprocating mechanism (bolt carrier, grey, in this application) is activated by the firing of the firearm.<br> |
| in a single rotational motion of the cam, to simultaneously push the trigger forward into a ready to fire position | Reciprocation of the bolt carrier causes the cam (Yellow) to rotate. In a single rotational motion, the cam surface rotates and pushes the trigger forward |

| | |
|---|---|
| and hold the trigger forward in the ready to fire position | and holds the trigger forward in the ready to fire position |
| until the reciprocating mechanism has reached an approximately closed, ready to fire position. | The reciprocating mechanism (bolt carrier in this application) has reached an approximately closed, ready to fire position. |

88.     Because the claim "comprises" specified steps, the fact that the Infringing Devices, when installed and used as the Defendants instruct, can also operate according to another method does not avoid infringement.

89.     Defendants' demonstrated use of the Infringing Device constitutes direct infringement of the '723 Patent under 35 U.S.C. § 271(a).

90.     Upon information and belief, Defendants have imported infringing devices that infringe the '723 Patent. On further information and belief, Defendants have imported MIM versions of the Infringing Device that are themselves a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, thus committing contributory infringement of the '723 Patent in violation of 35 U.S.C. § 271(c).

91.     Defendants instruct their customers, their followers—indeed anyone who will listen and/or watch their videos—to assemble the components they sold into a combination of parts that infringes the '723 Patent. Thus, Defendants actively induced infringement of the '723 Patent prior to its expiration in violation of 35 U.S.C. § 271(b).

92.     Accordingly, when a purchaser installed and used Defendants' Infringing Devices as instructed, there was direct infringement of the '723 Patent.

93.     Accordingly, the Defendants' provision of the Infringing Device design files for download, with full knowledge of the '723 Patent, was an indirect infringement of the '723 Patent prior to its expiration under 35 U.S.C. § 271(b).

94.     Defendants' acts of infringement were willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, reputation, and good-will.

95.     Plaintiffs have been substantially harmed by Defendants' infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, and damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

## COUNT IV – UNFAIR COMPETITION UNDER 15 U.S.C. § 1125 (LANHAM ACT § 43)

96.     The allegations set forth in paragraphs 1-95 are fully incorporated into this Fourth Count for Relief.

97.     Defendants' statements in promoting the Infringing Device through videos and online posts include false or misleading descriptions of fact, or false or misleading representations of fact.

98.     Defendants' statements misrepresent the nature, characteristics and qualities of the Super Safety Infringing Device design, as well as the nature and scope of the claims of the '723 and '247 Patents.

99.     Plaintiffs have been harmed by Defendants' unlawful unfair competition and are likely to continue to be harmed by such activities.

100.    Defendants' misrepresentations were and are willful.

101.    Under 15 U.S.C. § 1117, Plaintiffs seek Defendants' profits, damages sustained by Plaintiffs, and costs of this action. Further, under the circumstances of this case, Plaintiffs seek trebling of the actual damages. Further, if the Court should find that the recovery based on profits is inadequate, Plaintiffs pray that the Court will in its discretion enter judgment for such a sum as the Court shall find to be just.

102. Because of the blatant and willful nature of Defendants' misrepresentations, Plaintiffs submit this is an exceptional case and seek their reasonable attorneys' fees.

**COUNT V – TENNESSEE CONSUMER PROTECTION ACT,**
**TENNESSEE CODE ANNOTATED SECTION 47-18-101, *ET SEQ.***

103. The allegations set forth in paragraphs 1-102 are fully incorporated into this Fifth Count for Relief.

104. Defendants' statements misrepresent the nature, characteristics and qualities of the Super Safety Infringing Device design, as well as the nature and scope of the claims of the '723 and '247 Patents.

105. Defendants' statements in promoting the Infringing Device through videos and online posts include false or misleading descriptions of fact, or false or misleading representations of fact by, *inter alia*, (i) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services; (ii) causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; (iv) representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, when they are of another; (v) disparaging the goods, services or business of another by false or misleading representations of fact; and/or (vi) representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law.

106. As a result of Defendants' actions described herein, Plaintiffs have suffered an ascertainable loss of money, time, and/or value, entitling Plaintiffs to actual damages under Tennessee Code Annotated section 47-18-109(a)(1).

107.   Defendants' misrepresentations and other deceptive acts described herein were and are made willfully, intentionally, and/or knowingly, entitling Plaintiffs to treble damages pursuant to Tennessee Code Annotated section 47-18-109(a)(3).

108.   Defendants' misrepresentations and other deceptive acts described herein entitle Plaintiffs to reasonable attorney's fees and cost pursuant to Tennessee Code Annotated section 47-18-109(e)(1).

## COUNT VI – DEFAMATION

109.   The allegations set forth in paragraphs 1-108 are fully incorporated into this Sixth Count for Relief.

110.   Defendants published false statements regarding the infringement and validity of the Infringing Device, both on YouTube and http://hoffmantactical.com.

111.   Defendants' statements are both false and defamatory because they were made in an effort to injure Plaintiffs' character and reputation, and because Defendants either knew the statements were false and defamatory, made the statements with reckless disregard for the truth of the statements, or were negligent based on Defendants' failure to ascertain the truth of the statements.

112.   While neither ABC nor Rare Breed are public figures, upon information and belief, Defendants' statements were made with actual malice, in that Defendants made the statements with knowledge of their falsity or with reckless disregard for the truth.

113.   Plaintiffs have suffered actual damages in the form of injury to Plaintiffs' character and reputation, and that such injury has cased harm to Plaintiffs' reputation and standing in the community.

## COUNT VII – BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

114. The allegations set forth in paragraphs 1-113 are fully incorporated into this Seventh Count for Relief.

115. Plaintiffs and Defendants entered into a valid, enforceable, and legally binding contract resolving the dispute between Plaintiffs and Defendants related to Defendants' infringement of '223 Patent (the Settlement Agreement).

116. At the time of the execution of the Settlement Agreement, it was foreseeable that the infringing files Defendants released without permission would still be accessible on the internet.

117. Defendants' posting of the March 6, 2022, YouTube video in which he informs the viewers that the infringing files are still available on the internet constitutes frustration of the purpose of the Settlement Agreement, and essentially "provid[ed] . . . 3D CAD file[s] that induce[] others to make or have made parts that directly or indirectly infringe" at least one claim of the '223 Patent, and actively instructed viewers that they were available and easy to find. This conduct constitutes a breach of the Settlement Agreement.

118. As a result of Defendants' unlawful conduct, Plaintiffs have suffered actual damages in the form of continued infringement of the '223 Patent based on the files that are still "available" and that the public is aware of because of Defendants' conduct.

119. In taking the actions described herein, Defendants have violated the implied covenant of good faith and fair dealing that is implied as part of every contract in Tennessee.

120. Plaintiffs have suffered substantial harm through Defendants' unlawful actions and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, damages adequate to compensate for the harm to Plaintiffs' business, including lost profits, and

disgorgement of any advertising revenue obtained by Defendants by virtue of advertisements through social media where the statements are posted.

## COUNT VII – VIOLATION OF THE SHERMAN ACT § 1

121. The allegations set forth in paragraphs 1-120 are fully incorporated into this Seventh Count for Relief.

122. Defendants have entered into a contract, combination, and/or conspiracy with third parties to unreasonably restrain trade or commerce in violation of 15 U.S.C. § 1.

123. In particular, Defendants have engaged in conspiracy with third parties to restrain trade via the commission of targeted patent infringement against Plaintiffs by intentionally posting the 3D CAD and STEP files of the Infringing Devices on the internet. Each time a person or entity downloads the illegal and infringing 3D printing files or uses the STEP files to create an Infringing Device through MIM, 3D Print or CNC machining of the Infringing Device, that person has entered into a contract, combination, and/or conspiracy with Defendants to restrain trade in the firearms market by unfairly impeding Plaintiffs' competitive position in that market. Defendants' conduct is further exacerbated because Defendants falsely and misleadingly represent that the 3D print and STEP files do not infringe.

124. Upon information and belief, Defendants have either contracted with or facilitated others to contract with foreign entities to have Infringing Devices made abroad and later imported in the United States. The image below shows that international actors have downloaded files for the Infringing Device and are offering to make and sell Infringing Devices for import into the United States. At a minimum, Defendants have exported weapons-related information through posting the 3D files for the Infringing Device to international actors in order to further saturate the market:



125.    Defendants' conduct is in violation with the Sherman Act § 1 (15 U.S.C. § 1) because, through their conspiracy, Defendants have restrained trade and/or commerce by intentionally reducing the market for Plaintiffs' products by diluting the market with products that are legally protected by the limited monopoly provided to patent owners in the United States through Article I, Section 8 of the United States Constitution, and the statutes codified at 35 U.S.C. § 101, *et seq.*

126.     On information and belief, some of Defendants' agreements with third parties are horizontal agreements at the same market level and are therefore *per se* antitrust violations. To the extent, however, that any of such agreements are vertical in nature, they are negatively impacting competition in the relevant market under the rule of reason.

127.     As a result of Defendants' illegal restraint of trade and/or commerce, Plaintiffs have been damaged through reduced sales of Plaintiffs' legally protected products.

128.     Defendants' conduct was willful and malicious, and undertaken in bad faith.

129.     As a result, Plaintiffs are entitled to file this claim under 15 U.S.C. § 15, and are further entitled to "threefold" damages, costs, and attorneys' fees.

## COUNT VIII – VIOLATION OF THE SHERMAN ACT § 2

130.     The allegations set forth in paragraphs 1-129 are fully incorporated into this Eighth Count for Relief.

131.     Defendants are attempting to monopolize, and/or combining or conspiring with another person or persons to monopolize trade or commerce among the several states by flooding the market with free designs, thereby creating demand for the Infringing Devices in violation of 15 U.S.C. § 2.

132.     Defendants have and continue to commit targeted patent infringement against Plaintiffs in an attempt to flood the market for forced reset triggers by intentionally posting the 3D CAD and STEP files of the Infringing Devices on the internet. Each time a person or entity downloads the illegal and infringing 3D printing files or uses the STEP files to create an Infringing Device through MIM or CNC machining of the Infringing Device, that person has entered into a contract, combination, and/or conspiracy with Defendants to restrain trade in the firearms market by unfairly impeding Plaintiffs' competitive position in that market. Defendants' conduct is further

exacerbated because Defendants falsely and misleadingly represent that the 3D print and STEP files do not infringe. Defendants' actions are directly calculated and undertaken to create demand for Defendants' infringing products to the detriment of Plaintiffs' patent-protected products.

133.    Upon information and belief, Defendants have either contracted with or facilitated others to contract with foreign entities to have Infringing Devices made abroad and later imported in the United States. The image, *supra*, paragraph 124, shows that international actors have downloaded files for the Infringing Device and are offering to make and sell Infringing Devices for import into the United States. At a minimum, Defendants have exported weapons-related technology through posting the 3D files for the Infringing Designs and Devices to international actors in order to further saturate the market.

134.    Defendants' conduct is in violation of the Sherman Act § 2 (15 U.S.C. § 2) because, through their actions, Defendants are intentionally increasing demand for their infringing products in advance of launching a commercial version of their products that would directly compete with Plaintiffs' products, thereby reducing the market for Plaintiffs' products by diluting the market with products that are not legally protected by the limited monopoly provided to patent owners in the United States through Article I, Section 8 of the United States Constitution, and the statutes codified at 35 U.S.C. § 101, *et seq.*

135.    As a result of Defendants' illegal attempt to monopolize the forced reset trigger market, Plaintiffs have been damaged through reduced sales of Plaintiffs' legally protected products.

136.    Defendants' conduct was willful and malicious, and undertaken in bad faith.

137.    As a result, Plaintiffs are entitled to file this claim under 15 U.S.C. § 15, and further entitled to "threefold" damages, costs, and attorneys' fees.

## COUNT IX – TORTIOUS INTERFERENCE
## WITH BUSINESS RELATIONSHIPS

138.    The allegations set forth in paragraphs 1-137 are fully incorporated into this Ninth

Count for Relief.

139.    ABC and Rare Breed have existing and prospective business relationships with an

identifiable class of third persons, *viz.*, the prospective consumer market for forced reset trigger

devices.

140.    As evidenced by the facts alleged above (*e.g.*, those pertaining to the parties' prior

negotiation and agreements and Defendants' public statements of intent through their above-

described conduct to overwhelm the market and render Plaintiffs' enforcement of their patents

difficult or impossible), Defendants at all relevant times had or have knowledge of Plaintiffs'

prospective relationships with the consumer market for forced reset trigger devices.

141.    As evidenced by the facts alleged above (*e.g.*, those pertaining to the parties' prior

negotiation and agreements and Defendants' public statements of intent through their above-

described conduct to overwhelm the market and render Plaintiffs' enforcement of their patents

difficult or impossible), Defendants at all relevant times have intended to injure or entirely

foreclose Plaintiffs' relationships with the consumers constituting that market.

142.    As evidenced by the facts alleged above (*e.g.*, those pertaining to the parties' prior

negotiation and agreements and Defendants' public statements of intent through their above-

described conduct to overwhelm the market and render Plaintiffs' enforcement of their patents

difficult or impossible), Defendants at all times have had one or more improper motives and have

acted with the predominant purpose of injuring Plaintiffs.

143.     In addition to their improper motive, in engaging in the independently tortious acts described herein, Defendants have used improper means in knowingly interfering with Plaintiffs' prospective business relationships.

144.     Defendants' intentional interference with Plaintiffs' prospective business relationships has caused Plaintiffs to suffer damages.

## COUNT X – VIOLATION OF TENNESSEE UNFAIR SALES LAW, TENNESSEE CODE ANNOTATED § 47-25-203

145.     The allegations set forth in paragraphs 1-144 are fully incorporated into this Tenth Count for Relief.

146.     Defendants (i) advertise, or are preparing to advertise, (ii) offer to sell, or are preparing to offer for sale, or (iii) sell their Infringing Devices at less than cost, with the intent or effect of inducing the purchaser to unfairly divert trade from Plaintiffs, or to otherwise injure Plaintiffs, impair and prevent fair competition, injure public welfare, and otherwise unfairly compete, which is contrary to public policy.

147.     Defendants' actions are intended to deceive or mislead purchasers or prospective purchasers, or to substantially lessen competition or unreasonably restrain trade or tend to create a monopoly in favor of Defendants in commerce related to the forced reset trigger market.

148.     Defendants are advertising their intent to enter the market by virtue of various social media posts, including the post in which Defendants are preparing packaging for the sale and/or marketing of Infringing Devices, which constitutes *prima facie* evidence of Defendants' violation:



149.     As a result of Defendants' demonstrated disregard for Plaintiffs' patents and

Defendants' demonstrated intent to go to market with their own infringing devices, Plaintiffs

hereby apply for an injunction that would prevent Defendants from selling, offering for sale,

advertising, or otherwise promoting the infringing devices until adjudication of the matters and causes of action contained herein are resolved.

150.     Plaintiffs have been damaged by Defendants' advertisements, and would be irreparably damaged by Defendants' continued advertisement, offer to sell, or sale of Defendants' infringing products, and are therefore entitled to damages sufficient to compensate for such damages.

## COUNT XI – UNLAWFUL RESTRAINT OF TRADE AND DISCRIMINATION UNDER TENNESSEE CODE ANNOTATED § 47-25-109

151.     The allegations set forth in paragraphs 1-150 are fully incorporated into this Eleventh Count for Relief.

152.     Upon information and belief, Defendants are engaged in the business of manufacturing in the State of Tennessee, and are giving away, or otherwise selling Infringing Devices and/or Infringing Designs for less than the cost of manufacture.

153.     Upon information and belief, Defendants are undertaking their actions with the intent and purpose of destroying honest competition.

154.     As a result of Defendants' illegal actions, Plaintiffs' have suffered harm in the form of unfair competition, restraint of trade, and discrimination, in violation of Tennessee Code Annotated § 47-25-109.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

155.     Defendants are hereby notified that they are legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Defendants know, or reasonably should know, may be relevant to the accused Infringing Devices and/or Infringing

Designs or to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter, "Potential Evidence"). As used above, the phrase "electronically stored information" includes, without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored. These sources may also include any personal electronic, digital, and storage devices of Defendants' agents, resellers, or employees, if Defendants' electronically stored information resides there.

156. Defendants are hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence, including the destruction or concealment of Potential Evidence without the Court's express permission, may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendant's claims and/or defenses. To avoid such a result, Defendants' preservation duties include, but are not limited to, the requirement that Defendants

immediately notify their agents and employees to halt and/or supervise the auto-delete functions of Defendants' electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter:

a. A judgment in favor of Plaintiffs that Defendants have infringed the '247 Patent, '784 Patent, and the '723 Patent (prior to expiration);

b. A judgment in favor of Plaintiffs that Defendants' infringement was willful, and a declaration that this case is exceptional under 35 U.S.C. § 285;

c. A preliminary injunction enjoining Defendants and their principals, agents, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from discussing the claims of the Patents-in-Suit and the causes of action in this law suit during the pendency of this case, or other such equitable relief as the Court determines is warranted;

d. A permanent injunction enjoining Defendants and their principals, agents, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '247 and '784 Patents, or other such equitable relief as the Court determines is warranted;

e. A judgment and order requiring Defendants to pay to Plaintiffs their damages, costs, expenses, and prejudgment and post-judgment interest for Defendants' infringement of the '247 Patent, '784 Patent, and the '723 Patent as provided under 35 U.S.C. § 284, and an accounting of any ongoing post-judgment infringement;

f.      A judgment that Defendants have engaged in Unfair Competition in violation of 15 U.S.C. § 1125;

g.      A judgment requiring Defendants to pay Plaintiffs' actual damages under Tennessee Code Annotated section 47-18-109(a)(1), trebled pursuant to section -109(a)(3);

h.      A judgment requiring Defendants to pay Plaintiffs' attorney's fees and costs pursuant to Tennessee Code Annotated section 47-18-109(e)(1);

i.      A judgment that Defendants have engaged in defamation under the laws of the State of Tennessee;

j.      A judgment and order requiring Defendants to pay Plaintiffs their damages, costs, prejudgment and post judgment interest related to Plaintiffs' Unfair Competition and Defamation claims against Defendants;

k.      A judgment that Defendants have violated Sections 1 & 2 of the Sherman Act (15 U.S.C. §§ 1-2);

l.      A judgment and order requiring Defendants to pay Plaintiffs their damages, costs, prejudgment and post judgment interest, and attorneys' fees based on Defendants' violation of the Sherman Act; and

m.      Any and all other relief, at law or equity, to which Plaintiffs may show themselves to be entitled.

Dated:  December 23, 2025.                    Respectfully submitted,

                                              By:  /s/ Decker A. Cammack
                                                   Decker A. Cammack (motion for admission
                                                   *pro hac vice* forthcoming)
                                                   WHITAKER CHALK SWINDLE & SCHWARTZ
                                                   PLLC
                                                   301 Commerce Street, Suite 3500
                                                   Fort Worth, TX 76102
                                                   Telephone:  (817) 878-0500

Facsimile:  (817) 878-0501
DCammack@whitakerchalk.com

By:     /s/ Glenn D. Bellamy
        Glenn D. Bellamy (motion for admission *pro hac vice* forthcoming)
        WOOD, HERRON & EVANS, LLP
        600 Vine Street, Suite 2800
        Cincinnati, Ohio 45202
        Telephone:  (513) 241-2324
        Facsimile: (513)  241-6234
        gbellamy@whe-law.com

By:     /s/ Joseph Alan Jackson II
        Joseph Alan Jackson II, B.P.R. No. 030603
        SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
        601 Market Street, Suite 400
        Post Office Box 1749
        Chattanooga, TN  37401 1749
        Telephone: (423) 756-7000
        Facsimile: (423) 756-4801
        jaj@smrw.com

        *Attorneys for Plaintiffs*