## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>     Plaintiffs,<br><br>vs.<br><br>TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,<br><br>     Defendants. | Case No. 1:25-cv-00389-CLC-CHS |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION WITH INCORPORATED BRIEF IN SUPPORT

This is an action for patent infringement in which ABC IP LLC ("ABC") and Rare Breed Triggers, Inc. ("Rare Breed") (collectively, "Plaintiffs") accuse HOFFMAN TACTICAL LLC ("HT") and TIMOTHY HOFFMAN ("Hoffman") (collectively, "Defendants"), of infringing U.S. Patent No. 12,038,247 ("the '247 Patent"), U.S. Patent No. 12,031,784 ("the '784 Patent") and U.S. Patent No. 7,398,723 ("the '723 Patent") and seek other relief. Pursuant to Rule 65, Fed. R. Civ. P., Plaintiffs seek entry of a Preliminary Injunction against Defendants, showing as follows:

## BACKGROUND

1.     This lawsuit relates to direct and indirect infringement of the '247 Patent, the '784 Patent, and the '723 Patent (collectively, the "Patents-in-Suit"). True copies of the '247, '784, and '723 Patent are attached hereto as Exhibits A, B, and C, respectively.

2.     Plaintiffs hereby incorporate the factual allegations contained in the Original Complaint (Doc. 1) by reference.

3.     Plaintiffs discovered in early 2022 that Defendants were offering and distributing a downloadable 3D-printable modification to a standard AR-pattern trigger that effectively converted such trigger to a forced reset trigger. When made and assembled as instructed, Defendants' 3D-printable download infringes at least one claim of U.S. Patent No. 10,514,223 ("the '223 Patent.")

4.     Plaintiffs sent Defendants a cease-and-desist letter regarding Defendants' actively inducing infringement of the '223 Patent on February 9, 2022. After negotiations with Defendants and before having to initiate litigation, the Parties entered into an agreement to resolve the dispute on February 24, 2022 (the "Settlement Agreement"). At that time, Plaintiffs explicitly warned Hoffman that they had additional patent applications pending and, if Hoffman intended to remain active in the forced-reset trigger space, he must consult qualified patent counsel to review Plaintiffs' patents to avoid further infringement.

5.     During negotiations prior to the Settlement Agreement, Hoffman said he had ideas "to get around [Plaintiffs'] patents," or words to that effect. Thus, on the date of Defendants' release of the Infringing Design, they knew or should have known about the '723 Patent, which had been revived and assigned to ABC for more than a year before the release, in addition to Plaintiffs' pending applications, including both the '247 Patent (with an application publication date of March 14, 2024) and the '784 Patent.

6.     On March 6, 2022, Defendants posted a video on YouTube at https://www.youtube.com/watch?v=NxSFNreG_Ec, titled "Rare Breed C & D Letter, What Happened and Moving Forward."[1] In this video, Defendants actually inform viewers that the files

_____

[1] Declaration of Lawrence DeMonico Pursuant to 28 U.S.C. § 1746 in Support of Plaintiffs' Motion for Preliminary Injunction, January 6, 2026, (Ex. D), ¶ 5 (hereafter "DeMonico Decl.").

that Hoffman admits to removing from his download site are "still available if somebody wanted them," and attempted to subvert the patent system by instructing viewers to search out the files that he removed download links to so that they could continue to make and use infringing forced reset triggers according to Defendants' design that infringe the '223 Patent. *See* "*Rare Breed C & D Letter, What Happened and Moving Forward*," March 6, 2022, at 11:15 – 11:30 and 14:54 – 15:15, available at https://www.youtube.com/watch?v=NxSFNreG_Ec (last visited January 4, 2026).

7.      Defendants' infringement of the '223 Patent, their receipt of formal notice, the Settlement Agreement, and Plaintiffs' explicit warnings about additional patents and pending applications all establish that Defendants have been on clear and unambiguous notice of Plaintiffs' intellectual-property rights since at least February 2022. Defendants (i) instruct their viewers to search out the infringing files, while, upon information and belief, Hoffman has since become aware of the '723 Patent and (ii) continue to make, use, and share their 3D files for the Infringing Device and Infringing Designs (defined *infra*). These actions further demonstrate that Defendants either actually or constructively knew about Plaintiffs' intellectual-property rights. Certainly, any reasonable search for patents owned and/or assigned to either ABC or Rare Breed would have identified the '723 Patent more than a year before Defendants released the 3D print and STEP files for the Super Safety (the "Infringing Design") or publicly displayed Hoffman's use of the Super Safety (the "Infringing Device"). Defendants' conduct thereby demonstrated, at a minimum, reckless disregard for Plaintiffs' constitutional right of intellectual property protection if not blatant willful infringement.[2] This history is highly probative of Defendants' knowledge, intent,

---

[2] Defendants' mention of the existence of the availability of the 3D Print files if his audience "knows where to look" or words to that effect also represent a breach of the Settlement Agreement

3

and willfulness regarding the '247 and '723 Patents asserted in this case.

8. On or about April 6, 2025, representatives of Plaintiffs had a telephone call with Defendant Hoffman.[3] During that call, Defendant Hoffman *admitted* to his Infringing Devices infringing the claims of the '723 and '247 Patents. Defendants admit that Hoffman, *at a minimum*, made a statement regarding his thoughts on the infringement of the '723 Patent and '247 Patent by the Super Safety Infringing device, as evidenced by the screenshot below from HT's "X" social media account:



9. Later this year, on August 9, 2025, representatives of Plaintiffs approached Defendant Hoffman at the Hoffman Tactical booth during the Gun Owners of America ("GOA") Gun Owners Advocacy and Leadership Summit ("GOALS") in Knoxville, Tennessee.[4] During this in-person discussion (the "August 9 Conversation"), Defendant Hoffman made a series of statements that further confirm his long-standing knowledge of Plaintiffs' patent rights and his

---

between the Parties based on the earlier infringement of the '223 Patent as outlined in the Original Complaint (Doc. 1).

[3] DeMonico Decl. ¶ 6.

[4] *Id.* ¶ 7.

deliberate decision to subvert the patent system and infringe those rights.[5]

10.    Hoffman stated unequivocally that he "does not believe in patents," that "no one should have a patent," and that it is his view that no company should be permitted to exclude others from a market, regardless of patent rights. He further explained that, in his personal philosophy, a company's success or failure should depend solely on its business model and marketing practices, not on the lawful protections afforded by the United States patent system.[6]

11.    Hoffman also admitted that he had intentionally released the Super Safety design files to the public because he intended to use "the masses as guinea pigs." Hoffman stated that he wanted widespread copying, distribution, experimentation, and sale of the design by numerous individuals and companies to overwhelm the market and make enforcement of Plaintiffs' patent rights "difficult, if not impossible." According to Hoffman, he implemented this strategy to cause rapid market saturation, thereby impairing Plaintiffs' ability to pursue infringers or protect the exclusivity and limited monopoly granted by Plaintiffs' patents.

12.    Hoffman has further stated that in releasing the Infringing Device,

the super safety project was something that sort of just happened. It came up because of [*sic*] **I had an idea one day to…basically clone the…Rare Breed style…force reset trigger which I did**…. [After the cease and desist letter] I started just thinking about other ways of doing it more of just because I wanted to keep doing it…you know sort of like as an obstacle to overcome and then once I did I think really **what motivated that project and I can sort of say this now…more than in the past I don't think I've really said this before publicly, but what really motivated that project is I want people to be more comfortable working near the edge**. So instead of being scared and trying to self-regulate, being more comfortable working actually inside of our current legal framework and…**realizing that the federal government does not have unlimited power to just crush you…if it's a lot of people kind of working together and saying no, this is actually legal and we can do it, which is…basically what's happened**.

---

[5] *Id.*

[6] *Id.*

*See Tim of Hoffman Tactical,* April 24, 2025, at 42:26 – 43:26, *available at* https://www.youtube.com/watch?v=STpjQu5ka_Q (last visited January 6, 2026) (emphasis added).[7]



13.     Hoffman further represented that he had already arranged for the Super Safety to be manufactured using Metal Injection Molding ("MIM") and that, once the market had become sufficiently saturated with unlicensed copies and subpar derivative works, he planned to "swoop in" and dominate the market. He further acknowledged that many of the people selling the Infringing Devices participated in importing Infringing Devices from China (made using his openly accessible 3D files), offered no warranty, or failed to deliver products to customers. Hoffman stated that his strategy involved leveraging his personal popularity and public following,

---

[7] *Id.* ¶ 8.

combined with his ability to offer the lowest-priced Super Safety product available, to seize control of the market after intentionally encouraging widespread infringement. These statements confirm that Hoffman's infringement was not accidental or uninformed, but instead part of a calculated plan to disregard Plaintiffs' patent rights, distort the competitive landscape, subvert Article I, Section 8 of the United States Constitution, and profit from a market Defendants had intentionally destabilized.

14.     These admissions provide direct evidence of Defendants' deliberate intent to infringe, to induce infringement by others, and to undermine Plaintiffs' patent rights, and thus restrain legal commerce by attempting to dilute Plaintiffs' lawful monopolies granted under the authority of Article I, Section 8 of the United States Constitution. They further demonstrate that Defendants' infringement of the '247 Patent and the '723 Patent is willful under 35 U.S.C. § 284 and supports the imposition of enhanced damages.

15.     As recently as December 26, 2025, Hoffman responded to a request to a potential purchaser of a Super Safety that Defendant Hoffman Tactical does not sell the Super Safety "yet."[8]

16.     As recently as *yesterday* (January 6, 2026), Hoffman posted about "the new Super Safety lever." He states that he is "making these with metal injection molding," and that he is "[r]eally happy with how the surfacing on these turned out."[9] This indicates that Defendants are preparing to begin selling their own manufactured Super Safety Infringing Devices.

---

[8] *Id.* ¶ 10.

[9] *Id.* ¶ 11 (emphasis added). *See also id.* ¶ 9 (discussing a December 12, 2025, post by Hoffman Tactical in which he shows packaging containers that include a slot specifically sized for the "lever" portion of the Infringing Devices).



**The Inventions**

17.     The '783 Patent discloses a semiautomatic trigger mechanism that forces the trigger to reset via a cam and claims a method of accelerating the firing cycle using such a trigger mechanism.

18.     Typical AR15 and AR10-pattern firearms, for example, are considered semiautomatic firearms. The operation of a *standard disconnector* AR-pattern trigger mechanism is commenced by the trigger member being pulled by the user. The trigger member releases the

hammer from the trigger sear and allows the hammer to strike the firing pin. A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm. The rearward movement of the bolt carrier cocks the hammer on the disconnector and then the bolt is allowed to return forward into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger member in a pulled (i.e., fired) state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer in a cocked position. When the user reduces pressure on the trigger member to allow the trigger spring to reset the trigger member, the disconnector releases the hammer to engage the trigger sear.

19.     The purpose of the disconnector in a semiautomatic firearm is to hold the hammer in a cocked position until the trigger member is reset by a trigger spring when the user allows the trigger to reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to manually reset the trigger rapidly enough so that the sear engages before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, leaving the hammer un-cocked.

20.     In contrast, in a forced reset trigger mechanism, cycling of the bolt carrier or bolt causes the trigger member to be forced to the reset position and locks the trigger member in this position until the bolt or bolt carrier is back in battery, when it is safe for the user to pull the trigger again, without the need for a disconnector.

21.     The '784 Patent provides a device that works in a forced reset trigger system as an extended trigger member locking mechanism for use with a semi-automatic firearm that employs

a "deflectable extension of the locking member that is actuated by forward movement of the bolt carrier," among other innovations as explicitly claimed. The invention of the '784 Patent overcomes the geometric limitations of prior art designs for use in multiple and varied semi-automatic firearm designs by allowing a locking member to deflect from the body portion of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear.

22.     The '247 Patent relates to a semiautomatic trigger mechanism that represents an improvement on the above-described technologies because it has two modes of operation: one that operates as a standard disconnector trigger mechanism described above and another that allows the user to fire more rapidly by forcibly returning the trigger to the reset state.

23.     The '247 Patent invention teaches a forced reset mode of the trigger by a cam while the bolt cycles to the rear and then returns forward to the in-battery position. The cam also limits movement of the trigger member. The cam acts to prevent the trigger member from being pulled a second (or subsequent) time until the bolt carrier has returned to the in-battery position.

**The Infringing Devices**

24.     Defendants have and are currently making, importing, using, selling, and/or offering for sale one or more versions of a "Super Safety" Infringing Devices, which embodies the technology claimed in the '247, '784, and '723 Patents. Additionally, Defendants overtly and intentionally, with knowledge of the '247 and '784 Patents, have offered and continue to offer the Infringing Design for free download with detailed manufacturing instructions in a deliberate effort to undermine the limited monopoly conferred by virtue of the valid and enforceable '247 and '784 Patents. Defendants also made, imported, used, sold, and/or offered for sale the Infringing Device, which embodies the technology claimed in the'723 Patent prior to its expiration.

25.     Defendants have made or had made for them, imported, used, sold or offered for

sale the Infringing Devices via Defendants' website (https://hoffmantactical.com/designs/super-safety/), and have further offered free downloads of the design, with detailed manufacturing instructions, of the Infringing Devices via Defendants' website directing "customers" to its downloads available on http://www.odysee.com.[10]

26.     Defendants provide the design for a cam and cam lever that replaces a standard AR-pattern safety selector, with detailed manufacturing instructions, both for 3D printing and for machining of metal parts via Odysee.  When Infringing Devices are installed in combination with a standard AR-pattern hammer and disconnector, with standard springs, the combination creates the invention of the '247 and '723 Patents. The claims of the '784 Patent are directed to "an extended trigger member locking device," which directly infringes when made, used, sold offered for sale or imported without any combination with other components. The '784 Patent, Col: 5, ll. 12-14 (Exhibit C); *see also, e.g.,* https://odysee.com/@hoffmantactical:3/Super-Safety-V4.4-Developers-Pack:5).

27.     Whoever actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b). Defendants give detailed manufacturing instructions and instruct download customers and purchasers to assemble the Infringing Devices in a way that induces infringement of the '247, '784 and '723 Patents.

28.     The Infringing Devices also can operate in a "disconnector mode," which is much like that of a standard AR15 trigger.  By moving the safety selector between positions, the user can switch between (i) safe, (ii) standard semiautomatic with disconnector, and (iii) forced reset

---

[10] The website found at http://www.odysee.com is a web-based platform where members, *inter alia*, may both post and download 3D print files and other files (such as STEP files) for both 3D printing, machining, and MIM (metal injection mold). Odysee.com is Defendants' chosen platform to post the infringing designs for public download.

semiautomatic with cam modes.

29.    As set out in detail in Plaintiffs' Original Complaint, with pictorial illustrations, Defendants' Infringing Devices each infringe at least one claim of the '247, '784, and '723 Patents and, thus, Defendants are liable for patent infringement pursuant to 35 U.S.C. § 271(a), (b) and (c).

30.    In view of the Defendants' continued infringement after posting the August 15, 2025, YouTube video in which Hoffman incorrectly compares devices made according to the design he published to the '247 and '723 Patents, the infringement is willful.

## RIGHT TO A PRELIMINARY INJUNCTION

31.    The standard for considering a requested preliminary injunction is well established in this Circuit and District, as follows:

> When deciding a motion for a preliminary injunction, the Court considers and balances four factors: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether, without the injunction, the plaintiff will suffer irreparable harm; (3) whether issuance of the injunction will cause substantial harm to the defendant or others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009); *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir. 1998). These factors are not prerequisites to the issuance of an injunction but are factors to be balanced in considering whether to grant the injunction. *Coalition To Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

*Fidelity Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671, at *4 (E.D. Tenn. Nov. 4, 2013); *see also Silverman v. Walkup*, 21 F. Supp. 2d 775, 776 (E.D. Tenn. 1998) ("In deciding whether to issue a preliminary injunction, this Court evaluates four factors: '(1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public

interest would be served.' *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).").

32.     In the context of patent cases, "[a] party may obtain a preliminary injunction by showing that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1398 (Fed. Cir. 2022) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).

33.     With respect to the evidence the Court may consider in resolving the motion, the standard is more relaxed than the standard Rules of Evidence generally applicable:

> Generally speaking, district courts within this circuit have not required stringent adherence to rules of evidence when reviewing petitions for injunctive relief and have considered such evidence. *See Damon's Restaurants, Inc. v. Eileen K, Inc.*, 461 F. Supp. 2d 607, 620 (S.D. Ohio, 2006) (collecting cases from this and other circuits). *See also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."); *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) ("a preliminary injunction is customarily granted on the basis of procedures less formal and evidence that is less complete than in a trial on the merits.").

*Fidelity Brokerage Servs.*, 2013 WL 5936671, at *5.

34.     Injunctions are specifically authorized by the Patent Act in patent infringement cases. "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. As the Federal Circuit has stated:

> The Patent Act provides a patentee with the "right to exclude others from making, using, offering for sale, or selling the [patented] invention." 35 U.S.C. § 154(a)(1). This right has its roots in the U.S. Constitution's Intellectual Property Clause, which refers to inventors' "exclusive Right to their respective . . . Discoveries." U.S. Const. art. I, § 8, cl. 8. In furtherance of this right to exclude, district courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35

U.S.C. § 283. "[N]ot surprising[ly], given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to use an invention against the patentee's wishes," historically courts have "granted injunctive relief upon a finding of infringement in the vast majority of patent cases." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (Roberts, C.J., concurring) (emphasis in original).

*Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638-39 (Fed. Cir. 2015).

### A. Plaintiffs are Likely to Succeed on the Merits

35.     The evidence provided in the Complaint (including the detailed representative claim charts for the '247 and '784 Patents) and in the Declaration of Lawrence DeMonico filed herewith, with its exhibits, show that Plaintiffs are likely to succeed on the merits of their patent infringement claims.

36.     Representative claim 1 of the '784 Patent,[11] shown below, is likewise straight forward and demonstrates the straightforward language and applicability of the claims to the Infringing Devices and Infringing Designs:

> 1. In a forced rest trigger mechanism, an extended trigger member locking device, comprising:
>
> a locking member that is movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member, the locking member configured to be movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier, such actuating contact causing the locking member to move from the first position to the second position, the locking member having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position.

37.     Defendants' infringement of claim 1 of the '784 Patent is shown in detail below:

---

[11] The '784 Patent, Col. 5, l. 12 – Col. 6, l. 7 (Ex. B).

| 38. Claim 1: Language | Infringing Device (Super Safety) |
|---|---|
| 1. In a forced reset trigger mechanism, an extended trigger member locking device, comprising: | When installed and used as directed, the Super Safety is part of a forced reset trigger mechanism and functions as an extended trigger member locking device.<br><br><br><br>**Super Safety**<br>Super Safety 3D Printed Active Trigger System v4.4, Hoffman Tactical (July 19, 2023) ("Super Safety Guide") at 12<br><br><br><br>**Super Safety Installed**<br>(Plaintiff-generated renderings of Super Safety here and below; Locking member and bolt carrier shown here and below in section view for clarity)<br><br>"The Super Safety is a mechanism that actively resets the trigger of a firearm to allow the operator to fire |

15

| | |
|---|---|
| | again, quickly, and efficiently. The Super Safety has been designed to operate with AR-15 pattern firearms that use a mil-spec bolt carrier and fire control group." Super Safety Guide at 1. |
| a locking member that is movable between a first position in which it locks a trigger against pulling movement | The Super Safety operates as a locking member and has a first position in which the Super Safety locks the trigger member against pulling movement.  **Locked First Position** |
| and a second position where it does not restrict movement of the trigger member, | The Super Safety is moveable from the first position to a second position where it does not restrict movement of the trigger member.  **Unlocked Second Position** |
| the locking member configured to be movably supported by a frame | The Super Safety is movably (pivotally about the axis depicted below) supported by a frame (the lower receiver). |

| | |
|---|---|
| |  |
| and including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier, | The Super Safety has an upward extending portion (lever arm) configured to make actuating contact with a surface of the bolt carrier.<br><br> |
| such actuating contact causing the locking member to move from the first position to the second position, | The actuating contact causes the locking member to move from the first position to the second position. |

| | |
|---|---|
| |  **Unlocked Second Position** |
| the locking member having a body portion that is movably supported | The Super Safety has a body portion that is movably supported by the lower receiver. |
| and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position | The Super Safety has an upwardly extending deflectable portion (lever arm). The dovetail connection is designed to allow separate movement of the lever arm relative to the body portion between one position (depicted in red) where it is extended and another position where it is deflected (depicted in green). |



Below illustrates the upward extending deflectable portion's (lever arm) total separate travel with an overlay of the lever in both positions without the body portion moving.



"The dovetail joint does not immediately transfer torque from the lever to the cam. The lever pivots in the cam until the void is filled. Once the void is filled the hammer can transfer torque to the cam via the upper and lower contact surfaces and. Note that the void, the lower contact surface, and the upper contact surface, are shown on arbitrary sides of the dovetail, these features may be on either side of the dovetail depending on which direction the lever is moving. The amount

| | that the lever rotates in the dovetail before transferring torque to the cam is such that as the bolt carrier completes its forward movement, the cam rotates the neutral surface away from the cam follower and to a point where the cam follower begins to slide against the cam surface." (referenced numerals removed for clarity). Super Safety Guide at 4. https://www.scribd.com/document/843484122/Super-Safety-Documentation |
|---|---|
| and a deflected position. | The lever is now shown deflected independent of the body.  |

39.     Representative claim 15 of the '247 Patent is also straight forward and easily understandable. The language itself, as viewed considering the representative claim chart of the Original Complaint (Doc. 1), demonstrates the straightforward language and applicability of the claims to the Infringing Devices and Infringing Designs. However, for purposes of this Motion for Preliminary Injunction, Plaintiffs have included the representative claim chart for claim 15 of the '247 Patent as Exhibit E, because a likelihood of success on the merits of *all* claims is not necessary to establish likelihood of success on the merits for purposes of a preliminary injunction. *See Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) ("A party may

establish a likelihood of success by showing that *at least one valid and enforceable patent claim is likely to be infringed*") (citing *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007)) (emphasis added).

40.     As shown in the attached Exhibit E, representative claim 15 of the '247 Patent claims the entire trigger mechanism as part of the claim, including *e.g.,* the trigger member, sear, and hammer, whereas the '784 Patent focuses on the trigger locking device. The factual components of claim construction include the background science or the meaning of a term to a skilled artisan during the relevant time period. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1039 (Fed. Cir. 2016) (internal quotations omitted); *see also Metalcraft*, 848 F.3d at 1364.

41.     The Plaintiffs represent that the Court may determine Plaintiffs' likelihood of success without the need for full and detailed claim construction briefing in view of the detailed infringement analysis contained in Plaintiffs' Original Complaint (Doc. 1) based on the simple nomenclature used by the inventors in the respective claims of the Patents-in-Suit.

**B. Irreparable Harm**

42.     There is irreparable harm for at least three reasons. First, Defendants' widespread dissemination of how to practice Plaintiffs' inventions, and particularly with prompting that such use is *permissible*, could lead what Plaintiffs believe are dozens, if not hundreds, of acts of infringement by Defendants' "audience," which would likely be cost-prohibitive for Plaintiffs to forestall. This is in addition to Plaintiffs' right to exclude. *See* 35 U.S.C. § 154. Also, monetary damages would be difficult to ascertain. *Cf. Apple*, 809 F.3d at 641 ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.") (citation omitted). Conversely, Defendants would not suffer any legally cognizable harm in light of the fact

that their actions sought to be restrained are contrary to law, and would maintain the status quo with respect to Defendants' status as having yet to sell or offer for sale Infringing Devices. *See BlephEx, LLC*, 24 F.4th at 1404 ("[A] preliminary injunction preserves the status quo if it prevents future trespasses.") (quoting *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1232 (Fed. Cir. 1985)). "Even where a patent is applied for and granted after the allegedly infringing product enters the market, a preliminary injunction may still be used to prevent future trespasses on the patent, so long as the district court correctly applies the relevant factors." *Id.*

43.     Second, "[e]vidence showing that no amount of monetary damages, however great, could address the harm tends to show it is an irreparable harm." *Metalcraft*, 848 F.3d at 1368 (citing *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)). With respect to Defendants' free 3D Print and Step Files, there is no way to determine the amount of damages, because while there is likely some evidence showing how many of Defendants' "followers" *downloaded* the files from Odysee, there is no definitive way to determine how many of those who downloaded the files actually *used* the files, or whether a single user printed dozens, or even hundreds of Infringing Devices and later sold them to other parties. "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and *is irreparable*." *Id.* (emphasis added).

44.     With respect to Defendants' imminent sales, Plaintiffs have as yet been unable to confirm whether sales have taken place, so there can be no determination of monetary damages for the specific act of "selling or offering for sale" under 35 U.S.C. § 271 at present.

45.     Finally, as Defendants yet have no sales of the physical Infringing Devices, they would likely not be able to satisfy any money judgment. Irreparable harm may be found where "the facts show that the final equitable relief may be uncollectible." *Transamerica Ins. Fin. Corp.*

*v. North Am. Trucking Ass'n*, 937 F. Supp 630, 635 (W.D. Ky. 1996); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction designed to freeze the status quo is an appropriate form of relief when the defendant is likely to be insolvent at the time of judgment). Even the gross revenue of their sale would be insufficient to compensate for the actual damages to Plaintiffs.

### C. Balance of Equities and the Public Interest

46.     To obtain an injunction, Plaintiffs must also establish that the "the balance of equities tips in [their] favor, and that an injunction is in the public interest." *See Metalcraft*, 848 F.3d at 1369 (quoting *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016)).

47.     The public interest is in favor of enforcement of valid patents. "[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple*, 809 F.3d at 647 (citation omitted). Rare Breed practices its inventions, the accused products are novelties and not necessities to consumers, and "there is nothing improper, illegal, or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market." *Kingsdown Med. Consultants, Ltd. V. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988).

48.     In the instant case, Defendants publicly state that they are freely giving away their infringing 3D print files and Step Files, thus undermining the very monopoly granted by the Patent Laws (35 U.S.C. § 101, *et seq.*) under the authority granted to Congress under Article I, Section 8 of the United States Constitution. Additionally, Defendants are—according to them—not selling the Infringing Devices. If true, then there is no financial harm to Defendants by either (a) requiring them to remove the downloadable files, or (b) preventing them from offering Infringing Devices

for sale directly to consumers and/or distributors.

**D. Content and Scope of the Injunction**

49. Plaintiffs seek a very specific injunction. Defendants must immediately, in and with respect to the United States of America, its territories, and its commonwealths:

  a. Refrain from making, using, selling, offering for sale, or importing any of the accused Infringing Devices, whether for the purpose of use or offering such products for sale, whether by retail, through distributors, or wholesale.

  b. Remove the "Super Safety" Infringing Devices for free download on Odysee.com, as well as any other platform for downloads by consumers.

  c. Refrain from posting any of the Infringing Designs in the form of 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform in the future;

  d. Refrain from sending any of the Infringing Designs in the form of 3D Print files, STEP files, or DEV Packs either physically or electronically to any third party; and

  e. Refrain from licensing or attempting to license any third party for the purpose of selling, offering for sale, importing, distributing, promoting the Infringing Devices and Infringing Designs.

50. The requested injunction is neither overly broad, nor vague. *Cf. Granny Goose Foods, Inc. v. Bhd. Of Teamsters & AutoTruck Drivers*, 415 U.S. 423, 444 (1974); *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004).

51. The foregoing analysis supports an order granting the injunction because such an order would meet the requirements of Fed. R. Civ. P. 65(d), requiring it to "state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

24

## CONCLUSION

52.     In short, due consideration of all four factors in this patent infringement case all weigh heavily in favor of granting a preliminary injunction to forestall Defendants' infringement and inducement to infringe, as requested below in Plaintiffs' Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a preliminary injunction enjoining Defendants and their principals, agents, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '247 and '784 Patents, including, but not limited to, the following activities:

a.  Refrain from making, using, selling, offering for sale, or importing any of the accused Infringing Devices, whether for the purpose of use or offering such products for sale, whether by retail, through distributors, or wholesale.

b.  Remove the "Super Safety" Infringing Devices for free download on Odysee.com, as well as any other platform for downloads by consumers.

c.  Refrain from posting any of the Infringing Designs in the form of 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform in the future;

d.  Refrain from sending any of the Infringing Designs in the form of 3D Print files, STEP files, or DEV Packs either physically or electronically to any third party; and

e.  Refrain from licensing or attempting to license any third party for the purpose of selling, offering for sale, importing, distributing, promoting the Infringing Devices and Infringing Designs.

Respectfully submitted,

/s/ Decker A. Cammack
Decker A. Cammack (admitted *pro hac vice*)
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, TX 76102
Telephone: (817) 878-0500
Facsimile: (817) 878-0501
DCammack@whitakerchalk.com

/s/ Glenn D. Bellamy
Glenn D. Bellamy (admitted *pro hac vice*)
WOOD, HERRON & EVANS, LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
Telephone: (513) 241-2324
Facsimile: (513) 241-6234
gbellamy@whe-law.com

/s/Joseph Alan Jackson II
Joseph Alan Jackson II, B.P.R. No. 030603
SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
601 Market Street, Suite 400
Post Office Box 1749
Chattanooga, TN 37401 1749
Telephone: (423) 756-7000
Facsimile: (423) 756-4801
jaj@smrw.com

*Attorneys for Plaintiffs*

DATED: January 7, 2026.