IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,<br><br>　　　　Defendants. | Case No. 1:25-cv-00389-CLC-CHS |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER WITH INCORPORATED BRIEF IN SUPPORT

This is an action for patent infringement in which ABC IP LLC ("ABC") and Rare Breed Triggers, Inc. ("Rare Breed") (collectively, "Plaintiffs") accuse HOFFMAN TACTICAL LLC ("HT") and TIMOTHY HOFFMAN ("Hoffman") (collectively, "Defendants"), of infringing U.S. Patent No. 12,038,247 ("the '247 Patent"), U.S. Patent No. 12,031,784 ("the '784 Patent") and U.S. Patent No. 7,398,723 ("the '723 Patent") and seek other relief. Plaintiffs have filed a Motion for Preliminary Injunction ("PI Motion") on January 7, 2026 (Doc. 14). Plaintiffs have obtained service of process on Defendants via hand delivery by process server of both the Complaint and the PI Motion; the proof of service will be filed on January 12, 2026, or as soon as possible when the physical returns are in Plaintiffs' possession.

Due to intervening events demonstrating interim irreparable harm *currently underway*, pursuant to Rule 65(b), Fed. R. Civ. P., Plaintiffs file this Motion for Temporary Restraining Order seeking entry of a Temporary Restraining Oder ("TRO") against Defendants, showing as follows:

1. This lawsuit relates to direct and indirect infringement of the '247 Patent, the '784 Patent, and the '723 Patent (collectively, the "Patents-in-Suit").

2. In support of the TRO relief requested, Plaintiffs reference their PI Motion (Doc. 14), which they hereby incorporate by reference.

3. Plaintiffs hereby also incorporate the factual allegations contained in the Original Complaint (Doc. 1) by reference.

4. Hoffman has represented that he had already arranged for the Super Safety to be manufactured using Metal Injection Molding ("MIM") and that, once the market had become sufficiently saturated with unlicensed copies and subpar derivative works, he planned to "swoop in" and dominate the market. He further acknowledged that many of the people selling the Infringing Devices participated in importing Infringing Devices from China (made using his openly accessible 3D files), offered no warranty, or failed to deliver products to customers. Hoffman stated that his strategy involved leveraging his personal popularity and public following, combined with his ability to offer the lowest-priced Super Safety product available, to seize control of the market after intentionally encouraging widespread infringement. These statements confirm that Hoffman's infringement was not accidental or uninformed, but instead part of a calculated plan to disregard Plaintiffs' patent rights, distort the competitive landscape, subvert Article I, Section 8 of the United States Constitution, and profit from a market Defendants had intentionally destabilized. Apparently, Defendants are now putting their plan into motion.

5. This admission, together with the admissions detailed in the PI Motion (Doc. 14) at ¶¶ 1–12, provide direct evidence of Defendants' deliberate intent to infringe, to induce infringement by others, and to undermine Plaintiffs' patent rights, and thus restrain legal commerce

by attempting to dilute Plaintiffs' lawful monopolies granted under the authority of Article I, Section 8 of the United States Constitution. They further demonstrate that Defendants' infringement of the '247, '784 and '723 Patents is willful under 35 U.S.C. § 284 and supports the imposition of enhanced damages.[1]

6. As recently as January 6, 2026, Hoffman posted about "the new Super Safety lever." He states that he is "making these with metal injection molding," and that he is "[r]eally happy with how the surfacing on these turned out."[2] This indicates that Defendants are preparing to begin selling their own manufactured Super Safety Infringing Devices.

7. *Now*, Plaintiffs have uncovered evidence that efforts at selling or dispersing the infringing products are *currently underway*, calling for a TRO.[3] These specifically include the following:

   a. A comments message on January 6, 2026, corresponding to Defendants' post of their new metal injection molded Super Safety lever on January 6, 2026, from a "@dandytravis" asks: "is that what i just bought from you at the recent gun show in knoxville?" To which @hoffmantactical replies, "Yes.";[4]

   b. A comments message on January 7, 2026, corresponding to Defendants' post of their new metal injection molded Super Safety cam on January 7, 2026, by

---

[1] Plaintiffs are not seeking either a Temporary Restraining Order or a Preliminary Injunction based on the '723 Patent.
[2] Declaration of Lawrence DeMonico in Support of Plaintiff's Motion for Temporary Restraining Order ("DeMonico TRO Decl."), attached as Exhibit A, ¶ 4 (emphasis added). *See also* Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction with Incorporated Brief in Support, Ex. E to PI Motion (Doc. 14), ¶ 9 (discussing a December 12, 2025, post by Hoffman Tactical in which he shows packaging containers that include a slot specifically sized for the "lever" portion of the Infringing Devices).
[3] DeMonico TRO Declaration, *passim*.
[4] *Id.* ¶ 5.

"@fastforwardtactical" (a retail seller of firearms parts and accessories) that states "I'll take 10,000 units" to which @hoffmantactical replies, "@fastforwardtactical I can do that.";[5] and

c. *Today* on Facebook, an admin on the private Facebook group "Hoffman Tactical Super Safety" (which has at least 24,200 members) posted: "**Notice!!!** RB filed for a Preliminary Injunction 01/07/2026. If they succeed the court will order Hoffman remove the files from his website. <u>If you haven't downloaded the file. I suggest doing it now</u>…" (underlined emphasis added).[6]

## RIGHT TO A TRO

8. "When reviewing motions for TROs, courts must consider the following: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992)); *Midwest Retailer Associated, Ltd. v. City of Toledo*, 563 F. Supp. 2d 796, 802 (N.D. Ohio 2008) ('<u>The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions.</u>')." *Vitolo v. Guzman*, 540 F. Supp. 3d 765, 773 (E.D. Tenn. 2021) (emphasis added here), *reversed on the merits, holding injunctive relief should be granted*, 999 F.3d 353 (6th Cir. 2021). "Though the standard for a TRO is the same as a preliminary injunction, there is increased emphasis on irreparable harm." *Blount Pride, Inc. v. Desmond*, 690 F. Supp. 3d 796, 807 (E.D. Tenn. 2023) (citation omitted).

---

[5] *Id.* ¶ 8.
[6] *Id.* ¶ 10.

9. The standard for considering a requested preliminary injunction (and hence a TRO, *Vitolo*, *supra*), is well established in this Circuit and District, as follows:

> When deciding a motion for a preliminary injunction, the Court considers and balances four factors: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether, without the injunction, the plaintiff will suffer irreparable harm; (3) whether issuance of the injunction will cause substantial harm to the defendant or others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009); *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir. 1998). These factors are not prerequisites to the issuance of an injunction but are factors to be balanced in considering whether to grant the injunction. *Coalition To Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

*Fidelity Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671, at *4 (E.D. Tenn. Nov. 4, 2013); *see also Silverman v. Walkup*, 21 F. Supp. 2d 775, 776 (E.D. Tenn. 1998) ("In deciding whether to issue a preliminary injunction, this Court evaluates four factors: '(1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served.' *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).").

10. In the context of patent cases, "[a] party may obtain a preliminary injunction by showing that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1398 (Fed. Cir. 2022) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).

11. With respect to the evidence the Court may consider in resolving the motion, the standard is more relaxed than the standard Rules of Evidence generally applicable:

> Generally speaking, district courts within this circuit have not required stringent adherence to rules of evidence when reviewing petitions for injunctive relief and

5

have considered such evidence. *See Damon's Restaurants, Inc. v. Eileen K, Inc.*, 461 F. Supp. 2d 607, 620 (S.D. Ohio, 2006) (collecting cases from this and other circuits). *See also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."); *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) ("a preliminary injunction is customarily granted on the basis of procedures less formal and evidence that is less complete than in a trial on the merits.").

*Fidelity Brokerage Servs.*, 2013 WL 5936671, at *5.

12. Injunctions are specifically authorized by the Patent Act in patent infringement cases. "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. As the Federal Circuit has stated:

> The Patent Act provides a patentee with the "right to exclude others from making, using, offering for sale, or selling the [patented] invention." 35 U.S.C. § 154(a)(1). This right has its roots in the U.S. Constitution's Intellectual Property Clause, which refers to inventors' "exclusive Right to their respective . . . Discoveries." U.S. Const. art. I, § 8, cl. 8. In furtherance of this right to exclude, district courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. "[N]ot surprising[ly], given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to use an invention against the patentee's wishes," historically courts have "granted injunctive relief upon a finding of infringement in the vast majority of patent cases." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (Roberts, C.J., concurring) (emphasis in original).

*Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638-39 (Fed. Cir. 2015).

### A. Plaintiffs are Likely to Succeed on the Merits

13. The evidence provided in the Complaint (including the detailed representative claim charts for the '247 and '784 Patents) and in the Declaration of Lawrence DeMonico filed with the PI Motion, with its exhibits, show that Plaintiffs are likely to succeed on the merits of their patent infringement claims. Additionally, the new DeMonico Declaration filed with this TRO Motion further verifies this.

14. Representative claim 1 of the '784 Patent,[7] shown below, is straightforward and demonstrates the applicability of the claims to the Infringing Devices and Infringing Designs:

> 1. In a forced rest trigger mechanism, an extended trigger member locking device, comprising:
>
> a locking member that is movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member, the locking member configured to be movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier, such actuating contact causing the locking member to move from the first position to the second position, the locking member having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position.

15. Defendants' infringement of claim 1 of the '784 Patent is shown in detail below:

---

[7] Paragraphs 14 and 15 are reproduced from the PI Motion (Doc. 14) for the convenience of the Court.

| '784 Claim 1: Language | Infringing Device (Super Safety) |
|---|---|
| 1. In a forced reset trigger mechanism, an extended trigger member locking device, comprising: | When installed and used as directed, the Super Safety is part of a forced reset trigger mechanism and functions as an extended trigger member locking device.<br><br><br>**Super Safety**<br>Super Safety 3D Printed Active Trigger System v4.4, Hoffman Tactical (July 19, 2023) ("Super Safety Guide") at 12<br><br><br>**Super Safety Installed**<br>(Plaintiff-generated renderings of Super Safety here and below; Locking member and bolt carrier shown here and below in section view for clarity)<br><br>"The Super Safety is a mechanism that actively resets the trigger of a firearm to allow the operator to fire |

| | again, quickly, and efficiently. The Super Safety has been designed to operate with AR-15 pattern firearms that use a mil-spec bolt carrier and fire control group." Super Safety Guide at 1. |
|---|---|
| a locking member that is movable between a first position in which it locks a trigger against pulling movement | The Super Safety operates as a locking member and has a first position in which the Super Safety locks the trigger member against pulling movement.<br><br>**Locked First Position** |
| and a second position where it does not restrict movement of the trigger member, | The Super Safety is moveable from the first position to a second position where it does not restrict movement of the trigger member.<br><br>**Unlocked Second Position** |
| the locking member configured to be movably supported by a frame | The Super Safety is movably (pivotally about the axis depicted below) supported by a frame (the lower receiver). |

9

| | |
|---|---|
| |  |
| and including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier, | The Super Safety has an upward extending portion (lever arm) configured to make actuating contact with a surface of the bolt carrier.<br> |
| such actuating contact causing the locking member to move from the first position to the second position, | The actuating contact causes the locking member to move from the first position to the second position. |

| | |
|---|---|
| | **Unlocked Second Position** |
| the locking member having a body portion that is movably supported | The Super Safety has a body portion that is movably supported by the lower receiver. |
| and an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position | The Super Safety has an upwardly extending deflectable portion (lever arm). The dovetail connection is designed to allow separate movement of the lever arm relative to the body portion between one position (depicted in red) where it is extended and another position where it is deflected (depicted in green). |

11



Below illustrates the upward extending deflectable portion's (lever arm) total separate travel with an overlay of the lever in both positions without the body portion moving.



"The dovetail joint does not immediately transfer torque from the lever to the cam. The lever pivots in the cam until the void is filled. Once the void is filled the hammer can transfer torque to the cam via the upper and lower contact surfaces and. Note that the void, the lower contact surface, and the upper contact surface, are shown on arbitrary sides of the dovetail, these features may be on either side of the dovetail depending on which direction the lever is moving. The amount

12
Case 1:25-cv-00389-CLC-CHS    Document 15    Filed 01/09/26    Page 12 of 20
PageID #: 243

| | |
|---|---|
| | that the lever rotates in the dovetail before transferring torque to the cam is such that as the bolt carrier completes its forward movement, the cam rotates the neutral surface away from the cam follower and to a point where the cam follower begins to slide against the cam surface." (referenced numerals removed for clarity). Super Safety Guide at 4. https://www.scribd.com/document/843484122/Super-Safety-Documentation |
| and a deflected position. | The lever is now shown deflected independent of the body.  |

16. Representative claim 15 of the '247 Patent is also straightforward and easily understandable. The language itself, as viewed considering the representative claim chart of the Original Complaint (Doc. 1), demonstrates the straightforward language and applicability of the claims to the Infringing Devices and Infringing Designs. However, for purposes of this TRO Motion (as well as the previously filed PI Motion), Plaintiffs have included the representative claim chart for claim 15 of the '247 Patent as Exhibit E to the PI Motion (incorporated herein by reference), because a likelihood of success on the merits of *all* claims is not necessary to establish likelihood of success on the merits for purposes of a TRO or preliminary injunction. *See Metalcraft*

of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) ("A party may establish a likelihood of success by showing that *at least one valid and enforceable patent claim* is likely to be infringed") (citing *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007)) (emphasis added).

17. As shown in the PI Motion, representative claim 15 of the '247 Patent claims the entire trigger mechanism as part of the claim, including *e.g.,* the trigger member, sear, and hammer, whereas the '784 Patent focuses on the trigger locking device. The factual components of claim construction include the background science or the meaning of a term to a skilled artisan during the relevant time period. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1039 (Fed. Cir. 2016) (internal quotations omitted); *see also Metalcraft*, 848 F.3d at 1364.

18. The Plaintiffs represent that the Court may determine Plaintiffs' likelihood of success without the need for full and detailed claim construction briefing in view of the detailed infringement analysis contained in Plaintiffs' Original Complaint (Doc. 1) based on the simple nomenclature used by the inventors in the respective claims of the Patents-in-Suit.

**B. Irreparable Harm[8]**

19. There is irreparable harm for at least three reasons. First, Defendants' widespread dissemination of the Infringing Designs and knowledge of how to practice Plaintiffs' inventions, and particularly with prompting that such use is *permissible*, has led to what Plaintiffs believe are thousands of downloads, which in turn have led to what Plaintiffs believes are dozens, if not hundreds of commercial infringers, and potentially hundreds of thousands of acts of infringement

---

[8] Section B is largely reproduced from Plaintiffs' PI Motion (Doc. 14) for the Court's convenience, with additions that provide information related to developments that occurred either just prior to, or since, Plaintiffs filed the PI Motion.

by Defendants' "audience" and commercial infringers.[9] The scope of Defendants past infringement alone would likely be cost-prohibitive for Plaintiffs to forestall, which does not account for Defendants' demonstrated intent to expand their infringement. These concerns are in addition to Plaintiffs' right to exclude. *See* 35 U.S.C. § 154. Also, monetary damages would be difficult to ascertain. *Cf. Apple*, 809 F.3d at 641 ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.") (citation omitted). Conversely, Defendants would not suffer any legally cognizable harm in light of the fact that their actions sought to be restrained are contrary to law and would maintain the status quo with respect to Defendants' status as having yet to sell or offer for sale Infringing Devices[10]—especially in view of Defendants' budding attempts to begin sales. *See BlephEx, LLC*, 24 F.4th at 1404 ("[A] preliminary injunction preserves the status quo if it prevents future trespasses.") (quoting *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1232 (Fed. Cir. 1985)). "Even where a patent is applied for and granted after the allegedly infringing product enters the market, a preliminary injunction may still be used to prevent future trespasses on the patent, so long as the district court correctly applies the relevant factors." *Id.*

20. Second, "[e]vidence showing that no amount of monetary damages, however great, could address the harm tends to show it is an irreparable harm." *Metalcraft*, 848 F.3d at 1368 (citing *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)). With respect to Defendants' free 3D Print and Step Files, there is no way to determine the amount of damages, because while there is likely some evidence showing how many of Defendants' "followers"

---

[9] *See, e.g.*, DeMonico TRO Decl. ¶ 8 (a single commercial infringer requests 10,000 units).
[10] PI Motion, Ex. E, ¶ 3.

*downloaded* the files from Odysee, there is no definitive way to determine how many of those who downloaded the files actually *used* the files, or whether a single user printed dozens, or even hundreds of Infringing Devices and later sold them to other parties. "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and *is irreparable*." *Id.* (emphasis added).

21. With respect to Defendants' imminent sales, Plaintiffs have now confirmed that at least one sale has taken place, and an offer for *10,000 units* has taken place; however, there can be no determination of monetary damages for the specific act of "selling or offering for sale" under 35 U.S.C. § 271 at present.

22. Additionally, Defendants' followers are now posting on social media encouraging interested "customers" of the Infringing Devices to "[downloading] the file now."[11]

23. Finally, Defendants would likely not be able to satisfy any money judgment. Irreparable harm may be found where "the facts show that the final equitable relief may be uncollectible." *Transamerica Ins. Fin. Corp. v. North Am. Trucking Ass'n*, 937 F. Supp 630, 635 (W.D. Ky. 1996); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction designed to freeze the status quo is an appropriate form of relief when the defendant is likely to be insolvent at the time of judgment). Even the gross revenue of their sales would be insufficient to compensate for the actual damages to Plaintiffs.

C.  **Balance of Equities and the Public Interest**[12]

24. To obtain an injunction, Plaintiffs must also establish that the "the balance of equities tips in [their] favor, and that an injunction is in the public interest." *See Metalcraft*, 848

---

[11] DeMonico TRO Decl. ¶ 10.
[12] Section C, like Section B, is largely duplicative of the Balance of Equities and the Public Interest Section of the PI Motion (Doc. 14).

16

F.3d at 1369 (quoting *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016)).

25. The public interest is in favor of enforcement of valid patents. "[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple*, 809 F.3d at 647 (citation omitted). Rare Breed practices its inventions, the accused products are novelties and not necessities to consumers, and "there is nothing improper, illegal, or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market." *Kingsdown Med. Consultants, Ltd. V. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988).

26. In the instant case, Defendants publicly state that they are freely giving away their infringing 3D print files and Step Files, thus undermining the very monopoly granted by the Patent Laws (35 U.S.C. § 101, *et seq.*) under the authority granted to Congress under Article I, Section 8 of the United States Constitution. Given the Facebook post referenced above, a TRO should issue (a) requiring them to remove the downloadable files, or (b) preventing them from offering Infringing Devices for sale directly to consumers and/or distributors.

**D. Content and Scope of the TRO**

27. Plaintiffs seek a very specific TRO. Defendants must immediately, in and with respect to the United States of America, its territories, and its commonwealths:

    a. Refrain from making, using, selling, offering for sale, or importing any of the accused Infringing Devices, whether for the purpose of use or offering such products for sale, whether by retail, through distributors, or wholesale.

    b. Remove the "Super Safety" Infringing Devices for free download on Odysee.com, as well as any other platform for downloads by consumers.

c.  Refrain from posting any of the Infringing Designs in the form of 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform in the future;

d.  Refrain from sending any of the Infringing Designs in the form of 3D Print files, STEP files, or DEV Packs either physically or electronically to any third party; and

e.  Refrain from licensing or attempting to license any third party for the purpose of selling, offering for sale, importing, distributing, promoting the Infringing Devices and Infringing Designs.

28.  The requested TRO is neither overly broad, nor vague. *Cf. Granny Goose Foods, Inc. v. Bhd. Of Teamsters & AutoTruck Drivers*, 415 U.S. 423, 444 (1974); *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004).

29.  The foregoing analysis supports an order granting the TRO because such an order would meet the requirements of Fed. R. Civ. P. 65(d), requiring it to "state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

## CONCLUSION

30.  In short, due consideration of all four factors in this patent infringement case all weigh heavily in favor of granting a TRO to forestall Defendants' infringement and inducement to infringe, as requested below in Plaintiffs' Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a TRO enjoining Defendants and their principals, agents, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of the '247 and '784 Patents, including, but not limited to, the

following activities:

a. Refrain from making, using, selling, offering for sale, or importing any of the accused Infringing Devices, whether for the purpose of use or offering such products for sale, whether by retail, through distributors, or wholesale.

b. Remove the "Super Safety" Infringing Devices for free download on Odysee.com, as well as any other platform for downloads by consumers.

c. Refrain from posting any of the Infringing Designs in the form of 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform in the future;

d. Refrain from sending any of the Infringing Designs in the form of 3D Print files, STEP files, or DEV Packs either physically or electronically to any third party; and

e. Refrain from licensing or attempting to license any third party for the purpose of selling, offering for sale, importing, distributing, promoting the Infringing Devices and Infringing Designs.

## NOTICE PURSUANT TO RULE 65(b)

As shown in detail above and in the Declaration filed herewith, immediate and irreparable injury, loss, or damage will result to Plaintiffs if the TRO relief requested is not issued before Defendants can be heard in opposition hereto. The reasons therefor are included in the Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Temporary Restraining Order with Incorporated Brief in Support, attached as Exhibit A. Further, the undersigned certifies that Defendants have already been served with the Complaint and PI Motion putting them on notice of the parallel relief sought therein and will also undertake immediate effort to personally serve this Motion. In view of a sale having been made and the imminent "downloading" of infringing information currently threatened, no further notice should be required.

Respectfully submitted,

/s/ Decker A. Cammack
Decker A. Cammack (admitted *pro hac vice*)
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, TX 76102
Telephone: (817) 878-0500
Facsimile: (817) 878-0501
DCammack@whitakerchalk.com

/s/ Glenn D. Bellamy
Glenn D. Bellamy (admitted *pro hac vice*)
WOOD, HERRON & EVANS, LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
Telephone: (513) 241-2324
Facsimile: (513) 241-6234
gbellamy@whe-law.com

/s/Joseph Alan Jackson II
Joseph Alan Jackson II, B.P.R. No. 030603
SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
601 Market Street, Suite 400
Post Office Box 1749
Chattanooga, TN 37401 1749
Telephone: (423) 756-7000
Facsimile: (423) 756-4801
jaj@smrw.com

*Attorneys for Plaintiffs*

DATED: January 9, 2026.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record and/or individuals who are deemed to have consented to electronic service are being served with a copy of the foregoing on January 9, 2026 via the Court's CM/ECF System. Additionally, Plaintiffs intend to serve a copy of the foregoing via first class mail to 211 Shoal Creek Road, Englewood, TN 37329 pursuant to Fed. R. Civ. P. 5(b)(2)(C) and via email to Defendants' last known email address: tim@hoffmantactical.com.

*/s/ Decker A. Cammack*
Decker A. Cammack
