IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

---

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

Plaintiffs,

v. 1:25-CV-389

TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,

Defendants.

---

Chattanooga, Tennessee
January 28, 2026

BEFORE: THE HONORABLE CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE

HEARING ON MOTION FOR PRELIMINARY INJUNCTION

VOLUME II OF III


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 1 of 145
PageID #: 497

APPEARANCES:

FOR THE PLAINTIFF:

DECKER A. CAMMACK
Whitaker Chalk Swindle & Schwartz, PLLC
301 Commerce Street
Suite 3500
Fort Worth, Texas 76102

JOSEPH ALAN JACKSON, II
KATELYN MURDOCK
Spears, Moore, Rebman & Williams
601 Market Street, Suite 400
Chattanooga, Tennessee 37402

FOR THE DEFENDANT:

JACOB G. HORTON
JONATHAN M. BLANCHARD
Blanchard Horton PLLC
P.O. Box 5657
Oak Ridge, Tennessee 37830

- - -

## INDEX OF PROCEEDINGS

BRIAN LUETTKE
Cross-Examination by Mr. Horton ..........................4
Redirect Examination by Mr. Cammack .....................32

BRIAN LUETTKE
Cross-Examination by Dr. Blanchard ......................76
Redirect Examination by Mr. Bellamy ....................114

TIMOTHY HOFFMAN
Direct Examination by Mr. Cammack ......................123

## PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | RECEIVED |
|---|---|---|
| 1 | Curriculum Vitae of Brian Luettke | 43 |

THE COURT: This is a continuation of the case from yesterday.

Mr. DeMonico, you may retake the stand.

I believe that the direct examination was done.

MR. CAMMACK: Correct, Your Honor. I pass the witness.

THE COURT: Okay. So we'll now turn to the cross-examination.

MR. HORTON: Good morning, and may it please the Court. I am Jake Horton representing the defendants in the case, Hoffman -- Mr. Hoffman and Hoffman Tactical.

CROSS-EXAMINATION (Continuing)

BY MR. HORTON:

Q Mr. DeMonico, good morning.

A Good morning.

Q I have a few additional questions in follow-up to your testimony yesterday. If you have any trouble hearing me or if you need me to repeat anything, please feel free to ask. Okay?

A Okay.

Q Yesterday we heard a little bit about the relationship between ABC IP, LLC, and Rare Breed, the two plaintiffs in the case. Who owns ABC IP?

A ABC IP is owned by a group of companies.

Q A group of companies?

A That's correct.
Q Which companies?
A LAD, LLC, which I am the owner of, Leleux, LLC, and 1861, LLC. I believe there may be one other company, but I'm not sure I know the name of it.
Q Okay. So you own LAD, LLC?
A That is correct.
Q Who owns Leleux, LLC?
A Cole Leleux.
Q And you said there was another company?
A 1861, LLC. That's owned by Kevin Maxwell.
Q Okay. Kevin Maxwell. Okay. So the three companies that own ABC are owned by you Lawrence DeMonico, Cole Leleux, and Kevin Maxwell. Is that correct?
A That is correct.
Q Okay. Who owns Rare Breed?
A Kevin Maxwell.
Q Kevin Maxwell owns Rare Breed?
A That's right.
Q Okay. Do you have any ownership interest in Rare Breed?
A I do not.
Q Are you a director of Rare Breed?
A I am the president of Rare Breed.
Q You're the president of Rare Breed?

A That is correct.
Q Okay. Who are the other directors of Rare Breed?
A There are no other directors.
Q Okay. Who are the other officers of Rare Breed?
A There are no other officers.
Q Okay. So you're the sole officer of Rare Breed, Incorporated?
A That is correct.
Q Okay. Do any of the shareholders of Rare Breed have a controlling interest in Rare Breed? Do you know what I mean when I say "controlling interest"?
A Please explain.
Q Do any of the owners of Rare Breed hold enough ownership in the company that they're able to make decisions on behalf of the company?
A They do not make decisions on behalf of the company.
Q Okay. Who does?
A I do.
Q Okay. Did I ask you who the shareholders of Rare Breed are? Who are the shareholders of Rare Breed?
A Kevin Maxwell owns Rare Breed.
Q A hundred percent of Rare Breed?
A That is correct.
Q Okay. Thank you. I thought I had asked that, but it's a little early this morning. We heard some testimony

from you yesterday about the pricing of Rare Breed's FRTs. Remind me, how much do Rare Breed's FRTs sell for?
A The FRT-15L3 sells for $450, and the FRT-MR3 sells for 525.
Q Okay. And you testified that you are obligated to give $300 of that to ABC?
A That is correct.
Q Okay. How much does it cost Rare Breed to make one of the FRTs?
A That number changes based on, you know, various factors, price of material, I mean, all those things, but about -- about a hundred dollars.
Q Okay. And are there any costs of sales, additional costs associated with distributing, selling?
A We sell a hundred percent retail. So there are no distributor or dealer costs.
Q Okay. Any other costs of sales?
A Well, there's, I mean, a standard cost that a business might have, you know, operating a website, things of that nature.
Q Okay. So $450 for a 15L3, a 100-dollar cost to manufacture, $300 goes to ABC, that leaves $50?
A That's correct. That's for the FRT-15L3.
Q Okay. And for the MR3 that would leave $125?
A That's correct.

Q How many parts does the Rare Breed FRT have?
A I couldn't give you an answer on that right now.
Q Okay. Now, in the event this Court were to find that Mr. Hoffman's Super Safety device infringes Rare Breed's patents for its FRTs and Mr. Hoffman is ordered to pay $50 for each Super Safety device he sells, would that not be the same amount of money that Rare Breed would make if it sold one of its 15L3s to Mr. Hoffman's customers?
A I'm a little confused. Aren't -- just make sure I understand the question. Are you asking about Rare Breed's lost profits? Are you asking about royalties that would go to ABC?
Q I'm asking -- I'm asking how much Rare Breed would make excluding the amount that would go to ABC.
MR. CAMMACK: Objection, Your Honor. Calls for speculation. And it's still confusing.
THE COURT: And you'll have to educate me on this, but I don't know that I will or can make a determination on the validity of the patent, do I? That's for the jury, isn't it?
MR. HORTON: I'm sorry, Your Honor?
THE COURT: Is that a jury issue, or a judge issue?
MR. HORTON: All I'm asking for is how much profit Rare Breed makes from a sale.
THE COURT: Okay. Why don't you ask that, then. Your question --

MR. HORTON: Yes, sir.

THE COURT: -- asked something about, "If this Court decides this." And I'm not sure the Court decides that. That may be a jury issue, isn't it?

MR. HORTON: I believe that might be right, yes.

THE COURT: Okay. So why don't you ask the question the way you phrased it most recently.

MR. HORTON: I will do my best, Your Honor. Thank you.

BY MR. HORTON:

Q Let me try this again. Rare Breed's profit per FRT, excluding the amount that goes to ABC, is what?

A For the FRT-15L3 it is $50.

Q And for the MR3?

A About 125.

Q Okay. Have you ever heard the term reasonable royalty?

A I have.

Q Are you aware of any patent infringement laws that require a Court to award damages for patent infringement that are adequate to compensate for the infringement but in no event less than a reasonable royalty? Does that language -- is that language familiar to you?

A Are you asking me if I'm familiar with a law that states that?

Q Yes.
A I have heard that language before.
Q Okay. Your 300-dollar royalty that you pay to ABC, that represents -- yesterday there was some question -- there was some discussion about the percentage. You had said that it was about 60 percent. Is that right?
A I believe the question was asked me if that was about 60 percent. I don't think I came up with a percentage at all.
Q Okay. Is it about 60 percent?
MR. CAMMACK: Objection to form. Objection, Your Honor. He's asking him -- there's two different prices. There's two different -- the royalty's the same, but there's two different sales prices. So the percentage is different for each device. So about 60 percent is not a -- not an accurate -- he's not requesting accurate information.
THE COURT: I think he's asking the question what did he agree to yesterday.
MR. HORTON: That's correct, Your Honor.
THE COURT: You may proceed, Counsel.
MR. HORTON: I'm sorry, Your Honor?
THE COURT: If the witness can answer the question, you may proceed.
BY MR. HORTON:
Q Can you answer the question?

A Will you please ask the question again.
Q Was it your testimony yesterday that the 300-dollar royalty that you paid to ABC represents approximately a 60 percent royalty on one of your FRTs?
A It would be approximate for one of the models. But being that all models, especially the models that we have coming online in the near future, all have various different costs and will be sold at different retail rates, we have never -- never discussed a percentage. It's always just a 300-dollar flat royalty fee.
Q Are you aware of any license agreement for use of a patent related to FRT technology in which the agreed-upon royalty rate was 60 percent?
A Once again, you're asking me about percentages. And to be honest, yesterday was the first time a percentage has ever come up. We only discuss a flat royalty fee of $300. So I'm not sure how to answer your question.
Q Well, all I'm asking for is whether or not you're aware. Are you aware of any license agreement where -- for use of a patent related to FRT technology in which the agreed-upon royalty is 60 percent?
A No, sir. I'm not aware of any licensing agreement that discusses percentages at all for a royalty.
Q Are you aware of any license agreement other than your agreement with ABC for use of a patent related to FRT

technology in which the agreed-upon royalty was $300?

A Being that I believe we are the only company in the country with any patents whatsoever in the forced reset trigger space, I believe there probably are no other licensing agreements for forced reset triggers over four specific patents. So I would say that being that patents for forced reset triggers are so rare and ABC probably owns all of them, these would be the only ones that, I mean, exist, and would probably be -- I mean, are the only ones that I would know about anyway.

Q Are you aware of any license agreement for use of a patent related to the manufacture and sale of firearm components, any firearm components, in which the agreed-upon royalty is 60 percent?

A I'm not familiar with really any other patent licensing agreements in the space whatsoever.

Q Okay. Thank you. We heard testimony from you yesterday about the irreparable harm that Rare Breed would suffer if a preliminary injunction is not granted in this case. Is that correct?

A Yes, sir.

Q You mentioned that shortly after the May 9th, 2025, settlement agreement with the Department of Justice the number of companies that were out there selling FRTs exploded. Is that correct?

A Yes, sir.

Q And you believe and it's your testimony that a significant number of them either downloaded Mr. Hoffman's design from the internet and started making and selling that or created a derivative work based on Mr. Hoffman's design. Is that correct?

A I mean, those are the defendant's own words.

Q So is it your testimony that a number of third-party manufacturers have taken Mr. Hoffman's design and created a modified design based on Mr. Hoffman's design?

A That's a little bit open-ended. Do you mind if I explain?

Q Please.

A Okay. After we received the court's order in the Northern District of Texas declaring that forced reset triggers were legal, numerous infringers flooded the market at that point to make various infringing devices, primarily the Super Safety. That's when the market really began to become flooded, was after that. Then after the settlement with the government it continued to expand.

Now, if I understood your question correctly, it was did these infringers take Mr. Hoffman's design and either make it exactly or make a derivative work. I would answer that by saying many of these infringers took a file that was provided to them and then used the instructions that came along -- the

white paper that was provided with it by the defendant to primarily make largely -- the vast majority of them are exact copies of the Super Safety design that was provided to them. Very few, and only a couple that I can think of right off the top of my head, which Mr. Hoffman also said, had used that design to make a derivative work——that's not the best word to use, but we'll use it for lack of a better word——and that would be AS Designs and Atrius. But it was by the defendant's own admission those designs were based on the file that he provided.

Q The two companies that you mentioned, Atrius and A- -- what was it?

A AS Designs.

Q -- AS Designs, do you know whether either of them have filed for patent protection for their designs?

A I do not believe Atrius has filed for a patent. I'm not certain on that. We are in arbitration with Atrius now.

AS Designs, I think they sell more than one product. Their primary product for many, many months has been an exact copy of the file provided by Mr. Hoffman. They even explained that it was provided by Mr. Hoffman. It has his HT logo on the side of it. So that is their primary offering. And then they started offering a new product. The name doesn't come to me. I think there is a -- I've got a recollection I think they may have applied for a patent for the way it has been

advanced beyond the standard Super Safety, but I'm not entirely certain on whether or not they have actually filed a provisional or non-provisional application.

Q Do you know when these third-party manufacturers downloaded Mr. Hoffman's design?

A I think that would be very hard to say when anybody specifically downloaded a design or they took one that had been e-mailed to them or provided to them or whatever. I wouldn't -- I wouldn't be able to answer that question.

Q You testified that these third-party manufacturers began showing up everywhere after the May 9th settlement agreement. Is it safe to assume that these third-party manufacturers downloaded Mr. Hoffman's design before they released their products to market?

A Can you simplify that question and take out the extra to make sure I understand you?

Q The third-party manufacturers of Mr. Hoffman's design downloaded it from Mr. Hoffman or from somewhere else, then they made and released their products?

A I think it's reasonable --

MR. CAMMACK: Objection, Your Honor. We don't know if they downloaded it or if they received it directly from Mr. Hoffman through direct contact. It's assuming facts not in evidence, and it calls for speculation.

THE COURT: I'll allow the question.

THE WITNESS: Will you repeat the question?
MR. HORTON: Let me rephrase it slightly.
BY MR. HORTON:
Q Is it fair to say that the third-party manufacturers manufacturing Mr. Hoffman's design first received the design either from Mr. Hoffman or elsewhere, then began manufacturing and selling it?
A I think it's fair to say they would have to have the files to create it before you are able to create it.
Q Logical. (Moving head up and down.) And they began releasing their products shortly after the May 9th, 2025, settlement agreement?
A As I explained just a minute ago, many of these infringers——and I'm going to refer to them as infringers——started to offer the design provided by Mr. Hoffman after we received our order -- or after Judge O'Connor released his order in the Northern District of Texas. That was many, many, many months prior to our settlement agreement. So I don't know if you're looking for a date.
Q Just a general time frame. It would have been before -- you know, sometime approximately concurrent with or before May of 2025. Is that fair to say?
A Many of them did it before -- significantly before May of '25.
Q Okay. Do you know whether any of the people who

downloaded Mr. Hoffman's design have put the same design up on their own websites or accounts that they control for download?

A Once again, I just want to make Sure I understand your question. Are you asking me if other people have reposted and offered for download the files that Mr. Hoffman originally offered to the world for download?

Q Yes.

A Yes. This has taken place quite a bit. In fact, when someone has them taken down, somebody else will say, "I got you, Hoffman. I'll repost it. #CantStopTheSignal."

Q Are you aware that as of last night 15 different user accounts on Odysee.com have Mr. Hoffman's files available for download?

A That doesn't surprise me at all. It really just shows the coordination and cooperation with the defendant to ensure that these files stay available to the public no matter whether he is hit with a restraining order or preliminary injunction, they're going to find a way, make a way, no matter -- no matter what.

Q So is it fair to say that if a person wanted to download Mr. Hoffman's design they could find the design available for download from any one of a number of sources other than Mr. Hoffman?

A Call me crazy, but I feel like you're making my case for irreparable harm, because he only had to release the

original file one time and it -- now you can't put that genie back in the bottle.
Q So if I understand what you're saying, you're saying that a preliminary injunction against Mr. Hoffman would serve to present -- to prevent Mr. Hoffman's design from being available for you to download from Mr. Hoffman's website.
A Unless that preliminary injunction extended to those in participation or concert with, it probably would, because unless you can enjoin everyone that is in participation with him, then it probably would be worthless.
Q Do you know whether all of the third-parties that have posted Mr. Hoffman's design for download are in participation with him?
A If he provided it to them, I think you'd have to -- you'd have to say that they're in participation with the individual that provided it to them.
Q It's not possible for someone to download a file and then, independent of any plan or collusion with Mr. Hoffman, repost it online?
A It had to be provided to them in the first place, didn't it?
Q Is the -- are the files available -- that were available from Mr. Hoffman's website available for download by anyone, or did you have to have permission from Mr. Hoffman?
A I think it's fair to say that since the files have


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 18 of 145 PageID #: 514

ended up in China and have been illegally imported from China that they probably weren't protected like they probably should have been, so...

Q So anybody that wants to download them can download them?

A That's probably a safe bet.

Q Okay. Do you know whether -- let me back up. You testified that there are a number of third parties that are selling Mr. Hoffman's design or designs for safety systems based on Mr. Hoffman's design, correct?

A That is correct.

Q Do you know whether a preliminary injunction against Mr. Hoffman would serve to prevent Mr. Hoffman's design from being available for sale from these other third parties?

MR. CAMMACK: Objection, Your Honor. Calls for legal conclusion. He's asking the witness if he knows what a preliminary -- what the effect of a preliminary injunction -- the scope of a preliminary injunction should be.

THE COURT: Counsel?

MR. HORTON: I'm merely asking what the witness is aware of, Your Honor.

THE COURT: No preliminary injunction has been issued yet. So even I don't know what the scope of that injunction would be. I think you're asking this witness to divine in the future what this Court is going to do, what the scope of the

injunction is going to be, and then comment on that, when he has -- even I don't know what the injunction would say.

MR. HORTON: Let me ask a different question, Your Honor.

BY MR. HORTON:

Q Mr. DeMonico, do you know whether Mr. Hoffman has any control over these other third parties that are out there selling Mr. Hoffman's design or safety systems based on Mr. Hoffman's design?

A I don't know what kind of control Mr. Hoffman has over anyone.

Q We had talked a little bit yesterday about the other lawsuits that Rare Breed has filed regarding FRT manufacturers and sellers. In any of these other lawsuits has Rare Breed or ABC filed for injunctive relief, either a preliminary injunction or a temporary restraining order?

A Yes, sir.

Q In any of these lawsuits was the injunctive relief you requested denied by the court?

A Not yet, no, sir.

Q We heard testimony yesterday about the reputational harm that Rare Breed has suffered.

A It's significant.

Q You testified that followers of Mr. Hoffman's YouTube channel have spoken negatively about Rare Breed and

you. Is that correct?
A Negative doesn't even come close.
Q You testified that you have received death threats?
A Numerous.
Q How --
A I mean, even as recent as the last few days.
Q How do you know that the people who you allege did these things are followers of Mr. Hoffman's channel?
A Because they do it in his group, in the group in Facebook that he participates in, that is named after him. It is absolutely -- takes place in his group.
Q Are you aware of whether Mr. Hoffman has asked or directed any of his followers to do these things?
A As a matter of fact, I've seen him thank -- thank his followers in a YouTube statement for being negative to us, that is correct.
Q Thank them after they were negative?
A That is correct.
Q Are you aware of whether Mr. Hoffman asked anyone to be negative before they were negative?
A No, I am not aware.
Q Okay. Have any of these third parties indicated that they are unhappy, displeased——I know that's an understatement——with you or with Rare Breed because Mr. Hoffman is selling his Super Safety devices?

A I need you to ask that question again.
Q Yeah.
A And be very specific, please.
Q What I'm asking is, have any of these third parties who have spoken negatively about you or Rare Breed, have any of them indicated that the reason that they are displeased is because Mr. Hoffman is selling his Super Safety devices?
MR. CAMMACK: Objection. Form. Objection, Your Honor. Mr. Hoffman is under a temporary restraining order. He is not -- or should not be selling the devices.
THE COURT: Do you want to rephrase the question?
MR. HORTON: Sure.
BY MR. HORTON:
Q Have any of these third parties indicated to you that they are displeased with Rare Breed or with you because Mr. Hoffman has in the past sold or offered to sell his Super Safety?
A I apologize, and I'm not trying to be argumentative. I really, truly don't understand the basis for your question. Are you asking if they are unhappy with Rare Breed because he is selling a product or wants to sell a product?
Q That's what I'm asking.
A No.
Q Okay. Thank you. Have any of these third parties told you that they are unhappy with you or with Rare Breed

because Mr. Hoffman is making the CAD files for his Super Safety devices -- or because he had made the CAD files for his Super Safety devices available for download?

A Once again, it's literally just the opposite of that. "#CantStopTheSignal. No matter how many times you litigate, you can't stop him from doing this." They're just going to keep attacking me because of the narrative that Mr. Hoffman puts out that we have no valid claims and that we maliciously filed patent infringement actions.

Q So, stated differently, these third parties are expressing their displeasure that you are suing Mr. Hoffman?

A That we enforce our patent rights. They are displeased that we enforce our patent rights after the defendant puts out the narrative that we have no valid claim.

Q And they think that that's unfair?

A Sure.

Q Okay. Yesterday we discussed in this hearing the settlement agreement that was entered into between Rare Breed and U.S. -- and the U.S. Department of Justice. Do you recall that?

A I do.

Q Who negotiated this agreement on behalf of Rare Breed?

A I did.

Q Did you have the assistance of counsel at the time?

A I did.
Q Who were your attorneys?
A Jonathan Shaw helped me with that.
Q Okay. Who negotiated the agreement on behalf of the Department of Justice?
A I mean, about two dozen attorneys.
Q Okay. Can you name any of them?
A No. None of their names are immediately coming to mind, except for the chief counsel for the ATF, Robert Leider, was there as well. So I do remember that name. But, then, to be honest, there were about two dozen attorneys sitting on the opposite side of the table from me, and I don't remember any of their names.
Q Okay. You testified, or I believe you testified, that under the terms of the settlement agreement one of the obligations of Rare Breed is to enforce its patent rights against third-party manufacturers of FRTs. Is that correct?
A So long as we have a good faith belief that the particular device infringes one of the patents we have exclusive rights to.
Q Okay. And that is during the life of United States Patent Number 10,514,223. Is that correct?
A That is correct.
Q Okay. Did you bring this lawsuit against Mr. Hoffman and Hoffman Tactical to fulfill your obligations

under the settlement agreement?

A We have filed, I think I stated yesterday, 20 or more patent infringement actions. Obviously as a company we need to enforce our own patent rights, but we also have that as a requirement to our agreement.

Q You testified --

A Spec- --

Q Go ahead.

A Specifically, with so many infringing companies to deal with right now, that landscape changes on an almost daily basis, you know, new infringers pop into the market, we need to assess that, are they small, are they large. And being that Mr. Hoffman is responsible for -- I'm estimating here, but I'd say 80 to 90 percent of the infringers on the market, because almost all of them sell the Super Safety which he provided the files for, it -- it only makes sense that we're here.

Q Okay. Is one of the motivations of Rare Breed for bringing suit against Mr. Hoffman and Hoffman Tactical its obligations under the settlement?

A Of course that's a factor.

Q Okay. You testified that at the time the ATF was trying to rule that FRTs were illegal machine guns, that they -- and I'm not sure if I understand this correct, so please correct me if I'm not right -- they advised you that if

you attempted to assert your FRT patents against anyone else, they would consider that a violation of ATF regulations. Is that correct?

A You just said "a violation of ATF regulations." I want to be very clear when I answer this.

Q Yes.

A AUSA Michael Blume that works in the Eastern District of New York, he headed up the case in the Eastern District of New York against me and Rare Breed Triggers and the other parties. In no uncertain terms, he expressed, not only to me but to counsel, that they would see it as a violation of the injunction if we were to enforce our patent rights while we were enjoined. That is quite a bit different than the question you asked, but I want to make sure that this answer is very clear.

Q That's okay. That's okay. I appreciate it. And you testified that in light of that indication you did not want to risk running afoul of the injunction in that case. Is that correct?

A I absolutely do not want to find myself on the wrong side of a court and being found in contempt. So there was absolutely no question as to whether or not we were going to honor that injunction.

Q Okay. I believe yesterday one of the phrases that you said was, "No way I'm going to take that risk." Does that

sound familiar?
A I think it's reasonable to say I'm not going to risk being found in contempt when a court has specifically told me -- or enjoined me from -- from doing something.
Q Is it fair to say that there is also a risk associated with not bringing suit against a manufacturer of an FRT pursuant to the settlement agreement?
A I feel like you're trying to suggest I should have weighed the risk and possibly violated a court-ordered injunction.
Q That's not what I'm saying at all. What I'm asking is, the settlement agreement requires that you file suit against third-party manufacturers of FRTs. Is that correct?
A The settlement agreement came at the same time that injunction was lifted.
Q Mm-hmm. (Moving head up and down.)
A So I'm having a hard time following your -- your logic here.
Q Let me ask another question. If the U.S. Department of Justice determines on their own that one of the third-party manufacturers of FRTs they believe does infringe one of your patents and you determine on your own that it does not infringe one of the patents, is there a risk that you could get in trouble with the DOJ under the settlement agreement?
A You're asking me some wildly hypothetical questions

that require me to speculate. I'm not even sure how to address that question. If you want to simplify it, maybe I can. But --

Q Okay. I'd like to move on to the United States government's statement of interest that was filed with the Court in this matter. According to the statement of interest, the settlement agreement served to settle three different lawsuits. Is that correct?

A Can you name those lawsuits for me, please?

Q I believe those lawsuits were *United States v. Rare Breed Triggers, LLC*, Case Number 23-CV-369 in the Eastern District of New York.

A Okay.

Q *United States v. Miscellaneous Firearms and Related Parts and Equipment*, listed in Exhibit A, Case Number 23-CV-17 in the District of Utah.

A Okay.

Q And *National Association of Gun Rights, et al., v. Bondi*, which had previously been *NAGR v. Garland*, Case Number 23-CV-830 in the Northern District of Texas.

A Okay.

Q Are those the three lawsuits?

A Yes, sir.

Q Okay. Are you familiar with the name David Warrington?

A I am.
Q Did David Warrington represent Rare Breed Triggers in the Eastern District of New York case?
A Early on he did.
Q Are you aware whether David Warrington assisted in establishing the National Association for Gun Rights?
A He is a founder of NAGR, that is correct.
Q Are you aware whether David Warrington ever served as the National Director of the Young Americans for Freedom organization?
A I'm not familiar.
Q Are you aware whether David Warrington ever served as the chairman of the Virginia chapter of the National Federation of Republican Assemblies?
A I am unaware.
Q Where does David Warrington work now?
A He's in the White House.
Q Is David Warrington currently serving as White House counsel?
A Yes, sir.
Q (Moving head up and down.) Do you know when David Warrington was appointed to White House counsel?
A Not specifically. Not after he recused himself and left us in the Eastern District of New York.
Q Do you know whether it might have been in

December of 2024?
A I don't know.
Q So David Warrington served as Rare Breed's attorney in the *United States v. Rare Breed Triggers, LLC*, case in the Eastern District of New York, and David Warrington is now White House counsel?
A I feel like you're trying to suggest something improper has happened.
Q I'm merely asking a question. Am I correct?
A You are correct. He was our counsel in the Eastern District of New York, he withdrew, someone else from his firm stepped up to take over, and he moved into the White House.
Q And Mr. Warrington was serving as White House counsel at the time Rare Breed entered into the settlement agreement with the U.S. Department of Justice on May 9th, 2025?
A He's still in the White House.
Q At the time Mr. Warrington represented Rare Breed in the Eastern District of New York case, he worked for a law firm called Dhillon Law Group. Is that correct?
A That is correct.
Q Does anyone else from Dhillon Law Group now work for the U.S. government?
A Harmeet Dhillon is now in the DOJ in the Civil Division, and I believe one other attorney is, also. I can't

think of his last name right now. Gary Lawkowski has also moved into the White House. I'm not sure if there's anyone else.

Q Are you familiar with Harmeet Dhillon, the founder of Dhillon Law Group?

A I just told you she went to the Department of Justice and works in the Civil Division now.

Q Okay. So she is now -- I believe it's U.S. Assistant Attorney General for the Civil Rights Division at the United States Department of Justice?

A I'm unaware.

Q Okay. Do you know -- let me start over. Are you personally acquainted with anyone who works for the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives?

A "Personally acquainted," can you define that?

Q Do you know anyone, outside of your professional life, that works there?

A No, sir.

Q Do you know anyone in your professional life that works there?

A Well, I've had to negotiate the settlement agreement with Robert Leider of -- as he was one of the individuals. He's chief counsel for the ATF. So of course I've had to have dealings with him. And then of course I've had to be in a courtroom with quite a few individuals from ATF over the past

few years.

I mean, if you're asking if I have any kind of a relationship, no, I don't think I've ever, ever picked up the phone and called somebody from the ATF and said, "Hey, Buddy, you want to grab lunch?" or even had a professional conversation with them. The relationship that I feel like you're suggesting is that it -- I mean, there isn't one.

Q Other than Harmeet Dhillon, are you acquainted with anyone who works for the United States Department of Justice?

A I mean, I don't -- I wouldn't even say I'm acquainted with Harmeet Dhillon. I've spoken to her once in my life. So I don't really know her. And, no, I don't believe I know anyone that works for the DOJ.

MR. HORTON: I have no further questions.

THE COURT: Redirect?

MR. CAMMACK: Thank you, Your Honor. May it please the Court.

Give me just a moment to get organized here.

(Brief pause.)

REDIRECT EXAMINATION

BY MR. CAMMACK:

Q Mr. Horton asked you, Mr. DeMonico, about license agreements regarding forced reset triggers. Do you recall that -- those -- that line of questioning?

A I do.

Q Are you aware of any licenses related to forced reset triggers other than the licenses that are between Rare Breed and ABC?
A No. I don't think any license agreements can even exist, being that we're the only -- I believe we're the only company that have access to any forced reset trigger patents in the first place.
Q He also asked you if there were any -- any of your motions for preliminary injunction in any of the other lawsuits had been denied. Do you remember that question?
A I do.
Q Have any been granted?
A One. One comes to mind, yes.
Q Do you recall which case that was?
A It -- I don't want to violate a confidentiality cause. I need to make sure that I can answer this question. Is it okay if I ask counsel if it's okay to answer this question?
MR. CAMMACK: Your Honor, can we mark this portion of the transcript as confidential?
Let me rephrase. Your Honor, I move to mark the answer to this question as confidential.
THE COURT: Well, there are people in the courtroom.
MR. CAMMACK: Your Honor, everyone in the courtroom is affiliated -- everyone in the gallery is affiliated with us

or court staff or opposing counsel. If the Court orders it confidential, I assume that defendants would hold -- hold the answer as confidential.

THE COURT: As you know, there is a long tradition in this country of having open courts, and the case law, including from the Supreme Court, says that. I think you have to make a showing to demonstrate why the public should not have access to it. I don't think a request is sufficient.

A I can answer it this way. We have gotten a preliminary injunction against a group of companies I'll call the big daddy group. That was granted. That ended up turning into a permanent injunction with a consent judgment and a confidential settlement agreement.

We are now back in federal court with them and have moved to arbitration. The defendants in that case have posted a statement on their website stating that they are now enjoined again as an order from the arbitrator.

Q Thank you. In the 20-plus cases that you've testified that Rare Breed has initiated since the May 9th, 2025, settlement, has the Bureau of Alcohol, Tobacco, and Firearms or the DOJ filed a statement of interest in any of those cases?

A No, sir. This is the first.

Q In terms of -- were you involved in any way in the -- was Rare Breed involved with the decision to seek a

statement of interest by the DOJ?
A No, sir.
Q Mr. Horton also asked you about the requirement to file a lawsuit. Does the settlement agreement require you to file a lawsuit against someone who sells a forced reset trigger that Rare Breed believes has no merit?
A No. No. I think we have to have a good faith belief that the infringing device or what we believe to be the infringing device infringes one of our patents. I think we would be opening ourselves up to significant liability and litigation if we were to bring frivolous or malicious patent infringement actions against individuals.
Q Other than the settlement agreement, the language of the settlement agreement between Rare Breed and the ATF, are there -- has the ATF offered Rare Breed any other incentives for filing patent infringement lawsuits?
A The ATF has offered us zero incentives.
Q How would you describe the current relationship between Rare Breed and the ATF?
A We really don't have a relationship, but I do not believe that they are even happy that we are in the business of forced reset triggers, if we're just being transparent.
Q So in terms of the questions regarding Mr. Worthington and Ms. Dhillon and Mr. Lawkowski, Mr. Worthington -- of those three, were you -- you testified

that Mr. Worthington was involved as your counsel prior to leaving for White House counsel?

A That is correct.

Q Were either Ms. Dhillon or Mr. Lawkowski involved in the Rare Breed case in the Eastern District of New York?

A Absolutely not.

Q After Mr. Worthington --

A Can I stop you? It's Warrington --

Q Warrington?

A -- so that we get it right in the record.

Q Sorry. Apologies. After Mr. Warrington left the Dhillon Law Group for the White House, did he have any further involvement whatsoever in the case between the DOJ and ATF in the Eastern District of New York?

A Absolutely zero.

MR. CAMMACK: I'll pass the witness, Your Honor.

THE WITNESS: Is -- may I just say something, something that I'd like to answer? It's a bit of an answer to a question that I'd like to expand on. Is that okay?

MR. CAMMACK: Your Honor, I'll withdraw my "pass the witness."

BY MR. CAMMACK:

Q Is there anything else that you would like to inform the Court about?

A I do not believe that Mr. Hoffman has instructed his

followers to make death threats against me. I will say that honestly. But he has tens of thousands of followers that do follow him. And with the narrative that he pushes that we bring malicious and frivolous patent actions against people, crazy people do what crazy people do, and it turns into a mob mentality.

And I will tell you that my wife is petrified for my life and her life and our children's lives because crazy people do what crazy people do. And it only takes one crazy person to show up at a place like Shot Show, where I received numerous death threats of stabbing me, shooting me, checking to see if I wear Level 4 plates. We know what that means. It means if I'm wearing an armored vest.

I would like to point out that Mr. Hoffman has done nothing to speak to his tens of thousands of followers to tell them to settle down and let us handle this in the court. So by not speaking, I would say it is maybe not encouraging but it is allowing his followers to continue this behavior.

I am a professional. This is business. I wish we weren't here, but this is where we are. And to have followers threaten my life is -- it's gone too far, and this is -- this is too much.

Q Anything else?

A That's it.

MR. CAMMACK: Pass the witness, Your Honor.

THE COURT: Okay. You may step down.

THE WITNESS: Thank you, sir.

(Witness excused.)

THE COURT: You may call your next witness.

MR. CAMMACK: Your Honor, Mr. Bellamy will take the next witness, if it pleases the Court.

MR. BELLAMY: Your Honor, the plaintiffs call Brian Luettke.

MR. HORTON: Your Honor, we object, respectfully, to Mr. Luettke being called as a witness in this proceeding. Mr. Luettke was -- we were informed five minutes before the hearing started yesterday that Mr. Luettke was going to be called as an expert witness to testify. The only thing we were given five minutes before the proceeding was a copy of this person's CV. We have been provided no report, no summary of testimony as to what he will be testifying to. We've been provided with no data considered, facts considered, or analysis conducted pursuant to the expert rules. We respectfully move to exclude Mr. Luettke's testimony on the grounds that it is both untimely and constitutes unfair surprise.

MR. BELLAMY: We offer the opportunity to voir dire -- excuse me, voir dire this witness if they would -- if that would be helpful to them.

(Brief pause.)

MR. HORTON: And, Your Honor, if I may say, voir dire

regarding what? We've been given no indication at all as to what he may testify to.

MR. BELLAMY: Your Honor, I can put the witness on the stand and -- and have him explain what it would be that he would testify to before doing so, and then they can voir dire at that point if they wish.

MR. HORTON: Your Honor, testifying on the stand does not constitute proper notice. That is the definition of unfair surprise.

MR. BELLAMY: Your Honor, I don't want this to turn into a banter, but there was no requirement for witness lists. You know, we didn't say that we were going to call Mr. DeMonico, either. But obviously we needed to put on our evidence justifying a preliminary injunction. Part of that is the likelihood of success on the merits, and that would be to have an expert witness explain that the elements of the claims are found in the accused and therefore, you know, there is -- we put on our -- we have to put on at least a preliminary case of infringement, Your Honor, and that's what we would be doing.

MR. HORTON: Your Honor, the rules regarding fact witnesses are different than the rules regarding expert witnesses. Rule 26 requirements for disclosure ahead of time don't apply to the fact witnesses but they do apply to expert witnesses. Plaintiffs would have had to have known before five minutes before the hearing yesterday that they were going to

bring an expert witness to testify. And they provided us with absolutely no warning, no notice whatsoever.

MR. BELLAMY: I believe the Rule 26 requirements apply to trial and not to preliminary proceedings such as this.

(Brief pause.)

MR. BELLAMY: Also did not receive any objection yesterday after informing them that we intended to call Mr. Luettke.

MR. HORTON: Our objection is timely, Your Honor, their disclosure of their expert witness is not.

MR. BELLAMY: I would respectfully submit the question of -- to present our evidence of infringement, this is the only logical approach.

MR. HORTON: Your Honor, they submitted --

MR. BELLAMY: Someone has to testify.

MR. HORTON: Your Honor, they submitted a claim chart in their moving motion.

MR. BELLAMY: If they'll stipulate to the claim chart, then that's fine, we'll accept that as our evidence. I'm not sure how they're going to cross-examine it, but...

(Brief pause.)

MR. BELLAMY: As I said, if the claim chart is to be unrebutted, we'll accept that.

THE COURT: This is an issue I don't think that I have seen before. I think there are some important points to

keep in mind. One is, this is not a trial. And the Rules of Civil Procedure mainly address trial and preparing for trial and what happens after a trial. One of the issues in this case is whether the patents asserted are valid or there's some reason the Court should not at this point assume that they are valid. And obviously what the Court is doing is preliminary. Ultimately a decision will have to be made after a full trial on the merits here.

The purpose of the notice requirement for experts is so that both sides will be fully prepared to address the issues in the expert's opinion. And oftentimes experts are talking about a subject that is not within the ken of most people without some type of preparation.

Here, the parties have discussed at length the merits and the contents of the patents at issue and the technology. So I don't think that whatever this witness would have to say is going to be much of a surprise in terms of the technology and the subject of the witness's expertise. Aside from the rules and apart from the rules, it also would be extremely beneficial to the Court, in trying to make this initial determination of validity, to hear from someone who has more knowledge than the Court has on the subject.

So the Court is going to permit the witness to testify. If defense would like more time to cross-examine the witness, the Court of course would allow that. I'm not

suggesting this, but another option would be to continue the TRO until such time as counsel are prepared to move forward with the witness. I think it would be very beneficial to the Court to hear from the witness. I don't have to hear from the witness now. I have to hear from the witness at some point, though, to assist the Court in making a rational decision.

So I think the options are that we can just put this off, and I'm not sure how long it would take for counsel to become comfortable with the witness, or we can go ahead and now, and if there's a need for additional time, the Court will grant that additional need. Under both scenarios, though, the temporary restraining order would have to be extended. Does that make sense?

MR. HORTON: Yes, Your Honor. Give me just a second.

THE COURT: You may.

(Off-the-record discussion between defense counsel.)

MR. HORTON: Your Honor, would it be okay with the Court if we allow the expert to go ahead and testify on direct today and then if we need more time to cross-examine him bring that back up with the Court at that time?

THE COURT: I think that's what the Court -- that was one of the options that the Court presented.

MR. HORTON: That's what we'll do, Your Honor.

THE COURT: Does that sound fair to the plaintiffs?

MR. BELLAMY: That's acceptable.

THE COURT: Okay. Let's proceed, then.

(Brief pause.)

(The witness was duly sworn.)

BRIAN LUETTKE,

called as a witness at the instance of the plaintiffs, having been first duly sworn, was examined, and testified as follows:

DIRECT EXAMINATION

BY MR. BELLAMY:

Q Can you please state your name for the record, sir.

A Brian Luettke, L-U-E-T-T-K-E.

Q And what is your current occupation?

A I'm a consultant with Luettke Firearms Consulting, Incorporated.

MR. BELLAMY: Your Honor, I'd like to present a copy of Mr. Luettke's curriculum vitae, which was provided to defendants' counsel yesterday.

THE COURT: It's accepted.

(Plaintiff's Exhibit 1 was received into evidence.)

BY MR. BELLAMY:

Q Mr. Luettke, can you identify the document you've been handed?

A Yes. This is my current curriculum vitae.

Q Can you tell me, how long have you worked in the firearms field?

A For over 25 years.


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 43 of 145 PageID #: 539

Q And did you previously work at the ATF?
A Yes, I did.
Q What did you do there?
A So I worked for ATF for 22 years. I retired in October of 2020. For the first 16 years of my career I was a special agent doing criminal investigations, testifying in court, teaching. In 2014 I was promoted to supervisory special agent for the position of Resident Agent in Charge. I held that position for two years until ATF created a full-time training position in the Firearms and Ammunition Technology Division. I ended my -- the last three years of my career as the branch chief of the Advanced Firearms and Interstate Nexus Branch.
Q As branch chief what were your responsibilities?
A The role of -- or my job was to run, manage, teach the interstate nexus training course, which is a advanced-level training course offered to ATF special agents that teaches them how to -- it's an advanced-level course that teaches them how to examine, research, classify firearms. They have to complete the course before ATF will put them forward as an expert witness.
Q And I see in your curriculum vitae that you were responsible for ATF's national reference collections. Can you explain what that is?
A Yes. One other thing I'll add to the last answer

was, I also supervised -- I had a staff, training staff, and I also supervised ATF's armorers, who take -- who order firearms and maintain and replace parts on firearms.

One of my other duties as the chief was to maintain the collection, the reference collection, which contains over -- well over 10,000 firearms. Those firearms are used for assistance, assisting the firearms enforcement officers with classifications if they need to compare firearms. Also we use them as training aids in the nexus course. And also that's where the undercover prop guns come from.

Q Have you received training at firearm manufacturing facilities?

A Yes. I've been to over 40 firearms manufacturers, where we would meet with the representatives, basically get a tour of their manufacturing facility, learn about how they make firearms, their different components. Some of these are the big name companies in the United States such as Colt Firearm, Smith & Wesson, Ruger, SIG Sauer.

I also had the ability to travel, and I went to Excaliber Firearms in South Africa, Glock in Austria, Walther and Heckler & Koch in Germany, FEG in Hungary, as well as Colt Firearms in Canada, their manufacturing facility in Canada.

Q Since leaving the ATF, what type of work have you performed?

A Well, I teach a firearms identification class to law

enforcement, primarily in Michigan. I'm also a -- I consult with various attorneys, mainly, industry members, regarding firearms identification, firearms classification, operability, mechanical operation of firearms, machine guns, and things like that.

Q Have you previously testified as an expert witness?

A Yes, I have.

Q How many times?

A Approximately 38 times, primarily in federal court, a couple of times in state court.

Q And so in what subject areas have you testified as an expert?

A Firearms and ammunition identification, the interstate nexus of firearms and ammunition, firearms operability, machine guns, short-barreled rifles, shotguns, the mechanical operation of firearms, firearms technology, training and tactics, and forced reset triggers.

Q Have you previously provided testimony in cases involving forced reset triggers?

A Yes, I have.

Q Can you tell me what those involved?

A The two cases in particular, one was in Orlando, federal court in Orlando, Florida, and the other one was in Brooklyn, New York.

Q Okay. Have you also testified in criminal cases

involving forced reset triggers?

A No. I've consulted on those cases, but they've been settled.

Q Okay.

MR. BELLAMY: Your Honor, based on this testimony and his curriculum vitae, I'd like to move to qualify Mr. Luettke as an expert witness.

THE COURT: The Sixth Circuit——and as far as I know it's the only circuit that has done that——said it is improper and misconduct for a judge, a district court judge, to accept a witness as an expert in any field. So it's the practice in the Sixth Circuit to not acc- -- not certify an expert or even acknowledge an expert witness but just to let the attorneys question the witness. And if the defense feels that the witness is testifying outside of his competence, then the Court will address the issues.

The cases are out there if you'd like to read them. You may have a better understanding of the rationale for them than I do. I grew up with that practice, that you qualified the witness, then you asked the Court to certify the qualification, but that's not the way we do it in the Sixth Circuit.

MR. BELLAMY: Very well. I understand.

BY MR. BELLAMY:

Q Mr. Luettke, were you asked to provide expert

opinion in this case?
A Yes.
Q And what were you asked to analyze, what product?
A I was asked to analyze the Super Safety offered by Hoffman Tactical and determine whether or not it met the limitations of the patent claims, limitations of the patent claim.
Q And how did you examine that product?
A Well, I've physically handled a Super Safety not installed in a firearm, I've examined one in a firearm, and I've also test-fired a Super Safety.
Q In a firearm, I assume?
A Yes.
Q Can you briefly explain the distinction between a traditional semiautomatic trigger and how it works and a forced reset trigger and how it works?
A Yes. So in a forced reset trigger, the trigger -- the hammer is pushed down -- after the gun is fired, the hammer is pushed down, interacts with the trigger, which is --
THE COURT: And the hammer is inside of the body of the weapon.
THE WITNESS: Correct.
A The hammer is pushed down and touches the trigger, forces the trigger to reset. The locking member is moved into place, and it locks the trigger in a forward position, which

is the reset or the safe position, so it cannot be pulled, it's mechanically reset to a forward position.

In a semiautomatic firearm, the firearm is fired, the bolt carrier starts to move rearward, it hits the hammer, the hammer catches or is caught on the disconnector, which is also inside the firearm, and is held into place until the shooter releases pressure with their index finger, their trigger finger, it's usually called, to reset the trigger to a forward position.

Q You said that the hammer touches the trigger and forces it to reset. Are there other designs that -- where something other than contact by the hammer are what cause the -- force the reset?

A On a forced reset trigger?

Q Yes.

A I'm only familiar with the forced reset trigger being forcibly moved to a force -- to a reset position.

Q Well, when the bolt carrier or whatever part of the action cycles --

A Yes.

Q -- are you familiar with those that involve a cam that does the reset?

A Yes. I thought you were looking for more of a generic answer. Yes, so the cam -- in this particular instance, the Super Safety has a cam, which is the selector

switch, the safety selector, it has a cam, and that rotates into position, which forces a reset and locks the trigger.

MR. BELLAMY: May I turn this on?

(Brief pause.)

BY MR. BELLAMY:

Q Mr. Luettke, I've put on the screen here a chart that was part of the defendants' responsive brief, an exhibit to that. Have you seen this chart before?

A Yes.

Q I believe this was shown yesterday. Do you -- were you here to see that, too?

A I did -- I was not in the courtroom.

Q Okay. This shows several different things here, in three columns. The first column lists the claim language from -- looks like this is Claim 15, it says, even though it's marked as Claim 1, but Claim 15 as the -- of the '247 patent, do you see that in the left-hand column there?

A Yes, I do.

Q Okay. In the right-hand column there is an image that shows the -- a firearm with a Super Safety installed. Is that correct?

A That's correct.

Q Okay. I'd like to just go through the claim language here with you briefly. Does this involve a firearm trigger mechanism? Is a Super Safety involved in a firearm

trigger mechanism?
A Yes.
Q And does that mechanism -- when the safe- -- when the Super Safety is installed, does it include a hammer?
A Yes, it does.
Q And does that hammer have a sear catch?
A Yes.
Q And does it have a hook for engaging a disconnector?
A Yes.
Q And is it adapted to be mounted in a fire control mechanism pocket?
A Yes.
Q And is that fire control mechanism pocket in a receiver when it's installed?
A Yes, it is.
Q Does the hammer pivot on a transverse hammer pivot axis between set and release positions?
A Yes.
Q And is the hammer adapted to be pivoted rearward by rearward movement of the bolt carrier?
A Yes, it does.
Q When installed does it also include a trigger member?
A Yes.
Q Does that trigger member have a sear?

A Yes.
Q And is it -- that trigger member adapted to be mounted in the fire control mechanism pocket?
A Yes, it is.
Q And does -- is it -- the way it's mounted, does it pivot on a transverse trigger member pivot axis?
A Yes.
Q And is that pivot between set and release positions?
A That's correct.
Q Are the sear and sear catch in engagement in a set position when the hammer and trigger are in their set position?
A Yes.
Q And are the sear and sear catch out of engagement when they're in their release positions?
A Yes.
Q This also speaks to a disconnector. It says, "The disconnector has a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket." When installed, does this assembly include a disconnector so mounted?
A Yes.
Q And does that disconnector pivot on a transverse disconnector pivot axis?
A Yes.

Q And when a Super Safety is installed, is there a cam, does it include a cam?
A Yes. It's the safety selector, yes.
Q And does that have a cam lobe, and is it adapted to be moveably mounted in the fire control mechanism pocket?
A Yes. Correct.
Q So in the standard semiautomatic mode -- well, let me first ask you, the Super Safety that you examined, how many modes of operation is it operable in?
A It's operable in two modes. There's safe, which doesn't operate it, it locks it so it doesn't -- cannot fire, and then there's semiautomatic, and then FRT mode, forced reset trigger mode.
Q So it has what's been referred to as three positions but two modes of operation since the third one is safe. Is that what --
A That's correct.
Q So in a standard semiautomatic mode, this says the cam is in the first position. What does that mean to you?
A In the first position means that it's forward and it's ready, it allows the person to pull the trigger, it's not locked. First position is forward.
Q Okay. Does the cam stay in that position the entire cycle?
A No.

Q Okay. So it goes on to say, "Rearward movement of the bolt carrier causes rearward pivoting of the hammer." Does that happen?
A Yes.
Q Okay. "And it's such that the disconnector hook catches the hammer hook." Does that happen when fired in standard semiautomatic mode?
A Yes, in semiautomatic it does, yes.
Q Okay. "And thereafter the bolt carrier moves forward into battery." Is that the rest of the cycle?
A Correct.
Q And it goes on, "at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set position." Can you explain what that means?
A Yes. So in the semiautomatic mode, the hammer inside is caught on the disconnector. The disconnector -- so a person, after they pull the trigger and the gun cycles, a person can -- is holding onto the trigger because they just pulled the trigger. And it's up to the person, the shooter, to release pressure. You can hold it for a second, a minute, five minutes, however long you want to. It's up to the person, because of spring pressure and human input, to release pressure on the trigger to a reset position, which then allows them to pull the trigger again.

Q So they can't pull the trigger again until they release it and allow it to go back to the set position?

A The set position with the sear engagement, yes.

Q Okay. So this goes on to say, "whereupon, in forced reset semiautomatic mode." That's the other mode that you spoke of?

A Yes.

Q And it said, "said cam is in said second position." Does the cam begin in the second position?

A No, it's -- it cannot start in the second position because when the cam is in the second position that is a locked position. In other words, you can't pull the trigger in a locked position, or in the Safety -- in the Super Safety it would be on, like, a safe position. In its normal FRT mode, semiautomatic FRT mode, it's often referred to as a locked position. So the second position is the rear locked position.

Q But does it need to go through the second position to operate in the forced reset mode?

A Well, it starts in the first, and then during the cycle of operation it will go to the second and then move back to the front, to the first.

Q It goes on to say, "Rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook is prevented from catching the hammer hook."

Can you explain that --
A Correct.
Q -- to us?
A Yeah. So in the FRT mode the hammer does not get caught on the disconnector, it's a mechanical operation, which mechanically forces the reset on the trigger, there's no shooter input like I described as far as pressure, the index or trigger finger holding the -- the trigger. In the FRT mode it's mechanical, it happens automatically, it's not up to the shooter input to release the trigger, it's -- their finger and trigger are forcibly moved to a front position.
Q Can the disconnector and the hammer hook contact each other during this cycle in forced reset mode?
A Yes.
Q Okay. So if they contact each other, is that catching the hammer?
A Not catching as described -- as I previously described. It passes by it. It might hit the hook. The hammer might hit the hook on the disconnector. The way to describe it would be, if -- I spent 29 years in law enforcement, so if I'm chasing somebody and I grab their arm but I just barely grab it and they pull away, I didn't catch them, or since we're coming to the tail end of football season, if the quarterback throws the ball to a receiver and the receiver's hands touch the football and then drops it,

it's not a catch. So I'd say the same analogy applies to the disconnector on the forced reset, it might touch it, but it's not caught as traditional semiautomatic operation of the firearm.

Q So in the context of talking about a standard semiautomatic mode and forced reset mode, what is the effect of catching the hammer, of the disconnector catching the hammer?

A Well -- can you repeat your question, please?

Q Well, in -- in the standard semiautomatic mode, what is the effect of the disconnector catching the hammer?

A Well, it catches the hammer so there isn't a machine gun type fire, because if the hammer does not catch on the disconnector, the hammer would continue to move and would be -- be classified as a machine gun. It's also oftentimes called hammer follow. So in a semiautomatic that disconnector catches the hammer so it cannot continue to move back and forth.

Q So it has to stop the hammer. Is that correct?

A Yes. And like I testified earlier, you know, it catches on the disconnector on the semiautomatic mode, and it's up to the shooter to release pressure, and they can hold on to it for a minute, five minutes, a second or two, but it's up to -- it's shooter input that releases it.

Q So the -- the claim language continues here, "and

thereafter the bolt --" this is in the forced reset mode, "and thereafter the bolt carrier moves forward into battery, at which time the user can pull the trigger member to fire the firearm." How is that different from in the standard semiautomatic mode?

A Because it's not catching on a disconnector, the hammer is being pushed down, the firearm is moving to a locked position -- well, when the hammer is pushed down, it touches the -- the trigger, which forces it -- mechanically forces it to a reset forward position, this is happening very fast, and it goes into a locked position while the bolt carrier continues to move to the rear.

Q So going back to the -- in the standard semiautomatic mode, it says, "at which time a user must manually release said trigger member to free said hammer from said disconnector." Is that the contrast that you're speaking of?

A Yes, "manually release." I use the words, you know, "shooter input." They have to -- the person has to physically release the pressure on the trigger manually by their finger to allow the firearm to reset.

Q So you said that you saw this chart that the defendants included as an exhibit in their response, and in that they assert that with the Super Safety the disconnector is not prevented from catching the hammer hook. Is that true?

A Yeah, I don't think that -- I don't believe that's accurate at all, because in the Super Safety it resets -- it forcibly resets like the other forced reset triggers. When I test-fired it I had no shooter input involved in the -- in the reset of that trigger. That trigger functions very fast -- resets very fast, I should say, which allows a person to shoot the trigger. There was no human input to release pressure on the trigger to take the hammer off the disconnector.
Q In the claim chart, in the third column is a description of what we've been referring to as the '723 patent. Did you see that?
A Yes.
Q Would it be fair to say that the '247 patent is a three-position version of the '723 patent?
A Yes.
Q So in the Super Safety, what is it that causes the trigger to be forced to the reset position?
A It's the lower -- the lower circular part in yellow. So when the bolt carrier strikes the hammer, you can -- and the hammer is in red, it touches -- may touch the pointy part of the disconnector in orange. As the bolt carrier continues to move to the rear, that cam, the safety selector, in yellow, will rotate, and that's putting pressure on the trigger, which is in brown, which forces it forward.

Q I'd like to play an animated image of this -- or animated version of this image here, if I may, and ask you to --

THE COURTROOM DEPUTY: Where are you playing that from?

MR. CAMMACK: You can put it on mine. I'm connected here. (Indicating.)

THE COURTROOM DEPUTY: Are you hooked up over there?

MR. CAMMACK: Oh, I'm sorry. I had -- there we go. Sorry about that.

(Brief pause.)

BY MR. BELLAMY:

Q So, Mr. Luettke, we'll play this animation for you and ask you then to, with it moving, explain, and referring to the parts by name and color so that we can know what you're talking about, and explain to us what's happening as it cycles.

(The video was played in open court, and the proceedings continued as follows:)

A So the hammer was going forward and striking the firing pin. The cycle -- well, it's going to -- if you can just pause it for a minute.

So the hammer went forward, in blue, struck the firing pin in the bolt carrier group, the gun functioned, it's bringing the bolt carrier, which is in gray, darker gray, to

the rear, and -- stop for a second. Right there you can see the -- the hook on the hammer, which is in blue, passing by the disconnector hook, in green, and you can see how the trigger -- stop right there. So the trigger with the purple, you've got two piece, you've got a lever and you've got a cam. Well, the cam struck the rear portion of the trigger, in red, and it forced the trigger to a forward position.

Can you stop for a second?

And can you see on the front portion of the trigger, in red, where it's connecting with the blue hammer, the sear notch is being caught in the hammer's notch for the sear on the trigger. The bolt has conducted its -- its cycle of operation, it's moving to the rear, it's taking the lever with it, and now it's in the second position, meaning that it cannot fire in this position, the trigger is locked. The bolt carrier, in gray, has completed its rearward process and it'll start moving back to a forward position. And the back portion of that bolt carrier, in gray, is going to -- it's going to connect with the top of the lever, in purple, swinging that forward, taking it off safe, chambering a round, the bolt carrier -- or the bolt is. And now the trigger is ready to shoot, or be pulled.

MR. BELLAMY: Can you switch us back to this. Okay.

BY MR. BELLAMY:

Q Mr. Luettke, I'd like to turn your attention to

another chart. This is another one that the defendants provided as an exhibit in their response, and this one relates to the '784 patent. Were you asked to look at the '784 patent, also?
A Yes.
Q And there was some testimony yesterday about this first image here and about the way the colorization of it was at least incorrect. Do you recall that?
A I was not in here during that testimony.
Q Okay. So in this image there's a portion colored orange and a portion colored green. Are you familiar with this structure from the patent drawings?
A Yes.
Q Is there part of this that's orange that should be green because it's part of the locking member?
A Yes. The locking member -- we have the green part at the top, but the locking member continues, it's a two-piece that's connected. So right directly below it's colored orange, and that is not correct, it should be colored green because it's the locking member, it's a complete unit.
Q Would this be a more correct version --
A Yes.
Q -- of illustrating it? (Indicating.)
A Yes.
Q So in a forced reset trigger, there are a couple of

important functions, as I understand what you said. One is that there is something that forces the trigger to reset. And another is that something that causes that trigger to remain locked until the bolt carrier is what we call "back in battery," I think you said, so that it's safe for the trigger to be pulled again. Is that a correct characterization?

A Yes.

Q So let's look at the -- have you compared the language of Claim 1 of the '784 patent to the Super Safety as installed in a firearm?

A Yes. I've test-fired and I've analyzed that trigger, so, yes.

Q So this begins, "In a forced reset trigger mechanism" -- so when installed, is the Super Safety part of a forced reset trigger mechanism?

A Yes.

Q And this claims an extended trigger member locking device. Is that what this -- we were referring to before that was shown in green there? Is that what that means?

A Yes, the green portion, or it should be green.

Q And is it your understanding that the locking device is what locks the trigger from being pulled again too soon?

A Yes, that's correct.

Q So this goes on to say, "a locking member that is moveable between a first position in which it locks a trigger


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 63 of 145 PageID #: 559

against pulling movement --
A Correct.
Q "-- and a second position where it does not restrict movement of the trigger member." Can you just reiterate for us what -- what those two phrases mean.
A First position is when the trigger is locked and -- or that means the first position is where the trigger is unlocked and a person can pull the trigger. And the second position is where the trigger is -- the second position is locked so the person cannot pull.
Q So some patent attorney——maybe I was involved——was involved in writing this claim language. But in the prior patent, we were talking about the cam being in a first position. When it was in the first position there, the trigger was unlocked, correct?
A Correct.
Q And in this patent, though, in the context of this claim, the first position is the trigger being locked. Is that correct?
A That's correct. It's different.
Q So, as confusing as it may be, we need to keep in mind that these two are using opposite terminology of what first and second position means.
A Correct.
Q Okay. It says, "the locking member configured to be

moveably supported by a frame." When the Super Safety is installed, does it provide that locking member function?
A Yes, it does.
Q And is it moveably supported by a frame?
A Yes.
Q What's the frame?
A The part of the firearm that the trigger components go into. Well, in part. It's also what ATF classifies as a firearm. So that would --
Q The receiver.
A Receiver. Frame. Receiver for a rifle. Frame for a pistol.
Q It goes on, "and including a generally upward extending portion configured to make actuating contact with a surface of the bolt carrier." Does the Super Safety have a generally upward extending -- extension portion configured to make actuating contact with a surface of the bolt carrier?
A Yes. It's the lever that sticks up. And we saw it in the video making contact with the bolt carrier.
Q It goes on to say, "such actuating contact causing the locking member to move from the first position to the second position." So what -- in the Super Safety, what moves that lever or the -- the device between first and second positions?
A It would be the bolt carrier striking the lever,

because the lever is attached to a cam or the safety selector, and that is what moves between the safe and the FRT mode, between function.

Q So it goes on to say, "the locking member having a body portion that is moveably supported." Does the Super Safety have a bottom -- a body portion?

A Yes. That would be the cam, the selector switch.

Q "-- and an upwardly extending deflectable portion." Is that -- is that what you said was the lever part that sticks up?

A Yes, the lever.

Q And it says that upwardly extending deflectable portion is separately moveable relative to the body portion. In the Super Safety are those two members separately moveable relative to each other?

A Yes. It's not one solid piece.

Q Not one solid piece, but is it a rigid connection or -- or --

A There's some play in it. There's -- it slides, so there's -- it's moveable.

Q So it's moveable relative to the body portion between an extended position and a deflected position. So is that lever moveable between two positions?

A Yes. The lever's moving.

Q Okay. Does the claim require the parts to be

completely independent of each other?
A No.
Q In the '784 patent -- I'd like to play another version of the animation, if we can, so that you can point out that for us.
MR. BELLAMY: If you would go ahead and play.
This one will play, and then we'll show an enlargement of the Super Safety part.
(The video was played in open court, and the proceedings continued as follows:)
MR. BELLAMY: Okay. If you'll stop there.
BY MR. BELLAMY:
Q Do you see the enlargement that showed up in the lower left corner?
A Yes, on the left, in purple.
Q Okay. So as this continues can you then explain to us what's happening as this continues to cycle? So the -- go ahead.
A So as the bolt carrier's coming to the rear --
Q What happens when the bolt carrier first contacts that lever?
A It moves the trigger into a reset and locked position. And you can see on the -- in the purple cam -- or the -- not cam, but -- well, the cam, but you can see how the lever is moving and there's gaps in there, so it's not rigid.

So that's what I was talking about. So it's moving back and forth, it's resetting, locking it in position. You cannot pull the trigger in this position. It's not until the bolt carrier pushes that lever to a forward position, rotating the cam inside the firearm, unlocking it, and then the trigger can be pulled.

Q The patent shows two different embodiments of a locking member. Are you familiar with -- with those?

A Yes.

Q So, for example, in the prior version we were looking at, this is more of a 3D version. Is that one of those embodiments, as they call it, of the locking member?

A Yes. That's colored in green. The lighter green and a darker green is one unit, but it's -- they can move independently.

Q And in this -- and in this embodiment, how many pivot axes are there that involve that locking member?

A I believe one, at the top, in the middle portion.

Q The one in the middle that's labeled 24?

A Yes.

Q Okay. What about this one that's labeled 20 down here?

A Well, and then the lower portion is what's going to pivot to lock the trigger into place.

Q Okay. So in this version the lower part would --

would that be the body, and this would be the upper extension here? (Indicating.)
A That's accurately stated.
Q Okay. And so then taking -- pulling them apart here, one can see these -- the shape of these. I'll show you this. Do you recognize this as a second embodiment? (Indicating.)
A Correct. Just shaped a little bit different.
Q And in this one you have a body and you have an upper extension. And is the pivot axis for both parts coaxial with each other?
A Yes, that -- the lighter green will -- can deflect from the other portion.
Q Okay. So in the Super Safety is there a body portion that acts to lock the trigger when moved?
A Yes, it's the cam, the selector, safety selector, which is also the cam or the body.
Q And does it have -- does the Super Safety also have an upwardly extending portion?
A Yes, it's the lever portion.
Q And is it capable of at least -- of some separate movement independent of the body?
A Yes. We saw that in the -- in the animation.
Q So if that lever in the Super Safety did not have that amount of play, what would happen as it cycled?

A Well, it would deflect somehow or bend.
Q But the play in there keeps it from bending, having to bend?
A That's my understanding, yes.
Q So one other subject. You said that you had testified as an expert on other FRT cases, you said.
A Correct.
Q And that you had consulted on some criminal cases.
A That's correct.
Q Are there any current cases where someone is being prosecuted for possession of a Super Safety?
A Yes. There's two individuals in Ohio currently facing felony charges.
Q Do you have any knowledge of the ATF's current position on the legality of forced reset triggers?
A Yes.
Q And what is it?
A So I was at the Shot Show——I'm sure it's been described already——last week, and I stopped down at the ATF booth, approached some individuals who I did not know. I've been retired for five years. There were people present at the ATF booth who I knew. But I walked up and I didn't know who the person was and I asked -- it was more tongue in cheek on my part and I asked him, "Are FRTs legal?"
And the person said, "Hold on. You need to talk to"

this other person. So this other person came up, as well as one of the ATF attorneys, and they said that the only FRTs that are legal and covered by the agreement with the government are the Rare Breed triggers, at which point somebody I knew came over and then introduced me to them as a retired special agent. So that's the statement I got from them.

Q In the animation --

MR. BELLAMY: Can you put back up the one with the composite.

(Brief pause.)

MR. BELLAMY: Okay. If you'll run that to where the enlargement comes up.

(The video was played in open court, and the proceedings continued as follows:)

BY MR. BELLAMY:

Q So in that enlargement there, if you'll look at that, is there dead space around the dovetail part of the extension and the dovetail groove? Is there extra space -- I don't know if you want to call it "dead space," but extra space there?

A Yes, I think I referred to it as, like, a free play area where it can move. So it's not -- it's not a tight-fitting -- I mean, it's not super-loose, but it's not rigid, it's not tight in there.

Q And is it your understanding that that's designed into the design?
A Yes.
Q And that it's necessary for optimal functioning?
A Yes, I believe so. It was similar to when I physically handled one outside the firearm. There was play in there.

MR. BELLAMY: If you'll go ahead and run the animation.

(The video was played in open court, and the proceedings continued as follows:)

BY MR. BELLAMY:
Q Can you tell me as this runs, is the hammer caught by the disconnector?
A No. If it was caught by the disconnector, the hammer, in blue, the notch, and if it was caught on the disconnector, in green, the top portion of the disconnector would have caught the hammer so it didn't continue to move, it would have -- right -- well, back it up slightly. Right there. About there. In a normal firearm that's the position when a hammer is caught by the disconnector, it's caught, it's -- it stays there until the person, the shooter, releases pressure.

On this -- on this animation you can see that when the hammer is -- is being pushed down by the bolt carrier,

it's -- it touches that -- the pointy area of the disconnector in green, but it doesn't catch on it, it basically passes by it, it touches and passes -- passes by.

Q Based on your analysis in person, hands on with Super Safety installed, firing it and so forth, is this animation an accurate depiction of the interaction between the hammer and the disconnector during forced -- in forced reset mode?

A Yes. That's how I understand it.

MR. BELLAMY: Those are all the questions that I have, Your Honor.

THE COURT: Cross-examination.

MR. HORTON: Your Honor, before we had discussed the fact that we had not given -- been given any notice and had not had time to prepare to cross-examine this witness. Would it be permissible for the Court for us to break for lunch and then resume at possibly 2:00 to allow us the opportunity to resume cross-examination?

THE COURT: That would be possible. The Court has another engagement at 3:00 today, though, and that means we'd have an hour. That means we'll have to go into -- well, my assumption would be that we're not going to finish the presentation of evidence in one hour. That would necessitate us going into tomorrow.

MR. HORTON: Would 1:00 work, Your Honor?

THE COURT: 1:00 would be better for the Court.

MR. HORTON: Okay.

THE COURT: That gives you -- gives us two hours.

MR. HORTON: If we could do that, that would be good.

MR. CAMMACK: Your Honor, I think we're fine with a 1:00 start. If we do have to go into tomorrow, I would request that we could start a little bit earlier. I'm picking a jury in Midland, Texas, on Monday morning, and so I'd like to get to my trial prep. But I don't have a problem staying until tomorrow if we need to.

THE COURT: Well, that gives us two hours today.

MR. HORTON: Your Honor, we are actually driving in from Oak Ridge, and it's about an hour and 45 minutes to two hours to get here. So I was actually going to --

THE COURT: You must drive pretty fast. It takes me about two and a half hours.

MR. HORTON: I cannot speak further on that, Your Honor. I invoke the Fifth.

I was actually going to ask if we could start more like 11:00 tomorrow.

THE COURT: Well, why don't we decide that, then, when we see how far we go tomorrow.

MR. HORTON: Thank you, Your Honor.

THE COURT: Who knows, it may be you get all your evidence in this afternoon and there won't be any need for the

session tomorrow.

MR. CAMMACK: Your Honor, I will take the time over lunch and hopefully cut some of the chaff out of my examination of Mr. Hoffman.

THE COURT: We'll stand in recess, then. We'll reconvene at 1:00.

Oh, I'm sorry. As the Court said, it was not familiar with this issue of discovery in an injunction proceeding. As luck would have it, one of my colleagues, Judge Reeves, did encounter this about two and a half years ago, and this is what he had to say: "Next, defendant's argument that the Court acted hastily because it allowed testimony from an expert witness whom plaintiff disclosed the night before the hearing. It too was without merit. Defendant correctly contends that Rule 65(a) entitles the defendant to a fair opportunity to oppose the application for a preliminary injunction and to prepare for such opposition, but it cites no case law to support his argument on the specific issue that he now raises, that the Court's inclusion of the expert testimony divested him of a fair opportunity to oppose a preliminary injunction.

"When the Court denied defendant's oral motion to strike the expert testimony at the hearing, it cited the urgency of the proceedings and stated that it was aware of no discovery requirement that applied beforehand to a motion for

a preliminary injunction. Defendant cited no such requirement then, and he cites no such requirement now. Besides, the Court permitted defendant's attorney to perform the full cross-examination of the expert at issue, lessening, if not eliminating, whatever prejudice defendant complains of."

The court also noted that instead of the hearing being held in a hasty manner, it was held approximately two weeks after the motion for the temporary restraining order was filed. The name of this case is *SB vs. Governor Bill Lee*, and it is Number 3:21-CV-317, decided on February 21, 2023.

We'll stand in recess.

(Luncheon recess.)

THE COURT: Cross-examination.

(Brief pause.)

DR. BLANCHARD: Good afternoon, Your Honor.

Counsel.

Jonathan Blanchard, and I represent defendants Hoffman Tactical and Timothy Hoffman.

CROSS-EXAMINATION

BY DR. BLANCHARD:

Q Mr. Luettke. Is that a correct pronunciation? I want to say your name right.

A No, Luettke.

Q Luettke. Mr. Luettke. Well, thank you for helping us out today. I of course have questions.

I noticed here in your CV that there's a number of cases that you have served as expert witness in.
A I think I listed the locations on the CV.
Q On the CV?
A Correct.
Q Were any of those patent cases?
A Not really, no.
Q No.
A And I say that, not because I'm confused, but I just want to make sure that arbitration hearing that we spoke about earlier -- that was an agreement, but I don't know if it really pertained -- but in a sense it pertained to patents, so...
Q But this is the first what I'll call pure patent case that you've --
A Yes, that's correct.
Q Okay. Thank you.
Did you review any documents -- well, that's kind of overbroad. Have you had any specific training on the interpretation and construing of patent claims?
A Working with the attorneys. I've worked for -- "worked for" -- I've been consulting for Rare Breed since 2021 --
Q Okay.
A -- so I've had interaction with the attorneys and --

and they explain words to me, because it's definitely a different language.

Q Mm-hmm. So just generally with consultation, most of it having to do with their issues with the ATF and -- and whatnot, but there have been some patent issues that come up, and you've heard these things discussed.

A Sir, I have to tell you, I have tinnitus and some hearing issues, so I'm having a hard time hearing accurately what you're saying.

Q I'm sorry. So through your consulting for the last four or five years in various capacities, is it correct to say that it was mostly relating to the legality of the firearms and these other issues but there have been patent issues discussed, also?

A That's correct.

Q Is that correct? Okay. Okay. When were you asked to be an expert in this specific case?

A Specifically after the TRO was granted.

Q Okay. Thank you. And did you agree at that time? Did you agree after the T- --

A Oh, yes.

Q Okay. Okay. Have to ask, are you being paid for your testimony today?

A I'm not being paid for my testimony. I'm being paid for my time here.

Q For your time.
A But I am being compensated for my time, yes.
Q Okay. And I apologize for that question. That was my true question that you answered.
We saw a -- two representations, videography. Did you prepare either of those?
A No.
Q Okay. Do you believe them to be correct in showing the operation of the different devices?
A Yes. I think we only saw one, but it was played a couple of times --
Q That's --
A -- that it had the Super Safety inside the firearm and then it -- it concentrated on the -- the locking member.
Q The locking member. Okay. With regard to operation of the Super Safety, have you observed the Super Safety in operation, like, by, you know, a rapid camera footage, to see how it actually works and what -- how the parts contact during operation in relation to the videography we saw?
A I have watched quite a few videos on it. I've watched videos of law enforcement test-firing them in that Ohio case I spoke of.
Q But what I'm referring to is specific video of how the parts contact each other during operation, as this video purports to represent.

A I have not seen another animation of the -- that's not true. I did see an animation of the Super Safety. There was a gentleman online showing how they worked. He had a rendering of drawings and things. So...
Q Okay. But you haven't, yourself, observed the Super Safety in operation as it moves in the real world. Is that correct?
A Sir, I don't understand your question. I've watched people pull the triggers on that. So that's an operation. So I would have to say, yes, I have seen the operation.
Q If <u>operation</u> is defined that way. What I'm specifically addressing, trying to, is, as the parts move, they contact in different ways if they're mounted in a firearm. So to do this you'd have to have a receiver with maybe a plexiglass plate on one side. Have you observed how the parts move during actual operation in this manner?
A Not given your analogy with the plexiglass plate.
Q Okay. That was all I was asking.
A Okay.
Q Thank you. Do you know who prepared the video or videos we previously viewed?
A No.
Q You do not. Thank you. Now --
A Well, let me clarify. I believe the law firm did, but I don't know the individual who did it or anything.

Q That's fine.
A Okay.
Q To your knowledge, they were prepared by the lawyers, the video.
A Or the firm --
Q Okay. For the firm.
A -- however they did that.
Q However. Okay. That's fine. Thank you.
A Mm-hmm.
Q Now, you were comparing in your prior testimony the claims of two patents to the Super Safety. Have you also compared, well, let's say prior to this morning's testimony, the claims of specifically the '247 patent to the device described and depicted in the '723 patent?
A I have reviewed that, yes.
Q You have. Okay.
A Not extensively, but I have some knowledge on it.
Q You have. It wasn't just this morning.
A No.
Q Okay. Let's see. I will ask the same question, to be redundant, with regard to the second patent, the '784 patent. Have you compared its operation and parts and pieces with the '723 prior to this morning?
A Yes.
Q Okay.

A It's all on one chart. So yes.
Q Okay. Thank you. Let's see here. So -- let me see exactly -- okay. Would you agree -- I'm not going to argue over colors, but would you agree that the representation above the '247 patent is -- Figure 9(d) is actually from the '247 patent, that that figure is accurate? And --
A Well, the colors matter, and that's not accurate.
Q We will get to the colors.
A Okay.
Q But just the figure, that's all, the figure itself minus the colors.
A For the most part.
Q Okay. Would that statement also be correct with regard to Figure 2 of the '723 patent, that it is a correct representation of that device as you understand it?
A Yes.
Q Okay. So I'm going to walk through the claim, as was done previously. My questions will differ a little. But if we look at Claim 1 of the '247, it's represented under the Figure 9(d), we have a firearm trigger mechanism.
MR. BELLAMY: Objection. Just to clarify, I believe even though that's marked as 1, it's represented as Claim 15 at the top, which is one of the asserted claims.
DR. BLANCHARD: Ah. I apologize.
MR. BELLAMY: I just want to be clear.

THE WITNESS: I see Claim 15 at the top.

DR. BLANCHARD: Here. In fact, I will correct that for the record. There.

BY DR. BLANCHARD:

Q To continue, so the claim reads, "Firearm trigger mechanism comprising." And I believe you would agree that the '723 patent also depicts a firearm trigger, trigger mechanism.

A The '723 does.

Q Absolutely. Next we move to "a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket." Would you agree that the '723 patent also discloses these -- and I want -- okay.

A Sir, I cannot -- I cannot hear you accurately.

Q Ah.

(Brief pause.)

BY DR. BLANCHARD:

Q I apologize. Can you hear me now?

A Yes, sir.

Q Okay. And if you can't going on, let me know, because I can make more noise.

A All right.

Q In the claim here marked as Element A, we have a number of parts that are described and that are required for the '247. Would you agree that those parts are also shown

in -- in the '723 patent, a hammer, a sear catch, and a hook for engaging a disconnector, and adapted to be mounted in a fire control mechanism pocket, yellow area. Well, we won't go to the colors. Let's just stick with that.

A Yes, those parts are present.

Q Those parts. Now, what I'm going to try to do is keep our pictures up here as we continue to move through this claim, if I can. That's my goal.

Okay. We move to the next claim element, "to pivot on a transverse hammer pivot axis between set and release positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier."

In your opinion, is that -- are those parts and functions also provided in the '723 patent?

A Well, on the '723 it -- the bolt carrier, in purple, hits the -- the cam, and there's a separate piece of the trigger --

Q Well, the cam, we haven't -- I don't believe, sir, we've got the cam in this language. I'm just looking at the language of that one claim element shown right here. (Indicating.)

A Okay.

Q From my understanding, these parts are in standard guns, too. I don't want to belabor this, but I have to walk through these to show that each of these claim elements, in

your opinion, are in the '723, if they are.
A Yes, and there's additional parts as well.
Q There's -- yes.
A Yes.
Q Absolutely.
A Okay.
Q Moving on to the next block, "Trigger member, having a sear and adapted to be mounted in the fire control mechanism pocket, to pivot on a transverse trigger member, pivot axis between set and release positions."
Are these parts and functions also present in the '723 patent?
A Yes, but I just want to clarify a couple of things about the '723. My main focus was on the '247 patent. I have --
Q I understand.
A -- read it but not -- not really studied it, on the function. I understand certain aspects of it. So --
Q Well, I'll ask this question. This functionality here is present in a standard AR-15 rifle. (Indicating.)
A What did you just circle?
Q The Part C, "a trigger member --
A I can't see Part C.
Q "-- having a sear --" just Part C -- "having a sear --"

A Can you slide that up, please? This doesn't show up on my screen.
Q Oh. I understand. I'm sorry. Let's see.
Okay. Right here. (Indicating.) Part C. I can't even see that -- I can't see that far. There it is. It's all there. Should have wore glasses this morning. So...
A Yes.
Q Okay. Now, "wherein said sear --" this is from the '247, "wherein said sear and sear catch are in engagement in said set position of said hammer and trigger member." Okay. That language -- now I'm going to have no choice -- but would you say in your opinion that those parts and functions are also present in the '723 or, alternatively, a standard AR-15 trigger mechanism?
A Yes.
Q Thank you. "And are out of engagement in said release position of said hammer and trigger member."
A Correct.
Q Are those parts and functions also present in the '723?
A Yes, it appears so.
Q Okay. The next block, "said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis."


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 86 of 145 PageID #: 582

A Yes.
Q Are those parts and functions also present in the '723?
A Yes.
Q Thank you. And a cam, green -- now, I will use the colors referring to this cam here, I believe, trigger reset cam. (Indicating.) Okay. "A cam, green, having a cam lobe and adapted to be moveably mounted in the fire control mechanism pocket."
Would you also -- would you agree that the '723 has a cam, the trigger reset cam, with a cam lobe and a lever that is adapted to be moveably mounted in the fire control mechanism pocket?
A Yes, it appears so.
Q Thank you. "Whereupon, in a standard semiautomatic mode, said cam is in said first position. Rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook and thereafter the bolt carrier moves forward into the battery." Would you say that those parts and function are present in the '723 patent?
A Would you please slide up the paper so I can see that one?
Q I certainly will. Ah, well, this is -- okay. Sorry.

A And we're talking H, correct?
Q I'm talking H, yes, sir.
A Well, the '723 doesn't have a standard semiautomatic mode, it has a safe mode and a full FRT mode.
Q Okay. So in the '247, just to be certain, we have safe mode, we have standard semiautomatic, and FRT semiautomatic.
A Yes.
Q Is that correct?
A Correct.
Q In the Super Safety we have safe, standard semiautomatic, and repeat, reset, forced, whatever, semiautomatic operation, also.
A Forced reset, yes, those three, yes.
Q But you're saying that in the '723 we have only safe and forced reset semiautomatic. Is that correct?
A Yes.
Q Okay. Just a moment, please.
(Brief pause.)
BY DR. BLANCHARD:
Q Okay. Now, I'm putting up here the '723 patent and some language in it. And we've got the image of the parts in the '723. It states, Column 11, Line 11 of the '723 patent, "It is intended that the effect of the disclosed invention be able to be optimally selected or deselected by operating the

selector cam." When it's talking about selected and deselected, are you aware of what they're referring to there?
A Well, as I read that, I see that it's safe, you can move the cam, the selector switch, to a safe position, or to full FRT.
Q Or to full FRT. Let's continue. "-- and by configuring the trigger extension" -- now, that's this orange piece here, the trigger extension that extends the trigger from here to be able to be contacted by this cam. (Indicating.) Would you agree with that characterization?
A Yes.
Q Okay. "By configuring the trigger extension to be able to move forward and rearward within upon the rear of the trigger." So would we agree that that means this orange right here can move forward and backward? (Indicating.)
A Yes.
Q Okay. "-- within upon the rear of the trigger by means of a spring bias." Here's our spring. (Indicating.) Okay. "-- that competes with engagement surfaces machined in the selector cam."
Okay. "Moving the trigger extension forward or rearward would allow or prevent the cam from contacting the top bearing surface of the trigger extension."
Now, in your opinion, if that member, the orange part, is moved, as it says here, forward or rearward to

prevent the cam, that's the green part, from contacting the top bearing surface of the -- of the trigger extension, what happens with that device?

A Well, as I read it, it indicates that it's in an FRT mode because it's moving to lock it and unlock it.

Q Okay. If it is moved forward and thus unlocked, does the system remain in FRT mode?

A Moving forward to the unlocked position, that would be in FRT mode.

Q On forward to unlock, it's no longer contacting the green lever.

A Right. And the green lever wouldn't be in that position anyways if it was unlocked to fire, it would be in a forward position.

Q Right. So FRT mode occurs when——let's get this right, what they call it——the trigger extension, the orange part, when it's in the rearward point and gets pressed on, no question. But when the trigger extension moves forward, okay, and prevents the cam, the green thing, from contacting the top bearing surface of the trigger extension, what happens? How does the firearm operate then?

A Well, if it's contacting the bearing surface of the trigger, then it's going to be in a locked position. When it's not contacting, it's going to be in a fireable position.

Q It's going to be in -- but what type of fireable

position?
A More than likely FRT mode.
Q In the rear, correct. But when it's forward and this piece doesn't connect the green part, now the green part can move back and forth and exerts no force on the trigger. How does the firearm operate then? What mode is that?
A Put it on safe.
Q On safe? It's your opinion that that puts the device on safe.
A It's my opinion that when that lock -- see that -- the question and the -- doesn't add up to where that -- that cam is located.
Q Okay. But we're -- we're talking about the -- hold on. "The trigger extension forward or rearward would allow or prevent the cam from contacting the top bearing surface of the trigger extension. By having the trigger extension crafted so that it has a lower and higher part and such that when the lower part is beneath the cam, the cam does not make contact with the top bearing surface of the trigger extension." Here it says, "allowing or preventing the cam from resetting the trigger." If the cam cannot reset the trigger, in what mode does the firearm operate?
A "The trigger's not resetting -- allowing or preventing the cam from resetting the trigger." It's quite possible it's out of ammunition or it's on safe, because if

it's not --

Q Is it possible that it's in standard semiautomatic mode?

A No, I do not believe that this patent covers semiautomatic mode.

Q Why is that not what's being described here?

A Well, because it doesn't talk about being caught on the disconnector, and a little bit further down it talks about removing the selector switch so that it would still fire within forced reset trigger.

Q Well, it definitely describes forced reset, but this portion right here describes removing the ability for that cam to push on the trigger, and that means, I believe, it's my understanding, that now it operates in standard semiautomatic mode, it operates, in fact, just as if it didn't have the green cam.

A Well, in that depiction it doesn't look like the hammer catches on the disconnector. And as I've read this document, I have found no evidence or plain language that says that it fires in three position. That's why the '247 -- or '243 patent was created.

Q Okay. Your -- your opinion is -- is definitely your opinion. I would say -- so you don't believe that in the '723 the hammer catches on the disconnector? Now, it has hooks on it.

A Yes. And as I previously testified, I have briefly gone over the '723, I did not study it, I did not spend a lot of time, because when I was asked to analyze the Super Safety it was involved with the other patent, not the '723.

Q Not the '723. Well, let me ask a more general question. The parts in the '723 patent, in your opinion, the hammer and the portion that still operates as the disconnector, they've modified it. Are those both custom parts, not from a standard AR-15 trigger?

A They appear to be custom --

Q Custom parts.

A -- not standard military spec.

Q Right here we see a hook on the disconnector and a hook on the hammer.

A Yeah.

Q In your opinion, would they have made custom parts with those hooks if they did nothing?

A Well, it's my understanding that this trigger was never manufactured. So I never had an opportunity to analyze a real '723 trigger mechanism like I have with these other ones. And --

Q Well, in your CV it states that you have a lot of experience in manufact- -- with manufacturing gun parts.

A No, it does not.

Q Oh, it does not? With -- I'm sorry, then. Do you

have familiarity with manufacturing parts, metal parts?

A I do not manufacture parts. I've been to gun factories in numerous places that do, and I watched the C & C machines and watched them handcraft, in some situations, firearms, but I -- I'm not a firearms manufact- -- well, the license is a -- I have a FFL as a firearms manufacturer, but I don't make trigger components like this at all, or never made a trigger component.

Q Okay. Well, in your experience of manufacturing, or what you've observed, is it normal to spend the money to put nonfunctional parts into a device?

A Well, it depends on who's making it. It depends if it's sourced out and depends on how it has to be manufactured.

Q Okay. Fair enough. Thank you. Let me see. So just to confirm, it's your testimony today that, in your opinion, this paragraph of the '723 patent, Paragraph 11, is not describing a way to enable standard semiautomatic mode with the '723 device.

A Yes. It's my experience with reading patents like this, if it wanted to indicate that it was a three-position selector and it would fire in safe, semiautomatic, and FRT mode, then it would be more specific and address that and not leave it up to speculation.

Q Well, it's not speculation. They state right here, sir, that it moves forward and backward and that you can get

two different operations out of that. But that's okay. I'll move on. We -- we will agree to disagree.

Let's see. Just to follow up -- well, to actually move through -- that was our last -- the next portion of this claim, "at which time the user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to set position so that the user can pull said trigger member to fire the firearm."

Would you agree that that -- those parts and functionality are in the '723 patent?

A Well, as I previously stated, I don't -- reading the words, looking at the pictures, I'm not convinced that that hammer catches on that disconnector in that '723 drawing rendering.

Q That they have. So if we move to the next claim language, it states, "whereupon in a forced reset semiautomatic mode, said cam in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said connector hook is prevented from catching the hammer hook."

A Sir, can you please raise that language up?

Q I certainly can. I am sorry. Right there. (Indicating.)

A Yes.

Q Okay. So I believe you just testified that you believe that functionality is also present in the '723, that you don't believe that the disconnector hook --
A No, that's not what I meant. I meant -- I didn't -- I wasn't --
Q Okay.
A -- agreeing that it was in the '723.
Q Ah, you were saying in standard semi- -- your differentiation is standard semiautomatic mode. Is that correct?
A Yes. And we're talking about the '247.
Q Yes. We're --
A Okay.
Q Okay. I'm sorry. I shouldn't have -- I shouldn't have spoken. I should have let you finish.
So you previously said, I do believe, that you weren't convinced that the hammer and the disconnector, these two parts, in the '723, are contacting each other.
A Or catching.
Q Or catching. Okay. What -- catching. Sorry.
A Right. And --
Q So in that way you're thinking the '723 may do the same -- may also not catch, that it's prevented from catching?
A Correct. In the -- in a -- in that forced reset trigger application, that it's connecting on the disconnector?

Q I'll accept either one. Is that what you're --
A Yeah. I don't -- again, on the '723 patent --
Q Mm-hmm.
A -- it doesn't make sense that if it's in FRT mode that it's connecting on the disconnector. And catching on the disconnector, as I testified earlier today, that requires a person to release trigger pressure, which defeats the whole process of having a forced reset trigger.
Q Trigger. Understood. So when the '723 is operating in its forced reset mode, it's your opinion that the disconnector hook is prevented from catching said hammer hook. However, this claim is saying that in standard semiautomatic mode it's doing that, is what the claim says. It says, "In standard semiautomatic mode, such said disconnector hook is prevented from catching the hammer hook." And thus your testimony today, I believe, is that the '723 does not have the semiautomatic mode for this to happen.
A Yes. May I request to have a copy of what you're looking at, because you're reading and I -- I would like to follow along, and I --
Q I'm sorry. Of -- you want a copy of my claim chart here, or a copy of --
A Sir, whatever was showing on the screen, because you're reading it and it's not -- it's not elevated up.
DR. BLANCHARD: May I approach?

THE COURTROOM DEPUTY: (Indicating.)

DR. BLANCHARD: May I approach?

THE COURTROOM DEPUTY: Will you ask the Judge?

DR. BLANCHARD: May I approach?

THE COURT: No. You can go back to the lectern.

(Brief pause.)

THE WITNESS: Can you please tell me what paragraph you were on?

DR. BLANCHARD: The very bottom, where there's the highlighting on the last -- the last box on the bottom, where I am highlighting --

THE WITNESS: I believe that's J.

DR. BLANCHARD: I can't see. I'm now suffering from --

THE COURTROOM DEPUTY: Do you have another copy?

DR. BLANCHARD: Let's see. Of the '7 -- of the '24 -- do we have another -- Your Honor, may I approach counsel?

(Off-the-record discussion between defense counsel.)

DR. BLANCHARD: So the question --

THE WITNESS: I have read it. Okay.

DR. BLANCHARD: -- was --

THE COURT: Can you return it to counsel?

THE WITNESS: Yes, Your Honor.

THE COURT: He needs it to ask you questions.

THE WITNESS: Okay.

DR. BLANCHARD: Thank you.

BY DR. BLANCHARD:

Q So I was on -- I was referring to J and the last statement I had highlighted, "such that said disconnector hook is prevented from catching said hammer hook."

A And we are talking about --

Q And we were talking about that in relation to the '723. And I think what your testimony was reflecting, that you agree that the disconnector hook is prevented from catching said hammer hook in the '723 when it's operating in FRT, but that it doesn't do that in standard semiautomatic mode because in your opinion it doesn't have one.

A That's accurate.

Q Yeah. Okay.

A I do not believe the '723 has a semiautomatic mode.

Q Right. Understood. And the final element of the '247 patent claim, "and therefore the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm." Would you say that that functionality is also provided in the '723?

A Does your question relate to forced reset trigger, or the semiautomatic forced reset trigger, or semiautomatic trigger?

Q Just -- just the language here that states, "and

therefore the bolt carrier moves forward into battery, at which time the user can pull the trigger to fire the firearm."
A I would agree the '723 would function that way because it's a forced reset trigger.
Q In the forced reset mode.
A Yes.
Q Okay. Thank you. Okay. Now we're going to switch to the '784 patent.
A Okay.
Q Okay? We're of course also going to walk through this claim language. So, now, this is relating to just forced reset trigger mechanism, and it says, "There's an extended trigger member locking device."
Now, in your opinion is there a trigger member locking device in the '723 patent?
A No.
Q There is not. And why is that, sir? I'm sorry. And why is that, sir?
A Because in the '723 patent, the cam is green, and part of the trigger is -- looks red to me. They're separate pieces. They're not joined. They're not -- they're not one locking member working in concert, wherein in the Super Safety, in the middle, the yellow, the two pieces in yellow is an extended locking device. And in the '784 claim, although only part of it is green, the part below it is also supposed

to be green.
Q Yes.
A That works -- that's an extended trigger member locking device.
Q Okay. So what we're basically saying is, if I understand your testimony correctly, is that, "Okay, we have this piece and this piece, but here the bottom part is different from what we have here." (Indicating.)
A Correct. The bottom piece on the '784, it should be green, as I stated, because it's one piece, well, essentially, it's working together, it has a pin to connect and the spring in the middle there.
Q It has those parts.
A Correct.
Q It has a pin and a spring. Understood. So, now, just to show -- and this was shown this morning. This is a copy of the '784 patent. And here we show multiple versions, embodiments, as we would call them. This is one embodiment where we have two parts, we have a spring and a pin shown in Figures 2, 3, and 4. Do we agree with that?
A Yes.
Q Now, when we look at this, when we look at the top part that -- that folds, it folds backward, but it cannot fold forward, can it?
A Not forward. It does deflect to the rear --

Q It -- right.
A -- folds to the rear. And then when it --
Q Mm-hmm.
A -- as the gun cycles, then it would be back into that straight-up position.
Q Straight-up position. Okay. I just wanted to show -- and we have one other embodiment of this part, at the top, where the top piece, instead of being larger and having two parallel walls, just has a single perpendicular flipper.
A Correct.
Q Okay. But it also folds back in one direction.
A Yes.
Q Okay. Now, this patent you've looked at quite a bit, is my understanding. Is there any discussion or embodiment in the '784 about this deflection being any movement other than folding?
A Can you repeat that, please?
Q Yes. In the '784 patent is there any description or embodiment that shows the upper extended part undergoing any movement other than folding about a pin?
A Well, to answer your question, you said "any part." And there's a lot of words in that patent, so I can't just say if there's any part that would -- that indicates that at this particular time.
Q Is there any -- in these figures is there any

movement of this locking member other than folding possible? And when I say "folding," I mean pivoting back around a pin.
A I think it actually may also pivot forward when it goes into the unlocking position.
Q Well, it can't -- it can't move forward, because it's blocked. You're saying the lower portion?
A Well, when it goes back -- when the bolt carrier strikes it, well, it comes back up. Now -- I'll strike that. No, it pivots to the rear when the bolt carrier is moving to the rear, to deflect it or bend it downward and backwards.
Q And the "it" is -- the "it" is what portion? The little -- the top part --
A Yeah, the top of the --
Q -- or the bottom?
A -- the top member of it.
Q So the top part, it can fold forward, but then it's blocked by the lower body portion.
A Yes.
Q Okay. All right. Now, with this representation of the locking pin, this is just the -- is there any movement of that topper, of that top section——that would be 50 here——other than it folding backward?
A Well, it appears to be a wall in the front side, and so I'm not sure how that would fold forward.
Q All right. Thank you.

Move back here. Okay. So -- and that is the extended trigger member locking device. We would -- we would agree -- and I'll use -- I'll use your colors -- that that's the green item here with a top portion that folds backwards and/or -- okay, deflects, however you wanted to call it, but it folds around this pin with a spring, and then there's a bottom portion that moves separately from it. (Indicating.)
A Yes.
Q Okay. Okay. And it's your point -- it's your -- let me be sure you can see. Okay. That -- well, what's the difference, when I look at the '723, between this upper extended portion and this part right here that it pushes on? (Indicating.)
A Well, the '723, the green part is a cam --
Q Mm-hmm.
A -- not a upward extending lever.
Q Okay.
A And the -- and the red portion is actually part of the trigger. So it's not -- they're not conjoined. They interact, but they don't conjoin.
Q Well, now, what separates this upper extended member from this cam? To me, they both contact the bolt when it moves and they have a pin through them so they hinge and move. What's the functional difference there?
A Well, the difference is, on the '723 patent, it's

a --
Q Mm-hmm.
A -- it's part of the trigger, it's not part of the locking member.
Q No, I'm just talking about the green portion. You attempted to say that these are somehow different. And I'm saying they're shaped differently but they both contact the bolt, they both have a pin through them, which they pivot, and so both of them, when -- when pressed by the bolt, they exert -- well, this one exerts force downward, right? (Indicating.)
A Yep.
Q But what happens -- and I'll go back to your picture for the '784. Is force exerted downward on this lower body portion? (Indicating.)
A Well, the difference is, is that this was written in the patent as -- as one piece, where the other one is not. This is the upper -- or this is the locking member --
Q Okay.
A -- and it's --
Q The locking member --
A -- they're together.
Q -- is both pieces, correct?
A Yes, the two pieces --
Q Okay.

A -- you've got the body, and you've got the upward extending lever. Whereas in the '723 --
Q Mm-hmm.
A -- they're -- it's -- they're not the same language, they're not the same parts as the '784.
Q They're not the same parts. I -- I agree with you. All I was going at is, over here when the bolt contacts this portion and -- shown in green, when the bolt contacts this, does it put downward pressure on this part? (Indicating.)
A Yes, there's pressure on that part, because the part right now is -- it's pressure because it's locking the trigger from being able to be fired.
Q Okay. And here's the trigger portion here. (Indicating.)
A Correct.
Q So when the bolt contact- -- if this piece is up -- because it has a spring, so it moves up. If it's up and in contact with the bolt, is it correct that it pushes down and blocks -- is that how it works and --
A Well, when that lever goes up and it releases the pressure, then it allows the trigger to be pulled.
Q Okay. So if this -- if this piece is vertical, due to the downward exerted force, the trigger can't be pulled. Is that correct?
A Yes.

Q Okay. Okay. And once this piece folds backwards, then you can pull the trigger. Okay.
A No, when the piece is not folded backward, because this is still in the rearward movement.
Q So can this piece here, Piece 22, be straight up and be contacting the bolt and the trigger be pulled?
A Say that one more time, please.
Q I said, can Piece 22, the extended upper member, be contacting the bolt and the trigger still be pulled?
A No, because it's not going to be contacting the bolt when it's --
Q Okay. Okay.
A Well, the rearward portion might be, but not in that position.
Q All right. Okay. Let's see. So then it would be your position, if we look at the first portion of this claim that says, "a locking member that is moveable between a first position in which it locks a trigger against pulling movement," you -- would you say that that is also present in the '723?
A Yes.
Q So they both have that ability. Well, let me try to do what I did before. With regard to Element B of the '784 claim, "and a second position where it does not restrict movement of the trigger member." And when it's talking about

"it," it is -- appears -- would you -- it appears to be referring back to the locking member. Does the '723 have a locking member? We can disagree on the word, but have the functionality moveable between a first position to a second position where it does not restrict movement of the trigger?
A I believe so. Like I said, I've never examined one of these triggers. It's only going off of the patent.
Q It's -- it's just --
A Yeah.
Q -- and it's what it teaches to one of ordinary skill in the art, is --
A Correct.
Q -- is where we're at.
Then the next element, "the locking member configured to be moveably supported by a frame." Would you say that the same -- the parts we're referring to in the '723 patent are also supported by a frame? I --
A Yes.
Q Yes. That --
A Frame. Receiver.
Q That's an easy one.
A Yeah.
Q Going back to the '784, "and including a generally upward extension portion configured to make actuating contact with the surface of the bolt carrier."

Would you agree that there is a portion, an upwardly extending portion, that makes actuating contact with the surface of the bolt carrier?

A I would agree that the -- on the '723 patent on the right, the green part --

Q Mm-hmm.

A -- the cam, but that's not -- it's not the same language as having a body and an upward extending member.

Q Oh, different parts, yes.

A So it's -- it's different parts and it's -- so...

Q Okay. And then we get to, in the '784, "in a generally --" I don't know if you can see this. Let's see.

(Brief pause.)

BY DR. BLANCHARD:

Q I'm referring to here, yes, "and including a generally upward extension portion configured to make actuating contact with the surface of the bolt carrier."

Noting your prior stated differences with the '723, would you agree that the green member, whatever we refer to it as, that it makes actuating contact with the surface of the bolt carrier?

A Yes, the '723 green cam does make contact with the bolt carrier.

Q With the bolt carrier. Okay.

"-- such actuating contact causing the locking

member to move from the first position to the second position." That's -- that's back to the '784. In the '723, this is the -- again, this is the green part. And the contact being referred to there, I think we both agree, is the bolt. "-- and it causing the locking member to move from a first position to a second position."

A Yes, that's correct.

Q Going back to the '784, "the locking member having a body portion that is moveably supported."

When we go to the '723, the body portion—and I realize that's different, in your opinion; I'll use your picture—this is the body portion, correct? (Indicating.)

A Correct.

Q Okay. In the '723 we have this portion right here. (Indicating.) And the question is, is this part right here moveably supported by the lower receiver?

A It's supported by the lower receiver --

Q By the lower receiver. Okay.

A -- but it's not part of the cam.

Q It's -- it's not part of the cam. Understood. Now, when we say -- when you said "cam," I believe you're meaning it's not part of the locking member, this -- (Indicating.)

A Well, my last statement was for the '723 patent --

Q Okay.

A -- but, yes --

Q Okay. Okay.
A -- the locking member.
Q Then we move on with the '784, "and an upwardly extending deflectable portion that is separately moveable relative to the body portion between an extended position and a deflected position."
So if my understanding is correct, as we said, this part, hinged with this pin, can move up, and it can move to the deflected portion. I'm going to say the patent language supports fold only, you're going to use the word deflected, and that's fine, but it moves backwards, right?
A Correct.
Q Okay. And we have the -- the same movement of the green trigger reset cam here. (Indicating.)
A Well, that cam does move back from the bolt carrier, and move forward as well, or back to a position.
Q Right. It deflects. Okay. Well, after kind of going through that and looking at the similarities and differences -- alleged differences in the prior art, when we look at the '784, when the bolt carrier contacts this upper deflect- -- and you might not have heard the front -- first thing I said. I said, when the bolt carrier contacts the upper deflectable portion and passes it, is the lower body portion moved?
A I don't think the bolt carrier causes that portion

to -- well, that lower portion is what's blocking or locking the trigger.
Q So when the bolt carrier strikes the green part, you don't believe the orange part moves.
A No, it's -- I think it's already in the reset position.
Q Okay. And --
A It's just being locked.
Q And I can just say, here's some language from the patent, and it -- and it states in Column 1, Line 66 through 67, and Column 2, that when the extended portion is moving, it moves without pivoting the remainder of the locking member when contacted by the forward -- by the forward portion of the bolt carrier as it cycles. So I -- my point is, your statement is absolutely consistent with -- with what the patent states.
Now, when we look at the Super Safety, can the bolt carrier pass the lever, this portion, without moving the cam?
A Repeat that one more time, please.
Q Mm-hmm. In the Super Safety, can the bolt carrier, okay, moving backwards and forwards, complete cycling, pass this lever, the Super Safety lever, without moving this cam right here? (Indicating.)
A What position is the selector switch in?
Q The selector switch is in forced reset.

A Well, if it's in forced reset, then it needs to interact, and it'll lock the trigger in place.
Q My question was, is it possible for the bolt to move back and forth, putting force on this lever through the cycle, and this lower portion not move? (Indicating.)
A No, I don't believe so.
Q Okay. Now, when we move to the '723, in forced reset mode, same, is it possible for the bolt to move back and forth, thus contacting this cam, and it not move this lower body portion? (Indicating.)
A No, I don't believe so. I think it has -- it does contact it.
Q So in both the Super Safety and the '723, this lever -- in forced reset or repeat reset mode, this lever causes this lower cam to move. And over here, when the bolt travels back and forth, this movement causes this portion to move, also. (Indicating.)
A Yes.
Q Thank you. In this representation of the two-piece locking member in the '784, it is possible -- this is a question, I'm sorry -- is it possible for Part 22, the other extended member, to go all the way back, hinging here against the spring, and not move this lower body portion? (Indicating.)
A Well, it's already in the locked position when

that's going back.
Q Mm-hmm.
A So -- repeat your question one more time, please.
Q Yes. And we could look at both embodiments, but I think at this point we've determined they operate the same. There's a pin, there's a spring, and a piece that moves backwards but not forward. Is it possible, when the bolt is moving backwards and forward, for the upper part to move and this part not to move? (Indicating.)
A Yes.
Q Yes. Okay. And actually I apologize, I already asked that question and -- so...
(Brief pause.)
DR. BLANCHARD: Thank you.
End of my questions, Your Honor.
THE COURT: Redirect?
MR. BELLAMY: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. BELLAMY:
Q Mr. Luettke, let me try to take these one at a time here. You were -- we were just talking about the '784 patent. This Figure 6 from that, could you tell me what position the bolt carrier is in?
A It's in the forward position.
Q And so what position is the locking member in when

the bolt carrier is forward?
A The locking member is in the first position.
Q And is that locked, or unlocked?
A It's in the unlocked position.
Q When the bolt carrier is in the forward position, does that have any effect on the position of the bottom body portion of that locking member?
A Yeah, because it's released pressure on the -- on the trigger.
Q Does it move it? Does it move the bottom portion?
A Can you move your finger, please?
Q Of course. (Indicating.)
A Say that one more time, please.
Q Well, does it -- here is Figure 5 when the bolt carrier is not fully forward, it's in the locked position there?
A Correct.
Q And is the body portion of the locking member, the bottom part, is that in a different place there compared to here? (Indicating.)
A Yes, it's in the unlocked position, so it's not touching it.
Q So the bottom portion has moved?
A Correct.
Q So is it possible for this bolt carrier to go

through its full cycle and not cause the bottom portion to move?

A No.

Q When looking at the claim language, you were comparing, you know, what things are here and what things are there in between the '784 and the '723 patent and you were being asked to make some comparisons between the structure shown in the one patent versus the structure shown in the other.

I'd like you to instead focus on what defines the scope of the patent protection, which is the claims, the claim language. And here we have -- it says, "a locking member having a body portion that's moveably supported." I believe you've testified before that's on some sort of a frame.

THE COURT: I think he's asking you if you would move the display there. He cannot see what you're pointing to.

THE WITNESS: Thank you.

MR. BELLAMY: Sorry. Is that better?

THE WITNESS: Yes.

MR. BELLAMY: I apologize.

(Brief pause.)

BY MR. BELLAMY:

Q "The locking member having a body portion that's moveably supported." I believe you testified earlier that's supported on a frame?

A Yes.
Q Okay. And then the claim says, "in an upwardly extending deflectable portion that is separately moveable relative to the body portion."
A That's correct.
Q See that? That's correct?
A Yeah.
Q Okay. Does it say anywhere in that claim about it only folding to the rear?
A No.
Q Does it say anything about it only pivoting in one direction?
A No.
Q Does it say that -- that the top portion folds backward?
A No, it does not.
Q So there was some discussion and implication that this upper extending portion, the lighter green part, that somehow that was acting as a cam to press down on the lower portion. Was that the impression that you got?
A Yes. That was the question.
Q And is that upper portion a cam at all?
A No, it's not a cam, it's a lever.
Q And in contrast here, in the '723 patent, the green part is a cam. Is that correct?

A That's what the patent language calls it.
Q And when the cam moves, it -- well, first of all, in this version that cam is mounted to what? What does it pivot on? What supports that? Is it -- is it the frame or the receiver?
A In some aspect, yes, because it's got the hole to mount it, so, yes.
Q And I believe you testified this sort of Z-shaped orange below it, that's really part of the trigger. Is that what you said?
A I did say that.
Q Okay. So that cam, when it moves, it actually pushes down on the trigger. Is that correct?
A Correct.
Q And, in contrast, here, when this thing that's not a cam but a lever is moved, it's not pressing down on the trigger at all, is it?
A That's correct.
Q Is it not the fact -- the movement of the body part that either locks or unlocks the trigger?
A Yes.
Q Moving your attention to the Blakley '723 patent, the old expired Blakley patent, I believe -- was it your testimony that this is a two-position trigger?
A Yes, that was my testimony.

Q And that it's safe or fire?
A FRT fire, yes.
Q Okay. So there appears to be more than one embodiment shown in here, a version of this. One of these here we see that this cam interacts with this piece here that was -- I believe you described this as being part of the trigger. Is that correct? (Indicating.)
A That's correct.
Q Okay. And here they're not touching because the trigger is in the reset position. Is that right?
A Yes.
Q And also here, this pin is what that cam pivots on. Is that right? That pin that's marked 80?
A Yes.
Q So then we have this other version, and it appears to be some sort of drop-in piece that is supported by a different sort of frame or a different piece. Is that correct? (Indicating.)
A That's what it appears to be, yes.
Q Okay. If you put in a piece like that that you drop in rather than mount it to the receiver itself, is there risk of play or -- or tolerance imperfections there when you're putting in two pieces together instead of just one?
A Correct. The pin will hold it in place.
Q And this part down here below that was discussed as

being adjustable, could that make up for that play, you know, there being some irregularity or some tolerance difference between those two when you assemble it this way?

A Insert it with a pin, or it doesn't have a pin in this -- in this?

Q I'm sorry. The pin.

A This is being supported by the -- the item that looks like a drop-in auto-sear style.

Q This is Figure 5 from that patent. Up here we have more of a isometric or 3D, if you will, view of -- of how that's supported. Does that correspond? (Indicating.)

A Yes.

Q And then down here we have this piece that gets mounted onto the trigger. Is that correct? (Indicating.)

A That's correct.

Q And I know you've said you're not a manufacturing expert, but you've seen manufacturing, probably manufacturing specifications. Are the -- are these sort of drawings in a patent to the exact dimensions and representations from which someone would actually manufacture?

A No. There's no measurements on here.

Q And if we look at this, if this piece -- the bottom piece that's part of the trigger is adjustable. If that was pushed forward against that -- what's left of the disconnector, would that even operate?

A Pushed forward against the disconnector?
Q Right. If this piece, this Z-shaped piece at the bottom, was pushed forward all the way, bearing against that -- forward enough that somehow this cam would -- would not contact it when it rotated, and it was pushed to press against what's left of that disconnector, would this even operate anymore?
A No, I don't believe so.
Q You talked about before -- you were asked about this, how it could be adjusted to some position where the cam would not make contact. Do you recall that?
A Yes.
Q But then it says here afterwards, I think you referenced this, "the invention can be effected without the provision of a safety selector, whereupon the effect of the invention will be continually present unless the apparatus is removed from the firearm."
Do you read that to mean that if you take a safety selector out, it'll work, you just won't have a safe position?
THE COURT: Counsel, I think you inserted a word into the sentence there, you put safety in there.
MR. BELLAMY: I'm sorry, Your Honor? I --
THE COURT: You put a word into the sentence there.
MR. BELLAMY: Oh.
THE COURT: You put the word safety in there. Safety


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 121 of 145
PageID #: 617

does not appear.

MR. BELLAMY: Very well. I apologize. I'm used to just referring --

THE COURT: Although that may -- that may not make a difference, but for purposes of the record --

MR. BELLAMY: I think you're -- I think being exact is the thing to do here.

BY MR. BELLAMY:

Q "The invention can be effected without the provision of a selector, whereupon the effect of the invention will be continually present unless the apparatus is removed from the firearm."

So if -- if it can be -- if the effect of the invention is still in place when there's no selector, does that tell you that this has a -- could this have a standard semiautomatic mode?

A No. It's an FRT, forced reset semiautomatic.

Q And if you took this selector out completely, would it have a safe mode anymore?

A No.

Q Okay.

DR. BLANCHARD: That's all I have, Your Honor.

(Brief pause.)

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: Call your next witness.

MR. CAMMACK: Your Honor, plaintiff calls Mr. Timothy Hoffman.

(Brief pause.)

(The witness was duly sworn.)

TIMOTHY HOFFMAN,

called as a witness at the instance of the plaintiffs, having been first duly sworn, was examined, and testified as follows:

DIRECT EXAMINATION

BY MR. CAMMACK:

Q Good afternoon, Mr. Hoffman. Will you please state your full name for the record.
A Timothy Hoffman.
Q How old are you, Mr. Hoffman?
A Twenty-four.
Q And without putting it on the record, is the address that is in the plaintiffs' complaint correct --
A Yes.
Q -- for you? And that's also the address for Hoffman Tactical, right?
A Yes.
Q What's your highest level of formal education?
A A high school diploma.
Q Do you have any post high school education, formal

training as an engineer?
A No.
Q What about as a gunsmith?
A No.
Q An armorer?
A No.
Q Did you -- have you served in the military or law enforcement?
A No.
Q Now, when we were at the temporary restraining order hearing, your counsel made the -- made the comment that you were a social media influencer. Is that an accurate comment, or is that an accurate description of your employment?
A I run multiple social media pages, but that is not my employment, it's secondary to my business selling parts for firearms.
Q So can you describe your primary business selling parts for firearms.
A I design and release open-source designs, primarily for the AR-15, specifically lower receivers, but also upper receivers, hand guards, and other components, and I then have parts kits which customers can buy to complete those firearms if they desire.
Q Do you earn income for your social media pages that you -- your multiple social media pages that you operate?

A I do not.
Q What about your YouTube account, do you earn income from that?
A I do not.
Q Approximately what's your annual income from selling firearms parts?
A Are you looking for gross company sales, or estimated net profits?
Q Well, let's start with your personal income, annual income.
A That would be basically, from tax records, what I'm paying taxes on after I -- all my write-offs. Is that what you're looking for?
Q Yes.
A Last year it was approximately $80,000.
Q And no other sources of income. Is that right? You have no other sources of income other than your business. Is that right?
A Correct.
Q So in your declaration you mentioned -- just a moment. See if we can make this work a little better.
(Brief pause.)
BY MR. CAMMACK:
Q Okay. I'm showing you what was Exhibit 1 to Docket Number 26, which is defendants' response to plaintiffs' motion


Case 1:25-cv-00389-CLC-CHS Document 37 Filed 02/02/26 Page 125 of 145 PageID #: 621

for preliminary injunction. And with -- it's the file-stamped copy. Do you see that?
A Yes.
Q Do you recognize this document?
A Yes.
Q Did you draft this document? And I'll scroll through for you.
A I worked with my counsel to produce this document. I was involved.
Q Do you agree with everything that's written in this document?
A Yes.
Q Are there any changes or corrections you'd like to make since this hearing began?
A Not to my knowledge.
Q If we go to the very end here, we're going to see -- this is your signature on January 23rd of 2026. Is that right?
A Correct.
Q Okay.
MR. CAMMACK: Your Honor, may I inquire? I was a little confused. Are we going to go until 3:00 p.m., or 4:00 p.m. today?
THE COURT: 3:00.
MR. CAMMACK: 3:00 p.m? Thank you, Your Honor.

(Brief pause.)

BY MR. CAMMACK:

Q So in Paragraph 5 you state, "Among other things, I design parts for firearms, including designs for triggers, safeties, and other components for AR-15 style rifles, including repeat reset trigger components that modify the rifle safety selector to allow the cycling action of an AR-15 rifle to repeatedly reset the trigger between shots and fire again after each reset if finger pressure is continually applied to the trigger," right?

A Correct.

Q When you say "among other things" and you say you release designs for other firearms parts other than trigger safeties, what are you referring to?

A Designs for receivers, upper receivers, hand guards, stocks, and other firearms components in my several public releases.

Q Do you release designs for lower receivers?

A Yes.

Q And lower receivers are the -- typically if you purchase from a commercial manufacturer, that would be the serial-numbered part that -- that you have to get a background check for and gets recorded with the ATF, right?

A In order to transfer for commercial purposes a lower receiver, it requires a serial number, that is correct.

Q Your lower receivers do not have serial numbers, do they?
A My lower receivers are personally made firearms which are not transferred and do not require serial numbers, correct.
Q Have you ever sold a lower receiver?
A No.
Q Approximately how many have you made personally?
A A lot. During prototyping -- I could give you a ballpark number.
Q Go ahead. You can give me a ballpark --
A Fifty. Just a guess. It's been many years.
Q You also 3D-print magazines, ammunition magazines, for use in weapons, right?
A No. I've only attempted to print one magazine, and did not succeed due to dimensional errors. I've not attempted printing a magazine again. That -- well, I should correct that, actually. When you say "magazine" you're referring to any system that can store ammunition.
Q I mean magazines for use to supply ammunition to a firearm for -- for loading the firearm.
A Any specific firearm, or any firearm at all?
Q Any -- any firearm at all.
A I am working on developing a new magazine system, which I've built prototypes for, but there is no firearm for

it to fit in. So I don't know if that would meet your definition or not. It's not a functioning device, but it's something I have manufactured.

Q More conceptual at this point?

A Correct.

Q So in Paragraph 6 of your declaration, which is right there, this is where the -- you said, "Automatic firearms fire repeatedly without resetting the trigger." And then you go down, it says, "My design may be thought of as components that allow a repeat reset of the trigger after each round is fired." Right?

A Correct.

Q Is this the first time you've used a repeat reset to refer to what's commonly known as a forced reset trigger?

A I use the term active reset. However, considering that the term forced reset is used to describe Thomas Allen Graves's lineage, which has moved on to Rare Breed's products, I wanted to use a neutral term that was not connected to my branding or Rare Breed's branding. That's why, with my attorneys, we decided to use repeat reset, as it's a neutral term. In the past I've used the term active reset, as I believe it's the most technically accurate.

Q Again, my question was, is this the first time that you've used repeat reset to describe your triggers?

A Yes.

Q In Paragraph 10 you discuss -- you discuss Mr. Graves, and you said that "he was generally credited with pioneering FRT style repeat reset trigger technology beginning in the 1970s." Do you see that?
A Yes.
Q Have you ever met Mr. Graves?
A No. I have spoken with him on the telephone.
Q Do you know how old he is?
A No.
Q So if he were even as young as you in the 1970s, that would make him in his -- probably his eighties by now. Is that a fair assessment?
A It would be in his seventies by now.
Q What did you base this statement in Paragraph 10 upon in saying that "he was generally credited with pioneering FRT style repeat reset trigger technology beginning in the 1970s"?
A Mr. Graves told me this himself, and other people I've talked to who have interacted with him also say this. That's all I know. He's generally credited with it. I have no further knowledge.
Q So this is just -- you have no -- you have no factual basis to represent that he did develop this technology in the 1970s, do you?
A Not yet.

Q Do you plan to get that information?
A I don't know at this time.
Q When you say, "Not yet," that means that -- it sounds like you're anticipating getting that information.
A Mr. Graves gave me the impression that he had done this and that he had lots of documentation. I have no access to that and currently have no intent of working with that unless it arises in the future, which is why I used those words.
Q So in Paragraph 14, moving on, you discuss companies that are known to you -- sorry -- that are known to you to make components based on the Graves or other FRT designs, and when you say "components," you mean forced reset triggers, right?
A Trigger devices that achieve what we're going to call "forced reset," no matter how they work, correct.
Q So are you familiar with any of the companies -- I mean -- well, strike that. Are you familiar with the products that Arizona Regulator sells?
A I've never worked with them. I've only seen photographs. I'm slightly familiar with the mechanics, but only -- but very fuzzy.
Q What about Partisan?
A I have not worked with any of Partisan's triggers.
Q Are you aware that Rare Breed and ABC have filed a

lawsuit against Partisan?
A Yes.
Q What about Tommy Triggers, have you worked with them?
A No.
Q Are you -- have you communicated with them?
A No.
Q Are you aware that Rare Breed and ABC filed a lawsuit and have settled with Tommy Triggers?
A I knew there was a lawsuit. I wasn't aware of details on it.
Q What about Plinkify, are you -- have you had any discussions with them?
A No.
Q Do you know who runs Plinkify?
A No.
Q What about Freedom Finger, do you -- have you worked with them?
A I'm familiar with their product. I have never used it or worked with the company.
Q Do you know anybody at the company?
A No.
Q What about Redacted Industries, do you know -- have you worked with Redacted Industries?
A No.

Q Are you familiar with their products?
A Only in as far as I've seen their website.
Q Are you -- do you know anyone that works at Redacted Industries?
A No.
Q Same question, Advanced Reset Tech, are you familiar with their products?
A As with the previous items here, via their website, but I've never worked with any of their products in person --
Q Are you familiar --
A -- no.
Q Are you familiar with anyone that works there?
A Not to my knowledge.
Q What about TX Triggers USA?
A It would be the same answer.
Q The same three answers?
A Yes.
Q Going to Paragraph 15, you say, "The following ten companies are known to me to make components in accord with or based on my new design for a safety selector modified repeat reset trigger system. Some of these companies have much lower production costs arising from economies of scale and other factors regarding parts production than do I." Do you see that?
A Yes.

Q Okay. You said they have lower costs. What's the basis for your -- for your statement that some of these companies have much lower production costs?

A One of these companies informed me, and I would tell you which one. I believe it was Z3 Productions or Stark80. I mix them up, so I don't know which one it was. But I did speak with the owner of one of these companies relatively recently who informed me of his dealer price, and it was significantly lower than what my dealer price would be. In fact, it was very close to or lower than my production costs.

Q What are your production costs?

A Do you want to include overhead in that, or how do you want to try to estimate that? Because we haven't done that yet. I can give you a number, though.

Q Well, why don't you give me the number and tell me what that number represents in terms of your costs.

A So our direct costs, including packaging components——there's five components in our kit currently——is somewhere around approximately $25.

Q What are the five components that you put in your kit?

A We have the Super Safety cam, the Super Safety lever, and the modified trigger, which form the core product, and then we have an improved detent, which allows smoother operation, and then an optional centering block which keeps

the lever from walking the cam onto safe in some lower receivers.

Q What materials are you -- have you used in the kits that you have -- some of the 70 kits that you've sold so far?

A It depends on which component you're asking about.

Q What about the cam?

A The cam is 17 for stainless steel.

Q Is it machined, or metal injection molded?

A It's metal injection molded.

Q What about the lever?

A The lever is made via the same process and material as the cam.

Q The detent?

A The detent is a machined component in steel.

Q Do you make those, or do you purchase those and modify them?

A We've done both. Currently we are purchasing them from an OEM who manufactures them as a stock item since they are used in push-button safeties and other unrelated mechanisms.

Q Just for the -- for the Court's benefit, the detent is the portion that goes into the bottom of the receiver that if you turn the receiver up- -- upside-down and you take the pistol grip off, you'd drop the detent in, and it works in -- it works in conjunction with the selector switch on the side

so that it doesn't just spin around, right?
A Yes. So the detent is present in basically all of the safeties we've been discussing today, and it acts to -- to allow the user to move the safety lever or safety selector cam to a position so that it will stay in that position. It's a -- it's an over-center device, is what it is, and it's pretty standard.
Q Right. So the standard ones that you get from an OEM for use in any AR-15 that you modify are designed for use with the standard AR-15, M4, M16 selector switch, and it has a spring that it -- there's a spring, the detent, and the selector switch, and it keeps it in place as you flip it around, it keeps pressure on it so it doesn't just spin to different positions, correct?
A Correct. The detent rests in pockets on the selector body to hold it in position until it's overcome by the user rotating it.
Q Right. And so yours is modified to more of a dome shape on the end that interacts with your cam, right?
A We do that modification or we have them made with that feature, either way.
Q I just want to make sure everybody's clear what we're discussing. And the spacer block you're discussing, how does that operate?
A It's a 304 stainless steel component which is made

from laser cut and then bent sheet metal, and it simply sits in the lower receiver and keeps -- it has fingers which keep the lever centered in the lower receiver. This is not required in my lower designs since they have a more rationalized pocket. But many commercial lowers use different cuts in the rear of the lower receiver which can allow the -- the lever to have too much play side to side, which in certain circumstances can cause the lever to wiggle back and forth laterally——this is not forward and back——which will walk the cam onto safe while you're shooting the weapon. So this centering block, in certain guns, helps prevent that problem. It's not a requirement, and it's something I developed very recently for the -- for the commercial option, just so people wouldn't have that problem, just in case.

Q Okay. Well, moving on to -- so you said "lower production costs arising from economies of scale." So you -- well, you said, "in accord with or based on my new design." Are -- do all of these companies make -- to your knowledge, do they manufacture and sell a standard -- or a Super Safety made based on the information that you provide -- that you've provided in terms of either the dead files or the 3D print files?

A Some of these companies, two of them, have designed, you could say, improvements, they've added new art to allow additional functionality, and those are the products they

manufacture and sell.
Q Which two companies?
A Atrius and AS Designs.
Q Do you know how they modified the Super -- your Super Safety design?
A Yes, I'm familiar.
Q How did Atrius modify your design?
A So in order to understand that, I'd have to explain a little bit about how the Super Safety works.
Q We'll come back to that. I have some questions on your provisional application, which you'll have some pictures that might make that a little bit easier for folks.
Have you discussed your design with anyone at Atrius?
A No.
Q Are you familiar with anyone that works at Atrius?
A Yes.
Q Who?
A Malcolm.
Q Does Malcolm have a last name?
A I don't remember it at the moment, but he does.
Q What about AS Designs?
A I am familiar with one of the gentlemen at AS Designs. His last name starts with a K, and his first name escapes me, but he's one of the top -- if you mentioned a

couple of names, I can tell you which one it is.
Q Now, let's go down the list. With Fudd Arms -- and you have their -- I can see that you have their websites in your declaration. Do you know who the primary principle at Fudd Arms is?
A I do not.
Q Have you talked to anyone at Fudd Arms?
A Not to my knowledge.
Q What about Grey Market Research?
A Grey Market Research sent me a sample Super Safety at some point in the past, maybe a couple of years ago, a year ago. That's my interaction with them.
Q Did you communicate with them about it?
A We probably -- they probably asked first for my P.O. box, would be my guess.
Q One you received it, did you have any discussions with them?
A I did not. I generally have a lot of people offering to send stuff and don't have time to deal with it.
Q Are you -- what about Z3 Productions, are you familiar with anyone there?
A Yes. And as I mentioned earlier, there's a number of companies here which can be easy to mix up, but I'm familiar with a Zac who I believe is with Z3 Productions.
Q And have you had discussions with anyone at Z3

Productions?
A If Zac is the one with Z3, then, yes, I've been on several phone conversations with him.
Q What did you-all discuss on the several phone conversations?
A Litigation between himself and the plaintiff.
Q Anything else? Anything technical?
A We brought up the price of the -- dealer price of the kits, as I've previously mentioned.
Q Do you know what Z3's production -- well, let me -- you said earlier that they have lower production -- much lower production costs and you said that it was either Z3 or Stark80 that had much lower production costs, because they told you what their dealer price was and you know what your production cost is, right?
A Correct.
Q They didn't tell you what their production cost was?
A They did not.
Q What about 2AG?
A I'm only familiar with their -- their website.
Q Have you had any discussions with anyone at 2AG?
A No.
Q What about Stark80, have you had discussions with anyone there?
A We may have had an exchange on the social media

platform X a number -- two or three years ago, whenever this started. I don't know for sure. But the name is familiar to me from that time period.

Q What about Deez Nuts? I think their dba is DNT. Is that right? Or D- --

A That founds familiar.

Q I think that's right. Have you talked to anyone there?

A Not to my knowledge.

Q Are you familiar with anyone that works there?

A Not to my knowledge.

Q What about Polymer Pew?

A It would be the same answers.

Q URSA Security?

A Same.

Q And we talked about Atrius and AS Designs. Have you -- and part of -- in running your various social media pages, what platforms do you have a social media presence on?

A YouTube, Instagram, Twitter, or now X, Odysee.com, and I have videos -- I believe this is still set up to automatically upload to Rumble and possibly Brighteon.com, though I'm no longer active on those platforms.

Q You said Rumble?

A Rumble. I know I have videos over there. Haven't been over there in a while.

Q The other was Brighteon?
A Yes.
Q What about Discord?
A I'm not on Discord other than a couple unrelated or private groups related to computers or some other thing.
Q So nothing on Discord related to the Super Safety?
A No. My Discord interactions would have been probably several years ago at this point, related to other -- other things, just friends and that kind of thing.
Q Are any of the private groups that you're -- that you're in in Discord based on Rare Breed?
A No.
Q So approximately how many followers do you have on Facebook?
A My Facebook account is dedicated exclusively to hot air ballooning. I have no firearm content on Facebook, never had and hopefully never will.
Q It's exclusively related to what? I'm sorry.
A Hot air ballooning. I have a hot air balloon.
Q Are you familiar with the group Hoffman Tactical Super Safety?
A It has been brought to my attention.
Q Are you a part of that group?
A No.
Q Do you know the moderators from that group?

A I know there is a moderator of one of the groups who is involved in a case with the plaintiff, I believe in Mississippi, who informed me he was part of one of the groups, I don't know which one. That would be my only contact.
Q How many different groups are there related to the Super Safety on Facebook that you're aware of?
A There's just the one. So just the one that I'm aware of. The way I would phrase that reply is, I'm aware that there are groups on Facebook. I've taken no effort to look at them, so I don't know if it's one or multiple.
Q Have you ever posted on anything that's made its way to any of those groups?
A Not that I know of, unless someone screenshotted or otherwise took something that I posted.
Q Does the aim Isaiah Conrady sound familiar?
A No.
Q What about Ginger Breadman?
A Ginger Breadman is familiar because I was told he was a possible manufacturer. But I was unable to find any evidence of that, which is why it's not included on my list.
Q Have you made any efforts to contact Ginger Breadman?
A No.
MR. CAMMACK: Your Honor, it's 2:57. I think my next line of questioning would take about ten minutes.

THE COURT: We will break for the day, then. Do you want to resume tomorrow, or would you prefer to resume at a later date?

MR. CAMMACK: Your Honor, I'm picking a jury on Monday in Midland. So I'd like to conclude this if possible. So tomorrow -- I will stay and get this done.

THE COURT: Okay. Tomorrow? I think defense asked if we could start at 11:00, and I think the plaintiffs asked if we could start at 9:00. So why don't we compromise and start at 10:00?

MR. HORTON: Works for us, Your Honor.

MR. CAMMACK: Thank you, Your Honor.

THE COURT: That should displease everyone.

MR. HORTON: Thank you, Your Honor.

MR. CAMMACK: The best kind of settlement, isn't it, Your Honor? Nobody's happy.

I did want to offer the Court -- and we have not requested through the Court or through the marshals. We actually have an AR-15 lower assembly that has the stock and buffer and buffer tube and buffer spring removed, and it has no barrel. It has -- all it has is the lower assembly with the trigger with a Super Safety installed in it. And if the Court would like, I can -- I can follow whatever instructions you may have if you would like to get your hands on it and actually see it.

THE COURT: Talk to the marshals.

MR. CAMMACK: Okay, Your Honor.

THE COURT: Okay.

MR. CAMMACK: I will talk to them on our way out.

THE COURT: Okay.

(Evening recess.)