IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

---

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

Plaintiffs,

v.

1:25-CV-389

TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,

Defendants.

---

Chattanooga, Tennessee
January 29, 2026

BEFORE: THE HONORABLE CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE

HEARING ON MOTION FOR PRELIMINARY INJUNCTION

VOLUME III OF III


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 1 of 120
PageID #: 642

APPEARANCES:

FOR THE PLAINTIFF:

DECKER A. CAMMACK
Whitaker Chalk Swindle & Schwartz, PLLC
301 Commerce Street
Suite 3500
Fort Worth, Texas 76102

JOSEPH ALAN JACKSON, II
KATELYN MURDOCK
Spears, Moore, Rebman & Williams
601 Market Street, Suite 400
Chattanooga, Tennessee 37402

FOR THE DEFENDANT:

JACOB G. HORTON
JONATHAN M. BLANCHARD
Blanchard Horton PLLC
P.O. Box 5657
Oak Ridge, Tennessee 37830

- - -

INDEX OF PROCEEDINGS

TIMOTHY HOFFMAN
Direct Examination by Mr. Cammack (Cont.) ................3
Recross-Examination by Mr. Horton .......................93
Further Redirect Examination by Mr. Cammack ...........111

PLAINTIFF'S EXHIBITS

| NUMBER | DESCRIPTION | RECEIVED |
|---|---|---|
| 1 | Curriculum vitae of Brian Luettke | 55 |
| 2 | Metal version of Super Safety cam and lever | 56 |
| 3 | 3D-printed version of Super Safety cam and lever | 56 |

THE COURT: We were in the midst of cross-examination when we concluded for the evening. So we can resume with that.

MR. CAMMACK: Thank you, Your Honor.

May it please the Court.

<u>DIRECT EXAMINATION</u> (Continuing)

BY MR. CAMMACK:

Q Mr. Hoffman, yesterday when we -- before we adjourned for the day, you said that you were active on -- I believe you said Instagram, X, YouTube, and Facebook. Is that accurate?

A The Facebook is entirely unrelated. It's a personal account. But, yes, I am active on Facebook.

Q How many followers do you have on Instagram?

A Approximately-- It changes. Approximately 27,000, I believe is the right number.

Q Has that number changed since you introduced the Super Safety in July of 2023?

A Of course.

Q How many -- approximately how many followers on Instagram did you have prior to the release of the Super Safety in July of 2023?

A I don't know. It's been a few years. I know we've grown steadily since I opened my account, but I have no reference for what quantity of followers I had at that time.

Q Do you recall when you opened your Instagram


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 3 of 120 PageID #: 644

account?
A I believe it was in 2021. That could be off by a year, but it was around that time period.
Q Is it fair to say that your following on Instagram had a sharp increase -- you had a sharp increase in followers following the release of the Super Safety?
A I've actually never looked at those statistics. I don't know.
Q What about on X? How long have you had an X account?
A My X account was opened --
Q Let me rephrase that, because that can be confusing. Did you originally have a Twitter account?
A Yes.
Q And I don't know the exact date, but I believe it was somewhere around 2021 that -- or 2020 that X -- Twitter became X. Is that --
A I believe it was after that, but there was some time in the last four or five years it swapped over.
Q And you haven't changed your account since it changed from Twitter to X?
A Correct.
Q Did you also have a sharp increase in followers on X since you released the Super Safety in July of '23?
A As with Instagram, they don't provide any concise

statistics or graphs, so I've never looked at that.
Q Do you know how many followers you have on X approximately?
A Currently I have approximately 40,000 followers on X.
Q We talked about this a little bit yesterday and you said that you were -- I believe you said you were aware of the private Facebook group Hoffman Tactical Super Safety. Is that right?
A Yes.
Q And so if you look at the screen, this is a screenshot of -- maybe see if I can expand this a little bit, do a slide show here, it will help. And this slide show, if you look in the upper right, I've highlighted, that's a depiction of a Super Safety in the lower receiver of an AR-15. Is that accurate?
A To further clarify any point you're trying to make here, this is clearly a screenshot taken from the -- one of the pdf documents that I released with the Super Safety.
Q Okay. So this is your document that's -- that whoever created this -- this Facebook group used to promote this Facebook group or to identify -- well, correction, this is a screenshot that whoever created this Facebook group used to identify this Facebook group with the Super Safety?
A This appears to be taken from my document. I don't

know what their intent was.

Q So you designed -- you see where my -- if you look at the highlighted portion on the diagram, that is a diagram of the Super Safety that you either created or approved of?

A I created --

Q Okay.

A -- that Super Safety, yes.

Q And so as of a couple of days ago there were 24.6 thousand members. Do you see that it's highlighted under Hoffman Tactical Super Safety?

A Yes.

Q And then below that, the moderators, Ginger and Isaiah are the moderators. It's pretty small, but I'll -- Admins, I should say, not moderators. Do you see that?

A Yes.

Q And you said that you didn't know those people?

A Correct.

Q So we talked yesterday about one of the -- "one of the companies that makes components in accord with or based on my new design," in Paragraph 15 of your declaration, was Fudd Arms. Did you see that? Do you remember that?

A I recall discussing that.

Q So this is a link on the Hoffman Tactical Super Safety group that is posted by Steve Fuddster. Do you see that?

A Yes.
Q And it says, "Trusted Vendors." Do you see that, that pdf file name, Trusted Vendors?
A Yes.
Q Do you know -- do you have any idea -- do you know who Steve Fuddster is?
A No.
Q Have you ever seen a list of trusted vendors of the Super Safety?
A No.
Q So you've never seen -- on this next slide, you've never seen this list of trusted vendors?
A This appears similar to a list I saw of companies that were in litigation with the plaintiff. So it -- I don't know if this is the same list with different titles, but I've never seen this list under the context of a trusted vendors list.
Q So I just want you to answer it yes or no. I'm going to go down the list and ask -- yesterday in terms of these, and if I retread a little bit, I apologize, but I just want to -- looking at this list on Slide 4 of this PowerPoint presentation, go down these lists and ask if you've had interaction with these entities. Do you understand what I'm asking?
A Yes.

Q Okay. The first one is Dairyland Defense.
A Not that I'm aware of.
Q Hanes Tactical.
A Not that I'm aware of.
Q Polymer Pew.
A Not that I'm aware of.
Q EZ Prints.
A Not that I'm aware of.
Q Michael Felderman/Super Safe Triggers?
A Not that I'm aware of.
Q Active Safety Designs?
A Is that AS Designs?
Q I believe it is.
A The same company?
Q Yes.
A As we discussed yesterday, I've had contact with at least one gentleman from that company.
Q Jason Ramsden?
A Not that I'm aware of.
Q And we talked about Deez Nuts yesterday. Did have you interaction with them?
A I don't believe I have. We did discuss that yesterday. But not that I'm aware of.
Q Grey Market Research?
A They're a company who sent me that sample, as we

discussed, and I may have had contact with them surrounding them asking for an address and...
Q SkoPrints?
A Not that I'm aware of.
Q Hoffman Hoff?
A Not that I'm aware of.
Q Do you know who Hoffman Hoff is?
A No, but it's a -- kind of a scummy name if he's trying to pretend to be me.
Q Pembleton and Sons?
A Yes.
Q What was your interaction with Pembleton and Sons?
A He has an account on X, and he's made posts which I believe I have responded to on that social media platform and possibly others.
Q And we discussed Ginger Breadman. You don't -- have you had any interactions with him?
A Not that I'm aware of.
Q Harrison Gunworks?
A Not that I'm aware of.
Q Jacob Frog's Burse?
A Would you read that one again?
Q I think I skipped one, ZE -- it says ZE Pro, ZE Pro.
A Is ZE Pro in any way associated with the Z3 Productions we covered yesterday?

Q I don't know.
A Not that I'm aware of.
Q Jacob Frog's Burse?
A Not that I'm aware of.
Q AG Super Safety?
A Not that I'm aware of.
Q Den Slinger?
A Not that I'm aware of.
Q Tactical Titan? I believe they also have -- they go by 80Mills.
A 80Mills is -- the name is very familiar to me, possibly because they're involved in litigation with the plaintiff, but I've had no contact with them that I'm aware of.
Q Strange Waters?
A Not that I'm aware of.
Q Canuck Mag North/Archie?
A Not that I'm aware of.
Q Reset Def/Reset Defense?
A Not that I'm aware of.
Q Strike Gunworks?
A Do they go by any other names?
Q Not that I'm aware of.
A Then not that I know of.
Q Andrew Worley, Freedom Finger Triggers?

A I may have been in contact with him on a social media page where he made a comment. The name is familiar from social media. So it's possible that we had some sort of back-and-forth in a comments section or otherwise.

Q 144.1 Recoil Systems?

A Not that I'm aware of, unless there's some other dba. Recoil Systems is familiar to me but not under that name.

Q Tactically Broke?

A Not that I'm aware of.

Q And the last is Arsenal Armory.

A It will be the same answer.

Q Okay. So do you -- when you have -- you've had a substantial increase in your followers on social media, Instagram, you've -- you stated. And obviously in the temporary restraining order hearing your counsel said that if you were -- if the TRO were to be entered, you were going to lose $80,000 in sales the next day. Do you remember that?

MR. HORTON: Objection, Your Honor. Facts not in evidence. I don't believe he testified that there was a substantial increase in his followers.

THE COURT: I think the question related to something that he thinks that you made during your opening statement. He's asking about that, not about his own testimony.

Am I correct in that, Counsel?

MR. CAMMACK: You're correct, Your Honor.
A I believe my counsel said something to that effect.
Q Was that accurate, to your knowledge?
A I actually don't know. I'm not familiar with what loss and what time period he was referring to.
Q Approximately -- on the -- on -- so the hearing for the temporary restraining order was on January 12th, right? You were here.
A I was here for the hearing.
Q And you had a number of orders, a large number of orders, according to your counsel, that had already been placed.
A Incorrect. I don't believe that was ever alleged.
Q Okay. Well, tell -- explain how you stood to lose -- regardless of what the amount was, how the T- -- the temporary restraining order was going to cause you to lose money from the sale of the Super Safety immediately following the temporary restraining order hearing.
A I was intending to release our version of the Super Safety as a product, I believe the following day, and I was intending to make sales amounting to that figure, or approximately.
Q What were -- what was going to be your retail price for the -- for your version of the Super Safety?
A Ninety dollars.

Q And I believe you testified yesterday that that would include the -- the drum, the lever, a modified trigger, a lower receiver spacer, and a modified detent. Is that accurate?

A While the titles would be incorrect, that does summarize the parts in the kit.

Q So, so the record's clear, please state what the components were of your 90-dollar retail Super Safety.

A It would be a Super Safety safety selector cam, a Super Safety lever, an improved rounded detent, a modified mil-spec trigger, and a Super Safety centering block.

Q Where had you made -- in your declaration you state that you made approximately 70 sales prior to the temporary restraining order. Where did you make those sales?

A At a gun show referenced, I believe, in one of the plaintiffs' documents.

Q The one in Knoxville?

A There was actually two gun shows. We made a small number of sales at another gun show at an earlier date.

Q So I'm going to shift gears a little bit and look at your -- go back to your declaration.

(Brief pause.)

BY MR. CAMMACK:

Q Okay. I'm going to direct your attention to the monitor. And do you recall releasing a video on YouTube

called "Patents and the Super Safety"?
A Yes.
Q As you look at this still shot, does this appear to be the footage from that video?
A Yes.
MR. CAMMACK: Okay. I'm going to go ahead and play this. Hopefully the volume works. Let's see.
(The video was played in open court, and the proceedings continued as follows:)
BY MR. CAMMACK:
Q Okay. So you said it describes something similar to the Super Safety. Do you recall saying that?
A Yes.
Q Do you still stand behind that statement?
A How do you want to define the word similar here?
Q It's your words, not mine. How did you describe the word similar?
A The word similar here is referring to it using a cam system to reset the trigger, as opposed to the hammer contacting the trigger, or some other system.
Q Any other similarities that you were referring to in the video?
A I believe in my declaration I stated that there was some similarities in a particular portion of the patent, and that's also true. There's some -- Blakley reflects some of

the things that I did, that I improved upon.
Q Okay.
A We can find that in the declaration.
(The video was played in open court, and the proceedings continued as follows:)
BY MR. CAMMACK:
Q Right there you said, "It contacts a fin connected to the trigger." Do you remember saying that?
A Would you like me to describe what this fin does?
Q No, I'd like you to say yes or no.
A Yes.
(The video was played in open court, and the proceedings continued as follows:)
BY MR. CAMMACK:
Q So as you look at this, as you -- the portion we just viewed, if you contrast that to --
(The video was played in open court, and the proceedings continued as follows:)
BY MR. CAMMACK:
Q Just -- hold on. If we look at the --
(Brief pause.)
BY MR. CAMMACK:
Q Well, it's not going to cooperate, clearly. I've looked at this quite a bit. This is the claim chart for the '784. So there on the right, here, you recognize this as a

figure from the '723 patent that you were just referring to?
A It appears that is correct.
Q It's had some coloration done, obviously, right?
A There are colors added.
Q And you said in the -- in the video you said that the cam, this -- this colored green here, right? (Indicating.)
A Correct.
Q -- when the bolt moves -- the bolt carrier moves to the rear, contacts this fin attached to the trigger, right? That's what you said in the video.
A Correct.
Q Okay. Down here at the -- in the same para- -- underneath, in your claim chart declaration, you said that "the '723 device has a locking member, green and orange, with narrow hash parts in combination --"
DR. BLANCHARD: Objection, Your Honor. The claim chart was not part of Mr. Hoffman's declaration.
THE COURT: Counsel?
MR. CAMMACK: I'll rephrase, Your Honor.
THE COURT: Very well.
BY MR. CAMMACK:
Q So this claim chart was an exhibit to your response to our motion for preliminary injunction, wasn't it?
A I believe that is correct.

Q And this claim chart references your position as it relates to our motion for preliminary injunction and your argument as to why -- strike that -- it's your argument as to why -- or as to how to characterize the '723 patent, doesn't it?
A This document was prepared by my counsel.
Q Do you -- do you disagree with this document?
A I see no reason to at this time.
Q Okay. Well, so in that bottom part here, it says, "The device -- the '723 device has a locking member, green and orange, with narrow hashing parts in combination, that is moveable between a first position in which it locks the trigger member, in pink, against pulling movement." Do you see that?
A That statement is correct.
Q Except that the orange portion that -- is not part of the locking member, is it?
A If I may ask you a question, I think that would help clarify this matter.
Q You can ask.
A If the orange portion was removed, would the green portion be able to lock the trigger member?
(Brief pause.)
A I'll help you. The --
Q Well --

A -- answer is no.

Q Okay. You said that the -- in your video, that the -- that this is a fin that is attached to the trigger. It moves with the trigger, right?

A The word attached does not mean it's the same body. In this case the fin is moveable separately from the trigger and it is also attached to the trigger and can move with the trigger. There are several axes of movement illustrated in this drawing.

MR. CAMMACK: Objection. Nonresponsive.

BY MR. CAMMACK:

Q So if we go back -- if we go over to the '784, for example -- and of course this is your -- your coloration that everyone has agreed is incorrect in terms of the orange portion, because it adds part of the trigger housing. You remember that, right?

A To clarify, this document was prepared by my counsel with limited time. We appreciate any corrections that you may have made.

Q Before we get into that, do you know -- who did the coloration of the Figure 2 of the '723 patent? Was it you, or your counsel?

A I actually don't know. It wasn't me.

Q So it's your position now that the orange portion that's colored on the Figure 2 of the '723 patent is part of

the -- you're saying that that is part of the locking member.

A Yes.

Q Even though it's in no way connected to the lock- -- the cam, which is the green portion, right?

A The two components are intimately connected via their interactions with each other. There's no need for some sort of particular connection or weldment or rivet or pin in order for this locking member to function.

Q Well, the claim language doesn't -- doesn't disclose locking members, does it?

A The claim language says "locking --"

Q Yes or no, sir, please.

A Could you -- could you read the portion of the claim language you'd like me to speak to.

Q It says, "In a forced reset trigger mechanism, an extended trigger member locking device."

A The word <u>member</u> is not used in the plural.

Q And nor is the word <u>device</u>, is it?

A That's correct.

Q So moving to -- okay, so if we go to -- so this is the '723 patent with Figures 1 through 3. And the figure we were just looking at was Figure 2, right?

A I believe that is the case.

Q Have you -- are you familiar with this -- with the other figures in the '723?

A Yes.
Q Okay. So, without getting into semantics, which obviously we have to in patent law, but for now would you agree with me that in Figure 2 that the trigger is locked?
A Yes.
Q And in Figure 3 the trigger is not locked, correct?
A Yes.
Q And in Figure 1 the trigger is both unlocked and has been pulled.
A Yes, or the trigger is in its fired state. We can insinuate that it's been pulled by something.
Q Fair enough. The only -- some force has been exerted on the trigger to release the sear engagement with the hammer to allow it to move forward.
A And overcome the force of the trigger spring.
Q However, if you look in Figures 3 and Figure 1, in Figure 3 the cam portion is not even touching the fin, as you called it, that's attached to the trigger, right?
A The trigger is unlocked and in its forward position. As such, there is space somewhere, there is a void, which the trigger can move into to move into its fired position.
Q Thank you. The trigger being what we here have colored in pink, right?
A The trigger has been inappropriately colored with the trigger extension, also in pink, but the trigger is pink.

Q Isn't it true that the trigger -- the portion that's colored in pink can move independently of the cam portion that's colored in green when the trigger is in the unlocked position?

A Of course.

Q And that there is no mechanical connection between the trigger, the fin -- the trigger or the fin and the cam portion.

A As long as the bolt carrier remains in the closed position, there is no mechanical interaction in this particular state.

MR. CAMMACK: Objection. Nonresponsive. Move to strike.

BY MR. CAMMACK:

Q My question was, in Figure 3 -- strike that. There is no mechanical connection between any portion of the trigger or trigger fin, as you called it, and the green cam, yes, or no?

A If would you add to that question, "in Figure 3, when the bolt carrier is in its forward position," then I would agree with you, if you'd like to repeat the question.

Q No, I'd like you to answer yes or no. And object to the sidebar conversation, because --

MR. HORTON: Objection, Your Honor.

Q -- my question was answer --

THE COURT: Counsel, Counsel.

Q -- yes or no.

MR. HORTON: Arguing with the witness.

THE COURT: Counsel, Counsel, let's keep in mind where we are. Let's keep in mind that we are professionals. There is an examination going on. Let him finish his question. Then we can object. There's no need to overtalk each other. Okay? This is a court of law, not a barroom. We're going to do things professionally and the way that lawyers do things.

Now, there is an objection. What is the objection?

MR. HORTON: The objection is, arguing with the witness, Your Honor.

THE COURT: Counsel?

MR. CAMMACK: Your Honor, I was about to object as nonresponsive, because I asked a yes-or-no question and got nothing close to a yes-or-no question -- a yes-or-no answer.

THE COURT: Mr. Hoffman, the attorney is entitled to a yes-or-no answer if a yes-or-no answer can be given. So why don't you let him repeat the question again, and if you can, say yes or no.

THE WITNESS: Yes, Your Honor.

BY MR. CAMMACK:

Q In Figure 3 there is no mechanical connection between the green cam portion and the trigger or trigger fin, is there?

A Correct, because the bolt carrier is forward.

MR. CAMMACK: Objection to everything after, "Correct," Your Honor.

THE COURT: I think he answered your question yes.

BY MR. CAMMACK:

Q In Figure 2 there is likewise -- there is -- I agree that there is contact between the cam and the trigger fin. Right?

A The contact constitutes a connection.

MR. CAMMACK: Objection. Nonresponsive.

BY MR. CAMMACK:

Q There is contact there, correct?

A Yes.

Q But there is nothing that secures in any of these figures the green cam portion to the trigger and trigger fin, right?

A There is no weldment, rivet, or pin permanently fastening these components together outside of their overall relationship being permanently affixed to the receiver of a firearm.

Q And that's a great point, because we know that that green cam portion is secured to the lower receiver, right?

A Correct.

Q So that is secured to -- the green cam is secured to the lower receiver. The fin, trigger fin, trigger portion is

not secured to the cam.
A There is no direct connection between the cam body and the trigger fin body. They are connected via the other relationships in the mechanism.
Q My question was secured to. And you would agree that they're not secured to one another.
A Yes.
Q Thank you.
(Brief pause.)
BY MR. CAMMACK:
Q Okay. With respect to the '784 patent, you'd agree with me, would you not, that if we go to -- this is the figure that was essentially used by both -- counsel from both sides that has the extended trigger member locking device colored in light green for the cam portion and dark green for the lower portion, right?
A This is comparing it to the '723?
Q This is just a depiction of the Figure 7 of the '784 patent.
A You used the word "cam portion." I'd just like to clarify what you meant by that.
Q Right. Well, this is how you used the '784 in comparison to the '723. It's the upper -- it's the upward extending portion of the locking device. My question, though, is, in the '784 patent the lower portion and the upward

portion are mechanically connected, right?
A They are connected via a pin which allows the upper portion to fold, correct.
Q But fold doesn't appear in the '784 patent, does it?
A The '784 patent does not claim or use the word fold; however, it does illustrate folding in the --
Q Fold is your word. The claim language is "deflects." Right?
A Correct.
Q And then later --
A Or fold.
Q No, it doesn't say fold. You just said it didn't say fold. Right?
A The '784 patent uses the word "fold" synonymously with the word "deflect" in the specification; if I recall, the claim may only use the word "deflect," if that helps answer your question.
Q So in Claim 1 of the '784 patent, it says, after the preamble to the claim, the word "comprising." It says, "A locking member that is moveable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member." Do you see that part?
A Yes.
Q It says, "the locking member configured to be

moveably supported by a frame and including a generally upward extension portion configured to make actuating contact with the surface of a bolt carrier, such actuating contact causing the locking member to move from the first position to the second position, the locking member having a body portion that is moveably supported and upwardly extending deflectable portion that is separately moveable relative to the body portion between an extended position and a deflected position."  Right?

A Yes.

Q Okay.  In Claim 4 it says, "The device of Claim 1 wherein the locking member deflectable portion pivots relative to the body portion."  Do you see that?

A Yes.

Q Now, you'd agree with me, in all the study and videos that you've put out on your understanding of patents, that a dependent claim is inherently narrower than an independent claim, right?

MR. HORTON:  Objection.  Calls for legal conclusion.

MR. CAMMACK:  Your Honor --

THE COURT:  I'm not sure that's a -- I think that's more of a patent issue.  So I think it depends upon the witness's knowledge of patents.  I think he does have at least some knowledge of patents.  I think he's applied for one himself.  Overruled.

A The answer is, I don't know. I've only studied the primary claim here. I don't -- the dependent claims are -- I don't know.
Q Well, you'd agree with me that in Claim 4 it says, "wherein the locking member deflectable portion pivots relative to the body portion," right?
A Yes. Is that just above where it says it is spring-biased towards an extended position? Is that just above that point?
Q Let me help you. I'm talking about right here. (Indicating.)
A Let me see -- I see where it says, "the locking member deflectable portion is spring-biased." You're moving up from that.
Q Right here, "deflectable portion pivots." (Indicating.)
A I see where it's -- ah, I see the word "pivots relative to the body portion." Yes, I see that.
Q There's nothing in Claim 4 that says anything about being spring-biased, right?
A No, it appears that was in Claim 6.
Q Nothing in any of the claims says anything about folds, right?
A The claim appears to use only the word "deflected," correct.

Q Or "pivots," in the dependent claim that we just talked about.
A Claim 5 uses the word "pivots."
Q Okay. And -- but nowhere else is there any discussion of -- there's -- the word fold does not appear in any of the claims, right?
A It does not appear that the word fold is in these claims.
Q Would you agree with me in general that pivoting and folding describe different things?
A There is no similarity between these words, I agree, they're separate, define their own thing.
Q Okay. Back to your declaration. In Paragraph 23 you say, toward the end of that, "My work on designing the new trigger components progressed to detailed drawings around May of 2022, and I filed a provisional patent application covering my new design, titled, 'Active Firearm Trigger Mechanism,' on September 28th, 2022, as U.S. Application Number 63/377,498 (the '498 application)." Do you recall that?
A Could you bring up the copy --
Q I'll show it to you.
A -- of the declaration so I could verify that?
Q I started at "My."
A This is correct.

Q And then you go on to say, in Paragraph 24, "Later, in September of 2023, when my U.S. provisional application neared its one-year filing expiration date, I did not continue to pursue my patent rights by filing the required non-provisional application." Do you see that?

A Yes.

Q Mr. Hoffman, I'm going to -- this is Exhibit 4 to your response. I'm going to show you -- this is the cover page, which is the USPTO filing receipt, but I'd like to show you this and ask you, is this -- let me move some of this other stuff out of the way. Is this the first page of what you filed as your provisional application in September of 2022? (Indicating.)

A This appears to be part of my written description of my invention, yes.

Q Okay. You go on, in Paragraph 24, to say that, "While now regrettable, this seemed reasonable at the time, as I undervalued the technology due to the ATF --" oh, let me zoom in for you, sorry. "-- I undervalued the technology due to the ATF interpretation of such trigger components, was not in a financial position to hire a patent attorney, and thought that donating my invention to the public was a good thing to do." Do you see that?

A Yes.

Q Do you stand by that statement today?

A Yes. It summarizes my position at the time.
Q What was your understanding of the ATF interpretation of such trigger components in September of 2023?
A I was aware of the plaintiffs' interaction with the ATF and that there was ongoing litigation between them and the ATF or other members of the government surrounding the legality of these triggers.
Q Okay. But my question was more what -- what was your understanding of the ATF interpretation?
A Could you clar- -- are you trying to ask whether I thought they were legal or not, or are you trying to ask what I thought some member in the ATF thought their legality was?
Q I'm trying to ask what you meant by your statement.
A Thank you. I knew that someone in the ATF did not like these triggers, for political reasons, and that they were engaged in litigation with at least the plaintiff, I believe, over the legality of these triggers, hence someone in the ATF or the government wanted to prevent these triggers from being sold on the market or otherwise.
Q "Or otherwise." On the market --
A Yeah.
Q -- or --
A Well, I mean, I don't know what they were thinking,

but that's an -- I use that as an example. I don't know what they were trying to prevent, but it appears, due to their litigation with the plaintiff in this case, that they didn't like this technology.

Q Did you have an opinion of your own at the time regarding how you -- what you thought the outcome would be of the litigation between the ATF and plaintiffs?

A Yes.

Q What was that?

A That the triggers would be found legal.

Q What did you base that opinion on?

A The plaintiffs' own statements and my understanding of the law and my understanding of the technology, in addition to an expert opinion I obtained from a firearms expert in 2022, which I did to get a third party's opinion on the legality of my device.

Q Did you follow the litigation between the ATF and plaintiffs closely at that time?

A No. I was aware of it via videos that people did on the subject.

Q Were you aware that plaintiffs had obtained four opinions on -- regarding the legality of their devices prior to the litigation with the ATF?

A I may have been. I knew they obtained opinions, because I believe they informed me of that at some point.

Q With all those opinions, they still had their products seized, they were enjoined in New York, and were in four different lawsuits versus the DOJ in some shape, form, or fashion?

A Unfortunately that is correct.

Q And despite all that, you thought that they would prevail?

A Yes, because the facts were in their favor.

Q Did you ever participate, either financially or otherwise, in any action to support the legality of forced reset triggers or active reset triggers or repeat reset triggers at the time the plaintiffs were in their litigation with the Department of Justice?

A I may have made statements supporting them.

Q Did you take any action -- any legal action on your own?

A Lean into that a little bit more. You mean like filing a lawsuit, or --

Q Did you file a declaratory judgment action?

A No.

Q Did you seek a clearance from the ATF for the Super Safety to determine its legality?

A Are you trying to ask if I requested a determin- -- determinlation -- excuse me. I'll start over. Are you trying to ask if I had requested a determination letter from the

ATF's technical division?
Q A determination letter? Yes.
A I did not.
Q Why not?
A For the same reasons the plaintiff did not request a determination letter from the ATF's technical division.
Q How do you know why the plaintiff didn't seek a determination letter from the ATF's technical division? Did you talk to them about it?
A No. They've made many statements publicly that led me to believe what I do.
Q So you go on, in Paragraph 24 -- so even though you thought that plaintiffs were going to win against the DOJ, you said you undervalued the technology due to the ATF interpretation, right?
A That would have been one reason I undervalued it.
Q That's the reason you gave here.
A This is a correct reason.
Q Are there others that you -- are there other reasons that you undervalued the technology?
A Yes.
Q Are any of those reasons stated in Paragraph 24 of your declaration?
A No.
Q Are they stated anywhere else in your declaration?

A No.
Q And then you said that you were not in a financial position to hire a patent attorney, right?
A That is correct.
Q And then -- so with all of that, then you said you thought that donating your invention to the public was a good thing to do, right?
A That is correct.
Q So, with the Bureau of Alcohol, Tobacco, Firearms, and Explosives actively engaged in seeking an injunction against plaintiffs, with plaintiffs spending millions of dollars fighting the DOJ for a declaratory ruling -- a declaratory judgment that their forced reset triggers did not meet the definition of a machine gun, you thought the best thing to do was put your technology in the hands of the general public for them to use at their discretion.
A Yes. And if I may clarify a little bit here, I believed, if anything, this would help the plaintiffs' position by having more people use the technology. At no point did I believe that this would damage the plaintiff. If it had been brought to my attention at the time, if it's true, my actions may have been different, if that helps answer what you were getting at.
Q No. If you take the plaintiffs completely out of the equation, isn't it true that if the ATF would have won

against plaintiffs in their lawsuit, in the declaratory judgment action, the injunction, you would have just created a criminal out of everyone who downloaded your file, wouldn't you?

A I had complete confidence in the plaintiffs' ability to win.

Q Well, that goes directly against your undervaluing the technology due to the ATF interpretation of the trigger components, doesn't it?

A No.

Q How do you -- how do you justify those two seemingly opposite positions?

A Time. I'll clarify. At the time I released -- well, at the time this Statement Number 24 is describing, it looks like in -- sometime in 2023, the plaintiffs were currently in litigation. I didn't know how long that litigation would take. At the time it was still ongoing. If I were to have sold the trigger components myself, I would have been open to having to possibly get involved in litigation myself. At the time I was not in a financial position, I felt, to do this. However, I was fully confident the plaintiff would overcome the false accusations of their opponents at some point in the future.

Q But at no point was it a legal certainty that they would, was it?

A I don't think I'm qualified to make that decision.
Q So let me ask you this, shift gears a little bit: Do you support the Second Amendment of the United States Constitution?
A I support all aspects of our Constitution.
Q Including Article I, Section 8?
A Would you read it to me?
Q Article I, Section 8, Clause 8, says, quote, "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."
A I do. It is in the Constitution.
Q Okay. Do you recall making -- is this -- at the top of this slide, is that Hoffman Tactical, is this your -- is that your post?
A Yes.
Q What social media platform did you make this post on?
A This appears to be Instagram.
Q And was this -- this says it was posted on December 6th, 2025, right?
A That is the date listed on this screenshot.
Q Do you remember making this post?
A Yes.
Q And you say, "The request for a gag order to prevent

me from publicly dismantling faulty patents is my favorite part of this lawsuit."  Do you see that?
A I did make that statement.
Q And you think that's funny.
A I do.
Q Why?
A Because of the irony of requesting a gag order to prevent me from commenting on the claims of a patent, such claims being misapplied in the suit.
Q You believe that claims were misapplied, or the claims are invalid?
A There's actually arguments for both.  That would probably be a better question for my counsel than for me.
Q Do you believe that -- that the patents are faulty?
A The word "faulty" here is deeply untechnical, it's used in a post which is intended to use irony to be humoring or entertaining.  We'd have to dig into what faulty really means.  It really has no specific meaning here other than the patents do not apply in the way that the plaintiff's alleging they do.
Q But you provided no context for what you meant by "faulty."
A Correct, other than what I just explained to you.
Q And so you put this out to potentially forty- -- 40,000 followers?

A This would be Instagram. So it would be closer to the other number I gave you, twenty-seven, or something along that lines, 27,000.
Q In Paragraph 25 of your declaration -- well, in Paragraph 25 you say you uploaded your design and 3D print files to the internet on July 20th, 2023. Do you see that?
A I do.
Q And at the time that you uploaded your files, were you aware of the restraining order and preliminary injunction against -- that was in force -- that was entered against the plaintiffs?
A I don't know.
Q Did you at some point become aware of it?
A Yes.
Q Did you ever have a chance to read it?
A No.
Q Did you know that they were precluded from enforcing their patents as a condition of the injunction?
A I did not.
Q But it really benefited you, didn't it?
A Not that I'm aware of.
Q But the fact remains that -- so while Rare Breed and ABC were prevented from enforcing their patents, you were giving away your accused products here that -- that we're litigating here in this court away for free to the public via

design files, right?

A I would disagree on the portion that the plaintiffs were prohibited from enforcing their patents, because I don't have any knowledge on that, I can't speak to that being true or not. So if you'd break that question into smaller pieces, I can answer.

Q That's okay. It says, "Before I took your files down --" and by that you mean -- we're looking right here. (Indicating.) It says before you took your files down -- and that was on January 13th of 2026?

A That would have been as soon as I got back into the office after the TRO. So I believe that's correct. Maybe the next morning.

Q Or the 12th. That was the day that -- of the hearing.

A It was immediately after the hearing.

Q Okay. You estimate that 32,000 downloads occurred of your design files. Do you see that?

A Yes.

Q And by the design files, do you mean the DEV Pack or the STEP files that allowed machining or MIM -- creation of MIM molds?

A The design files, as described here, would -- would refer to the DEV Pack, and the other files would refer to my more general release with documentation, correct.

Q And the 83,000 downloads of your 3D print files. Do you see that?
A Yes. And by 3D print files here I'm referring to my download, which include STL files, standard triangle language files, which are a form of mesh file.
Q Did you also -- had you also posted any instructions or documentation to assist down- -- the people that downloaded your files to implement them?
A I included detailed descriptions and illustrations of how the Super Safety functioned in detail. I also included detailed documentation and descriptions of how the triggers could be modified and the parts could be manufactured via additive manufacturing in plastic.
Q Did anyone ever contact you to ask you for assistance?
A Hundreds or thousands of people have probably asked me for assistance in troubleshooting problems with their Super Safeties.
Q Did you provide that assistance?
A I tried to inform some of these people of the issues that they were suffering from that were causing their malfunctions. I unfortunately was unable to get back to a lot of them just because their problems were due to other companies' products and not mine and I've limited time resources to respond.

Q Were any of the company -- or were any of the -- did you provide any assistance to any of the companies that are listed in Paragraph 15?

A "Assistance" meaning what we just discussed?

Q Yes.

A I had a conversation with one of the representatives from AS Designs in, I believe, August of 2025 where I pointed out a design flaw in one of their products.

Q Was there a -- did you have any criteria -- you said you assisted -- when people would ask, you would assist some but not all, due to the volume. Were there other reasons that you chose not to assist certain people, or was it just the sheer volume of people that were asking for help?

A It was just the volume. If I had time and focus, I would reply; otherwise, I would just delete the e-mail and move on to something more pressing.

Q So in Paragraph 26 you said the third -- a third party was making -- selling Super Safety and received a C&D letter from plaintiffs on the '247 patent. That's here in Paragraph 26. Do you see that?

A Yes.

Q Who was that third party?

A I believe it was the Z3 Productions, which we have discussed previously, though, as I said at that time, I'm a little fuzzy on this list, there's a lot of companies here.

But I believe it was the Z3 company who received the cease and desist letter.

Q How did you become aware that they received a cease and desist letter?

A A copy of the first page of this letter was e-mailed to me.

Q So if you had to go back to your -- do you still have that e-mail?

A Yes.

Q So if I ask for it in discovery, you're going to -- you're going to give it to me?

A Of course.

Q Do you remember the conversation that you had with the person that contacted you about the cease and desist letter?

A I did have a conversation with him at that time, I believe. It may have been months later. It's been a little while. But, no, I don't remember anything specific. If you have something specific you're looking for, I can try to recall that.

Q I just want to know if you recall any of the details of the conversation.

A No.

Q Let me shift gears for a little bit. Do you recall the discussion yesterday with Mr. Luettke regarding the '247

patent and its -- and the claim language of the '247 patent as compared to the Super Safety?

A Yes.

Q And the primary disagreement that your counsel raised was the use of the word "catch." Do you remember that?

A We raised several major disagreements. That was one of them.

Q What are the others, to your recollection?

A The '723 patent describes art which is exactly the same as the art which the plaintiff is attempting to describe by expanding the scope of the '247 patent claims to cover.

Q So there's a dispute as to whether the '723 -- and your position is that it is a three-position --

A The '723 is factually a three-position selector. I mean, I could build a prototype. It's all right there. It's not a -- I don't believe it's a matter of dispute. It's a matter of fact. We'll get to that at some point in the future.

MR. CAMMACK: Objection. Nonresponsive.

BY MR. CAMMACK:

Q Yes or no, the dispute is that you believe that the '723 is a three-position device.

A Yes, the '723 is three-position.

Q Thank you. There's also -- you've also raised several times, including in your patents and the Super Safety

video on YouTube, that Claims 15 through 23 should not have been allowed, right?
A I could expand on that. My position at that time was influenced by a claim chart the plaintiff filed in a different lawsuit, which they have changed in my lawsuit. So I was wrong because I was using a claim chart which had errors in it. That was my reference. So my reference material was incorrect.
Q So you'd agree with me that as long as the specification supports a claim, an applicant can amend their claims -- the pending claims at any time before the patent issues.
A Of course.
Q But that's not what you said in your video.
A In the video I compared the claims to the plaintiffs' claim chart, which I had access to at the time, and made conclusions based on that.
Q Is this the video -- do you recall this from being in the video, "Patents and the Super Safety, The Facts"?
A Yes.
Q August 15, 2025, right?
A That is the date shown here. That sounds correct.
(The video was played in open court, and the proceedings continued as follows:)
MR. CAMMACK: Let me fix the volume here.

THE WITNESS: Yeah, it's a little quiet.

MR. CAMMACK: It is a lot quiet. I'm not sure why. That's okay. We will --

THE COURTROOM DEPUTY: I have it up here.

MR. CAMMACK: I'm sorry?

THE COURTROOM DEPUTY: I have it up. It's up on the --

MR. CAMMACK: Okay. That's okay.

BY MR. CAMMACK:

Q So on the -- this is the claim chart that you filed as Exhibit 6 to your response to the motion for preliminary injunction. Do you recognize this?

A I don't know which exhibit this is, but this appears to be our claim chart.

Q If you look at the bottom, it says 26-6. Do you see that?

A Yes.

Q And that was added by the Court when it -- once it was filed, so...

A Yes.

Q Okay. Now, again we have the coloration issue, and I just want to direct you fairly quickly to -- there we go. So the claim language says, at the very bottom here——I'll zoom in for us; I think this gets to the heart of the matter——"Whereupon --" whoops. It's not going to cooperate.

There we go. "Whereupon in a standard semiautomatic mode said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that the disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery," right?
A Yes.
Q Okay. And then the next page says, "at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set position so that the user can pull said trigger member to fire the firearm," right?
A Yes.
Q And then it says, "whereupon in a forced reset semiautomatic mode said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook," right?
A Yes. I think it would be helpful if you read the last claim as well, but it's up to you.
Q Well, I'm trying to get there. I just -- you mean the last --
A Element, yeah, the last section there, the last box.
Q Mm-hmm. Right. And it says, "and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm," right?

A Correct.
Q Okay. So in this context -- in the context of this claim, which the plaintiffs wrote, catch requires a user -- if the connector is caught, the user must release the trigger to allow -- to allow the trigger to reset and thereby allowing the trigger to fire, right?
A False.
Q What I said is false?
A Correct. What you said is false. We can walk through the patent one word at a time, and I can show you exactly why. The claim was written in the context of -- there's a lot to this. I could -- I could help you understand this if you desire.
Q I understand it. Thank you for your -- for your offer to assist me in my almost 30 years of being a patent attorney. I think I've got it covered.
I'm asking you that -- whether or not this says, "in a standard semiautomatic mode said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the said disconnector hook catches said hammer hook and thereafter the bolt carrier moves forward into battery," right?
A The word --
Q That's what it says, that you just --
A Correct. Yes. I agree.


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 47 of 120 PageID #: 688

Q Okay. And then it says, in the very next -- it starts the very next one, "at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set position so that the user can pull said trigger member to fire the firearm." That's what it says, right?
A Yes.
Q Okay. And your position, generally speaking, is that the Super Safety does not -- or actually catches, for some period of time, the connector.
A Yes.
Q But by the time it gets into battery, that's not the case, right?
A Correct.
Q Thank you. The user does not have to release pressure on the trigger to -- for the -- for the trigger sear to be released and the weapon to fire again, right?
A Correct. I think what's tripping you up --
Q Thank you. That's-- Thank you. That's all.
(Brief pause.)
BY MR. CAMMACK:
Q Okay. Back to the '784 patent figures. This is a copy of the Figure 7 coloration that you had that defendants filed in their response, right?
A Yes.

Q Okay. Do you agree with me that Claim 18 is part of the trigger housing, right? I mean, I'm sorry, Reference Numeral 18 is part of the trigger housing. It's over here on the far left. (Indicating.)
A Yes.
Q And that 26 is the lower portion of the locking member, right?
A Yes.
Q Okay. But in your -- in your brief in -- on Page 10 you actually cite to the entirety of the orange-colored portion as the lower portion of the locking member.
A I think -- I'd like to clarify that this is not my brief. This was prepared by my counsel with limited time.
Q I'm sorry, but your name -- you are one of the named defendants, right?
A Correct.
Q Then it is your brief, right?
A Yes. I just want to clarify that I'm not arguing about the correction in color if there was an error made when it was being colored.
Q Are you saying if you had drafted it, you would have drafted it differently?
A I would have left the section called 18 not orange. That appears to be an error, which I think we've already addressed previously.

Q So would you agree -- do you agree, or disagree, with me that if we look at the '784 patent, the '784 patent does not -- and this is the preamble -- the '784 patent, Claim 1, is only directed to an extended trigger member locking device, right?
A Correct.
Q It doesn't -- it doesn't claim a forced reset trigger or any -- or an active reset trigger or any type of trigger mechanism. It's an extended trigger lock- -- member locking device for use in a forced reset trigger mechanism, right?
A Yes.
Q Okay. And you were here when Mr. Luettke was -- when Dr. Blanchard was discussing at length with Mr. Luettke about the coloring, and that -- I believe he used the word "folding," and there was some dispute about that. I think we've -- we've killed that dead horse.
A I'm not sure that we have, but I do recall it being discussed --
Q Right.
A -- yes.
Q Okay. And that -- and we've also agreed that the green portions of this Figure 7 that both sides have now used is the more appropriate depiction of the extended -- or, sorry, of the extended trigger member locking device, right?

A The green portion, Number 26 and Number 18 being different colors is appropriate. I can agree to that if you'll ask that.
Q Okay. Fair enough. Now, moving on, this is -- these are Figures 1 through 4 of the '784 patent. You recognize those, right?
A Yes.
Q Okay. Now, I've got the laser pointer out now. Can you see it where I'm -- can you see it up here on the screen?
A Yes.
Q Okay. So in Figure 2 we have what's described as the lower locking member, right -- the lower portion, I'm sorry, of the extended trigger locking mechanism, right?
A Correct.
Q And obviously this is the upper, right? (Indicating.)
A Correct.
Q Okay. And so it's -- "the locking member is moveable between a first position in which it locks a trigger against a pulling movement," right?
A Correct.
Q So that's what the claim language says. And that would be -- if you look at Figures 5 and 6, in Figure 5 you'd agree with me that the trigger is locked, right?
A Yes.

Q And it's locked because -- oh, well, let me do that. It's locked because the front portion -- or the portion on the right, the direction of fire, the front portion of the lower -- the lower portion -- the front, I guess you'd call it a cutout -- is engaged with the trigger and prevents it from being moved upward.

A Counselor, do you really want to argue the drawings with me?

Q I do --

THE COURT: Mr. Hoffman, Mr. Hoffman.

THE WITNESS: Yes, sir.

THE COURT: I think you can tell by now that counsel is very dogged, he's going to pursue this. If you want to be on the stand for the next week, you can keep doing what you're doing. If you'd like him to finish his job, just go ahead and answer the questions yes or no and don't get into arguments or disputes with him. He's not going to quit. In fact, he probably enjoys getting into arguments. So if you want this to go smoothly and have some end point, you may be well-advised to just answer his questions and just let editorials go to another time.

THE WITNESS: Yes, Your Honor. I will do that.

BY MR. CAMMACK:

Q Okay. So this notch at the -- on the lower right side is engaged -- of 26 is engaged with the trigger.

A Yes.
Q And that prevents the trigger from being moved out of engagement with the sear, right?
A Yes.
Q And at this stage the upper portion of the locking member is -- is vertical, right?
A Yes.
Q Would you agree with me that the upper -- that pin, which is Reference Numeral 24 in the drawing, allows the upper portion of the locking member to pivot relative to the lower portion?
A Yes.
Q And then in Figure 6 we're in an unlocked position, unlocked and fired position, right?
A Yes.
Q Because the bolt carrier has moved the extended trigger locking member, the entire thing, forward, it has pivoted on the lower pin, 20, and allowed it to move forward, disengaging the notch from the trigger, right?
A Yes.
Q Now, you could -- there's no requirement of specifically what geometry the lower portion and the upper portion have, right?
A Where?
Q In the --

A Claim?
Q In the claim, in the patent, anywhere. It just says there's a lower portion. There are no dimensions given. Right?
A Correct.
Q It's just there's a lower portion and there's an upper portion, and the claim language describes how those move relative to one another, the trigger, and some of the other trigger components.
A Yes. The claim language is very broad.
Q So this is just a hypothetical, but I could shorten the lower portion and extend the upper portion, right?
A Of course.
Q And that upper portion clearly extends upwardly, right?
A Of course.
Q And the lower portion is -- it's still -- it can still perform its function, right?
A Yes.
Q And that's just one on the left, and then you have the other on the right that's put into the geometry of the lower receiver, right?
A Yes.
Q Okay. So in your -- back to your declaration, maybe.

(Brief pause.)

MR. CAMMACK: Okay. Here we go. One last -- one last thing before we move on. And I have a --

Your Honor, the marshals were very accommodating this morning. May I approach the witness, or I could approach the Bench, too, but I would like to have him confirm that this is in fact the cam portion and the lever portion of a Super Safety.

THE COURT: Okay. Please give it to Ms. Lewis.

MR. CAMMACK: Yes, ma'am -- or yes, sir.

(Brief pause.)

MR. CAMMACK: Thanks. Let me give you both of them. There's two.

THE COURTROOM DEPUTY: Do you want me to hand it one at a time or --

MR. CAMMACK: They're easily distinguishable.

THE WITNESS: Thank you.

THE COURT: Do you have an exhibit number for those?

MR. CAMMACK: Your Honor, I think -- as a matter of fact, I can take care of some housekeeping now. I believe we would like to offer the CV of Mr. Luettke as Exhibit -- as Plaintiffs' 1.

THE COURT: Very well. It's received.

(Plaintiffs' Exhibit 1 was received into evidence.)

MR. CAMMACK: And I would like to enter the metal

version of the Super Safety cam and lever as Exhibit Plaintiffs' 2.

THE COURT: Any objection?

MR. HORTON: May we see them, Your Honor?

MR. CAMMACK: Subject to --

THE COURT: Of course. Of course.

Ms. Lewis, will you retrieve them again and let defense counsel see them.

THE COURTROOM DEPUTY: Yes, Your Honor.

MR. CAMMACK: And the same conditional offer of Plaintiffs' 3, which would be a 3D-printed version of the Super Safety cam and lever, Your Honor.

(Brief pause.)

MR. HORTON: No objection, Your Honor.

THE COURT: It's received.

(Plaintiffs' Exhibits 2 and 3 were received into. evidence.)

BY MR. CAMMACK:

Q Mr. Hoffman, the metal version -- well, let's talk about the Plaintiffs' 3, which is the 3D-printed version, right?

A Yes.

Q And that, on one side, has -- well, it actually may be easier if you hand it back to me so I can put it on the screen so that everyone else can see.

THE COURTROOM DEPUTY: Just the one?
MR. CAMMACK: I'm sure he knows which one it is. Yeah, that's it. Thank you.
BY MR. CAMMACK:
Q So this is -- that is the cam portion, right? And if you'd look very closely, you can see that it says -- has an HT -- if you get the light just right, you can see that it has an HT engraved in the end of it, right? (Indicating.)
A Yes.
Q Okay. So we're looking at the portion that -- this portion here -- and, please, this is your -- this is based on one of your files, right?
A Yes.
Q And you know that for a fact because it's got the HT in it, right?
A I can see all the geometry is my geometry.
Q So this portion over here is where the detent interacts with the Super Safety cam, right? (Indicating.)
A Yes.
Q And the portion here on the far left is what's used for semiautomatic mode, right? Standard semiautomatic mode.
A Yes.
Q And that's because there's no lobe here, right?
A There's no cam surface.
Q No -- no cam surface or lobe that -- that interacts

with the trigger once the trigger is fired.
A Correct.
Q The middle portion is the forced reset mode, or repeat reset mode, as you are now calling it, right?
A Active reset, repeat reset, forced reset --
Q Right.
A -- yes.
Q And the lever, that we've seen plenty of pictures of, slips into the dovetail -- wow, I have a lot more respect for surgeons that use cameras. And this is how --
A The lever is backwards. You need to flip it around to be accurate.
Q I'm sorry. There we go. Right. Okay. And so it sits -- if we look at this compared to Paragraph 37, the figure in Paragraph 37 --
A It's the same, yes.
Q -- this is the way -- this is the same. Well, this is the way -- this is what we're looking at, right?
A Yes.
Q I got that pretty close. And obviously there's a little bit of a void there, right?
A Yes.
Q And that void allows the lever to pivot relative to the cam, right?
A It's a wiggling action, but we can call it a pivot,

that would be mechanically correct, if you want to.
Q Let's be mechanically correct. And so as the bolt carrier goes back, it pulls the Super Safety back, and what you have at that point is solid cam surface engaged with the back of the trigger, right? (Indicating.)
A Yes.
Q So when -- when this is pulled all the way back, there is absolutely no way that someone could fire this weapon, right? (Indicating.)
A I sure hope not. Correct.
Q It would be a -- it would be a weapon malfunction rather than some function of the trigger or Super -- of the Super Safety's design.
A This is assuming we're in the active reset mode, correct?
Q Right.
A Okay. Yes.
Q And as it goes -- as the bolt carrier goes forward, it will catch -- or it will -- it will -- maybe let's not use the word catch, it will engage at the top of the lever --
A Contact.
Q -- contact, engage, contact, and push it forward, which allows -- as you have force rearward on the trigger, despite that force, it will push the back of the trigger down --

A No. You appear to have this backwards here. I think --
Q Oh, yeah. You're right. I'm sorry.
A Yeah. You can run over it again.
Q As you go back, it will push the back of the trigger down, which causes it to engage the sear catch right there, right? (Indicating.)
A Yes.
Q And as it goes forward, it allows the bolt to go back into battery, and once it's back into battery the -- and once it's released, the cam portion is allowed to move up as soon as it gets into this portion -- as the back of the trigger gets into the open portion of the cycle. Is that generally accurate?
A That's generally. It's a little more complicated than that, with the geometry, but it allows the trigger to move into the cam, riding the cam down. So it's kind of a double action there. But I think we understand what you're trying to say, so I'll say correct.
Q Okay. Now, so -- have you ever heard the -- I saw on your -- on your -- I just want to -- this is just a little bit of background. So we've looked at this slide before, and it says at the bottom, "#lawsuit, #HoffmanTactical, #SuperSafety," right?
A Correct.

Q What -- why do you have #lawsuit there?
A Because a lawsuit had been filed against me.
Q And what is the -- what is the effect on Instagram of you putting #lawsuit in the post?
A To inform people that I'm being sued in a lawsuit, and so that I can reference this post at some point in the future using the hashtags, which is the purpose of hashtags.
Q Okay. That is the purpose of hashtags. So have you ever heard of the hashtag CantStopTheSignal?
A Yes.
Q Have you seen that hashtag used on Instagram?
A I have seen it used online, I can't say specifically Instagram.
Q Have you seen it used with reference to the Super Safety?
A I believe I have.
Q And what is your understanding of what CantStopTheSignal means relative to the Super Safety?
A People are reflecting on the idea that if the federal government were to claim that it was a machine gun and force me to remove the files, that the files would still be on the internet. I believe it's a reference to a film made sometime in the last 20 years.
Q So let's continue on just briefly here. And on Paragraph 38 of your declaration -- before we get into that,

have you ever posted CantStop -- #CantStopTheSignal on any of your posts?
A I don't believe I ever have.
Q You're not sure?
A There's a -- it's a chance that, like, four years ago I used it in some other context. But I'm -- I'm relatively confident I have not, but I don't want to say no, because there's a chance that I did something I don't remember.
Q Okay.
A I don't -- I find it to be a -- kind of a crude reference, but that's just my opinion.
Q Okay. So this is Paragraph -- these are the -- in Paragraph 38 you essentially say that you have been made aware that plaintiffs have litigations ongoing accusing multiple defendants of infringing their patents, including the '223 patent relating to FRT technology. And this is the list, right? This is the list that is in your declaration.
A Yes.
Q How were you made aware of these lawsuits?
A These lawsuits were compiled by my attorney, and he said they were correct. And I looked at them, and they all look familiar, so I had no problem with it being in here. I think this is factually true.
Q You -- with the exception of Z3 and 80Mills, who


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 62 of 120 PageID #: 703

we've discussed before, have you had any interactions with any of the defendants listed -- that you list in Paragraph 38?

A I think AS Designs we also talked about a little bit.

Q Okay.

A That's --

Q And obviously you.

A Yeah, and obviously myself. Thank you.

Q What about Firearms Systems, LLC?

A Yeah, I'm not familiar with that.

Q Spider Hole?

A No, not familiar with that one.

Q Dairyland Defense? We've talked about that one earlier.

A Yeah. I think we've gone over all these, but I'd be happy to do with it.

Q Nguyen is one that we haven't -- that we haven't seen before.

A Yeah. Never heard of him, I mean, as far as communication or -- I don't really know anything about it.

Q And then Kline, do you have any idea whether or not the Kline in 3:25-CV-454 in the Southern District of Mississippi is Ginger Breadman?

A No. I'm not aware of any connection. I've communicated with Kline, as we discussed yesterday, and he's

not brought it to my attention at all.

Q Did you-all share notes on the lawsuits and help each other?

A We had a phone conversation where he discussed the details of his lawsuit, I think specifically a tracker being attached to his vehicle in relation to something with the lawsuit.

Q Okay. So in Paragraph 39 you said you felt compelled -- or you feel compelled to comment on Item 12 as found in plaintiffs' motion for preliminary injunction reproduced below, which is here and we'll get to it in a second. That's what you're talking about, right? That quote from our brief?

A Yes.

Q And you said, "While the text attributed to me and reproduced is mine, the plaintiffs have taken my statements egregiously out of context." Okay?

A Yes.

Q Okay. So with that statement in front of you, explain why you believe that plaintiffs took your statement out of context.

A My statement was made in regards to possible action by the federal government against Super Safeties and other forced reset triggers, as we've previously discussed. It appears, in my reading of the plaintiffs' statement, that they

are in- -- somehow trying to insinuate that my statements were in reference to infringing their patents and violating patent law, which is completely false.

Q It has nothing to do with the fact that with so many people working together it would make it virtually impossible for plaintiffs to enforce their patents against other people that have Super Safeties?

A Nothing at all to do with that.

Q Okay. Well, just so we -- do you think it would be fair to see some of the text -- or to see the video that shows more of what was said prior to this quote that we made, to -- to give the Court the proper context?

A I think that would help add context. Additionally I had in-person conversations with members of the plaintiff where I said similar things directly in relation to the ATF when the plaintiff was aware of what I was saying. So the plaintiff was fully aware of the context.

Q Okay. So this is -- do you know -- who is this on the video? This is the video that -- where you made the statement, right?

A While I don't recognize the gentlemen, it's been a while, I do recognize the name of the channel. I believe I did a podcast on this -- on this channel or podcast.

Q And in fact—I'll blow this up—that's you, right?

A Correct.

Q Same shirt and everything, right?
A Different shirt, but, yeah, that's me.
Q But this is the other gentleman that was on the podcast, right?
A Yes.
Q I'm sorry --
A Yeah, that's -- I was seeing --
Q -- I've zoomed out, and so it doesn't allow me to --
A Yeah, that's evident. I mean, that -- of course I'm not going to -- none of that's disputed. I was on this podcast.

MR. CAMMACK: Okay. We'll cross our fingers.

(The video was played in open court, and the proceedings continued as follows:)

BY MR. CAMMACK:
Q Do you feel like that more accurately catches the context of the quote that we -- that plaintiffs put in its --
A Yeah, that's a perfect capture.
Q Thank you. But, regardless, you say -- your attorneys, at least when questioning Mr. DeMonico, asked about connections between plaintiffs and the government, right?
A I believe that was a line of questioning yesterday.
Q Is it your position that Rare Breed is working with the government?
A That is not my position. At this point we don't

have any information to -- to prove that. I think the testimony we had yesterday from Mr. DeMonico stands on its own.

Q Have you read -- have you read the plaintiffs' original complaint against you?

A Yes.

Q It says, "Defendants --" in Paragraph 60 of the complaint, it says, "Defendants have -- defendants have further attempted to affect the relationship between plaintiff Rare Breed and the relevant market, the consumers of forced reset triggers, by offering their infringing designs at less than cost, i.e., for free, in an effort to divert customers from plaintiffs' legitimate products in favor of defendants' infringing products." Right? You see that. That was -- that was plaintiffs' allegation.

A Yes.

Q Did you do that?

A No.

Q Are you aware of any Super Safeties that have been imported from China?

A In the plaintiffs' documents, they allege that, and I have no reason to deny it.

Q Did you put any restrictions on your files that you posted for download that would prevent or at least prevent to a -- the downloading from places outside the United States?

A There -- I have no reasonable way of achieving that. I would have, but I don't have those -- those means or capabilities. So the answer is no.
Q Do you know if those capabilities exist?
A I'm not sure.
Q Did you investigate it?
A Not deeply.
Q So in your response brief you talk about -- your attorneys put this in the pleadings, this is on Page 24, and it says, "There's nothing immoral or otherwise wrong about providing the public with a product resulting from a design-around of existing patent rights." Do you see that?
A Yes.
Q They're quoting a case there, *State Industries*, 751 F.2d 1226. Do you consider the Super Safety a design-around?
A Previous to this case I would have said no, since it was independently conceived. However, it appears that courts have considered it to be a design-around, and I'm not going to disagree with any previous rulings.
Q So there -- you did not have any -- it was not a design-around -- when you -- when you claimed to have designed it, it was not intended to design around the '784 patent?
A Correct.
Q Or the '247 patent?

A Correct. I was unaware of those patents at the time.
Q You were only aware of the '223 patent, right?
A Correct.
Q Okay. I'm going to close this for just a moment, and I'm going to show you -- you have a website at www.hoffmantactical.com, right?
A Yes.
Q Okay. So if we go to www.hoffmantactical.com and I am connected to the internet and I hit Enter, is what's shown on the screen there your website?
A Yes.
Q It's the home page, right?
A Yes. Pretty, isn't it?
Q I'm sorry?
A I said, Yes. It's pretty, isn't it?
Q Everybody to their own kick. If we go to designs, you mentioned that you designed several things. These are some of the lowers that you designed --
A Yes.
Q -- right? This is a -- looks like a full upper and lower combined stock system. And then we have the Super Safety. Right?
A Yes.
Q And you said that all of these files -- or all of

these designs are design files that you present to the public for free download, right?
A Yes.
Q Except for the Super Safety at this point, right?
A Correct. The Super Safety is enjoined.
Q Right. And these kits that allow you -- allow people to assemble their printed designs that you've uploaded are where you make your money, and that's on this -- that's shown on this page, right?
A Correct.
Q Okay. And you have articles and contact and subscriptions. Do you interact with your customers and viewers on your web- -- through your website?
A We have a contact form where people can send me e-mails. So --
Q Is that the way you receive most of your correspondence?
A Yes.
Q So if we go back to Home, you made a statement here on January 14th of 2026. Do you see that?
A Yes.
Q Can you read that for the Court?
A The statement I made on January 14th, or the previously made statement I made at a previous date? Because there's two statements here that were made at separate times.

Q Well, there's no date on the previous statement. Can you read everything in the olive box?
A Gladly. "I freely shared my Super Safety in the hopes that the community would make it impossible for the federal government to use their standard bully tactics to shut down yet another legal item. This has proven deeply effective. The downside was that I was unable to manufacture the Super Safety myself without giving the Feds a central point of attack until now. The popularity of the Super Safety is now great enough that even were I raided it would have little effect on the industry as a whole."
Q When did you make that statement?
A I don't know the exact day, but it was sometime in the last couple of months when I put that on there.
Q Before the plaintiffs filed the lawsuit?
A I don't know.
Q And then below that it says, "We have postponed sales for the duration of a two-week temporary restraining order, updated 1/14/2026-Tim," right?
A Correct.
Q And that's your -- that's the only portion that is accurately dated at 1/14, right?
A Correct. That's the date when I added that statement to inform.
Q What are you referring to in the state- -- the

statement above that's in normal type, not all caps --
A As we've previously covered --
Q I'm not -- my question's not finished.
A Okay.
Q -- where you say --
A Excuse me.
Q What are you referring to when you say, "The government's stan- -- the federal government, to use their standard bully tactics"? What are the federal government's standard bully tactics, in your opinion?
A The tactics they used against the plaintiff, where they harass someone who they don't like but have no legal position against, basically.
Q So prior to the extensive litigation that plaintiffs engaged in, you know that they -- I mean, they sent a cease and desist letter to you, right?
A Who?
Q Plaintiffs. About the '223 patent.
A Correct.
Q Okay. So you knew that the plaintiffs were intent on enforcing their intellectual property rights before you designed the Super Safety, right?
A Correct.
Q And you say in this statement, "The downside was that I was unable to manufacture the Super Safety myself

without giving the Feds a central point of attack," right?
A Correct.
Q So what you did was, you tried a distributed approach where you sent your files out as wide and far as you possibly could, right? Correct?
A Correct.
Q And you would never be the target of anything. You could just skate by. And if they got their products seized, like Cameron Smith, for example, or someone else, then you're going to walk away scot-free and go laughing all the way to the -- to the YouTube camera.
A I think I would take it much more seriously than that, as in the case of Mr. Smith. However, that is true, by not selling the product myself, I reduced the exposure of myself and the family to unjustified law enforcement raids, which tend to be traumatic.
Q Now, you said that, "-- until now. The popularity of the Super Safety is now great enough that even were I raided it would have little effect on the industry as a whole," right?
A Correct.
Q And that means from the federal government, right?
A Correct.
Q Or anyone trying to enforce a patent that infringes -- that's infringed by a Super Safety.

A False.
Q How is that -- how is that true?
A The statement is specifically referring to if I were raided by the federal government for selling what they falsely deem to be a machine gun, it would not have an effect on the other companies. If the other companies were much smaller, me being raided would place a damper on the industry. I can now sell the Super Safety without having to be concerned about affecting the livelihoods of the other companies involved.
Q Did you hear Mr. Luettke's testimony yesterday where he testified that the ATF considers that the Rare Breed forced reset trigger is the only legal forced reset trigger on the market?
A I heard that Mr. Luettke spoke with people at the ATF booth.
Q It's a yes or no.
A Yes.
Q Thank you. But you said the popularity of the -- I didn't say what you meant by the statement. Isn't it true, though, that the Super Safety -- because of your actions in distributing the Super Safety for free download everywhere, it greatly increases the -- the inability of plaintiffs to effectively enforce their patent rights?
A No. I think if the plaintiffs successfully enforce their patent rights against me, the rest of the market will

stop selling.
Q Have -- you have read some of the posts against -- about Rare Breed, have you not?
A I've seen posts which they've included.
Q Have you seen -- just as one example, I mean, you talked -- we talked with Mr. DeMonico about the death threats, right?
A Unfortunately I've now become aware of those.
Q Nobody here is saying that you're behind those. I'm just saying you're aware now.
A I am now aware, yes.
Q And you say you've talked to the folks at AS Designs, right?
A Correct.
Q And have you seen the video that they posted about Rare Breed?
A The video was brought to my attention because a cease and desist letter was sent, which someone e-mailed to me, so I saw a reference to the video there, if that's what you're asking.
Q Did they -- what did they tell you when you spoke to them about the cease and desist letter?
A AS Designs?
Q Yes.
A Nothing. I don't believe the cease and desist

letter is involved with AS Designs in any way.

Q But you -- I said have you seen -- you saw the video how?

A The video is by Atrius.

Q I'm sorry, Atrius. I'm sorry.

A Oh, excuse me. I wasn't sure what we were doing there.

Q Please forgive me. I've been up here for a while.

A Let's -- no worries. We can begin that over.

Q Okay. Have you seen the Atrius video?

A Yes, as I just said.

Q Okay. And have you spoken to Atrius about the video?

A No.

Q Did anyone at Atrius call you and tell you about the video?

A No.

Q Or e-mail you?

A No.

Q Direct message you?

A The cease and desist letter that was sent to Atrius was brought to my attention. At this time I don't know who sent that letter, I don't -- or that e-mail with a copy of the cease and desist letter. It's possible that a representative of Atrius sent that, so I can't speak to that at the time.

But I bring that up because that would be the only communication we may have had.

Q You would agree with me that there is -- that this is just one of many things that have been posted on the internet denigrating Rare Breed and supporting Hoffman Tactical, right?

A Correct.

MR. CAMMACK: Your Honor, I apologize, there's a little bit of coarse language in this.

(The video was played in open court, and the proceedings continued as follows:)

BY MR. CAMMACK:

Q It says, "This is for Hoffman," right? So that's somebody that's supporting participating with you in your -- in your Super Safety -- they -- Atrius sells a Super Safety or a version of the Super Safety, right?

A I believe Atrius has a version of the Super Safety which they have a patent filed -- filing for. I don't know --

Q But it's a derivative of the Super Safety, right?

A It's an improvement on my invention, yes.

(The video was played in open court, and the proceedings continued as follows:)

BY MR. CAMMACK:

Q And they painted "Rare Breed" on that -- on the side of that car, right? "Rare Greed," I think is what they put.

A I think it was "Rare Greed," with a G, rather than a B.
Q Right.
(The video was played in open court, and the proceedings continued as follows:)
BY MR. CAMMACK:
Q But in the whole thing, they've -- you've seen the term "Rare Greed," right?
A Yes.
Q And not just from Atrius but from many, many, many others, in Instagram, on X, on YouTube comments?
A Yes.
Q And you have not -- but you have not participated in any of those conversations, have you?
A On social media I may have been involved in the threads, but I don't believe I've made any direct participation in any crude or -- language.
Q You did -- you have posted -- you have posted threads and information -- or not threads, but you have posted on threads that -- when things have happened in the lawsuit, and directed it to your -- to your followers on Instagram and X, right?
A I've informed my followers of facts of the case.
Q And have you read the comments that they have posted in response to your posts?

A Some of them.
Q Have you ever taken affirmative action to discourage them from posting in response to any of your postings on the internet --
A I don't believe I have.
Q -- on social media? Sorry.
A I don't believe I have on social media.
Q So you see them, and that's perfectly fine with you.
A The nature of social media makes it difficult for me to control.
Q But you haven't told them that -- whether you support or do not support the things that they're saying regarding Rare Breed or ABC, right?
A I have to -- well, yes, because I don't want to admit to any possible wrongdoing. I want to try to not comment on nonfactual matters of the case.
THE COURT: Counsel, it's --
MR. CAMMACK: I was just going to pass the witness, Your Honor.
THE COURT: It's about 12:15. Why don't we take our lunch break now. We'll resume at 1:15, 1:15.
MR. CAMMACK: Thank you, Your Honor.
(Luncheon recess.)
THE COURT: You may resume.
MR. CAMMACK: Thank you, Your Honor.

BY MR. CAMMACK:

Q Mr. Hoffman, we talked a little bit yesterday about your -- and this morning about your discussions and interactions with -- or lack thereof, with some of the other -- some of the Super Safety sellers, right?

A Correct.

Q And one of -- one of the ones we discussed was Grey Market Research, right?

A Correct.

MR. CAMMACK: Hold on. My computer appears to have locked up. I believe I have a slide of that I can show. Just a moment. Bear with me. I apologize.

(Brief pause.)

MR. CAMMACK: Let's see. We will -- I will do this a different way.

(Brief pause.)

THE COURTROOM DEPUTY: Is it something I can help you with?

MR. CAMMACK: No. My computer just decided to stop working all of a sudden.

BY MR. CAMMACK:

Q Let me just ask you a question. Have you ever -- have you received any financial assistance from anyone in the Super Safety community to assist with legal fees?

A No.

Q Are you a participant in any of the -- in the Go Fund Me page that Grey Market Research has established for defendants for Super Safeties?
A No.
Q Were you aware that that Go Fund Me page exists?
A Yes.
Q How did you become aware of that?
A They made posts on social media, which I saw.
Q Have they offered you assistance financially?
A I've had a lot of people send me e-mails offering assistance. So I don't know if they particularly did so or not. I wouldn't be able to remember.
Q Have any of those sent you any funds?
A No.
Q What about Tactical Titan, are you aware that they are also established -- have established a crowd sourcing site for -- to support your legal defense?
A Separate from the Go Fund Me?
Q Are you aware of a separate one from the Go Fund Me that Grey Market Research has established?
A I'm familiar only with the -- the one fundraiser which they've posted about.
Q Earlier you testified that you believe that the -- if the Court enters the preliminary injunction, that it will have a substantial effect on shutting down the potential

infringers -- or the infringers that are out there that are using your design. Is that a fair characterization?
A False. I believe I stated that if this lawsuit in its entirety was -- it was concluded by the Court that I did in fact infringe the plaintiffs' patents, that that would have some sort of -- of an influence, nothing to do with the preliminary injunction.
Q Do you think that a preliminary injunction would have an effect on the sellers of Super Safety devices?
A No.
Q Why not?
A Because in a preliminary injunction the facts have not yet been decided. Obviously that's all to the best of my knowledge. I'm not a lawyer. So that's just my understanding.
Q Okay.
MR. CAMMACK: We are going to try this one more time.
(Brief pause.)
BY MR. CAMMACK:
Q All right. This is -- do you recognize the figure -- this exhibit as a -- as the figures from your provisional patent application?
A Yes.
Q And in this -- in this particular figure, you -- in Figure 4 it has the direction of travel of the bolt. Rear

would be to the right of the screen, and forward would be to the left of the screen, right?

A Correct.

Q So this -- in Figure 4 it's depicting the bolt carrier moving back, and the lever has been pushed all the way rearward. And if I expand this you can see that the cam prevents -- it's -- basically that's locked, the trigger is locked from -- it cannot move relative to the sear, right?

A Correct.

Q And if I look -- if I go to the other side, this is Figure 5 and this is unlocked, right, as the -- the lever has been pushed forward, the -- the cam is no longer forcing down the trigger, and the trigger -- the trigger can -- the force on the trigger will move it out of the sear, the sear connection, and it will allow the hammer to fall and fire, correct?

A Yes.

Q And that's described in the text -- in the highlighted text, it says, "The dovetail joint does not immediately transfer torque from the lever to the cam. The lever, 110, pivots in the cam until the void, 220, is filled," right?

A Correct.

Q Then it goes on to say, "The amount that the lever rotates in the dovetail before transferring torque to the cam,

100, is such that as the bolt carrier, 160, completes its forward movement, the cam, 100, rotates the neutral surface, 260, away from the cam follower and to a point where the cam follower begins to slide against the cam surface," right?

A Correct.

Q And then, "Once the cam, 100, moves into this position, the trigger bow, 390, can be pulled again by the operator as previously described," right?

A Correct.

Q So going back to this slide, Figure 4 is rearward, and then once the carrier goes back forward and -- so it's trigger locked here, bolt is rearward. And this one, which is -- it's a blowup in more detail, but in this one the bolt carrier has moved back forward and engaged or contacted the lever as it moves forward and it's -- at the same time it does that, it moves the lobe on the bottom of the lever rearward -- not the lobe, but the dovetail rearward and rotates the cam until the surface of the cam is no longer in contact with the trigger, right?

A The last phrasing there, just to help——I don't think I disagree, I just want to clarify——the lever moves a small amount within the cam, and then the cam rotates to unlock. Was that what you were trying to say?

Q Right. But -- and it's the same thing -- it's basically what's said here when it says, "The lever, 110,

pivots in the cam, 100." That's what you're talking about when you say the cam -- the lever pivots in the cam, is that small movement that's back and forth, right?
A Rotates, but correct.
Q And then if we look at Figure 3, this is all the way forward, and you can see that the trigger has -- the hammer has fallen, the weapon has been fired, the trigger is no longer engaged with the sear, and you have -- and that shows how the -- the cutout in the cam accommodates the movement of the trigger, right?
A Correct.
Q Okay. Thank you. So just real quickly, how many -- you said earlier that the statement that you put on your website where you discussed how many -- that there are now -- the Super Safeties are so prevalent and they're so widespread, or words to that effect, that you feel confident now that you can go ahead and sell your version of this -- your version of the Super Safety, right?
A Yes.
Q Do you know approximately how many are -- how many Super Safeties are out in the marketplace?
A I do not.
Q Was there a threshold that you felt like you needed to -- that the Super Safety market needed to surpass before you felt comfortable selling your own?

A No.
Q Is there any possible way for you to know how many Super Safeties are out there?
A I think we could speak with all of the companies involved, possibly subpoenas. I don't know what the process would be. But the information should exist. I don't have access to it. But, I mean, theoretically it should be possible to get that number.
Q Did you have any -- did you have any projections or forecasts of the number of Super Safeties you intended to -- that you thought you would sell personally or that Hoffman Tactical would sell once you began selling your metal injection mold version?
A When I began that project, I guessed 3000 per year.
Q 3000 per year?
A That's the number that I decided on.
Q Was that -- that was just your goal?
A No, that was what I reasonably thought the market would support at that time.
Q So if you were selling 3000 per year and the jury and the Court adopted the reasonable -- or the -- as a reasonable royalty the royalty that you've heard plaintiffs discuss as what they pay for -- or what they -- what Rare Breed pays in royalties, that math comes out to $900,000, right?


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 86 of 120 PageID #: 727

A It sounds about right.
Q 300 times 3000, $900,000.
A It's just math. I wouldn't debate that.
Q If you were -- if defendants were found liable for patent infringement and were forced to pay at a minimum a reasonable royalty of $900,000 per year, would you have the financial resources to do that?
A From my understanding, that would be far greater than a true reasonable royalty.
Q Again, not my -- that was not my question. Would you be able to pay a reasonable royalty if adjudicated liable on the patent infringement claims, without any enhanced damages, any attorneys' fees, et cetera, to pay $900,000 per year in a royalty fee?
A So it's your -- just to clarify, you're asking with the sales I would make on the Super Safeties, would I have enough money to then pay royalties if I lost the case, to clarify --
Q I'm --
A -- or just in general.
Q I don't -- I don't care how you do it, as long as it's legal, to have the money to pay --
A Oh, well, then --
Q -- Hoffman Tactical and -- and you personally, to pay damages, if you -- you personally and your company Hoffman

Tactical were found liable for patent infringement.
A With that broader definition, I believe I could pay, we could get the money.
Q Do you have -- do you have that money presently or currently?
A No.
Q How would you go about getting it?
A We'd have to figure that out, but I think we could raise the funds.
Q When you say "we," who do you mean? Who are you referring to?
A Myself and Hoffman Tactical, LLC, my -- it's just me pretty much, but, technically.
Q So going back really quickly, you know, we talked a little bit about -- we looked at your provisional application, and then there's also -- there's also the claim charts that -- have you looked at the claim charts that we -- that plaintiffs filed in its complaint?
A Yes.
Q Obviously I'm not going to ask you if you agree or disagree with how -- with the arguments that plaintiff made in those, but if you look at the original complaint, this is on several pages, the claim chart, but this is another depiction that's, I believe, similar -- just to make sure that we're all on the same page with respect to the technology here, that if

you look at the version on the left -- or the picture on the left shows a Super Safety and the trigger in a locked position, right?

A Yes.

Q So when that lever -- the lever portion is rotated upward, it extends upward instead of canted, it's -- that is still a locked position, right?

A Yes.

Q Then if you go to the next one -- oops, you go to the next one, that is unlocked, correct?

A Yes.

Q But not fired.

A Correct.

Q Okay. And then in the aftermath of the cease and desist back in 2022, you posted a video in and around -- you posted the video on March 6th of 2022, I -- do you remember that video?

A Yes.

Q I don't believe it was recorded at that time, because the settlement agreement between Hoffman Tactical and the plaintiffs was entered into prior to it and you make some references to, "We're working through the settlement," but you -- you thanked several people for the -- for their participation and help. And most of these we've already looked at. Okay. So this is that -- this is a portion of

that video, right?
A Yes.
Q And you made this video sometime in late February, early March, of '22, right?
A Sometime in that time period.
Q Okay.
(The video was played in open court, and the proceedings continued as follows:)
BY MR. CAMMACK:
Q Do you recall that video?
A Yes.
Q And so once the cease and desist -- it's true that after you received the cease and desist you posted that you had received a cease and desist on social media, right?
A Yes.
Q And your followers at the time began posting videos posting -- making comments and posts on Rare Breed's website basically disclosing their unhappiness with Rare Breed's cease and desist letter to you, right?
A Yes.
Q And you were thanking them for doing that because you thought that it had a beneficial effect for you, right?
A I believe that that let Rare Breed know that the community did not want them to file a full suit against me.
Q And so you believe that it was a positive thing that

those people would intimidate Rare Breed to not try to enforce their patent rights against you.
A I would not use the word "intimidate." And also it was not a matter of enforcing patent rights. I was appreciative that the situation was remedied without a full lawsuit being filed.
Q At a walk-away. There were zero dollars paid, right?
A Legal fees for lawyers aside, correct.
Q So you just said that your goal was to sell 3000 units of Super Safeties per year, right? A few minutes ago.
A Yes, I believe I said that.
Q Two weeks -- two weeks and two days ago at the preliminary -- at the temporary restraining order hearing, I believe your counsel said from this podium that you were prepared to sell 10,000 units tomorrow.
A No, we were prepared to sell approximately 900 to a thousand units, which is what our retail -- just divide the number they gave you by $90. Do that math.
Q Well, no, I'm --
A Yeah.
Q -- I was here, and I heard them say 10,000 units.
A I believe that was an error. I do actually recall something about this, and that was -- that was false. It was, I believe, $80,000 divided by $90 per unit, was the actual

number.
Q There's a -- on one of your -- one of your comments on Instagram, you made the -- someone said, "I'll take 10,000," and you said, "I can do that." Do you remember that post?
A Yes.
Q I don't have it to show you, but you remember the post, right?
A Of course. Of course.
Q If that were the case and you were -- and you were to pay a 300-dollar royalty on each one of those -- of those triggers to Rare Breed for patent infringement, that would be $3 million, wouldn't it?
A The math sounds correct.
Q Would you be able to pay a 3 million-dollar-per-year -- or, I'm sorry, just a single one-time 3 million-dollar royalty payment to Rare Breed for infringe- --
A As I said --
Q Let me finish, please.
A I apologize.
Q Would you be able to pay a 3 million-dollar royalty for a 10,000-unit sale of Super Safeties to Rare Breed, yes or no?
A I don't know.

MR. CAMMACK: Pass the witness.

THE COURT: Redirect examination?

RECROSS-EXAMINATION

BY MR. HORTON:

Q Mr. Hoffman, good afternoon.

A Good afternoon, Counselor.

Q I want to ask you some more questions about your testimony today. Have you ever developed any list of trusted vendors for your Super Safeties?

A No.

Q Have you ever instructed or authorized anyone else to do so?

A No.

Q Is your Super Safety design identical to what is described in the '723 patent?

A No.

Q Is your Super Safety design an improvement on the '723 patent?

A No.

(Brief pause.)

THE WITNESS: That last question, we may have to restate that. Would you give me the full patent number? I'm thinking about it, I might be mixing up two patents. Just give me, like, a date or a name or something or -- yeah, if you show it to me, I can definitely clarify, because I think I might be

mixing '723 and '247 up.
BY MR. HORTON:
Q Okay. So if you look on the screen, this is the claim chart for the '784 patent, but over here on the right-hand column this is the '723 patent.
A Thank you. I had made an error in my previous statement.
Q Okay.
A I believed it was the '247 you mentioned.
Q Okay. Let me ask the question again.
A Thank you.
Q Is your Super Safety design an improvement on the '723 patent?
A It does improve several elements of the '723. I think I can say yes.
Q Okay. Thank you. I'd like to keep looking at this claim chart if we could.
Let's go back a little bit. You were asked in your testimony -- can you see this section of the claim that I'm pointing to? (Indicating.)
A Yes.
Q You were asked in your testimony about, in a forced reset trigger mechanism, an extended trigger member locking device. Do you recall that?
A Yes.

Q What is the next word in that claim?
A "Comprising."
Q Okay. And down here, the next phrase, "a locking member that is moveable between a first position in which it locks a trigger against pulling movement," and then next, "and a second position where it does not restrict movement of the trigger member, the locking member configured to be moveably supported by a frame."
A Yes.
Q "And including a generally upward extension portion configured to make actuating contact with a surface of the bolt carrier."
A Yes.
Q Does the locking device have one, or two, parts to it?
A It has two -- at least two parts, or more.
Q What are those two parts?
A A body portion and an upwards extension. Would you like me to number them?
Q Are you able to number them based on this figure? I'll try to get a little bit closer.
A Yes. It appears to be -- the upwards extension is 22, and the bottom portion is -- or the body portion is 26.
Q Thank you. Does the lower portion -- that's the body portion. Does the lower portion move when the upper

portion folds and is struck by the bolt?
A No.
Q Okay. When does the lower part move?
A When the upper portion -- when the bolt moves forwards and the upper portion does not bend or move in relation to the lower portion, at that point the lower body portion may move.
Q Okay. Now I'm going to show you, this is -- it's hard to read, but this is -- it's especially hard to read if I'm zoomed in all the way. There we go. This is the '784 patent, and it is -- this is hard to read, but it's Document Number 1-2, which is Exhibit 2 to the complaint in this matter. Do you see that?
A Yes.
Q I'd like to turn the page a little bit. First of all, let me -- okay. I'm going to have to zoom in a bit again, so bear with me.
(Brief pause.)
BY MR. HORTON:
Q That should work. Can you see that clearly?
A Yes.
Q Okay. You were asked in your testimony previously about this deflectable portion. Do you see that?
A Yes.
Q "And separately moveable relative to the body

portion between an extended position and a deflected position." Do you see that?
A Yes.
Q Okay. Let's look in the specification of the patent. This is going to be difficult, but I'll find a way. Okay. Do you see this paragraph right underneath where it says, "Summary of the Invention"?
A Yes.
Q And it starts out with the phrase, "The present invention."
A Yes.
Q Could you read that paragraph, please, out loud?
A Yes. "The present invention provides a deflectable extension of the locking member that is actuated by the forward --" excuse me, I added a word. If I may start over.
Q Go ahead.
A "The present invention provides a deflectable extension of the locking member that is actuated by forward movement of the bolt carrier but deflects or folds to avoid interfering contact with the forward portion of the bolt carrier as the bolt carrier cycles to the rear."
Q So this paragraph here uses the words "deflects or folds."
A Correct.
Q Is it your understanding that those two words are

used interchangeably?
A It is.
MR. CAMMACK: I would object to that, Your Honor, as that is calling for a legal conclusion. The claim construction of whether or not -- and whether or not something is used interchangeably is the exclusive province of the Court and -- in view of the specification and any expert testimony. And the plaintiffs -- whether or not something is used interchangeably in the world of patent law is beyond the scope of what I believe he's qualified to give an opinion about.
THE COURT: The Court will take his statements as coming from a layperson. The Court does not attribute any expertise to his statement. In his mind he thinks that deflects and folds mean the same thing. The Court obviously is not bound by that.
MR. CAMMACK: Thank you, Your Honor.
THE COURT: Continue.
MR. HORTON: Thank you, Your Honor.
BY MR. HORTON:
Q Okay, Mr. Hoffman, I'm going to try to bring another paragraph into focus. Right here where it starts, "Two example embodiments," can you read that?
A Yes. "Two example embodiments are illustrated having a one-way hinge feature that causes the locking member to pivot in one direction when actuated by a rear portion of

the bolt carrier as it returns to the in-battery position and to give way, i.e., deflect or fold, without pivoting the remainder of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear."

Q Okay. And to back up -- I'm getting away from the microphone a little bit. To back up, this describes a one-way hinge feature, correct?

A Correct.

Q And it says that that "one-way hinge feature is designed to give way, i.e., deflect or fold."

A Correct.

Q "Without pivoting the remainder of the locking member."

A Correct.

Q Is it your understanding that this use of "deflect or fold" is used interchangeably?

A Yes.

Q And this is hard to see, but we are on Column 3 of the specification. This looks to be Line -- starting at Line 56, where it says, "Rearward," could you read there?

A Yes. "Rearward force applied to the foldable extension from the front towards the rear causes the foldable extension to fold on the pivot pin and allow the bolt carrier to pass without causing the pivotal movement --" I added the word pivotal. I don't know if you want me to just continue

or -- I added a word in there.
Q Start -- I can't see. Start again. Just start at -- start back at "Rearward."
A Excuse me. Thank you. "Rearward force applied to the foldable extension from the front toward the rear causes the foldable extension to fold on the pivot pin and allow the bolt carrier to pass without causing pivotal movement of the locking member body."
Q Thank you. And there are numbers scattered throughout this sentence, correct?
A Yes.
Q What number is right after the words "foldable extension"?
A It appears to be 22.
Q Is that a reference to the figures?
A I believe it is.
Q See if I can do this without changing the zoom. Okay. No, I have to. All right. We're back into this Figure 2, Figure 3, Figure 4 view of the '784 patent.
A Yes.
Q 22, that's this piece right here. (Indicating.)
A Yes, the upwards extension.
Q Okay. Looking at the claim chart in the '784 patent, that is this green part. (Indicating.)
A Yes.


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 100 of 120 PageID #: 741

Q Okay. And then the part labeled 26 is this part that maybe should have been green, it's green in the other -- in the other figure, but it was colored orange in this figure, correct?
A Yes.
Q Okay. 26 -- 26 is what part?
A The locking member body.
Q Okay. So returning -- I broke the zoom. There we go. The auto-focus is taking a minute to adjust. So read this paragraph for me one more time.
A "Two example embodiments are illustrated, having a one-way hinge feature that causes the locking member to pivot in one direction when actuated by a rear portion of the bolt carrier as it returns to the in-battery position and to give way, i.e., deflect or fold, without pivoting the remainder of the locking member when contacted by the forward portion of the bolt carrier as it cycles to the rear."
Q Thank you. Is there any embodiment described or illustrated in the '784 patent that shows anything other than a hinged connection where the top part folds backwards?
A No.
Q I'd like to turn, if I could, to the portion of the claim chart regarding the '247 patent. Do you recall being asked about this?
A I believe so.

Q During your examination you were asked about the last three portions of this claim. And I'll just read them. "Said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and a cam, green, having a cam lobe adapted to be moveably mounted in the fire control mechanism pocket."

A Yes.

Q "Whereupon in a standard semiautomatic mode said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook and thereafter the bolt carrier moves forward into battery," and I'm going to just continue here, "at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm. And whereupon in a forced reset semiautomatic mode said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook. And thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm."

Do you recall being asked about that?

A Yes.
Q At one point you were asked a question and your answer was, "False." And you asked to explain that answer. Is that correct?
A Yes.
Q Would you like to now?
A Yes.
Q Can you please explain your answer.
A Yes. The disconnector hook engages the hook on the hammer regardless of whether the system is in forced reset semiautomatic mode or standard semiautomatic mode.
Q Mr. Hoffman, to be clear, are you talking about your device? Are you talking about the function of your device, or are you talking about the function of the device in the '247 patent?
A I'm referring to my device.
Q Okay. Say that again for us. In your device, what was it?
A So in the Super Safety and in the '723 patent——I believe that was where the question was directed previously today——the disconnector hook engages with the hook on the hammer in exactly the same way regardless of whether the system is in forced reset semiautomatic mode or standard semiautomatic mode. And I can show why if you feel it's necessary.


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 103 of 120 PageID #: 744

Q Would you -- how would you show why?
A If we move up one square here to the claim language -- let's see.
Q J is right there. Is that where we want to be?
A Let's see. We want to go to the semiautomatic portion. This is specific to the '247.
Q Tell me -- tell me where.
A A little further up, mm-hmm.
Q Is that it? (Indicating.)
A Yes. It says, "Whereupon in standard semiautomatic mode said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery."

In the part where it's discussing the disconnector hook catching the hammer hook, that is before the bolt carrier moves forward into battery. The word "thereafter" suggests that we're looking at an order of operation, which is a chronological list of events that take place.
Q The word "thereafter" here on Part K?
A Yes. It has the same meaning in both cases.
Q Okay.
A At the time the hammer engages with the disconnector hook, the trigger has not been reset. The bolt carrier, it continues to move rearward. So at that time when the

hammer -- I'll rephrase to make it easier.

The bolt carrier is moving rearward. It rotates, pivoting the hammer to the rear. And the hammer then engages, snaps over, the disconnector. At that point in the cycle the relationship between the hammer and the disconnector is identical regardless of operating mode. Later in the cycle the trigger is reset, which may cause the disconnector to then release the hammer. In standard semiautomatic mode, that takes place when the user releases the trigger. In forced reset semiautomatic mode, that takes place when the bolt rotates the cam, forcing the trigger to reset. But the engagement between the hammer and the disconnector never changes, it's exactly the same movement and relationship between the parts at that point in the cycle.

To clear up the confusion here, when it says the disconnector does not engage with the hammer, what that means is, it's referring back to the invention described in the '247 patent where a protuberance on the safety selector is moved by the user to disable the disconnector. In that case the hammer never engages with the disconnector. That's where that language comes from as it's supported in the patent, to help clear up where this misunderstanding first came from.

Q Thank you. Anything else you'd like to clarify about that?

A I'd just like to add that the Super Safety in no way

disables or is capable of disabling the disconnector as in the '247 patent.

Q Thank you. Now, do you recall you were asked about a video where you talked about a clone of RB's -- of Rare Breed's design? Do you recall that?

A Yes.

Q In the video where you talked about a clone of Rare Breed's design, did that relate to the design that you took down from the internet in 2022 in response to Rare Breed's cease and desist letter, or did that relate to the present design that's the subject of this lawsuit?

A That related to the design which I removed immediately after receiving that cease and desist letter and shares no commonality with the Super Safety involved in this lawsuit.

Q At that time in 2022 when you received Rare Breed's cease and desist letter, were you aware of the '223 patent prior to receiving the C&D letter?

A I do not believe I was.

Q Were you aware of the '223 patent when you made and uploaded that design?

A I do not believe I was.

Q You put your CAD files for your Super Safety design, the design that's the subject of this lawsuit, online on July 20th of 2023. Is that correct?

A Yes.
Q Were you aware of the '247 patent when you put your CAD files for the Super Safety online?
A No.
Q Were you aware of the '784 patent when you put your CAD files for the Super Safety online?
A No.
Q Were you aware of the '723 patent when you put your CAD files for your Super Safety device online on July 20th, 2023?
A No.
Q This is going to sound like a silly question, but I want you to answer it anyway. If you weren't aware of any of those three patents, did you intend that someone who downloaded your CAD files for your Super Safety design, did you intend for them to infringe the '247 patent?
A No. That would have been impossible without --
Q Why would it have been impossible?
A Due to no knowledge of the patent, and --
Q You didn't --
A -- yeah.
Q -- know that the '247 patent existed.
A Correct.
Q Same question for the '784 patent. Did you intend that someone who downloaded your CAD files and made your Super

Safety device, did you intend that they would infringe the '784 patent?
A No.
Q Why not?
A It would have been impossible since I was unaware of that patent and we don't infringe it.
Q When you put your CAD files online for the Super Safety, did you intend that someone who would download and make that design would infringe the '723 patent?
A No.
Q Why?
A I was unaware of the patent.
Q When did you become aware of the '247 patent, the '784 patent, and the '723 patent?
A Could we do those one at a time?
Q Sure. How about the '247 patent?
A The '247 patent was brought to my attention in April. I believe there's a date in my statement. I believe it was early April of 2025 --
Q Okay.
A -- maybe April 2nd. There's -- the date's in my declaration.
Q Okay. When did you first become aware of the '784 patent?
A When it was filed against me for this lawsuit in

December.

Q When you were served with the complaint in this case?

A Yes, when this case was filed.

Q When did you first become aware of the '723 patent?

A I don't know the exact date, but it was sometime between the April date when I became aware of the '247 patent and in August where I did that video discussing it. Some -- some time period in there I became aware.

Q In the time since you have become aware of these three patents, have you reviewed them?

A Yes.

Q Have you read them?

A Yes.

Q Have you looked at the claims?

A Yes.

Q Based on your understanding of those patents -- we've discussed previously you're not a patent attorney. Based on your understanding of the claims, do you believe that your Super Safety device infringes the '247 patent?

A It does not infringe.

Q Do you believe that your Super Safety device infringes the '784 patent?

A It does not infringe.

Q At this time right now, do you believe that your

device infringes the '723 patent?
A I have not thought about that in any great depth, because it's expired.
Q When did the '723 patent expire?
A I believe it was in 2024.
Q When did you become aware of the '723 patent?
A In 2025 sometime.
Q So in the time since you have been aware of the '723 patent, is it possible to infringe the '723 patent?
A I do not believe it is.
Q Why not?
A Because it's expired.
Q So at no time in -- relevant to this lawsuit, at no time have you ever had your CAD files available for download with the intent that someone would download them and specifically infringe the '247 patent, the '784 patent, or the '723 patent. Is that correct?
A That's correct.
Q Okay. We've talked at great length about your social media accounts, and you have a large number of followers on your social media accounts and your YouTube channel. I don't know if YouTube qualifies as social media or not, I don't know the distinction.
In all of your followers and all of the people that interact with your online presence, do you have any agreement

or arrangement with any of these people that allows you to control what they post online?

A I do not.

Q Have you ever -- let me ask this: Of the people that have downloaded your CAD files, do you have any agreement or arrangement that allows you to specifically dictate to them whether or not they are allowed to make or sell your Hoff- -- your Super Safety design?

A I do not.

Q And this one is very important. Have you ever instructed or directed any of your followers or any of the people online to post something negative or hateful or threatening about Rare Breed or about Lawrence DeMonico?

A I have never instructed anyone to say anything threatening or hateful and certainly not dangerous to anyone, let alone the plaintiffs in this case.

Q Have you ever instructed, directed, or suggested that anyone should make death threats to Lawrence DeMonico or his family?

A Absolutely not.

MR. HORTON: Your Honor, I have no further questions.

THE COURT: Recross?

(Brief pause.)

FURTHER REDIRECT EXAMINATION

BY MR. CAMMACK:

Q Really quickly, Mr. Hoffman. We have -- in terms of the '2- -- and with respect to the '247 patent, I'm talking about the -- where it says, "at which time --" oh, sorry, "in the forced reset semiautomatic mode, the rearward movement of the bolt carrier causes the rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook," right, which we've talked about that a lot.
A Yes.
Q Isn't it true that when the hammer is reset by the bolt carrier group it over-rotates past the disconnect?
A The hammer is swung rearward by the bolt carrier group?
Q Correct. It goes past the disconnect, right?
A Correct.
Q It's not caught by the disconnect, it's -- it goes past it, right?
A I would continue to use the word catch. This is, I believe, semantics at this point.
Q It is semantics. That's -- that's most of --
A Oh.
Q -- most of what patent law is.
A Let's continue.
Q So then after that happens, the trigger is reset by the bolt carrier group, and it's further to the rear, right?
A Correct.

Q Okay. And the hammer's still over-rotated, it's not -- it's not in contact with the disconnect, right?
A Correct. The hammer is -- is being held down by the hammer cam surface on the belly portion of the bolt carrier group.
Q Right. And then as the bolt moves forward -- the bolt carrier group moves forward and it -- and the cam portion is released or extended to the -- with the -- in both cases, both in yours and in the '247, as that top portion moves forward relative to the bottom portion, eventually in both the trigger portion is -- is unlocked so that the rearward force on the trigger can fire the weapon, right?
A At some point in the cycle, yes.
Q And so by the time the hammer is released to where it would normally catch in a standard semiautomatic mode, the -- it's -- the trigger's already been fully reset, right?
A Correct.
Q Okay. And you're not going to agree to this, but I would argue that because of that it -- it's in -- as the bolt moves past that, it's not caught, because if it were caught, then the bolt couldn't fire -- or the hammer could not fall and strike the firing pin, right?
A Respect- -- yes. Respectfully I believe the very specific point we disagree on is the word "thereafter." That was added to the language by whoever wrote this patent for a

specific reason.

MR. CAMMACK: I'll object to everything after "yes," and we'll move on.

BY MR. CAMMACK:

Q I'm going to show you -- when discussing the '784 patent a moment ago -- so your counsel directed you to this portion, I guess it begins down here in the Summary of the Invention, on the last page, where it begins -- well, I'm sorry, right underneath the Summary of the Invention, it says, "The present invention --

A Yes.

Q "-- provides a deflectable extension," et cetera. I'm not really concerned about that. It says "deflects or folds." The patentee uses -- you said that the patentee used the words -- or you agreed with him that the patentee used the word "deflects" and "folds" interchangeably, right?

A Yes.

Q Is there anyplace in this patent that says that the patentee used -- uses the words "deflect" and "fold" interchangeably?

A That's the way he uses them. He doesn't --

Q That wasn't my --

A -- explic- --

Q That was not my question.

A Please rephrase.

Q Does he explicitly say, "For use in this patent the word fold and deflect are interchangeable"?
A No.
Q And at the very bottom he says, "Two example embodiments are illustrated having a one-way hinge feature that causes the locking member --"
A I see that.
Q Right. And then it says, "-- one-way locking member to pivot in one direction when actuated" -- I'm sorry, "when actuated by a rear portion of the bolt carrier," et cetera, et cetera, right? And it says, "to give way, i.e., deflect or fold, without pivoting the remainder of the locking member when contacted by the forward portion of the bolt," right?
A Yes.
Q So when you look at the figures of the '784 patent, okay, I think we can probably agree that -- maybe I'll just do it this way. So on the -- in the first figure, Figure 1, we have the upward extending portion and the body portion, right?
A Yes.
Q Okay. And so this pin here is the pivot -- or the pivot point that allows the upward extending and deflectable portion to move, right?
A Yes.
Q And they call it a one-way hinge, right?
A Yes.


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 115 of 120 PageID #: 756

Q In the summary, right? In the -- what we just read in the Summary of the Invention.
A Yes.
Q The claim does not use the term one-way hinge, does it?
A The claim is very broad, yes.
Q So when you look at Figure 4 here at the bottom, you can see that it stops the -- the geometry -- the configuration of the upward extending portion and the lower -- and the body are designed so that when -- once the -- once the upward portion pivots back to the -- to its original position before it's deflected or pivoted backward, that it stops here, correct?
A Yes.
Q And then when the rear portion of the bolt carrier continues forward, it catches that -- that portion and -- that upward extending portion, and because it's locked it moves the entire thing, right?
A Yes.
Q Okay. Now, isn't that the same thing that the Super Safety is doing, because it pivots backward and then it pivots back forward as it continues to move forward with the -- when it's contacted by the rear portion of the bolt, it releases the trigger for firing, right?
A The patent is describing a full cycle. You are only

describing the return cycle. The primary focus of the patent is the rearward cycle, not the return cycle. So it's difficult to answer that question when you're comparing half a cycle to an entire cycle. I can't answer that. It's apples and oranges. I don't know how to answer that.

Q Okay. Let me help you. Number 1, you agreed earlier that the '784 describes only a locking device, right?

A Yes.

Q And the Super Safety performs the function of a locking device from the time that the bolt is in the rearward position until it moves -- until the bolt carrier moves forward and the rear portion of the bolt carrier contacts the lever and continues to rotate the whole thing in the same direction that the '784 device does until it releases the trigger, right?

A Yes.

Q So -- and there is movement of the lever relative to the cam, right? It pivots.

A Yes.

Q And that movement is a pivot, right?

A We can call it that.

Q You call it that in your provisional application.

A I believe I used the word "rotate." Pivot, we can use it at this point. I think it -- it'll work.

Q Thank you.


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 117 of 120 PageID #: 758

MR. CAMMACK: I have no further questions, Your Honor.

THE COURT: Thank you.

You may step down.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

MR. CAMMACK: And plaintiff rests its portion of the case.

THE COURT: We'll hear from the defense, then.

Are you ready for your first witness?

MR. HORTON: Nothing further from us, Your Honor.

THE COURT: Okay. So that means, then, the Court has heard all the evidence that is presented. Obviously this is a matter of some complexity. The Court is going to issue a written decision, and the Court expects it will do that shortly. Until the Court does, the temporary restraining order remains in effect.

MR. CAMMACK: Your Honor, I had one question. Is there any -- I've heard a rumor that you may prefer having findings of fact and conclusions of law filed by the parties. I wanted to see if that is something that you would expect us to do in this case.

THE COURT: How quickly do you think you could do that?

MR. CAMMACK: I would think that, Your Honor, we

could probably have something to you no later than Monday.

THE COURT: Monday.

MR. CAMMACK: Proposed findings of fact and conclusions of law. Well, I take -- let me rephrase that, Your Honor. I think it might depend on how quickly we can get -- both sides have agreed to request an expedited copy of the transcript. I believe that we can do -- that would be extremely helpful in proposing findings of fact and conclusions of law. So I don't know -- so maybe I should retract my previous statement.

THE COURT: Next Thursday? Do you think you could get it done in seven days?

MR. HORTON: Your Honor, I've got depositions next week. Would it be possible for the Court to go forward without findings of facts and conclusions of law from the parties?

THE COURT: It is possible. Obviously if I do that I won't have the benefit of your input. So, yes, the Court -- that's what the Court discussed initially. But proposed findings of fact and conclusions of law are very, very helpful.

MR. CAMMACK: Okay.

DR. BLANCHARD: Your Honor, were you wishing to have that next Thursday? Was that --

THE COURT: Well, he had suggested Monday, which is agreeable to the Court because --

MR. CAMMACK: Your Honor, I withdrew that.

THE COURT: -- we'd like to make a decision quickly. But then he retracted that and he said a little bit later. So I tossed out next Thursday. That's a week from today.

DR. BLANCHARD: A week from today? Yes, Your Honor, defense will do that.

THE COURT: Okay. Very well. Very well, then. And if you can get them in earlier than that, please do so.

MR. CAMMACK: Yes, Your Honor.

THE COURT: Okay.

END OF PROCEEDINGS

I, Elizabeth B. Coffey, do hereby certify that I reported by machine stenography the proceedings held on this date in the above-styled cause and that this transcript, produced by computer, is an accurate record of said proceedings.

s/Elizabeth B. Coffey

Elizabeth B. Coffey, FCRR
Official Court Reporter
United States District Court


Case 1:25-cv-00389-CLC-CHS Document 38 Filed 02/02/26 Page 120 of 120 PageID #: 761