ABC IP, LLC, a Delaware limited liability
company, and RARE BREED TRIGGERS,
INC., a Texas corporation,

Plaintiffs,                                             )
                                                         ) Case No. 1:25-CV-00389-CLC-CHS
v.                                                       )
                                                         )          Hon. Curtis Collier
   TIMOTHY HOFFMAN, an individual,     )
   and HOFFMAN TACTICAL, LLC, a        )
   Tennessee limited liability company, )
                                                         )
Defendants.                                             )

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      Defendants Timothy Hoffman and Hoffman Tactical, LLC respectfully submit the following

proposed Findings of Fact and Conclusions of Law in opposition to Plaintiffs' Motion for

Preliminary Injunction.

## I. PROPOSED FINDINGS OF FACT

**A. Background Facts**

1. This Court has subject matter jurisdiction over this patent infringement action pursuant to

   28 U.S.C. §§ 1331 and 1338(a). Personal jurisdiction and venue are proper in this District.

   (ECF 1 ¶¶ 8-9).

2. Plaintiff ABC IP, LLC ("ABC IP") is a Delaware limited liability company that owns patent

   rights related to specific implementations of forced reset trigger technology. (ECF 1 ¶¶ 1, 15).

3. Plaintiff Rare Breed Triggers, Inc. ("Rare Breed") is a Texas corporation engaged in the manufacture and sale of forced reset triggers. Rare Breed holds exclusive rights to ABC IP's patent portfolio. (ECF 36 at 1:6; 24:15-16).

4. Defendant Hoffman Tactical LLC is a Tennessee limited liability company owned solely by Mr. Hoffman. (ECF 36 at 1:9-10; ECF 26-1 ¶ 2).

5. The complaint in this matter was filed December 23, 2025. (ECF 1 at 59). Plaintiffs asserted U.S. Patent No. 12,038,247 ("the '247 Patent"); U.S. Patent No. 12,031,784 ("the '784 Patent"); and U.S. Patent No. 7,398,723 ("the '723 Patent"). (*Id*. at 1).

6. A Temporary Restraining Order (TRO) was entered by this Court on January 13, 2026 ordering Defendants to prevent further downloads of files that had been available for public download since July 20, 2023, nearly three years, and to prevent future sales of the Super Safety AR-15 trigger modification components. (ECF 20; ECF 26-1 ¶ 25).

7. A Preliminary Injunction (PI) hearing was held in this matter by this Court on January 27th-29th, 2026. (ECF 36; ECF 37; ECF 28).

8. Mr. Hoffman is a developer of firearm parts and accessories. (ECF 26-1 ¶ 4; ECF 36 at 7:4-5).

9. Mr. Hoffman's designs include triggers, safeties, and other components for AR-15 style rifles, including repeat reset trigger components that modify the rifle's safety selector. (ECF 36 at 7:5-8; ECF 26-1 ¶ 5).

10. Historically, the market for forced reset trigger devices was very small because the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") considered these devices the equivalent of machine guns until 2025. (ECF 26-1 ¶ 17; ECF 36 at 7:12-14).

11. On May 13, 2025, Plaintiff Rare Breed and its principal, Lawrence DeMonico, entered into a settlement agreement with the U.S. Department of Justice establishing the legality of trigger components providing repeat reset functionality. (ECF 26-3).

12. As a condition of the agreement, Plaintiff Rare Breed and Lawrence DeMonico agreed "to take all reasonable efforts to engage in patent enforcement seeking prohibitory injunctions against any person or entity that manufactures, sells, or distributes any FRT during the life of U.S. Patent No. 10,514,223, provided RBT, Mr. DeMonico, and Mr. Maxwell have a good faith argument that the device is within the scope of the patent." (ECF 26-3).

13. Plaintiff Rare Breed's obligation under the settlement agreement was a factor motivating Plaintiffs to bring the present lawsuit. (ECF 26-3; ECF 37 at 24:24-25:5).

14. A repeat reset trigger modifies an AR-15 rifle to allow the rifle to fire repeatedly when finger pressure is continually applied to and maintained against the trigger, with the trigger resetting between each shot. (ECF 36 at 7:8-10).

15. Repeat reset triggers include both active reset and forced reset trigger component designs. (ECF 37 at 129:15-22).

16. A repeat reset trigger is not a pioneer invention where nonce and functional claim language can be argued broadly without ensnaring prior art. (ECF 36 at 10:12-15).

**B. Mr. Hoffman's Design and Development**

1. Mr. Hoffman designed AR-15 trigger components that modify the rifle to provide repeat reset functionality using only two new parts and a modified stock AR-15 trigger. (ECF 36 at 7:17).

2. The new parts consist of an altered safety selector and a vertical lever that pivots or rotates the safety selector in response to passage of the bolt carrier. (ECF 36 at 7:18-20; ECF 37 at 49:23-50:2).

3. For these new parts to operate properly, the standard AR-15 trigger must also be modified. (ECF 36 at 7:20-21).

4. Mr. Hoffman's design is substantially cheaper to manufacture due to its simplicity and low relative parts count in relation to prior designs. (ECF 36 at 8:5-7; ECF 26-1 ¶ 23).

5. Mr. Hoffman filed a provisional patent application covering his new trigger components on September 28, 2022. (ECF 36 at 8:8-9; ECF 26-1 ¶ 23; ECF 38 at 28:16-19; ECF 26-4).

6. Mr. Hoffman did not further pursue his patent rights by filing a non-provisional application. (ECF 26-1 ¶24; ECF 38 at 29:2-5).

7. Mr. Hoffman uploaded the design and associated 3D print files to make the new parts out of plastic to the internet on July 20, 2023 for public use. (ECF 36 at 8:11-13; ECF 26-1 ¶ 25; ECF 38 at 38:5-6).

8. Before Mr. Hoffman prevented download of his files from his user account on January 13, 2026, pursuant to this Court's entry of a Temporary Restraining Order (TRO), approximately 32,000 downloads of his design files and approximately 83,000 downloads of his 3D print files occurred. (ECF 26-1 ¶ 25; ECF 38 at 39:17-18; ECF 38 at 40:1).

9. Mr. Hoffman is aware of at least ten companies known to make trigger components in accordance with or based on his designs. (ECF 36 at 8:14-16; ECF 26-1 ¶ 15).

10. Many third-party manufacturers began offering products based on Mr. Hoffman's design after Judge O'Connor's order of July 23, 2024 in the Northern District of Texas, which was many months prior to the May 9, 2025 settlement agreement between Plaintiffs and the Department of Justice. (ECF 37 at 13:14-20, 16:16-24).

11. Mr. Hoffman learned of the '247 patent on April 2, 2025. (ECF 26-1 ¶ 26; ECF 38 at 108:17-19).

12. Mr. Hoffman learned of the '784 patent from the present lawsuit, thus shortly after December 23, 2026. (ECF 26-1 ¶ 28; ECF 38 at 108:23-25).

13. When Mr. Hoffman uploaded his design and 3D print files for public download he was not aware of and thus never intended to infringe nor to cause anyone to infringe the '247, '784, or '723 patents. (ECF 38 at 107:2-108:12).

14. Even after Mr. Hoffman learned of the '247 and '784 patents, Mr. Hoffman did not believe his design (referred to as the "Super Safety" by Mr. Hoffman) infringed any of the asserted patents and thus never intended to infringe or to cause anyone to infringe any of these patents, as he believed the claimed designs were very different from his Super Safety. (ECF 38 at 109:17-24).

## C. The Expired '723 Patent as Prior Art

1. U.S. Patent No. 7,398,723 (the "'723 patent") expired in 2024, over a year before this preliminary injunction hearing. (ECF 36 at 7:25; 10:21-24; ECF 14-3).

2. Any alleged harm arising from the expired '723 patent ended well over a year ago. (ECF 36 at 10:19-23).

5

3. To the extent that Mr. Hoffman's design finds inspiration in prior art, it may be found in an unclaimed embodiment of the expired '723 patent. (ECF 36 at 7:22-25).

4. The '723 patent describes a three-position selector device having safe, standard semi-automatic, and forced reset semi-automatic operating modes. (ECF 38 at 43:23).

**D. Noninfringement of the Asserted Patents and Prior Art Entrapping Claim Scope**

1. Plaintiffs have failed to establish that any third party has directly infringed the '247, '784, or '723 patents using Mr. Hoffman's publicly released files.

**1. The '784 Patent (U.S. Patent No. 12,021,784)**

1. The '784 patent addresses a modification to the locking member of U.S. Patent No. 10,514,223 (the "'223 patent) where claim 1 of the '784 patent requires an "extended trigger member locking device" and a "locking member" as represented in FIGs. 2-4 and 8-10 of the '784 patent. (ECF 38 at 50:1-5, 51:11-12; ECF 1-2 at cl. 1, Figs. 2-4, 8-10, Col. 1 lines 33-52, Col. 5 line 12-Col. 6 line 7).

2. Claim 1 of the '748 patent also requires that the two-piece "locking member" include "an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position." (ECF 36 at 10:25-11:4; ECF 37 at 66:8-16; ECF 38 at 25:25-26:10, 101:18-21; ECF 14-2).

3. The '748 patent uses the terms "deflect" and "fold" and interchangeably, in some instances referring to the upper extending deflectable portion as a "foldable extension 22" and in other instances referring to the same part as a "deflectable extension portion 22". (ECF 38 at 25:14-17, 97:22-98:2; ECF 14-2 at col. 3, lines 51, 53, and 57 and col. 4, lines 10 and 51).

6

4. The '784 patent lower body portion does not pivot during rearward passing of the bolt carrier; only the upper extending deflectable portion of the locking member folds or deflects in response to being struck by the forward surface of the bolt carrier. (ECF 36 at 11:4-8; ECF 37 at 76:4-17; ECF 38 at 97:17-21).

5. The upper extending deflectable portion of the locking member folds relative to the lower body portion reducing its vertical height to allow the bolt carrier to pass rearward over the locking member. (ECF 38 at 97:17-21, 100:4-8).

6. Mr. Hoffman's device uses a solid metal lever to contact and transfer movement from the bolt carrier to the safety selector cam where the solid metal lever does not hinge, fold, or deflect relative to the safety selector cam in allowing the bolt carrier to pass rearward or forward over the solid metal lever. (ECF 26-5 at pp. 2, 4-5, Col. 2).

7. In Mr. Hoffman's design both the safety selector cam and the vertical lever rotate together in response to rearward and forward passing of the bolt carrier. (ECF 36 at 11:11-14; ECF 37 at 113:3-6).

8. Mr. Hoffman's device lacks the required upwardly extending deflectable portion or any legal equivalent thereof not ensnared by the prior art as when Mr. Hoffman's lever rotates relative to the safety selector cam, the lever does not change in upward height during movement of the bolt carrier, thus it does not "upwardly extend" as it has no hinge or equivalent "deflectable portion" as required in the '784 patent. (ECF 26-5 at p. 4, Col. 2).

9. The advantage of the '784 patent design [over the '247 and '723 designs] is that it can be used in rifles other than the AR-15, such as the AR-10. (ECF 36 at 11:8-9).

10. The '784 patent design loses standard semiautomatic operation, so the rifle only has safe and repeat reset operating modes. (ECF 36 at 11:9-10, 45:17-18).

11. To the extent that the '784 patent claims are argued broadly enough to cover Mr. Hoffman's design, the claims lose enablement in view of the figures and text of the '784 patent and ensnare the prior art, including the expired '723 patent. (ECF 36 at 11:16-22).

**2. The '247 Patent (U.S. Patent No. 12,038,247)**

1. The '247 patent addresses an alteration of the expired '723 patent where asserted claim 15 of the '247 requires that "whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook." (ECF 36 at 12:7-10; ECF 36 at 12:5-8; ECF 14-1 at Fig. 9C, col. 2 lines 4-14, col. 14 line 64-col. 15 line 3).

2. The '247 patent accomplishes this prevention with a protuberance or lobe added to the safety selector that forces the disconnector back and out of the way when the rifle is placed in forced reset semi-automatic mode. (ECF 36 at 12:9-13; ECF 38 at 105:15-22).

3. The expired '723 patent uses disconnector and hammer hooks. (ECF 36 at 12:23-25).

4. The '247 patent when in a "standard semi-automatic mode" the "said disconnector hook catches said hammer hook" after every shot as the disconnector is not disabled by the safety selector when in standard semi-automatic mode. (ECF 37 at 54:5-8, 16-17)

5. In direct contract to the '247 patent, but like the expired '723 patent, Mr. Hoffman's design never disables the disconnector, thus in Mr. Hoffman's design the disconnector hook catches the hammer hook with every shot fired in both repeat reset and standard semi-automatic

8

modes because in Mr. Hoffman's design the mechanical relationship between the disconnector and the hammer remains the same in both modes – which is the same mechanical relationship present in the '247 patent during standard semi-automatic but not during forced reset semi-automatic mode. (ECF 36 at 12:14-18; ECF 38 at 48:1-ll, 105:2-14).

6.  Mr. Hoffman's design lacks a "forced reset semi-automatic mode" where a cam is in "said second position" because the safety selector cam in Mr. Hoffman's design always starts in a first position where a user can pull the trigger and ends in the same first position to allow the user to pull the trigger again. (ECF 26-6 at p. 5, col. 2; ECF 37 at 55:8-22; 53:20-22).

7.  Plaintiffs' attempt to broaden the language of the '247 patent to cover the opposite of what the '247 patent claims require results in invalidity due to loss of enablement in view of the '247 patent figures and description while ensnaring the prior art. (ECF 36 at 12:19-22; ECF 38 at 43:14-18).

**F. A Loss of Potential Sales is not Irreparable Harm**

1.  After the May 9, 2025 settlement agreement between Plaintiffs and the Department of Justice, the number of companies selling FRTs "exploded." (ECF 37 at 12:22-24).

2.  A significant number of third-party manufacturers either downloaded Mr. Hoffman's design from the internet or created derivative works based on Mr. Hoffman's downloadable design. (ECF 37 at 13:8-20; ECF 26-1 ¶ 15).

3.  If a person wanted to download Mr. Hoffman's design, they can find the design available for download from a number of sources other than Mr. Hoffman. (ECF 37 at 17:20-23).

4.  Multiple other manufacturers and sellers are now selling parts identical to or based on Mr. Hoffman's design. (ECF 36 at 9:1-4; ECF 26-1 ¶ 15; ECF 37 at 19:7-11).

9

5. If this Court were to grant Plaintiffs' preliminary injunction motion, Mr. Hoffman's files will remain available for download from multiple third-party sources, just not from his user account. (ECF 36 at 8:20-9:2; ECF 37 at 18:22-19:6).

6. Similarly, preventing Mr. Hoffman from selling parts based on his design only prevents him from entering the market, as multiple other manufacturers and sellers are now selling parts identical to or based on his design. (ECF 36 at 8:24-9:1; ECF 38 at 111:4-9).

7. Sales not made by Mr. Hoffman will be made by someone else. (ECF 36 at 9:3-4).

8. Mr. Hoffman has no control over third parties that are downloading or selling his design or components based on his design. (ECF 38 at 7:18-11:12; 41:1-16; 110:24-111:9).

## F. Calculation of Monetary Damages

1. Plaintiff's FRT-15L3 product sells for $450, costs approximately $100 to manufacture, and $300 goes to ABC IP, leaving Rare Breed with a profit of $50 per unit. (ECF 37 at 7:2-23).

2. The FRT-MR3 sells for $525, costs approximately $100 to manufacture, and $300 goes to ABC IP, leaving Rare Breed with a profit of $125 per unit. (ECF 37 at 7:3-25).

3. Rare Breed sells 100% retail with no distributor or dealer costs. (ECF 37 at 7:15-16).

4. Mr. DeMonico is not aware of any other license agreement for use of a patent related to FRT technology in which the agreed-upon royalty rate was 60 percent of the product's sale price. (ECF 37 at 11:11-22).

5. Mr. DeMonico is not aware of any license agreement for use of a patent related to the manufacture and sale of firearm components in which the agreed-upon royalty is 60 percent of the product's sale price. (ECF 37 at 12:11-16).

## G. Equities and Public Interest

1. Mr. Hoffman would like to join the many other existing sellers of his product design, as he does not believe his new design infringes any valid patent claim. (ECF 26-1 ¶ 29).

2. Maintaining enjoinment of Mr. Hoffman's product sales of presently manufactured and anticipated-to-be manufactured products will continue to result in a significant loss of sales and expected revenue, continued harm caused by failure to fulfill orders, and costs associated with tooling, transportation, and storage of enjoined products. (ECF 26-1 ¶ 30).

3. On January 26, 2026 the Department of Justice (DOJ) representing the Bureau of Alcohol and Firearms (ATF) filed a statement of interest to put a finger on the scales of the public interest element in this matter. (ECF 28; ECF 36 at 19:8-10, 20:5-8).

## II. PROPOSED CONCLUSIONS OF LAW

## A. Standard for Preliminary Injunction

1. Preliminary injunctions are "drastic and extraordinary remedies" that are "not to be routinely granted." *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004).

2. A preliminary injunction is never awarded as of right. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).

3. A patentee seeking a preliminary injunction must establish: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375-76 (Fed. Cir. 2009); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Winter*, 555 U.S. at 20.

11

4. The movant bears the burden of proving entitlement to preliminary relief by a clear showing. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

5. Failure to demonstrate even one of the required factors justifies denial of a preliminary injunction. *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994).

6. As Plaintiffs' Motion for Preliminary Injunction is brought on the basis of patent infringement, the Plaintiffs must show its likelihood of success proving both infringement and the patent's validity. *Entegris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1351 (Fed. Cir. 2007).

## B. Likelihood of Success on the Merits

1. The plaintiff fails to meet its burden of demonstrating likelihood of success on the merits if the defendant raises a "substantial question" concerning validity or infringement. *Altana Pharma AG v. Teva Pharms. USA, Inc*., 566 F.3d 999, 1005-06 (Fed. Cir. 2009); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010).

2. To show a substantial question, the defendant need show nothing more than "vulnerability" of the patent to invalidity; proving invalidity is an issue for trial. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001).

3. A patent claim is invalid under 35 U.S.C. § 112 if the specification does not enable the claimed invention. *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1993) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)).

4. A single species does not enable a genus without one of ordinary skill in the art being able to visualize or recognize the genus members from the species alone. *Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010).

5. A claim is invalid if argued so broadly as to ensnare the prior art. *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002); *Senmed, Inc. v.*

12

*Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 821 (Fed. Cir. 1989); *Stewart-Warner Corp. v. City of Pontiac, Mich.*, 767 F.2d 1563, 1572 (Fed. Cir. 1985).

6. Mr. Hoffman's knowledge of Plaintiffs' patents in suit occurred much later than his making his design files publicly available, and Mr. Hoffman is credible when he states that he did not believe that he infringed the patents after becoming aware of them. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 563 U.S. 754, 765 (2011) (…induced infringement under § 271(b) requires a plaintiff to show that the alleged infringer knew or should have known his actions would induce actual infringements and that this showing includes proof that the alleged infringer knew of the patent.).

7. Plaintiffs have offered no evidence nor otherwise established direct infringement attributable to Mr. Hoffman's downloaded files, and hence they have failed to meet their burden of showing a likelihood of success in establishing induced infringement of any asserted patent in relation to Mr. Hoffman's files. *Global-Tech Appliances*, 563 U.S. at 762-63.

8. Claim 1 of the '748 patent requires "an extended trigger member locking device". Based on the findings of fact concerning the substantial differences between Mr. Hoffman's device and the '784 patent (specifically that Mr. Hoffman's device uses a solid metal lever to contact and transfer movement from the bolt carrier to the safety selector cam that does not hinge, fold, or deflect as taught in the '784 patent), Defendants have raised a substantial question as to whether the '784 patent, as properly construed, reads on Mr. Hoffman's device. *Cybor Corp. v FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

9. Claim 1 of the '748 patent also requires "an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position". Based on the findings of fact concerning the substantial differences between Mr.

13

Hoffman's device and the '784 patent (specifically that Mr. Hoffman's device lacks the required upwardly extending deflectable portion or any legal equivalent thereof not ensnared by the prior art as when Mr. Hoffman's lever rotates relative to the safety selector cam, the lever does not change in upward height during movement of the bolt carrier, thus it does not "upwardly extend" as it has no hinge or equivalent "deflectable portion" as required in the '784 patent), Defendants have raised a substantial question as to whether the '784 patent, as properly construed, reads on Mr. Hoffman's device. *Cybor Corp.*, 138 F.3d at 1454; *Bayer AG*, 212 F.3d at 1247.

10. Based on the findings of fact concerning the substantial differences between Mr. Hoffman's Super Safety design and the '784 patent (specifically that both the safety selector cam and lever move together in Mr. Hoffman's design in response to the passing of the bolt carrier, whereas in the '784 patent the lower body portion does not move while the upwardly extending deflectable portion folds around the pin in response to the passing of the bolt carrier), Defendants have raised a substantial question as to whether the '784 patent, as properly construed, reads on Mr. Hoffman's device. *Cybor Corp.*, 138 F.3d at 1454; *Bayer AG*, 212 F.3d at 1247.

11. Plaintiffs did not establish that the functional language and nonce terms of the '784 patent claims are enabled beyond the embodiments present in the '784 patent and their counterparts as would be visualized by a person of ordinary skill in the art. *Ariad*, 598 F.3d at 1350. Under the *Ariad* test, in view of the missing claim elements discussed above, the Plaintiffs are unlikely to succeed in arguing that the claim language of the '784 patent as enabled by the figures and specification reads on Mr. Hoffman's design, or that Mr. Hoffman's design would be considered a legal equivalent of the claimed design under the Doctrine of Equivalents. *Id.*; see also, *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149

14

F. 3d 1309, 1316 (Fed. Cir. 1998). Hence, Defendants have successfully established the vulnerability of the '784 patent to noninfringement in relation to the Mr. Hoffman's device. *Amazon.com, Inc.*, 239 F.3d at 1359.

12. Claim 15 of the '247 patent requires "whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook". Based on the findings of fact concerning the substantial differences between Mr. Hoffman's design and the '247 patent (specifically that Mr. Hoffman's disconnector hook is not "prevented from catching said hammer hook" during rearward movement of the bolt carrier), Defendants have raised a substantial question as to whether the '247 patent, as properly construed, reads on Mr. Hoffman's device. *Cybor Corp.*, 138 F.3d at 1454; *Bayer AG*, 212 F.3d at 1247.

13. Based on the findings of fact concerning the substantial similarities between the '247 patent and the expired '723 patent, if Mr. Hoffman's disconnector is argued to be prevented from catching said hammer hook, then the '247 patent claims read on and ensnare the prior art as the '723 patent design also prevents the disconnector from catching the hammer hook. *Tate Access Floors*, 279 F.3d at 1367; *Senmed*, 888 F.2d at 821; *Stewart-Warner Corp.*, 767 F.2d at 1572.

14. Claim 15 of the '247 patent requires "whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer…". Based on the findings of fact concerning the substantial differences between Mr. Hoffman's Super Safety design and the '247 patent (specifically Mr. Hoffman's design lacks "said cam is in the second position" prior to rearward movement of the bolt carrier causing rearward pivoting of the hammer), Defendants have

15

raised a substantial question as to whether the '247 patent, as properly construed, reads on Mr. Hoffman's device. *Cybor Corp.*, 138 F.3d at 1454; *Bayer AG*, 212 F.3d at 1247.

15. Plaintiffs did not establish that the functional language and nonce terms of the '247 patent claims are enabled beyond the embodiment present in the '247 patent and their counterparts as would be visualized by a person of ordinary skill in the art. *Ariad*, 598 F.3d at 1350. Under the *Ariad* test, in view of the missing claim elements discussed above, the Plaintiffs are unlikely to succeed in arguing that the claim language of the '247 patent as enabled by the figures and specification reads on Mr. Hoffman's design, or that Mr. Hoffman's design would be considered a legal equivalent of the claimed design under the Doctrine of Equivalents. *Id.*; see also, *Ethicon,* 149 F.3d at 1316. Hence, Defendants have successfully established the vulnerability of the '247 patent to noninfringement in relation to the Mr. Hoffman's device. *Amazon.com, Inc.*, 239 F.3d at 1359.

16. Because Defendants have raised a substantial question concerning both infringement and validity of the asserted patents when their claims are argued broadly enough to cover Mr. Hoffman's designs, Plaintiffs cannot show a likelihood of success on the merits sufficient for the granting of a preliminary injunction. *Altana Pharma*, 566 F.3d at 1005-06; *AstraZeneca*, 633 F.3d at 1050.

## C. Irreparable Harm

1. To succeed on a motion for preliminary injunction, a plaintiff must demonstrate that irreparable harm is likely in the absence of an injunction. *Titan Tire*, 566 F.3d at 1375-76; *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012), quoting *Winter*, 555 U.S. at 22.

16

2. The purpose of a preliminary injunction is to prevent substantial and immediate irreparable injury, not address alleged harm such as the public availability of Mr. Hoffman's files for public download that has been ongoing for close to three years. *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991); *Apple*, 678 F.3d at 1325; *Winter*, 555 U.S. at 22.

3. Based on the findings of fact that approximately 32,000 design file downloads and 83,000 3D print file downloads occurred before Mr. Hoffman prevented continued download of his files, and that third parties have independently reposted the files on multiple platforms since the files were no longer available for download from Mr. Hoffman's user account, enjoining Mr. Hoffman will not prevent continued download and dissemination of his design and 3D print files. *Titan Tire*, 566 F.3d at 1375-76; *Apple*, 678 F.3d at 1325; *Winter*, 555 U.S. at 22.

4. Plaintiffs' assertions that this Court's entry of a Preliminary Injunction preventing file downloads from Mr. Hoffman's user account would somehow prevent future irreparable harm in the form of "trespasses on Plaintiffs' patent rights" or decrease Plaintiffs' ability to "police the market" are not supported in the findings of fact. *Nutrition 21*, 930 F.2d at 872.

5. Based on the findings of fact that multiple third-party manufacturers are already making and selling products based on Mr. Hoffman's design, and that preventing Mr. Hoffman from selling will not prevent others from selling, an injunction against Mr. Hoffman regarding future intended sales will not prevent substantial and immediate irreparable harm to Plaintiffs. *Nutrition 21*, 930 F.2d at 872.

6. Granting a Preliminary Injunction against Mr. Hoffman's intended sales would simply shift the market for his designs to a third party other than Mr. Hoffman that is or soon will be selling such designs and deny Mr. Hoffman from participating in the existing and developed market. *Automated Merch. Sys. v. Crane Co.*, 357 Fed. Appx. 297, 301 (Fed. Cir. 2009)

17

(internal citations omitted); *see also Apple*, 678 F.3d at 1324-25 ("A mere showing that [the patentee] might lose some insubstantial market share . . . is not enough.").

7. Plaintiffs' substantial and immediate irreparable harm cannot be Mr. Hoffman joining the at least twenty sellers and ten manufacturers of his designs or derivatives of his designs. *Nutrition 21*, 930 F.2d at 872.

8. Irreparable injury to Plaintiffs caused by Mr. Hoffman cannot be that Mr. Hoffman makes sales as opposed to multiple existing parties other than Plaintiffs. *Nutrition 21*, 930 F.2d at 872.

9. Where the alleged harm is not caused solely or primarily by the defendant, but rather by numerous third parties over whom the defendant has no control, irreparable harm is not established. *Titan Tire*, 566 F.3d at 1375-76 (plaintiff must show likelihood of irreparable harm in the absence of the requested relief); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  [Furthermore], it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

10. Monetary damages are adequate to compensate for patent infringement where the harm can be calculated with reasonable certainty. *eBay*, 547 U.S. at 391; *Nutrition 21*, 930 F.2d at 872.

11. Based on the findings of fact that Plaintiffs have a "royalty" rate of $300 per unit, that Rare Breed's profit margins are quantifiable (less than $50 or $125 per unit depending on model), and that Plaintiffs sell 100% retail with little distribution costs, monetary damages can be calculated with reasonable certainty and are adequate to compensate Plaintiffs for any provable infringement.  *eBay*, 547 U.S. at 391; *Nutrition 21*, 930 F.2d at 872.

18

12. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began. *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988)

13. The reasonable royalty determined must be a royalty that would have resulted from a hypothetical negotiation between the parties, and not simply a royalty either party would have preferred. *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006); citing *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988) (overruled on other grounds).

14. Plaintiff Rare Breed pays a $300 "royalty" to ABC IP per unit sold. Plaintiffs have offered no evidence that this amount would be less than a "reasonable royalty" for use of the asserted patents, or that this amount would be insufficient to compensate Plaintiffs for any infringement of the asserted patents.

15. A 57 to 67 percentage payment of the sale price of a product paid as a patent royalty would not be considered reasonable if the parties to the negotiation had the ability to freely negotiate.

16. It would not be difficult to determine an average reasonable royalty for trigger components, repeat reset or otherwise from a study of the existing marketplace for firearm upgrade and alteration parts.

## D. Balance of Equities

1. The balance of equities weighs against granting a preliminary injunction where the plaintiff has adequate remedies at law and the defendant would be excluded from the market despite substantial questions regarding the validity and infringement of the asserted patents. *Titan*

*Tire*, 566 F.3d at 1381; *Hybritech Inc. v. Abbot Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1998);
*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).

2. Based on the findings of fact, even if Plaintiffs were harmed by the public availability of Mr.
   Hoffman's files, preventing Mr. Hoffman from providing the files for public access will not
   prevent that harm. *Titan Tire*, 566 F.3d at 1381.

3. Based on the findings of fact that multiple third-party manufacturers will continue to sell
   Super Safety devices regardless of whether Mr. Hoffman remains enjoined, the balance of
   equities does not favor an injunction that singles out one defendant while others continue to
   sell. *Hybritech*, 849 F.2d at 1457.

4. Based on the findings of fact concerning the shared operability Mr. Hoffman's design may
   have with the expired '723 patent, and the substantial questions raised regarding infringement
   and validity under Plaintiffs' argued claim construction, the equities weigh against preventing
   Mr. Hoffman from selling a design likely based on expired or uninfringed patent rights. *State
   Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235-36 (Fed. Cir. 1985); *see also Bonito
   Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151 (1989) ("[A]fter the expiration of
   a federal patent, the subject matter of the patent passes to the free use of the public as a matter
   of federal law.").

5. The balance of equities does not tip in Plaintiffs' favor. *Id.*

## E. Public Interest

1. The public interest is served by ensuring that patent rights are not extended beyond their
   proper scope and that invalid or non-infringed patents do not improperly restrict competition.
   *See, e.g., Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969) ("Surely the equities of the licensor
   do not weigh very heavily when they are balanced against the important public interest in
   permitting full and free competition in the use of ideas which are in reality a part of the public

20

domain."); *Pope Manufacturing Co. v. Gormully*, 144 U.S. 224, 234 (1892) ("[I]t is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly.").

2. The public interest is served by allowing legitimate design-around efforts and innovation in firearm technology, albeit with the payment of money damages if the design-around is proven unsuccessful. *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235-36 (Fed. Cir. 1985).

3. There is public interest in promoting competition in the marketplace, which would be undermined if a preliminary injunction is granted. *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969) ("[T]he equities of the licensor do not weigh very heavily when they are balanced against the important public interest permitting full and free competition in the use of ideas which are in reality a part of the public domain.").

4. Based on the findings of fact, the public interest is best served by recognizing Mr. Hoffman's continued right to compete by joining the existing and developed market pending a full determination of the questions of noninfringement, invalidity, and unenforceability on the merits.

5. Based on the findings of fact that Plaintiffs are obligated under their Settlement Agreement with the Department of Justice to engage in patent enforcement, and that this obligation is a factor motivating this lawsuit, the equities do not favor granting an injunction that serves Plaintiffs' contractual obligations to a third party (the DOJ) and establishes an improper monopoly for regulatory purposes rather than solely on legitimate patent and design-around rights.

6. The patent law is not a regulatory tool to be misused by the government to regulate products over which the government has no regulatory authority. *See*, *e.g.*, *Angiotech*

21

*Pharmaceuticals Inc. v. Lee*, 191 F.Supp.3d 509, 518 (E.D. Va. 2016) ("[T]he nation's patent law regime is not a regulatory scheme in the typical administrative law sense; rather, the Patent Act operates much more like a traditional common law unilateral contract offer by Congress.").

7. The public interest is not served by misusing the extraordinary relief of an injunction for patent infringement to establish an improper monopoly benefitting a government sanctioned seller while excluding other participants from the market. *Id.*

## F. Summary

1. Plaintiffs have failed to demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; or (4) that an injunction is in the public interest.

2. Because Plaintiffs have failed to demonstrate even one of the required factors for a preliminary injunction, their motion for preliminary injunction should be denied. *Reebok Int'l*, 32 F.3d at 1556.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court:

1. DENY Plaintiffs' Motion for Preliminary Injunction; and

2. TERMINATE the Temporary Restraining Order should it remain in place upon this Court's ruling.

Respectfully submitted this 5th day of February, 2026.

22

s/Jacob Horton
Jacob G. Horton (TN BPR # 025467)
Blanchard Horton PLLC
PO Box 5657
Oak Ridge, Tennessee 37830
(865) 269-2673
JHorton@blanchard-patent.com
***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. Mail. Parties may access this filing through the Court's electronic filing system.

s/Jacob Horton