IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>    Plaintiffs,<br><br>vs.<br><br>TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,<br><br>    Defendants. | Case No. 1:25-cv-00389-CLC-CHS |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

Come Plaintiffs, ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("Rare Breed") (collectively, "Plaintiffs") and, in further support of Plaintiffs' Motion for Preliminary Injunction with Incorporated Brief in Support [14] ("PI Motion") and pursuant to the Court's oral instructions at the hearing on the Preliminary Injunction Motion ("PI Hearing"), which took place on January 27-29, 2026,[1] respectfully submit these proposed findings of fact and conclusions of law in support of their request for a preliminary injunction in this action against Defendants Timothy Hoffman and Hoffman Tactical, LLC ("Defendants").

---

[1] The PI Hearing followed the Court's hearing on January 13, 2026 ("TRO Hearing") of Plaintiffs' Motion for Temporary Restraining Order with Incorporated Brief in Support [15] ("TRO Motion"). Following the TRO Hearing, the Court granted Plaintiffs' request, entered a Temporary Restraining Order Under Rule 65 of the Federal Rules of Civil Procedure [20] ("TRO") restricting Defendants' actions as set forth therein, and ordered Plaintiffs to post an injunction bond of $20,000.00 (*see* TRO 2), which Plaintiffs did on January 14, 2026 (*see* Notice of Receipt for Injunction Bond [21]). The Court is in possession of the transcript of that hearing ("TRO Hr'g Tr.").

## PROCEDURAL BACKGROUND

1. On December 23, 2025, Plaintiffs filed this suit against Defendants, alleging infringement of various patents, including U.S. Patent Nos. 12,038,247 (the '247 Patent) and 12,021,784 (the '784 Patent). (*See* Original Compl. for Patent Infringement ("Compl.") [1]).

2. The '247 Patent is directed to a forced reset trigger mechanism that is reset by operation of a cam and that operates in both standard semiautomatic and forced reset modes. (*See* Compl. Ex. A ('247 Patent).)

3. The '784 Patent is directed to a locking mechanism for a forced-reset trigger ("FRT"). (*See* Compl. Ex. B ('784 Patent); PI Hr'g Tr., Vol. 1, 39:15-18.)

4. On January 7, 2026, Plaintiffs filed the PI Motion. On January 27, 28, and 29, 2026, this Court held the PI Hearing. The proceedings were transcribed and are available in transcripts referred to herein as Vol. 1, Vol. 2, and Vol. 3, respectively.

5. Plaintiffs made an opening statement and called three witnesses: Mr. Lawrence DeMonico, Mr. Brian Luettke, and Mr. Timothy Hoffman (called as an adverse witness). Defendants likewise made an opening statement and presented additional evidence through examination of those same witnesses.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

6. Having considered the pleadings on file, the Motion, the admissible and competent evidence presented at the Hearing, and the arguments of counsel, the Court concludes that the Motion should be **GRANTED**. In support, the Court makes the following Findings of Fact and Conclusions of Law:

7. The owner of a patent can file a civil action in district court to obtain monetary and injunctive relief against an infringer, i.e., one who "makes, uses, offers to sell, or sells any patented

invention." 35 U.S.C. § 271.

8. "Whoever actively induces infringement of a patent is liable as an infringer." *See* 35 U.S.C. § 271(b).

9. Pursuant to 35 U.S.C. § 271(c),

   > whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

10. Congress authorized injunctive relief "in accordance with the principles of equity." 35 U.S.C. § 283. Under these principles, the Supreme Court has held that a patentee must satisfy the traditional four-factor test applicable to requests for injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006).

11. For a preliminary injunction, the four-factor test requires a showing of (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm (with no adequate remedy at law); (3) the balance of the hardships is in favor of the party seeking injunction; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

12. No factor is dispositive, as "the court must balance all factors . . . in the exercise of its sound discretion." *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008); *see also McNeilly*, 684 F.3d at 615.

## Likelihood of Success on the Merits

13. Because infringement of one claim of one patent creates liability, likelihood of success on either one of the asserted patents justifies injunctive relief; it is not necessary to establish

likelihood of success as to both asserted patents.

14. ABC owns and Rare Breed is the exclusive licensee of the asserted FRT patents, which are presumed valid. (PI Hr'g Tr. 24:8-16.)

15. Plaintiffs have demonstrated a likelihood of success on the merits because patents issued by the USPTO are presumed valid at the injunction stage, and Defendants failed to rebut that presumption. 35 U.S.C. § 282. Defendants also failed to raise a substantial question of either infringement or validity of the asserted patents. *Cf. Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005-06 (Fed. Cir. 2009).

16. The testimony of Plaintiffs' expert witness, Brian Luettke, was credible and established that the limitations of claim 15 of the '247 Patent and claim 1 of the '784 Patent were met by the Super Safety. (PI Hr'g Tr., Vol. 2, 43:9-73:11; 76:21-122:23.) Accordingly, Defendants infringe at least claim 1 of the '784 Patent and claim 15 of the '247 Patent.

17. Defendants (through Mr. Hoffman's testimony and otherwise) did not raise a "substantial question" about infringement as to either of the asserted patents. To the contrary, Mr. DeMonico's testimony established that Defendants mischaracterized the teachings of the '784 Patent and how the claimed inventions operate. (PI Hr'g Tr., Vol. 1, 40:9-45:24.)

18. The Plaintiffs" expert, Brian Luettke, presented unrebutted testimony that '723 Patent teaches a two-position trigger, *i.e.*, a selector that adjusts between safe and forced reset fire. (PI Hr'g Tr. Vol, 2, 118:22 – 119:2.) In fact, the "invention can be effected without the provision of a selector," so it could not be a 3-position trigger. (PI Hr'g Tr. Vol. 2, 121:13 – 122:17.)

19. Prior to entry of the TRO, Mr. Hoffman personally used and sold "Super Safety" devices (TRO Hr'g Tr. 25:15-23; PI Hr'g Tr., Vol. 3, 12:19-13:19.)

20. Hoffman chose not to pursue patent protection for the Super Safety design in September of

2023 because the ATF considered it illegal at that time. (Decl. of Timothy Hoffman in Supp. of Def.'s Resp. to Pls.' Mot. for Preliminary Injunction [26-1] ("Hoffman Decl.") ¶ 24.)

21. Use of the accused product establishes direct infringement under 35 U.S.C. § 271(a), further supporting likelihood of success.

22. On July 20, 2023, prior to entry of the TRO, Mr. Hoffman and publicly distributed CAD and 3D-print files of infringing devices together with instructions for manufacturing and use ("Super Safety Files"). (*See* PI Hr'g Tr., Vol. 1, 7:4-8:24; Vol. 2, 13:2-18:21; Vol. 3, 39:17-40:13; Hoffman Decl. ¶ 25.)

23. Hoffman was aware of the '723 Patent at the time he publicly posted the Super Safety files for unrestricted download. (Hoffman Decl. ¶ 20.)

24. He also provided assistance (in the form of "troubleshooting") to many of the "hundreds or thousands" of persons who asked for it in connection with Super Safeties. (PI Hr'g Tr. Vol 3, 40:9-41:16.)

25. Distribution of detailed design files and instructions and assistance in "troubleshooting" constitute active steps to encourage infringement and supports a finding of inducement under 35 U.S.C. § 271(b).

26. Hoffman testified that at least these companies are known to him to make products "in accord with or based on" his Super Safety design:

   a. Fudd Arms: https://fuddarms.com/products/s7c-super-safety-kit;

   b. Grey Market Research: https://greymarketresearch.net/safety-products/;

   c. Z3 Productions: https://www.z3pro.com/product-page/copy-of-batch-7-cpm-10v-a2-ar-super-safety-kit;

   d. 2AG: https://2agsupersafety.com/;

    e. Stark80: https://stark80.com/home/shop/?orderby=date;

    f. Deez Nuts Tactical: https://deeznutztactical.com;

    g. Polymer Pew: https://polymerpew.com/;

    h. URSA Security: https://ursa-sec.com/product/tim-hoffman-super-safety-kit/;

    i. Atrius: https://atrius.dev/atrius-forced-reset-selector/; and

    j. AS Designs: https://activesafetydesigns.com/ss-parts/.

(Hoffman Decl. ¶ 15.)

27. Hoffman's continued dissemination of the Super Safety Files with actual knowledge of the patents satisfies the scienter requirement for inducement of infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-77 (2011); (PI Hr'g Tr., Vol. 3, 72:14-23 (Mr. Hoffman's testimony that he "knew that [Plaintiffs] were intent on enforcing their intellectual property rights before [he] designed the Super Safety").

28. Hoffman's goal in dissemination of 3D Print files, STEP files, and Developer's Packs (DEV Pack) was to make judicial or regulatory enforcement against such devices (by ATF or Plaintiffs) ineffective. ( *Id.* at 69:9-74:9; https://hoffmantactical.com/.)

29. Others ("the community" who helped or continue to help make dissemination unstoppable were and are helping Hoffman accomplish indirectly what he cannot do directly, and make it "impossible for the federal government to use their standard bully tactics to shut [the Super Safety] down. (PI Hr'g Tr., Vol. 3, 69:9-74:9; *see also id.* at 61:8-23 (testimony and evidence regarding the hoffmantactical.com homepage contents presented live at the hearing, which included the following statement by Defendant) (emphasis added).

> I freely shared my Super Safety in the hopes that the community would make it impossible for the federal government to use their standard bully tactics to shut down yet another legal item. This has proven deeply effective. The downside was that I was unable to manufacture the Super Safety myself without giving the feds a central point of attack. Until now: The popularity of the Super Safety is now great enough that even were I raided it would have little effect on the industry as a whole.
>
> WE HAVE POSTPONED SALES FOR THE DURATION OF A TWO WEEK TEMPORARY RESTRAINING ORDER. UPDATED 1/14/2026. THE TRO WAS EXTENDED UNTIL FEB 10th. UPDATED 2/5/2026.
>
> -Tim

30. The 3D files Hoffman posted for unrestricted download are being used to produce the Super Safety product in China. (*Id.* at Vol. 1, 52:10-53:3; Vol. 2, 18:22-19:6; Vol. 3, 67:19-68:3.) Hoffman took no precautions to prevent the export of the files to China. PI Hr'g. TR. Vol. 3, 67:23 – 68:7.

31. Any person who knowingly assists conduct that undermines the court's authority acts in concert, regardless of motive. *See U.S. v. Hall*, 472 F.2d 261, 267 (5th Cir. 1972); *Waffenschmidt v. MacKay*, 763 F.2d 711, 718 (5th Cir. 1985); *see, also e.g.*, *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 508 F. App'x 498, 500, 502 (6th Cir. 2012); *Mfg. Repair & Overstock, Inc. v. Kasinger*, No. 1:24-CV-268, 2025 WL 1208690, at *4, *8 (E.D. Tenn. Apr. 25, 2025). Non-parties who act with knowledge to frustrate enforcement of this Court's order are bound, regardless of whether their actions are motivated by ideology or protest rather than commercial gain, provided they have notice of the Court's order, and are either "in active concert or participation with" Defendants. *See* Fed. R. Civ. P. 65(d)(2)(C).

32. Non-parties who, with notice of this injunction, act to bring about a result forbidden by the injunction are in active concert or participation. *See id.*; *Hall*, 472 F.2d at 267; *Montezello v. Pesce*, No. 2:21-CV-00906-DJC-EFB (PC), 2025 WL 2555791, at *3 n.5 (E.D. Cal. Sept. 5, 2025).

33. The Court finds that the Plaintiffs have satisfied their burden to prove a high likelihood of

success on the merits, and that Defendants have failed to raise a substantial question of infringement or invalidity.

### Irreparable Harm

34. Rare Breed and Hoffman are direct competitors because both sell a version of a forced reset trigger. Loss of the right to exclude others from practicing the patented invention constitutes irreparable harm not compensable by money damages. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638 (Fed. Cir. 2015); (TRO Hr'g Tr. 21:6-22:15).

35. Hoffman's unrestricted distribution of Super Safety Files resulted in and would continue to result in widespread copying, third-party manufacturing, and uncontrolled downstream infringement. (PI Hr'g Tr., Vol. 2, 12:2-17:10.)

36. The scope of infringement caused by public file distribution cannot be reliably quantified and includes foreign and anonymous actors. (PI Hr'g Tr., Vol. 3, 67:19-68:7.)

37. Where damages are difficult to quantify and enforcement impracticable, injunctive relief is appropriate. *Apple Inc.*, 809 F.3d at 645.

38. ABC receives a fixed royalty of $300.00 per unit sold, and Rare Breed makes between $50.00 and $125.00 gross profit per unit such that each lost sale results in actual lost royalty and profit to Plaintiffs of $350.00-$425.00. (PI Hr'g Tr., Vol. 1, 56:23-57:16; Vol. 2, 9:11-15; Vol. 3, 12:23-25, 86:9-88:9.)

39. Because the sale price of Hoffman's Super Safety is $90.00 per unit, even the total gross revenue from sales could not compensate for the harm to Plaintiffs. (PI Hr'g Tr., Vol. 3, 12:23-25, 86:9-88:9.)

40. Further, the evidence showed that Defendants would likely be unable to satisfy the judgment if the jury awards money damages. (PI Hr'g Tr. Vol. 1, 56:8-63:13; Vol. 2, 125:9-19; Vol. 3,

87:4-88:13 (testifying that if Defendants were required to pay royalties of $900,000.00 per year, they would have to "figure that out").

41. Defendants have publicly and baselessly stated that forced reset triggers are "not new" (PI Hr'g Tr., Vol. 1, 7:11) and that the '784 Patent is invalid (*id.* at 9:17-10:15; 10:24-12:5) creating confusion among consumers.

42. Because of the above-described actions and statements, Rare Breed and its president Lawrence DeMonico have suffered injury to their reputation, including their reputation as innovators (PI Hr'g Tr., Vol. 1, 47:17-48:23; Vol. 2, 20:21-23:16), have endured death threats (likely from "the community") (*id.* Vol. 2, 36:23-37:22) and would suffer further irreparable harm in the absence of an injunction.

43. Rare Breed has lost market share (PI Hr'g Tr., Vol. 1, 49:13-50:20) and has been forced to alter its business strategy and pricing on a product with modest profit margins (*id.* at 51:24-52:9; Vol. 2, 7:2-25) because of Defendants' infringement.

44. Courts have noted that irreparable harm can manifest as loss of market share, price erosion, and harm to reputation or goodwill when the patented invention is central to the patentee's business and competition is direct. *Apple Inc.*, 809 F.3d at 639, 646; *see also Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006).

45. To establish irreparable injury, a plaintiff must show that a "causal nexus relates the alleged harm to the alleged infringement[,]" which "just means that there must be proof that the infringement causes the harm. *Apple*, 809 F.3d at 639. "When a patentee alleges it suffered irreparable harm stemming from lost sales solely due to a competitor's infringement, a finding that the competitor's infringing features drive consumer demand for its products satisfies the causal nexus inquiry." *Id.* at 651. Similarly, "[w]here two companies are in competition against

one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351 (Fed. Cir. 2012) ("[Being in d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."). *See also BlephEX, LLC v. Myco Indus.*, 24 F.4th 1391, 1405 (Fed. Cir. 2022) (finding that where the parties are "direct competitors," plaintiff had suffered "price erosion, loss of goodwill, and damage to its reputation, and [was] threatened with extinction by the continued sales of the [accused infringing product]," the district court did not err in finding irreparable harm.).

46. The Court finds that without an injunction, Plaintiffs will suffer irreparable harm.

### **Balance of Equities**

47. The balance of equities favors Plaintiffs where an injunction preserves patent rights and merely delays unlawful activity. "'Requiring a plaintiff to compete against its own patented invention places substantial hardship on the patentee, and when willful infringement is found, the balance of hardships weighs in favor of granting an injunction.'" *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, No. 17-cv-1574, 2023 WL 5349374, at *21 (D. Del. Aug. 21, 2023) (alterations omitted) (quoting *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011)).

48. Ultimately, equity considers that an infringer who elects to build its business on infringement accepts the risk of business destruction when enjoined. A patent infringer who has built a business around an infringing product cannot complain about the balance of hardships when enjoined. The harm to such an infringer is deemed self-inflicted, and the infringer's claimed hardships from an injunction do not weigh against issuance of relief. *Broadcom v. Qualcomm*,

543 F.3d 683, 794 (Fed Cir. 2008) (citing *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).

49. Defendants did not present evidence of having made a substantial investment, and any harm to Defendants from an injunction is limited and temporary, while Plaintiffs face permanent loss of patent exclusivity absent relief.

50. The Court finds that the balance of equities weighs heavily in favor of the plaintiffs.

### Public Interest

51. The public interest favors enforcement of patent rights and preventing ongoing infringement. *Apple Inc.*, 809 F.3d at 647.

52. The public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions. *Apple Inc.*, 809 F.3d at 647 ("[T]he public generally does not benefit when that competition comes at the expense of a patentee's investment-backed property right. To conclude otherwise would suggest that this factor weighs against an injunction in every case, when the opposite is generally true.").

53. Similarly, enforcement of valid patents promotes innovation and respect for the rule of law. *John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1339 (Fed. Cir. 2011) (recognizing the "axiom that enforceable patent rights are good for innovation and the economy").

54. The United States appeared on behalf of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") pursuant to 28 U.S.C. § 517 to inform the Court of the government's position regarding public-interest considerations and submitted a Statement of Interest (Doc. 28) in connection therewith.

55. In the Statement of Interest, the United States took the positions that:

   a. Because the settlement between the United States and Rare Breed resolved the legality of Rare Breed's products, but does not bind other potential manufacturers who have not agreed to the same limitations on the sale and distribution of forced-reset triggers, Plaintiffs' patent enforcement actions would support ATF's public safety efforts, if successful in enjoining use of FRTs by third parties;

   b. Because the "terms of the settlement" between the United States and Rare Breed "does not bind other potential manufacturers, who have not agreed to the same limitations on the sale and distribution of FRTs,"[2] plaintiffs' "enforcement actions would support ATF's public safety efforts." *Id.* p. 7; and

   c. Defendants "intentional distribution of infringing 3D print files to encourage widespread copying, distribution, experimentation, and sale of the design by the public;

   d. "in evaluating the four factors for a preliminary injunction, public interest should be weighted heavily in plaintiffs' favor." *Id.*

56. The ATF's interest in limiting use of FRTs is underscored by the allegations in this litigation. Here, Plaintiffs allege intentional distribution of infringing 3D print files to encourage widespread copying, distribution, experimentation, and sale of the design by the public. (*See* Compl. ¶¶ 31-32), and Mr. Hoffman's own testimony and public postings indicate that he intended by posting the Super Safety Files to "make it impossible for the federal government to use their standard bully tactics to shut down yet another legal item." (PI Hr'g Tr., Vol. 3, 69:9-72:13; https://hoffmantactical.com/).

---

[2] Statement of Interest of the United States of America (Doc. 28), pp. 6 – 7 (listing the limitations on the sale and distribution of forced reset triggers in the Settlement Agreement).

57. The Court finds that the Public Interest factor weighs heavily in favor of Plaintiffs.

### Preliminary Injunction

58. Based on the foregoing, Plaintiffs have established each of the four factors relevant to requests for preliminary injunction, *viz.*, they have shown (1) a likelihood of success on the merits, (2) that they will be irreparably harmed absent a preliminary injunct, (3) that balance of equities weighs in their favor, and (4) that the public interest favors the requested preliminary injunction.

59. Accordingly, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court **GRANTS** the preliminary injunction requested by Plaintiffs in the PI Motion.

60. Defendants and their principals, agents, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in participation or active concert therewith who aid or abet in the distribution of the Super Safety device or 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform who receive actual notice of this Order are hereby **ORDERED** to refrain from infringing, contributing to the infringement, or inducing infringement of U.S. Patent Nos. 12,038,247 and 12,031,784 until after a judgment on the merits of this action as follows:

    a. Refrain from making, using, selling, offering for sale, or importing any of the accused the "Super Safety" device or any derivatives thereof, whether for the purpose of use or offering such products for sale, whether by retail, through distributors, or wholesale;

    b. Remove and not re-post the "Super Safety" Infringing Devices for free download on Odysee.com, or any other platform for downloads by consumers.

    c. Refrain from posting any version of the Super Safety device in the form of 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform;

d. Refrain from sending any version of the Super Safety device in the form of 3D Print files, STEP files or DEV Packs either physically or electronically to any third party; and

e. Refrain from licensing or attempting to license any third party for the purpose of selling, offering for sale, importing, distributing, promoting the Super Safety or derivative designs thereof.

f. Defendants **SHALL**

   i. **CONSPICUOUSLY** post a full-page file-stamped copy of this Court's injunction as issued on the home page of Defendants' website, which shall remain posted unless and until the injunction is lifted;

   ii. post a link to Defendants' home page on **EVERY** social media account with which Defendants are registered within three days of the date of the Court's issuance of the injunction, together with a statement that informs the users of that social media platform that the purpose of the link is to inform his followers of the issuance of the injunction; and

   iii. file proof of compliance with the Court by filing with the Court a copy of the revised hoffmantactical.com home page and screen shots of Defendants' posts in each of Defendants' social media accounts.

g. This injunction shall apply to all who have notice of this injunction, including through Defendants' compliance with (f) above.

**Injunction Bond**

61. Rule 65(c) of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

62. It is well-settled in the Sixth Circuit that district courts have discretion to determine (i) whether a Rule 65 bond is appropriate, and (ii) if it is, the amount of such bond. *See Doe #11 v. Lee*, 609 F. Supp. 3d 578, 618 (M.D. Tenn. 2022) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)) ("'[T]he rule in the Sixth Circuit has long been that the district court possesses discretion over whether to require the posting of security.'"); *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982) (citing R*oth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)) ("[T]he amount of an injunction bond is within the sound discretion of the district court."); *AAA Auto Glass, Inc. v. Arrow Auto Glass Operating Co., LLC*, No. 3:24-CV-400-TAV-DCP, 2025 WL 2808918, at *15 n.17 (E.D. Tenn. Sept. 30, 2025) (quoting *PMP – Romulus, Inc. v. Valyrian Mach., LLC*, No. 23-CV-10822, 2023 WL 7127505, at *6 (E.D. Mich. Oct. 30, 2023)) (noting that, while the Sixth Circuit "'advises'" district courts to address the bond requirement, "'the ultimate decision of the issue is within the discretion of the trial judge'").

63. "When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present." *Ever-Seal, Inc. v. Halferty*, No. 3:22-CV-00082, 2022 WL 418692, at *10 (M.D. Tenn. Feb. 10, 2022). Relatedly, courts have based their determinations of bond amounts on, *inter alia*, "potential lost profits, lost market share, and associated costs of relaunch." *Sanofi-Synthelabo*, 470 F.3d at 1385 (internal quotation marks omitted); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2954 (3d ed.) (noting that

courts "usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.").

64. Defendants did not address the bond issue either in their briefing (*see generally* Resp. to Pls.' Mot. for Prelim. Inj. [26]) or at the preliminary injunction hearing (*see generally* PI Hr'g Tr. Vols. 1-3). Accordingly, the Court is under no obligation to address it. *See Knox Trailers, Inc. v. Clark*, No. 3:20-CV-137, 2022 WL 95933, at *1 (E.D. Tenn. Jan. 6, 2022) (quoting *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 953 (6th Cir. 2007)) ("The Sixth Circuit has held that 'a court has no mandatory duty to impose a bond as a condition for the issuance of injunctive relief,' only that a district court must consider requiring a bond when a party raises that issue.").

65. Even if it were, based on Mr. Hoffman's testimony and the positions he adopted at the TRO and preliminary injunction hearings, the $20,000.00 bond provided in connection with the TRO is more than adequate to provide security for Defendants if the Court grants the requested preliminary injunction.

66. At the TRO hearing, Defendants' counsel represented that:

    a. if the TRO were granted, Defendants stood to lose $80,000.00 in sales "tomorrow" (*i.e.*, on January 14, 2026) because "10,000 people" on an email list maintained by Defendants were "ready to purchase a first-round offering" of Defendants' infringing products (TRO Hr'g Tr. 32:9-33:3; *see also id.* at 33:22-24 (stating that "loss of sales figures for the expected rollout tomorrow will be much, much higher than $20,000");

b. It was "highly unlikely" that those sales would come to fruition after the expiration of the fourteen-day TRO because Defendants would be forced to disappoint those customers' expectations and thereby suffer reputational harm (TRO Hr'g Tr. 33:6-18).

67. At the preliminary injunction hearing, Defendants' damages estimates were far more modest. Mr. Hoffman acknowledged the above-referenced representation and testified that:

   a. he did not know whether it was accurate, because he was "not familiar with what loss and the time period [his counsel] was referring to" (PI Hr'g Tr., Vol. 3, 12:2-5);

   b. The 10,000-unit figure was an "error" (*id.* at 91:23-24), and it was "[i]ncorrect" to suggest that Defendants had already received a "large number of orders" for Super Safeties—although he "intended" to release the Super Safety on that date and expected to "make sales amounting to that figure, or approximately" (*id.* at 12:10-22), and they were simply "prepared to sell approximately 900 to a thousand units" at that time (*id.* at 91:17-18);

   c. the Super Safety would retail for "[n]inety dollars" (*id.* at 12:23-25);

   d. he had only sold approximately seventy (70) Super Safeties prior to entry of the TRO (*id.* at 13:12-19); and

   e. Given the widespread dissemination of Super Safeties (based on his dissemination of the dev packs and CAD files), he now believes he can sell his Super Safeties (*id.* at 85:12-19), and that he "guessed" that he could sell "3,000 [units] per year" (86:9-15).

68. As the foregoing demonstrates, Defendants have failed to offer more than speculation and guesswork concerning the damages they may sustain if, in hindsight, the requested preliminary injunction was improvidently granted. Given that paucity of evidence, Plaintiffs respectfully submit that the Court should leave the extant bond amount of $20,000.00 in place, as the amount is both appropriate and well within the Court's considerable discretion in this matter.

Dated: February 5, 2026.  Respectfully submitted,

/s/ Decker A. Cammack
Decker A. Cammack (admitted *pro hac vice*)
David A. Skeels (admitted *pro hac vice*)
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, TX 76102
Telephone: (817) 878-0500
Facsimile: (817) 878-0501
DCammack@whitakerchalk.com
dskeels@whitakerchalk.com

/s/ Glenn D. Bellamy
Glenn D. Bellamy (admitted *pro hac vice*)
WOOD, HERRON & EVANS, LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
Telephone: (513) 241-2324
Facsimile: (513) 241-6234
gbellamy@whe-law.com

/s/Joseph Alan Jackson II
Joseph Alan Jackson II, B.P.R. No. 030603
SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
601 Market Street, Suite 400
Post Office Box 1749
Chattanooga, TN 37401 1749
Telephone: (423) 756-7000
Facsimile: (423) 756-4801
jaj@smrw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By: /s/ Joseph Alan Jackson II