IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>   Plaintiffs,<br><br>vs.<br><br>TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,<br><br>   Defendants. | Case No. 1:25-cv-00389-CLC-CHS |

## **M E M O R A N D U M**

Before the Court is the motion of Plaintiffs, ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("Rare Breed"), for a preliminary injunction against Defendants, Timothy Hoffman ("Hoffman") and Hoffman Tactical LLC ("Hoffman Tactical"), in connection with Plaintiffs' claims of patent infringement. (Doc. 14.) Defendants responded in opposition. (Doc. 26.) The Court held a hearing on Plaintiffs' motion on January 27 through 29, 2026. (Docs. 31, 33, 34.) Plaintiffs and Defendants submitted their respective proposed findings of fact and conclusions of law on February 5, 2026. (Docs. 40, 41.) Based on the parties' written submissions and the evidence and argument presented during the hearing, the Court largely adopts Plaintiffs' proposed findings of fact and conclusions of law, as set out in Section III below, and will **GRANT** Plaintiffs' motion for a preliminary injunction (Doc. 14).

I.  **BACKGROUND**

ABC owns certain patents related to forced-reset trigger systems for semiautomatic firearms.[1] ABC's Patent No. 12,038,247 (the "'247 Patent") concerns a device that uses a cam[2] to reset a semiautomatic trigger for accelerated firing and allows the operator to select between standard semiautomatic mode and forced-reset, or accelerated firing, mode. (*See* Doc. 1-1 ['247 Patent].) ABC's Patent No. 12,031,784 (the "'784 Patent") concerns a locking mechanism for a forced-reset trigger system. (*See* Doc. 1-2 ['784 Patent].) ABC also owned now-expired Patent No. 7,398,723 (the "'723 Patent"), which concerned a mechanism to force a trigger to reset using a cam. (*See* Doc. 1-3 ['723 Patent].) Rare Breed is the sole licensee of ABC's patent portfolio and sells forced-reset trigger mechanisms based on ABC's patents.

Mr. Hoffman is the sole owner of Hoffman Tactical. He designs parts for firearms. He also releases firearm-related designs and 3D print files for free public download. He derives his income from selling firearm parts and kits. He also engages in social-media activity.

On December 23, 2025, Plaintiffs filed a complaint against Defendants in this Court asserting twelve causes of action. (Doc. 1.) Included among the claims are claims that Defendants have directly and indirectly infringed the '247 Patent, the '784 Patent, and the now-expired '723 Patent through a product and design known as the Hoffman Tactical Super Safety. (*Id.* at ¶¶ 61–95.)

---

[1] A semiautomatic firearm fires one round of ammunition each time the operator pulls the trigger, automatically loading the next round of ammunition without any additional action by the operator before the trigger can be pulled again. Forced-reset trigger systems accelerate this firing sequence.

[2] A cam is "a rotating or sliding piece of machinery (as a wheel or a projection on a wheel) that imparts motion to" or receives motion from another piece of machinery. *Webster's Third New Int'l Dictionary* (Merriam-Webster 1993).

On January 7, 2026, Plaintiffs filed their pending motion for a preliminary injunction (Doc. 14), supported by a declaration of Lawrence DeMonico ("Mr. DeMonico"), president of Rare Breed (Doc. 14-4), and other exhibits. Plaintiffs base their motion on the alleged current and likely future infringement of the '247 Patent and the '784 Patent. (Doc. 14 ¶¶ 35–41.)

Two days after filing their motion for a preliminary injunction, Plaintiffs filed a motion for a temporary restraining order ("TRO"), arguing that intervening events made waiting for adjudication of the preliminary-injunction motion harmful to them. (Doc. 15.)

The Court held a TRO hearing on January 13, 2026, at which counsel for both parties appeared. (Doc. 19.) The Court granted the TRO, ordering that the Defendants:

a. Refrain from making, using, selling, offering for sale, or importing any of the accused Infringing Devices, whether for the purpose of use or offering such products for sale, whether by retail, through distributors, or wholesale;

b. Remove the "Super Safety" Infringing Devices for free download on Odysee.com, as well as any other platform for downloads by consumers.

c. Refrain from posting any of the Infringing Designs in the form of 3D Print files, STEP files, or Developer's Packs (DEV Pack) on any platform;

d. Refrain from sending any of the Infringing Designs in the form of 3D Print files, STEP files or DEV Packs either physically or electronically to any third party; and

e. Refrain from licensing or attempting to license any third party for the purpose of selling, offering for sale, importing, distributing, promoting the Infringing Devices and Infringing Designs.

(Doc. 20 at 2.) The Court also ordered Plaintiffs to post a $20,000 bond. (*Id.*)

The Court set the preliminary-injunction hearing for January 27, 2026. (*Id.*) Defendants filed a response to the motion for preliminary injunction on January 23, 2026, supported by a declaration of Mr. Hoffman and other exhibits. (Doc. 26.)

The United States (the "Government") filed a statement of interest on January 26, 2026, pursuant to 28 U.S.C. § 517 and *Gil v. Winn Dixie Stores, Inc.*, 242 F. Supp. 3d 1315, 1317 (S.D. Fla. 2017), addressing the public-interest factor the Court must consider in determining whether to issue a preliminary injunction. (Doc. 28.)

The Court held a hearing on the motion for preliminary injunction January 27 through 29, 2026.[3] (Docs. 31, 33, 34.) Following opening statements, Plaintiffs presented testimony from Mr. DeMonico; Brian Luettke, who presented opinion testimony; and Mr. Hoffman, whom Plaintiffs called as an adverse witness. Defendants questioned each witness following Plaintiffs' examination and did not call any additional witnesses. The parties submitted their respective proposed findings of fact and conclusions of law (Docs. 40, 41) on February 5, 2026, following the release of transcripts of the hearing (Doc. 36 ("Tr. Vol. 1"), Doc. 37 (Tr. Vol. 2"), and Doc. 38 ("Tr. Vol. 3")).[4]

## II. STANDARD OF REVIEW

When determining whether to issue a preliminary injunction, a federal court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether the "balance of equities tips" in the movant's favor; and (4) whether the public interest would be served by the

---

[3] Because of the length of the preliminary-injunction hearing, the Court extended the TRO until the earlier of the issuance of the Court's decision on the motion for preliminary injunction or February 10, 2026. (Doc. 32.) On February 10, 2026, the Court extended the TRO for one additional day, to February 11, 2026. (Doc. 43.)

[4] Plaintiffs filed a supplemental brief on February 10, 2026. (Doc. 42.) Because Defendants have not had an opportunity to respond before the expiration of the TRO and have not agreed to an extension of the TRO, the Court has not included the contents of the supplemental brief in its analysis in this Memorandum.

issuance of a preliminary injunction. *Blephex, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1398 (Fed. Cir. 2022) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

A patentee demonstrates a likelihood of success on the merits by showing "it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

"The single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Wright and Miller § 2948.1. A preliminary injunction will be denied if the applicant has an adequate remedy at law. *First Nat'l Bank & Trust Co. of Mich. v. Fed. Reserve Bank of Chicago*, 495 F. Supp. 154, 157 (W.D. Mich. 1980).

In balancing the equities, a court must "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the nonmoving party will incur if the injunction is granted." *Hybritech, Inc. v. Abbot Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1998).

The public has a strong interest in the protection of patent rights, as this encourages innovation. *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).

> [T]he United States Constitution itself reflects a strong public policy interest in 'promot[ing] the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.' U.S. Const. art. I, § 8, cl. 8. The Constitution delegated this power to Congress, who, in turn, promulgated the patent statute, 35 U.S.C. § 271, prohibiting patent infringement.

*Hydrojug, Inc. v. Five Below, Inc.*, 625 F. Supp. 3d 684, 717 (N.D. Ohio 2022) (alteration in original) (holding public interest would benefit if court granted injunction protecting patent rights).

**III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW[5]**

1. The owner of a patent can file a civil action in district court to obtain monetary and injunctive relief against an infringer, *i.e.*, one who "without authority makes, uses, offers to sell, or sells any patented invention." 35 U.S.C. § 271.

2. "Whoever actively induces infringement of a patent shall be liable as an infringer." *See* 35 U.S.C. § 271(b).

3. Pursuant to 35 U.S.C. § 271(c),

    [w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

4. Congress authorized injunctive relief "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.  Under these principles, the Supreme Court has held that a patentee must satisfy the traditional four-factor test applicable to requests for injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–93 (2006).

    **B.  Likelihood of Success on the Merits**

5. Because infringement of one claim of one patent creates liability, likelihood of success on either one of the asserted patents justifies injunctive relief; it is not necessary to establish likelihood of success as to both asserted patents.

---

[5] Having found most of them to be relevant and justified based on the evidence presented during the hearing and the record in this case, the Court largely adopts Plaintiffs' proposed findings of fact and conclusions of law (Doc. 41) in this section of the Memorandum.

6. ABC owns and Rare Breed is the exclusive licensee of the asserted forced-reset-trigger patents. (Tr. Vol. 1, 24:8-16.)

7. Patents issued by the United States Patent Office are presumed valid. 35 U.S.C. § 282. Defendants have failed to raise a substantial question of either infringement or validity of the asserted patents. *Cf. Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005–06 (Fed. Cir. 2009).

8. The testimony of Mr. Luettke was credible and established that the limitations of claim 15 of the '247 Patent and claim 1 of the '784 Patent were met by the Super Safety. (Tr., Vol. 2, 43:9–73:11; 76:21–122:23.) Accordingly, Defendants infringe at least claim 1 of the '784 Patent and claim 15 of the '247 Patent.

9. Defendants did not raise a "substantial question" about infringement as to either of the asserted patents. Rather, the testimony established that Defendants mischaracterized the teachings of the '784 Patent and how the claimed inventions operate. (*See, e.g.*, Tr., Vol. 1, 40:9-45:24.)

10. Mr. Luettke presented unrebutted testimony that the '723 Patent teaches a two-position trigger, *i.e.*, a selector that adjusts between safe and forced reset fire. (Tr. Vol, 2, 118:22–119:2.) In fact, the "invention can be effected without the provision of a selector," so it could not be a three-position trigger. (Tr. Vol. 2, 121:13–122:17.)

11. Prior to entry of the TRO, Mr. Hoffman personally used and sold "Super Safety" devices (Doc. 30 [TRO Hr'g Tr.] 25:15–23; Tr., Vol. 3, 12:19–13:19.)

12. Use of the accused product establishes direct infringement under 35 U.S.C. § 271(a), supporting Plaintiffs' likelihood of success.

13. On July 20, 2023, prior to entry of the TRO, Mr. Hoffman publicly distributed CAD and 3D-print files of infringing devices together with instructions for their manufacturing and use

("Super Safety Files"). (*See* Tr., Vol. 1, 7:4–8:24; Vol. 2, 13:2–18:21; Vol. 3, 39:17–40:13; Hoffman Decl. ¶ 25.)

14. Mr. Hoffman provided assistance (in the form of "troubleshooting") to many of the "hundreds or thousands" of persons who asked for it in connection with Super Safeties. (Tr. Vol 3, 40:9–41:16.)

15. Mr. Hoffman testified that at least these companies are known to him to make products "in accord with or based on" his Super Safety design:

   a. Fudd Arms: https://fuddarms.com/products/s7c-super-safety-kit;
   b. Grey Market Research: https://greymarketresearch.net/safety-products/;
   c. Z3 Productions: https://www.z3pro.com/product-page/copy-of-batch-7-cpm-10v-a2-ar-super-safety-kit;
   d. 2AG: https://2agsupersafety.com/;
   e. Stark80: https://stark80.com/home/shop/?orderby=date;
   f. Deez Nuts Tactical: https://deeznutztactical.com;
   g. Polymer Pew: https://polymerpew.com/;
   h. URSA Security: https://ursa-sec.com/product/tim-hoffman-super-safety-kit/;
   i. Atrius: https://atrius.dev/atrius-forced-reset-selector/; and
   j. AS Designs: https://activesafetydesigns.com/ss-parts/.

(Hoffman Decl. ¶ 15.)

16. Defendants' actual knowledge of the '247 Patent began at the latest on April 6, 2025. (Doc. 14-4 [DeMonico Decl.] ¶ 6.) Moreover, the facts here implicate the doctrine of willful blindness, in that Plaintiffs made Mr. Hoffman aware through negotiations surrounding a settlement agreement executed in February 2022 of Plaintiffs' intent to continue pursuing

patents in forced-reset-trigger technology. (Tr., Vol. 1, 34:6–35:16; Doc. 1-4 [Settlement Agreement]); *see Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 777 (2011) (holding doctrine of willful blindness may "apply in civil lawsuits for induced patent infringement under 35 U.S.C. § 271(b)."

17. Defendants' dissemination of the Super Safety Files with willful blindness to the '247 Patent and '784 Patent, and Defendants' continued dissemination of the Super Safety Files with actual knowledge of the '247 Patent, satisfies the knowledge requirement for inducement of infringement.

18. The 3D files Hoffman posted for unrestricted download are being used to produce the Super Safety product in China. (Tr., Vol. 1, 52:10–53:3; Vol. 2, 18:22–19:6; Vol. 3, 67:19–68:3.) Defendants took no precautions to prevent the export of the files to China. (Tr., Vol. 3, 67:23–68:7.)

19. The Court finds that the Plaintiffs have satisfied their burden to prove a high likelihood of success on the merits, and that Defendants have failed to raise a substantial question of infringement or invalidity.

### B. <u>Irreparable Harm</u>

20. Rare Breed and Defendants are direct competitors because both sell a version of a forced-reset trigger. (Doc. 30 [TRO Hr'g Tr.] 21:6–22:15.)

21. Loss of the right to exclude others from practicing the patented invention can constitute irreparable harm not compensable by money damages. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638–39 (Fed. Cir. 2015).

22. Defendants' unrestricted distribution of Super Safety Files resulted in and would continue to result in widespread copying, third-party manufacturing, and uncontrolled downstream infringement. (Tr., Vol. 2, 12:2–17:10.)

23. Where damages are difficult to quantify, injunctive relief may be appropriate. *Apple*, 809 F.3d at 645. The scope of infringement caused by public file distribution in this case cannot be reliably quantified and includes foreign and anonymous actors. (Tr., Vol. 3, 67:19–68:7.)

24. ABC receives a fixed royalty of $300.00 per unit sold, and Rare Breed makes between $50.00 and $125.00 gross profit per unit such that each lost sale results in actual lost royalty and profit to Plaintiffs of $350.00-$425.00. (Tr., Vol. 1, 56:23–57:16; Vol. 2, 9:11–15; Vol. 3, 12:23–25, 86:9–88:9.)

25. Because the sale price of Hoffman's Super Safety is $90.00 per unit, even the total gross revenue from sales could not compensate for the harm to Plaintiffs. (Tr., Vol. 3, 12:23–25, 86:9–88:9.)

26. Further, Defendants would likely be unable to satisfy the judgment if a jury awards money damages. (Tr. Vol. 1, 56:8–63:13; Vol. 2, 125:9–19; Vol. 3, 87:4–88:13 (testifying that if Defendants were required to pay royalties of $900,000.00 per year, they would have to "figure that out" and "raise the funds").

27. Courts have noted that irreparable harm can manifest as loss of market share, price erosion, and harm to goodwill when the patented invention is central to the patentee's business and competition is direct. *Apple*, 809 F.3d at 639, 646; *see also Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006).

28. Because of Defendants' statements about Plaintiffs and their patents, Rare Breed and Mr. DeMonico have suffered injury to their reputations, including their reputations as innovators

(Tr., Vol. 1, 47:17–48:23; Vol. 2, 20:21–23:16); Mr. DeMonico has endured death threats from members of the public (*id.* Vol. 2, 36:23–37:22); and both would likely suffer further irreparable harm without an injunction.

29. Rare Breed has lost market share (Tr., Vol. 1, 49:13–50:20) and has been forced to alter its business strategy and pricing on a product with modest profit margins (*id.* at 51:24–52:9; Vol. 2, 7:2–25) because of Defendants' infringement.

30. To establish irreparable injury, a plaintiff must show that a "causal nexus relates the alleged harm to the alleged infringement[,]" which "just means that there must be proof that the infringement causes the harm." *Apple*, 809 F.3d at 639. "When a patentee alleges it suffered irreparable harm stemming from lost sales solely due to a competitor's infringement, a finding that the competitor's infringing features drive consumer demand for its products satisfies the causal nexus inquiry." *Id.* at 641. Similarly, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("[Being in d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."); *see also BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1405 (Fed. Cir. 2022) (finding that where the parties were "direct competitors," plaintiff had suffered "price erosion, loss of goodwill, and damage to its reputation, and [was] threatened with extinction by the continued sales of the" accused infringing product, the district court did not err in finding irreparable harm.).

31. The Court finds that without an injunction, Plaintiffs will suffer irreparable harm.

### C. Balance of Equities

32. The balance of equities favors patentees where an injunction preserves patent rights and merely delays unlawful activity. "Requiring a plaintiff to compete against its own patented invention, with the resultant harms . . . places a substantial hardship on that plaintiff." *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, No. 17-cv-1574, 2023 WL 5349374, at *21 (D. Del. Aug. 21, 2023) (internal alterations omitted) (quoting *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011)).

33. Ultimately, equity considers that an infringer who elects to build its business on infringement accepts the risk of business destruction when enjoined. *Broadcom v. Qualcomm*, 543 F.3d 683, 794 (Fed Cir. 2008) (citing *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).

34. Defendants did not present evidence of having made a substantial investment, and any harm to Defendants from an injunction is limited and temporary, while Plaintiffs face permanent loss of patent exclusivity absent relief.

35. The Court finds that the balance of equities weighs in favor of Plaintiffs.

### D. Public Interest

36. The public interest favors enforcement of patent rights and preventing ongoing infringement. *Apple*, 809 F.3d at 647.

37. The public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions. *Id.* ("The public often benefits from healthy competition. However, the public generally does not benefit when that competition comes at the expense of a patentee's investment-backed property right.

To conclude otherwise would suggest that this factor weighs against an injunction in every case, when the opposite is generally true.").

38. The Government appeared on behalf of the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") pursuant to 28 U.S.C. § 517 to inform the Court of the ATF's position regarding public-interest considerations and submitted a Statement of Interest. (Doc. 28.)

39. In the Statement of Interest, the United States took the following positions:

    a. Because a prior legal settlement between the United States and Rare Breed resolved the legality of Rare Breed's products, but does not bind other potential manufacturers who have not agreed to the same limitations on the sale and distribution of forced-reset triggers, such as not to design forced-reset triggers for handguns, Plaintiffs' an injunction in this matter would support ATF's public-safety efforts, if successful in enjoining use of forced-reset triggers by third parties; and

    b. "in evaluating the four factors for a preliminary injunction, public interest should be weighted heavily in plaintiffs' favor." (Doc. 28 at 6–7.)

40. The Court finds that the public interest weighs heavily in favor of an injunction.

### E. Preliminary Injunction

41. Based on the foregoing, Plaintiffs have established each of the four factors relevant to requests for preliminary injunction, namely (1) a likelihood of success on the merits, (2) that they will be irreparably harmed absent a preliminary injunct, (3) that balance of equities weighs in their favor, and (4) that the public interest favors the requested preliminary injunction.

42. Accordingly, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court will **GRANT** Plaintiffs' motion for a preliminary injunction.[6]

F. **Injunction Bond**

43. Rule 65(c) of the Federal Rules of Civil Procedure provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

44. "When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present." *Ever-Seal, Inc. v. Halferty*, No. 3:22-CV-00082, 2022 WL 418692, at *10 (M.D. Tenn. Feb. 10, 2022). Relatedly, courts have based their determinations of bond amounts on, among other factors, "'potential lost profits, lost market share, and associated costs of relaunch' in the event of wrongful enjoinment." *Sanofi-Synthelabo*, 470 F.3d at 1385; *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2954 (3d ed.) (noting that courts "usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the

---

[6] Sections 60(f) and 60(g) of Plaintiffs' proposed findings of fact and conclusions of law (Doc. 41) suggest the Court should order Defendants to post a copy of the issued injunction on their websites and social media accounts, and that the Court should order that the injunction bind "all who have notice of" it, including through its suggested posting by Defendants. This relief exceeds what was requested in Plaintiffs' motion (Doc. 14) and was not addressed during the preliminary-injunction hearing. Therefore, the Court does not include Sections 60(f) and 60(g) of Plaintiffs' proposed findings of fact and conclusions of law (Doc. 41) in the accompanying Preliminary Injunction.

complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.").

45. Defendants did not address the bond amount in their briefing (*see generally* Resp. to Pls.' Mot. for Prelim. Inj. [26]) or at the preliminary injunction hearing (*see generally* Tr. Vols. 1-3).

46. Based on Mr. Hoffman's testimony and the positions he adopted at the TRO and preliminary-injunction hearings, the $20,000.00 bond provided in connection with the TRO is adequate to provide security for Defendants if the Court grants the requested preliminary injunction.

47. At the TRO hearing, Defendants' counsel represented that:

   a. if the TRO were granted, Defendants stood to lose $80,000.00 in sales "tomorrow" (*i.e.*, on January 14, 2026) because "10,000 people" on an email list maintained by Defendants were "ready to purchase a first-round offering" of Defendants' infringing products (Doc. 30 [TRO Hr'g Tr.] 32:9–33:3; *see also id.* at 33:22–24 (stating that "loss of sales figures for the expected rollout tomorrow will be much, much higher than $20,000"); and

   b. it was "highly unlikely" that those sales would come to fruition after the expiration of the fourteen-day TRO because Defendants would be forced to disappoint those customers' expectations and thereby suffer reputational harm (Doc. 30 [TRO Hr'g Tr.] 33:6–18).

48. At the preliminary-injunction hearing, Defendants' damages estimates were more modest. Mr. Hoffman acknowledged the above-referenced representation and testified that:

   a. he did not know whether it was accurate, because he was "not familiar with what loss and the time period [his counsel] was referring to" (Tr., Vol. 3, 12:2–5);

   b. The 10,000-unit figure was an "error" (*id.* at 91:23–24), and it was "[i]ncorrect" to suggest that Defendants had already received a "large number of orders" for Super Safeties—although he "intended" to release the Super Safety on that date and expected to "make sales

amounting to that figure, or approximately" (*id.* at 12:10–22), and they were simply "prepared to sell approximately 900 to a thousand units" at that time (*id.* at 91:17–18);

c. the Super Safety would retail for "[n]inety dollars" (*id.* at 12:23–25);

d. he had only sold approximately seventy (70) Super Safeties prior to entry of the TRO (*id.* at 13:12–19); and

e. Given the widespread dissemination of Super Safeties (based on his dissemination of the dev packs and CAD files), he now believes he can sell his Super Safeties (*id.* at 85:12–19), and that he "guessed" he could sell "3,000 [units] per year" (86:9–15).

49. Defendants have failed to offer more than speculation concerning the damages they may sustain if the preliminary injunction is improvidently granted. The Court finds the current bond of $20,000.00 is appropriate.

IV. **CONCLUSION**

For the foregoing reasons, the Court will **GRANT** Plaintiffs' motion for a preliminary injunction (Doc. 14) and continue the injunction bond of $20,000.

**An appropriate order will enter.**

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**