# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

    Plaintiffs,

vs.

TIMOTHY HOFFMAN, an individual, and HOFFMAN TACTICAL LLC, a Tennessee limited liability company,

    Defendants.

Case No.: 1:25-cv-00389-CLC-CHS

Hon. Curtis Collier

## PLAINTIFFS' RESPONSE TO DEFENDANTS' PARTIAL MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO AMEND PURSUANT TO RULE 15(a)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Come Plaintiffs, ABC IP, LLC and Rare Breed Triggers, Inc. (collectively, "Plaintiffs"), through counsel, and respond to Defendants' Partial Motion to Dismiss (Doc. 55) ("Motion to Dismiss") and Brief in Support (Doc. 56) ("Brief"), in which Defendants seek dismissal of certain causes of action alleged in the First Amended Complaint for Patent Infringement (Doc. 47) ("First Amended Complaint"), filed by Plaintiffs on February 16, 2026.

For the reasons explained herein, Plaintiffs respectfully submit that each of the causes of action for which Defendants seek dismissal is adequately pleaded under the Federal Rules of Civil Procedure and should not be dismissed pursuant to Rule 12(b)(6).

### I. BACKGROUND AND FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT OR OTHERWISE APPROPRIATE FOR CONSIDERATION ON THE MOTION TO DISMISS

The factual allegations set forth in First Amended Complaint, as well as the other items the

Court may consider in ruling on the Motion to Dismiss,[1] clearly state the following:

Since at least February 2022, Defendants have been aware of or willfully blind to Plaintiffs' patent portfolio. (*See* First Am Compl. ¶¶ 23-26, 28; Mem. (Doc. 45), at ¶¶ 16-17.) Mr. Hoffman has a ***stated*** distaste, if not outright contempt, for the United States Patent system and, regarding the infringing Super Safety, ***stated*** goals of:

- using "the masses as guinea pigs" to insulate Defendants from criminal liability (with a cavalier attitude toward the potential legal consequences for those "masses");

---

[1] Because Defendants take a rather truncated view of the facts pleaded in the First Amended Complaint, Plaintiffs reproduce them chronologically in this section, including facts that were properly incorporated by reference into the First Amended Complaint but not expressly stated (*e.g.*, Mr. Hoffman's statements made in the March 6, 2022 and August 15, 2025 YouTube videos referenced therein ("March 6, 2022 Video" and "August 15, 2025 Video," respectively), which Defendants correctly acknowledge may be considered by the Court in ruling on this motion (*see* Br. 2 (quoting *Bell v. Southfield*, 37 F.4th 362, 364 (6th Cir. 2022); *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008)). In addition, under the Sixth Circuit's "liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)," *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001), the Court may also, without converting the Motion to Dismiss into a motion for summary judgment, consider, *inter alia*, other documents incorporated by reference into the pleadings, matters of public record, items appearing in the record of the case, and other items appropriate for the taking of judicial notice, *see Zahuranec v. CIGNA Healthcare, Inc.*, No. 21-3695, 2022 WL 1619493, at *2 (6th Cir. May 23, 2022) ("In our review [of a Rule 12(b)(6) motion], we consider not only the complaint but also documents incorporated by reference and matters subject to judicial notice."); *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (holding that a court ruling on a Rule 12(b)(6) motion may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint"); *Twomey v. F.B.I.*, 27 F. App'x 331, 333 (6th Cir. 2001) (holding that a district court could consider a transcript made part of the case record in evaluating a motion to dismiss without converting it into a motion for summary judgment); *Roane Cnty., Tenn. v. Jacobs Eng'g Grp., Inc.*, No. 3:19-CV-206-TAV-HBG, 2020 WL 2025613, at *3 (E.D. Tenn. Apr. 27, 2020) (noting that, *inter alia*, a jury trial transcript from another case could be considered on a motion to dismiss without conversion because it was a "public court record[]"). Accordingly, in evaluating the Motion to Dismiss, the Court may also consider, *inter alia*, the transcripts of the TRO and preliminary injunction ("PI") hearings and exhibits admitted therein (*see* Docs. 19 (TRO Hr'g Minute Entry), 30 (TRO Hr'g Tr.), 31 (PI Hr'g Minute Entry, Jan. 27, 2026), 33-34 (PI Hr'g Minute Entries, Jan. 28-29, 2026), 36 (PI Hr'g Tr., Jan. 27, 2026 ("Jan. 27, 2026 Hr'g Tr.")), 37 (PI Hr'g Tr., Jan. 28, 2026 ("Jan. 28, 2026 Hr'g Tr.")), 38 (PI Hr'g Tr., Jan. 29, 2026 ("Jan. 29, 2026 Hr'g Tr.")), and 44 (Am. Exhibit List)).

2

- promoting "widespread copying, distribution, experimentation, and sale of the [Super Safety] design by numerous individuals and companies" and "intentionally encourag[ing] widespread infringement" of Plaintiffs' patents to "overwhelm the market [with Super Safeties and their derivatives]," thereby making "enforcement of Plaintiffs' patent rights 'difficult, if not impossible'" and "saturat[ing] the market with unlicensed copies and subpar derivative works"; and

- thereafter leveraging his "personal popularity" and "public following," to "'swoop in' and dominate the market" (First Am. Compl. ¶¶ 31-33).

Defendants have knowingly and willfully furthered the above-described goals and scheme by, *inter alia*, undertaking a years'-long campaign (*see, e.g.*, First Am. Compl. ¶¶ 28, 31-34) to spread misinformation and consumer confusion about the legal status of their Super Safety devices vis à vis Plaintiffs' patents and products. Specifically, since entering into the Settlement Agreement concerning the '223 patent on February 24, 2022, in response to the February 9, 2022 Cease-and-Desist letter ("2022 CAD Letter") (*see* Am. Compl. ¶¶ 23-25; Ex. D, Settlement Agreement (Doc. 47-4)):

- On March 6, 2022, Mr. Hoffman posted the March 6, 2022 Video (https://www.youtube.com/watch?v=NxSFNreG_Ec, which has received over 47,000 views as of April 4, 2026), in which he discussed the 2022 CAD Letter and Settlement Agreement and (despite contradictory and unconvincing statements that the "community" should continue to "support" Rare Breed against the ATF), stated that, *inter alia*: (i) he (even at that point) had been working on "other options" and "interesting solutions" concerning FRTs, that he "might be sharing . . . pretty soon" (Mar. 6, 2022 Video, at 1:42-59); (ii) the reasons proffered by Plaintiffs for sending the 2022 CAD Letter were "bogus" and "not valid in the current

circumstances" (*id.* at 5:14-17); (iii) based on "court precedent and all that stuff," his activities "aren't really induced infringement," and if he could have afforded it, he "could have kept the files up . . . , sued Rare Breed . . . , and probably could have won and kept the files up" (*id.* at 10:47-11:06); (iv) "if someone wants the files" (or modifications thereof), "they're really easy to find anywhere on the web . . . right now with a little bit of poking around," and "the community still has the designs" (*id.* at 11:16-37); (v) the legal considerations were "a moot point" because of the files' availability (*id.* at 11:43-48); (vi) the situation had "looked really bad for" Rare Breed, and "there's a lot of negative press about Rare Breed," which "could have been helpful . . . to [him] not getting sued" (*id.* at 12:25-30); and, relatedly, "[o]ne thing that was really helpful" (to Mr. Hoffman) was the blowback Rare Breed's attempt to enforce its patent rights generated among the firearm-modification community, whose "support" he "really, really appreciated" (*id.* at 13:32-14:02); (vii) "Rare Breed has . . . sued people, and it has looked bad," although they had "reasons"—which he characterized as potentially "[il]legitimate" (*id.* at 13:21-26); (viii) there "would not be any lawsuit," and they were "trying to work out an agreement," although he was not "too worried about it" (*id.* at 14:20-51); and (ix) viewers should "stay tuned" for the other products he was developing (*id.* at 16:25-28).[2]

- In July 2023, apparently without having consulted competent patent counsel, and certainly without having inquired of Plaintiffs concerning potential infringement issues, Defendants

---

[2] In connection with the February 2022 CAD Letter, Plaintiffs also alleged that they advised Mr. Hoffman to consult qualified patent counsel to review their patents and avoid further infringement and offered to provide him with copies of their patent documents on request "to assist him in avoiding future infringement." (First Am. Compl. ¶ 25.) Instead of proceeding with any caution, and even while settlement negotiations were taking place, Mr. Hoffman suggested, in essence, that he intended to "get around" Plaintiffs' patents (or used similar verbiage), at which time Plaintiffs had applied for the '784 patent and would acquire the '723 patent in approximately three months as assignee. (*Id.* at ¶¶ 14, 18, 26.)

4

released designs for the Super Safety. (*See, e.g.*, First Am. Compl. ¶ 88; Mem. ¶ 13; Aug. 15, 2025 Video, https://www.youtube.com/watch?v=xCiGqo-cXXE&t=13s, at 3:15-3:20.)

- On April 6, 2025, Mr. Hoffman admitted to Plaintiffs that the Super Safety had infringed the '723 and '247 patents or, at a minimum, opined on its infringement thereof and acknowledged their existence. (First Am. Compl. ¶ 29; Mem. ¶ 16.)

- In an August 9, 2025 conversation with Plaintiffs, Mr. Hoffman expressly disclaimed the legal or normative force of the U.S. Patent system, indicating, in essence, that he has a right to infringe notwithstanding the law. (*See* First Am. Compl. ¶¶ 30-32.) During that conversation, he further elaborated his scheme (using MIM Super Safeties, the production of which he had arranged, and which he acknowledged were being manufactured in and imported from China) to "use 'the masses as guinea pigs'" to promote the widespread infringement of Plaintiffs' patents, "cause rapid market saturation," and make Plaintiffs' enforcement efforts "'difficult, if not impossible,'" after which he would "'swoop in' and dominate the market" by "leveraging his personal popularity and public following." (*Id.* at ¶¶ 32-33.)

- On August 10, 2025, Mr. Hoffman ***affirmatively represented*** to his followers through the Hoffman Tactical "X" (formerly Twitter) account (with over 42,000 followers as of April 2026), that the Super Safety ***does not infringe*** Plaintiffs' patents. (*See id.* at ¶ 29 (over 42,000 views of the post).)

- On August 15, 2025, Mr. Hoffman posted the August 15, 2025 Video on the Hoffman Tactical YouTube account (*see* Am. Compl. ¶ 20 (citing Aug. 15, 2025 Video, with approximately 140,000 views as of April 4, 2026), in which he specifically addressed the Super Safety's infringement of the '247, '723, and '223 patents (although he incorrectly applied the claims), stating, in pertinent part, as follows: (i) he developed the Super Safety in "early 2022" (Aug.

5

15, 2025 Video, at 0:23-28); (ii) at least one of his designs "did infringe [the '223 patent], allegedly," though he and Plaintiffs had "worked [it] out" (*id.* at 0:49-1:03); (iii) the '723 patent was "expired" (it had expired in September 2024, *see* First Am. Compl. ¶ 17) and was "prior art,"[3] although he stated that it "describe[d] something really similar to the Super Safety," functioned "much like the Super Safety," and gave "context" to the dispute over the '247 patent (*id.* at 1:40-2:35); (iv) having obtained one of Plaintiffs' cease-and-desist letters to another company in connection with the Super Safety, that the Super Safety does ***not*** infringe the '247 patent and is not "really relevant" and "doesn't apply" to the Super Safety, as he would "show [the viewership]" (though he is not a patent lawyer and does not appear to have then consulted patent counsel) (*id.* at 3:20-3:34); (v) (through a legally untutored, speculative, and inaccurate exegesis of the '247 patent (*id.* at 3:40-7:42)), that claims may only be legitimately added to a patent to narrow claims already asserted, but not to later "expand[] the scope of the patent," such that were was "no way [one could] add new claims to the Super Safety because if the original patent d[id not] cover [it]," and it did not, then the new claims could not either (*id.* at 7:44-8:09, 8:15-25); (vi) (a) the '247 patent "in no way applies to the Super Safety" (*id.* at 8:10-8:13), and (b) "obvious[ly] . . . doesn't cover the Super Safety in any way" (*id.* at 16:20-23), further stating that the new claims asserted in the '247 patent "ha[d] a number of issues" (*id.* at 8:24-27); (vii) Plaintiffs' position concerning the Super Safety's infringement of the '247 patent was "completely nonsensical," and Claim 16 of the '247 patent was "completely invalid" and "nonfunctional" because Plaintiffs (a) conflated and equivocated the meaning of relevant terms (though he had "figure[d] it out"); (b) had tried "to take the previous valid

---

[3] Plaintiffs have alleged that Defendants infringed the '723 patent prior to its expiration. (*See* First Am. Compl. ¶ 22.)

language from the patent and twist it to cover the Super Safety"; and (c) were engaged in a "gross attempt at expanding a patent's scope after it was filed to cover existing technology" (*id.* at 8:29-16:30).

- o In what he described as a summary of his points, Mr. Hoffman asserted that: (i) the "original FR-15 patent has nothing to do with the Super Safety"; (ii) "the Super Safety is covered under a now-expired patent, the original Blakely patent" and "the heart of the Super Safety is prior art"; (iii) Plaintiffs' allegations in the other lawsuits that the Super Safety infringes the '247 patent are simply wrong because "the Super Safety does not in any way infringe the '247 patent"; and (iv) the addition of new claims to the '247 patent after the Super Safety's release were invalid because they conflate key terms within the claim language; are (again) "nonsensical" and thus "invalid . . . in and of themselves." (*Id.* at 16:44-18:35).

- o Finally, given his analysis, he posed the rhetorical question "how there is a possibly a lawsuit?" by speculatively asserting that ***Plaintiffs "attempt[ed] to grossly change the language or redefine terms" and "twist[ed] . . . terms" that do "not apply to the Super Safety in any way,"*** and represented that his explanation "clear[ed] up a lot of congestion surrounding this patent disaster" (*id.* at 18:35-19:24 (emphasis added)).

As the Court is aware, between August 2025 and the filing of this lawsuit in December 2025, Defendants continued to (i) make infringing Super Safety files generally available so as to induce infringement of the '247, '784, and '723 patents, (ii) sell Super Safeties, and (iii) post (or maintain) online videos and comments that knowingly and materially misrepresent the legal status of Mr. Hoffman's designs and products as non-infringing (and which were defamatory to Plaintiffs inasmuch as they were false or implied false facts about Plaintiffs, injuring their reputations). (*See* First Am. Compl. ¶¶ 52, 56, 58-63, 68.)

7

Concerning harm, Plaintiffs have alleged, *inter alia*, lost sales / market share, harm to their character and reputation, and injuries to their relationship with consumers in the relevant market— *i.e.*, consumers of FRTs. (*See, e.g.*, First Am. Compl. ¶¶ 60, 62-63; *see also* Jan. 27, 2026 Hr'g Tr. (DeMonico direct examination), at 47:17-48:25, 49:13-50:8 (testimony that (i) Mr. Hoffman has advanced a "narrative" to his tens of thousands of followers in the FRT consumer market that Plaintiffs have "no valid claims," and their litigation is "malicious and without merit," and (ii) this false narrative has caused them "reputational harm" and the loss of "significant market share"); Jan. 28, 2026 Hr'g Tr. (DeMonico cross and redirect examinations), at 20:21-23:16, 25:9-17, 36:23-34:24 (testimony that (i) Plaintiffs' reputational harm was "significant," (ii) Mr. Hoffman's followers had made extremely negative remarks about Plaintiffs and him personally (for which Mr. Hoffman had thanked them) and had made death threats to him, (iii) those harms resulted, at least in part, from Mr. Hoffman's "narrative," and (iv) Defendants were responsible for (an estimated) "80-90 percent of the infringers on the market"), 124:10-16 (Hoffman direct examination) (testimony about social media presence); Jan. 29, 2026 Hr'g Tr. (Hoffman cross-examination), at 3:7-5:15, 36:13-38:3 (testimony about December 6, 2025 Instagram post (to approximately 27,000 followers) stating that Plaintiffs' patents are "faulty" and unmeritorious), 75:2-79:15 (testimony about Defendants' extensive social media presence, participation in social media threads denigrating Plaintiffs, and video dedicated to Mr. Hoffman depicting explosion (from rapid gunfire) of vehicle with "Rare Greed" written on the side).

## II. LAW AND ANALYSIS

### a. Plaintiffs' Cause of Action Under the Lanham Act Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)

The Sixth Circuit has established a five-part test for establishing a false advertising claim under the Lanham Act:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). "The statements need not have appeared in a format resembling traditional advertising." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015). In addition, "[w]here statements are literally false, a violation may be established without evidence that the statements actually misled consumers." *Certified Podiatric*, 185 F.3d at 614.

Construed in favor of Plaintiffs, the facts alleged or otherwise properly before the Court show that: (a) Mr. Hoffman made false statements of fact about his product or those who would use Hoffman's downloads; *i.e.*, they could be constructed, sold, or used without violating Plaintiffs' patent rights, and Plaintiffs' patent claims were baseless or frivolous; (b) those statements deceived or tended to deceive the intended audience (the FRT consumer market) that they could use what Defendants had uploaded free from any permission of or legal violation as to Plaintiffs; (c) those statements were likely to influence purchasing decisions (*i.e.*, by encouraging consumers not to buy from Plaintiffs); (d) those statements were in interstate commerce (*i.e.*, online or via the internet); and (e) there was a causal link between Hoffman's statements and harm to Plaintiffs, *i.e.*, the lost sales/profits Plaintiffs would have earned had consumers purchased FRTs from them (rather than from Defendants or those selling products derived derive from their infringing designs). (*See supra* Part I.) Those facts are adequate to "give [Defendants] fair notice," *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) of Plaintiffs' Lanham Act claim for

9

purposes of Rule 12(b)(6).[4]

In addition, Defendants' contention that Plaintiffs are required to allege that Mr. Hoffman's statements concerning patents were made in bad faith to recover under the Lanham Act finds no basis in the law. (*See* Br. 7-11 (quoting (or citing) *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999) [hereinafter "*Zenith*"] in support of a "bad-faith" requirement as to Mr. Hoffman's statements concerning infringement; *Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004) [hereinafter "*Globetrotter*"] for the proposition that "'[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent"; and *Roadtec, Inc. v. Rd. Sci., LLC*, No. 1:10-CV-338, 2013 WL 12123358, at *5 (E.D. Tenn. Aug. 29, 2013) [hereinafter "*Roadtec*"] for the proposition that "[b]ad faith [is] required in Lanham Act § 43(a) claim brought against patent holder"); *see also* Br. at 4 (quoting *Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314 (2d Cir. 1950) ("[I]t is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are.").

But those cases are readily distinguishable and do not support Defendants' argument, because each applies to patentees / patentholders, not to accused infringers. *See Zenith*, 182 F.3d at 1353-55; *Globetrotter*, 362 F.3d at 1374-75; *Roadtec*, 2013 WL 12123358, at *5; *Kaplan*, 182

---

[4] Defendants' contention that Plaintiffs have failed to allege that their speech was commercial (where it was simply "informative") is similarly unavailing. "The Sixth Circuit has defined "commercial advertising or promotion" as "(1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry *or to a substantial portion of the plaintiff's or defendant's existing customer or client base*." *Grubbs*, 807 F.3d at 801 (emphasis added). Mr. Hoffman's statements described *supra* were clearly intended to entice the public to use his designs, and his commercial speech via YouTube and at trade shows similarly evidences "commercial advertising" and "promotion."

F.2d at 313-14; *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 370-71 (S.D.N.Y. 2000) (applying *Kaplan*'s holding to patentee, not accused infringer).

Accordingly, *Zenith*, *Globetrotter*, *Roadtec*, and *Kaplan* do not apply to *this* case, where the **patentholder** alleges supplemental state-law claims against an alleged infringer, and nothing in those decisions contemplates the sort of role reversal implicit in Defendants' argument, *i.e.*, that Plaintiffs are obliged to prove that Mr. Hoffman's misrepresentations were made in bad faith. Moreover, while Defendants assert that the "bad-faith" requirement should extend to non-patentholders in addition to patentholders (*see* Br. 8), they cite **no** authority standing for that proposition and entirely fail to explain how the decisions they cite support it or square with this lawsuit's factual posture, or why the bad-faith requirement ought to be so extended.[5]

### b. Plaintiffs' Cause of Action Under the TCPA Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)

"The TCPA makes it unlawful to engage in 'unfair or deceptive acts or practices affecting the conduct of any trade or commerce.'" *Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-CV-00046-DCLC-JEM, 2024 WL 4351650, at *16 (E.D. Tenn. Sept. 30, 2024) (quoting Tenn. Code Ann. § 47-18-104(a)). "'A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact,'" while an "'unfair act or practice is one that, while not necessarily deceptive, is likely to substantially injure consumers, is not reasonably avoidable by consumers, and is not outweighed by competing benefits to the consumer market.'" *Id.* (quoting *Tucker v. Sierra*

---

[5] Even if the bad-faith standard applied, and Plaintiffs were required to show Mr. Hoffman's bad faith in communications concerning his designs' and devices' non-infringement, Plaintiffs respectfully submit that his statements—untutored legal opinions presented as facts to a credulous audience, made absent consultation with counsel, and which he had no legitimate basis to present as true—were objectively baseless and made in subjective bad faith, in line with his overall scheme.

*Builders*, 180 S.W.3d 109, 116-17 (Tenn. Ct. App. 2005)); *Microsoft Corp. v. Sellers*, 411 F. Supp. 2d 913, 920 (E.D. Tenn. 2006) ("Likelihood of customer confusion is the essence of the test for a violation of the T[CPA].").[6] "Section 47-18-104(b) sets out 52 acts that are declared to be unlawful and in violation of the statute." *Zen-Bio, Inc. v. Regions Bank*, No. 2:23-CV-02475, 2024 WL 1053337, at *5 (W.D. Tenn. Mar. 11, 2024).[7]

To recover under the TCPA, "'[a] plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . .'" *ChampionX, LLC v. Resonance Sys., Inc.*, 726 F. Supp. 3d 786, 833 (E.D. Tenn. 2024) (quoting *Tucker*, 180 S.W.3d at 115); *see also Taylor v. Thomas*, No. 2:12-2309-JPM-CGC, 2013 WL 12033168, at *4-6 (W.D. Tenn. Dec. 17, 2013) (quoting (i) *Discover Bank v. Morgan*, 363 S.W.3d 479, 495-96 (Tenn. 2012) for the propositions that "'[a]n ascertainable loss is a deprivation, detriment, or injury that is capable of being discovered, observed, or established,'" and a loss is ascertainable so long as "'it is measurable, even though the precise amount of the loss is unknown'"; and (ii) *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010) (a Lanham Act case) for the proposition that the deprivation of a plaintiff's ability to control its brand image and reputation occasioned by

---

[6] "[D]eceptiveness" is a "broader, more flexible standard of actionable merchant misconduct than the traditional remedy of common-law fraud," and "[a] deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker*, 180 S.W.3d at 116. "[U]nfairness" is "even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive." *Id.*

[7] As set forth in the First Amended Complaint, Plaintiffs alleged section 47-18-104(b)(2)-(3), (5), (7)-(8), and (12) as predicate unlawful acts or practices. (*See* First Am. Compl. ¶ 108.) Plaintiffs withdraw § -104(b)(7) and (12) as unlawful predicate acts.

the defendant's trademark infringement constituted an "ascertainable loss" for purposes of the TCPA).[8]

While Defendants make a pro forma argument that Plaintiffs have not alleged sufficient facts under Rule 9(b) (*see* Br. 9-11), as set forth above, Plaintiffs have pleaded (and the Court properly has before it) extensive facts about the "who, what, when, where, and how" of their TCPA claim, including those related to (i) Defendants' engagement in unfair or deceptive practices declared unlawful by the TCPA (under the specified -104(b) predicates); and (ii) ascertainable losses of money, property, and other items of value.

Specifically, with respect to the first element (defendant's engagement in unfair or deceptive act or practice declared unlawful by the TCPA), Plaintiffs have pleaded (and the items that the Court may consider show) the following:

- **"causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services," § -104(b)(2); "causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another," § -104(b)(3); "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," § -104(b)(5)**

As shown above, Mr. Hoffman has, through the use of various social media and internet platforms (including his own website): (i) made available to the relevant consumer market (and other manufacturers participating in it) infringing designs and devices, and (ii) repeatedly, affirmatively represented to members of that consumer market that his designs and products (and

---

[8] TCPA claims must be pleaded with specificity under Federal Rule of Civil Procedure 9(b), *see ChampionX, LLC*, 726 F. Supp. 3d at 833, which requires the plaintiff to "specify the 'who, what, when, where, and how' of the alleged fraud" (or TCPA violation), *AGFA Photo USA Corp. v. Parham*, No. 1:06-cv-216, 2007 WL 1655891, at *6 (E.D. Tenn. June 5, 2007); *see also ChampionX, LLC*, 726 F. Supp. 3d at 833 (quoting *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) ("'A complaint sufficiently pleads the time, place, and content [under Rule 9(b)] so long as it ensures that the defendant possesses sufficient information to respond . . . .'").

13

Case 1:25-cv-00389-CLC-CHS     Document 64     Filed 04/06/26     Page 13 of 27
PageID #: 1156

their derivatives) do **not** infringe any of Plaintiffs' (purportedly "faulty") patents (and indeed that their claims are "nonsensical" and "completely invalid"), such that Plaintiffs' enforcement actions (including against them) were and are malicious and frivolous.

Those actions constitute unfair or deceptive acts that were calculated to cause—and have caused—consumer confusion and misunderstanding concerning (i) the "approval" or "certification" of Defendants' devices (*i.e.*, that (a) they do not infringe, and (b) Plaintiffs' claims that they do are groundless); (ii) the "affiliation, connection, association with, or certification by" of both Plaintiffs' and Defendants' products (*i.e.*, an inaccurate presentation of their status relative to each other under U.S. patent law); and (iii) the "approval" and "characteristics" their designs and devices have (*i.e.*, that they do not infringe under U.S. patent law).

- **"disparaging the goods, services or business of another by false or misleading representations of fact" § -104(b)(8)[9]; and/or**

As set forth above, Defendants' promotion of a false narrative concerning (i) the infringement of their designs and devices and (ii) Plaintiffs' attempts to safeguard their intellectual property rights—and their tolerance of third parties' similarly false, defamatory, and threatening statements without correction or admonition—constitutes disparagement of Plaintiffs' business through false or misleading representations of fact.

Regarding injury, the facts pleaded by Plaintiffs (and the other items that may properly considered by the Court in resolving the Motion to Dismiss) plainly allege that, Plaintiffs' conduct in violating the above-recited provisions of section -104(b) has caused them ascertainable loss

---

[9] The Sixth Circuit has characterized section -104(b)(8) as a "'state law analog'" to the Lanham Act's false-advertising provision and, hence, subject to the same analysis. *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 459 (6th Cir. 2024).

from:  (i) a loss of market share (and, correspondingly, lost sales); (ii) general reputational harm; and (iii) a loss of control over brand image.[10]

For the reasons explained above, Plaintiffs respectfully submit that they have stated a plausible claim for relief under the TCPA sufficient to withstand the Motion to Dismiss.

### c.  Plaintiffs' Cause of Action for Defamation Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)

In Tennessee, "a plaintiff pursuing a defamation claim must show that: '(1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'"  *Whiting v. City of Athens*, 699 F. Supp. 3d 652, 663-64 (E.D. Tenn. 2023) (quoting *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571-72 (Tenn. 1999)).  "It is a question of law for a court whether a communication has the capacity to be understood as defamatory."  *Id.* at 664 (citing *Pate v. Service Merch. Co., Inc.*, 959 S.W.2d 569 (Tenn. Ct. App. 1996)); *see also Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3CV, 2013 WL 175807, at *5 (Tenn. Ct. App. Jan. 16, 2013) (alterations in original) (citation and internal quotation marks omitted) ("A statement is defamatory "if it tends so to harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her].").

"A trial court may determine that, as a matter of law, a statement is not defamatory only when the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." *Aegis Scis. Corp.*, 2013 WL 175807, at *6 (internal citation

---

[10] Defendants make the same "bad-faith" argument concerning Plaintiffs' TCPA as they do with Plaintiffs' Lanham Act claim (*see* Br. 7-11), which fails for the same reasons explained *supra* Part II.a, which Plaintiffs expressly incorporate herein as to the TCPA.

and quotation marks omitted).  In making that determination, a court must (i) judge the "[a]lleged defamatory statements" . . . within the context in which they are made," *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000), (ii) "'constru[e them] in their 'plain and natural' import," and (iii) determine whether they are "'reasonably construable' as holding the plaintiff up to public hatred, contempt, . . . ridicule. . . . [or] disgrace," *Whiting*, 699 F. Supp. 3d at 664 (quoting *McWhorter v. Barre*, 132 S.W.3d 354, 364 (Tenn. Ct. App. 2003)).

"Opinions are not automatically protected by the United States Constitution" and "may be actionable if the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Revis*, 31 S.W.3d at 253.  Similarly, "[u]nder the doctrine of defamation by implication, a true statement of fact may support a defamation claim if the statement reasonably conveys a defamatory meaning."  *SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 577 (Tenn. Ct. App. 2024).  "The test is whether the statements made are 'capable of implicitly bearing a defamatory meaning when read by a reasonable person.'"  *Id.* (quoting *Grant v. Com. Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *13 (Tenn. Ct. App. Sept. 18, 2015)).

Defendants contend that Mr. Hoffman's statements simply present his "good faith belief that the Super Safety does not infringe any of Plaintiffs' patents" and, hence, even if untrue, cannot constitute defamatory statements.  (Br. 12.)  But Mr. Hoffman's statements go well beyond that characterization.  As the facts directly pleaded and otherwise properly before the Court show:

- Without any possible basis except for his own misapplication and misunderstanding of patent law, Mr. Hoffman (falsely assuming before his viewers an authoritative posture and a genuine understanding of patent law) repeatedly and affirmatively represented to them that (i) the Super Safety ***does not*** infringe Plaintiffs' patents; and (ii) Plaintiffs' legal positions were

"nonsensical," a mere effort to "twist" patent language to cover the Super Safety, and "gross" redefinitions or misapplications of patent law;

- Mr. Hoffman repeatedly and intentionally implied that Plaintiffs' claims of patent infringement and efforts to enforce their patents are baseless, malicious, frivolous, and improper;

- Defendants' followers (part of the relevant consumer market) have made innumerable negative and threatening remarks about Defendants and their principals, including death threats, and have even exploded vehicles bearing Rare Breed's name; and

- Mr. Hoffman *appreciated* his followers' negative reactions to Plaintiffs (and their principals), *thanked* them for the "negative press" Plaintiffs suffered as "helpful" to him and certainly has not made any efforts to use his considerable influence to discourage such comments.

Accordingly, Plaintiffs respectfully submit that their claim for defamation is adequately pleaded and should not be dismissed.[11]

### d. Plaintiffs' Cause of Action for Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)

As is well-established, to recover for a breach of contract, a plaintiff must prove: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Thompson v. Am. Gen. Life & Acc. Ins. Co.*, 404 F. Supp. 2d 1023, 1028 (M.D. Tenn. 2005).

---

[11] In Tennessee, all defamation claims require proof of actual damages, but not necessarily special damages, including at the pleading stage. *See Reyes v. Seaton Enters., LLC*, No. 1:07-CV-196, 2008 WL 2066447, at *5-7 (E.D. Tenn. May 13, 2008) (declining to dismiss defamation claim at the pleading stage, *inter alia*, for the plaintiff's failure "to particularly plead damages"). Here, Plaintiffs have alleged that Mr. Hoffman's statements described herein have injured their character and reputation and caused them damages (*see* First Am. Compl. ¶¶ 60-62, 114-16) and have presented additional facts expressly demonstrating those injuries (*see, e.g.*, Jan. 27, 2026 Hr'g Tr. 47:17-48:25, 49:13-50:8).

In addition, all Tennessee contracts include an implied covenant of good faith and fair dealing in regarding performance and enforcement. *See Beijing Fito Med. Co., Ltd. v. Wright Med. Tech., Inc.*, 763 F. App'x 388, 392-93 (6th Cir. 2019). Where a party contends that an opposing party has breached some specific contractual provision, he may allege as an "element or circumstance" of that contractual breach the breach of the implied duty of good faith and fair dealing. *See id.* at 393. The covenant requires that a party perform the terms of the contract in a spirit of good faith. *See Berry v. Mortg. Elec. Registration Sys.*, No. W2013-00474-COA-R3CV, 2013 WL 5634472, at *7 (Tenn. Ct. App. Oct. 15, 2013); *see also Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653,666 (Tenn. 2013) (noting that the covenant "protects the parties' reasonable expectations as well as their right to receive the benefits of their agreement")). "Whether a party has breached the implied covenant can be fact-specific, and courts often defer resolving that question to the jury" but turns on the parties' "objectively reasonable" expectations under the contract. *See Beijing Fito Med. Co., Ltd.*, 2019 WL 480410, at 394 & n.2.

Here, the Settlement Agreement plainly stated that Mr. Hoffman "agree[d] not to make, have made, offer for sale, or sell any product or device that directly or indirectly infringes any claim of the '223 Patent or to make, release, distribute, or provide any 3D CAD file that induces others to make or have made parts that directly or indirectly infringe any claim of the '223 Patent." (Settlement Agreement § 1.) Yet, as set forth above, less than two weeks after executing the Settlement Agreement on February 24, 2022, Mr. Hoffman was developing or had developed other FRT designs (presumably the Super Safety), and, at least as of March 6, 2022, was already (i) advising his followers to "stay tuned" for those forthcoming designs, (ii) instructing that the files he had agreed to remove were "really easy to find"; (iii) opining that his device did not infringe, anyway, and he would probably have "won" in a legal proceeding; and (iv) thanking his followers

for the "negative press" against Rare Breed.

In short, from the moment he signed it, Mr. Hoffman had no intention of performing his obligations—most notably those set forth in § 1—in good faith, and breached both the letter and the spirit of the Settlement Agreement by immediately informing his viewers that they could infringe (and implying that they should continue to do so without fear).[12]

### e. Plaintiffs' Cause of Action Under Section 1 of the Sherman Act Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)

Plaintiffs' theory under this count is that – based on circumstantial evidence – there was a conspiracy between Defendants and third parties, and, particularly, that Defendants and others are trying to drive Plaintiffs out of the market by substituting infringing products, with designs made downloadable by Defendants, for Plaintiffs' products at lower costs or no charge in violation of Plaintiffs' patent rights.

Under Sixth Circuit precedent, "factors to evaluate in [the § 1] analysis include: (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).

Plaintiffs concede that the first of these four factors does not weigh in their favor: in the short run, it *is* in the alleged conspirators' economic self-interest to substitute Mr. Hoffman's products over Plaintiffs due to lower cost. However, from what Plaintiffs can ascertain, the alleged

---

[12] Plaintiffs have also alleged that they have suffered damages, including lost profits, from this breach (*see* First Am. Compl. ¶ 123) although they have not been quantified at this point in the proceedings.

conspirators are uniform in their actions, have exchanged or had opportunity to exchange information (through numerous online communications), and certainly have a common motive to conspire (*i.e.*, swamp the market with infringing goods to defeat Plaintiffs from being able to enforce their patent rights and thereby essentially squeeze them out of the market).

Viewing the First Amended Complaint as a whole and construed in favor of Plaintiffs, drawing all inferences to sustain the claim, Plaintiffs have sufficiently alleged the conspiracy by circumstantial evidence. *See, e.g.*:

> As an initial matter, "it has long been settled that explicit agreement is *not* a necessary part of a Sherman Act conspiracy." *United States v. General Motors Corp.*, 384 U.S. 127, 142-43, 86 S. Ct. 1321, 16 L. Ed. 2d 415 (1966) (emphasis added). The Sherman Act proscribes agreements to restrain trade, "whether express or implicit [or] whether by formal agreement or otherwise." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132-33 (9th Cir. 2011). While conclusory allegations of parallel conduct will not suffice, the pleadings need only allege enough facts "to *suggest* that an agreement was made." *Twombly*, 550 U.S. at 556-57 (emphasis added). That is, there must be enough facts presented "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556-57.

*Solyndra Residual Trust v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1040 (N.D. Cal. 2014). Also, this conspiracy is in restraint of trade as a type of or akin to price fixing. *See, e.g.*:

> No antitrust violation is more abominated than the agreement to fix prices. With few exceptions, "'price-fixing agreements are unlawful *per se* under the Sherman Act and . . . no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense.'" *Arizona* v. *Maricopa County Med. Soc'y*, 457 U.S. 332, 345, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 84 L. Ed. 1129, 60 S. Ct. 811 (1940)).

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003) (footnote omitted), *cert. denied*, 540 U.S. 940 (2003). It does not matter if the agreement is to *lower* prices: "Horizontal price fixing is a per se violation regardless of whether the prices set are minimum or maximum." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).

An agreement (circumstantial) between Defendants and their colleagues to undercut Plaintiffs by giving away, or selling at cut-rate prices, unlawful infringing products to prevent Plaintiffs from selling their own legitimate product in the market is tantamount to a price-fixing arrangement. (Alternatively, it could be seen as a concerted refusal to deal, also a *per se* violation. *See, e.g.*, *Tacker v. Wilson*, 830 F. Supp. 422, 427 (W.D. Tenn. 1993) (discussing conditions under which concerted refusal to deal constitutes a *per se* violation of § 1).

While the facts before the Court are quite unusual, even *sui generis*, the net effect of Defendants' (and others') acts is the same as price-fixing to drive the legitimate competitor from the market anticompetitively. *Cf. Solyndra Residual Trust*, 62 F. Supp. 3d at 1040 ("Here, the pleadings specifically allege facts that are more than sufficient to suggest that Defendants reached an agreement to fix prices and flood the American market with their below cost Chinese-made panels for the purpose of stifling competition.").

Accordingly, Plaintiffs' § 1 claim should not be subject to dismissal for failure to state a claim in the first instance.

      **f.**   **<u>Plaintiffs' Cause of Action Under Section 2 of the Sherman Act Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)</u>**

Defendants urge dismissal of Plaintiffs' § 2 claim (insofar as it is a conspiracy to monopolize) as being subject to the same defect as to § 1. However, as shown, a conspiracy *is* alleged circumstantially. Defendants and their cohorts are attempting to monopolize the FRT market by, conjunctively with others, stealing it away from Plaintiffs, the legitimate purveyor. *Cf.*:

> [A]ctual exclusion of competitors is not necessary to that crime . . . . A correct interpretation of the statute and of the authorities makes it the crime of monopolizing, under § 2 of the Sherman Act, for parties . . . to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to

21

exercise that power.

*American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). *See id. further*:

> No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a **matter of inference deduced from the acts of the person accused** and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. **The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words**. *United States v. Schrader's Son*, 252 U.S. 85. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

328 U.S. at 809-810 (emphasis added).

Here, Defendants by their actions and others with whom they have contact in their "course of dealing" (if not, in fact, in some cases an "exchange or words") are attempting to exercise monopoly power in the FRT market by excluding Plaintiffs therefrom and taking the industry for their own. Consequently, this claim should not be dismissed.

### g. Plaintiffs' Cause of Action for Tortious Interference with Business Relationships Is Adequately Pleaded and Should Not Be Dismissed Pursuant to Rule 12(b)(6)

To state a claim for tortious interference with business relationships under Tennessee law, a plaintiff must plead the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

22

*Tom James Co. v. Rich*, No. 3:24-CV-01310, 2025 WL 1908058, at *3 (M.D. Tenn. July 10, 2025)

(quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)).[13]

> **i.** **The Allegations and Facts the Court May Consider Adequately Show Plaintiffs' Existing and Prospective Relationships with an Identifiable Class of Third Persons**

Defendants contend that Plaintiffs' alleged class of persons—the "consumer market for [FRT] devices" (First Am. Compl. ¶ 143)—is insufficient because it is merely a "'generalized reference[]'" to third parties. (*See* Br. 21 (quoting *Gold Sci. Consultants, Inc. v. Cheng*, No. 3:07-CV-152, 2009 WL 1256664, at *10 (E.D. Tenn. May 4, 2009)).

But *Gold Science Consultants* (and *United Biologics, LLC v. Amerigroup Tenn., Inc.*, No. 3:19-CV-180, 2024 WL 770640, at *16 (E.D. Tenn. Jan. 18, 2024)) were decided at the summary judgment stage, not on a motion to dismiss, and Defendants significantly overstate the holding in *United Biologics, LLC*. *See Gold Science Consultants*, 2009 WL 1256664, at *1, *10; *United Biologics, LLC*, 2024 WL 770640, at *16 (emphasis added) ("[C]ourts in Tennessee . . . have found that simply identifying a general class of third parties is not sufficient ***to survive a motion for summary judgment***. . . . [which requires a plaintiff to] produce evidence of prospective business relationships beyond mere generalized references to third parties ***but not necessarily rising to the***

---

[13] While Defendants contend that Plaintiffs have failed to meet ***any*** of those elements, they make no arguments concerning (3) intent, (4) improper motive or means, or (5) damages (*see* Br. 20-21), waiving opposition as to those elements, *see Jones v. FBI*, No. 3:21-CV-225, 2021 WL 5239586, at *1 (E.D. Tenn. Nov. 10, 2021) (holding that, under Local Rule 7.2, the failure to respond may constitute a waiver of opposition). In any case, they have been adequately pleaded. Concerning intent, Plaintiffs' allegations set forth above ***plainly*** show that Defendants specifically intended to rupture the relationship between Plaintiffs and the consumer FRT market as part of their scheme— not intentional conduct with that incidental effect. *See Assist-2-Sell, Inc. v. Assist-2-Build, LLC*, No. 1:05-CV-193, 2005 WL 3333276, at *3-4 (E.D. Tenn. Dec. 6, 2005). Similarly, while Plaintiffs have alleged damages, they are not required to do so with specificity at this stage. *See id.* at *7 (holding that a party "need not allege specific damages at the pleading stage to state a cause of action for tortious interference with business relations"). Defendants' improper means and motive are discussed *infra*.

*level of identifying specific third parties who actually contemplated a business relationship with the plaintiff.*").[14]   Indeed, this Court has interpreted Tennessee law's use of the word "identifiable" to suggest that "a plaintiff need not name a specific person in the initial stages of litigation," and that even the failure to name a "class of third persons does not require dismissal" at the pleading stage.  *Assist-2-Sell, Inc.*, 2005 WL 3333276, at *6-7.

Here, Plaintiffs *have* alleged an identifiable class of third persons and facts concerning exemplary identifiable members of this class, *e.g.*, those posting on social media (including on Defendants' accounts) statements that they will not purchase from "Rare Greed" (and now cheering on the exploding of automobiles bearing its name), and Mr. Hoffman certainly understands that there is a specific consumer market for FRTs.  (*See* Jan. 29, 2026 Hr'g Tr. (Hoffman cross-examination), at 67:7-16, 74:10-17, 85:20-86:1, 86:9-19 (Mr. Hoffman's testimony concerning the consumer FRT market).)[15]

### ii. The Allegations and Facts the Court May Consider Adequately Show Defendants' Improper Motive and Means

---

[14] Likewise, *Overnite Transp. Co. v. Teamsters Local Union No. 480*—an unpublished case— misapplied *Trau-Med* to require a relationship with a specific third party, No. M2002-02116-COA-R3-CV, 2004 WL 383313, at *12-13, when it actually requires proof of "an existing business relationship with specific third parties **or** a prospective relationship with an identifiable class of third persons," *Trau-Med*, 71 S.W.3d at 701.

[15] The knowledge element requires more than "mere awareness of the plaintiff's business dealings with others in general."  *Trau-Med*, 71 S.W.3d at 701; *see also Pers. Comput. Sys., Inc. v. Cent. Knox, Inc.*, No. 3:11-CV-374, 2012 WL 1108245, at *5 (E.D. Tenn. Mar. 30, 2012) (dismissing a tortious-interference cause of action, *inter alia*, where the complaint did not allege that the defendant knew about the specific relationships with which the plaintiff complained it had interfered).  Here, the facts alleged amply demonstrate Mr. Hoffman's knowledge of Plaintiffs' relationship with the consumer FRT market.

A plaintiff may satisfy the fourth element of a tortious interference claim by alleging that the defendant had an "improper motive" or used "improper means." *Trau-Med*, 71 S.W.3d at 701.

To show that a defendant had an "improper motive" in taking the actions alleged to constitute interference, a plaintiff must allege that its "'predominant purpose was to injure plaintiff.'" *Trau-Med*, 71 S.W.3d at 701 n.5. "Improper means" are not limited by an exhaustive list but can include independently tortious conduct and statutory violations (such as those pleaded herein), as well as otherwise unethical business practices or "sharp dealing." *See id.*; *see also Yoe v. Crescent Sock Co.*, No. 1:15-CV-3-SKL, 2015 WL 13847410, at *13 (E.D. Tenn. Dec. 11, 2015) (stating that patent infringement "if proven might . . . [constitute] improper means of interfering with business relationships").

As set forth above, Mr. Hoffman has made serious efforts, over a period of years, to make Plaintiffs' enforcement of its patent rights difficult or impossible so that Defendants can "swoop in" and dominate the market. Accordingly, in addition to constituting improper means, Mr. Hoffman's actions in infringing their patents, dissembling to his audience about that infringement, and impugning Plaintiffs' character can plausibly be interpreted as indicating a predominant purpose to injure Plaintiffs.

## III.   <u>CONCLUSION</u>

For the reasons explained above, Plaintiffs respectfully submit that this Honorable Court should deny the Motion to Dismiss in its entirety and permit each of their claims to proceed.

Dated: April 6, 2026.                    Respectfully submitted,

By: /s/ Decker A. Cammack
    Decker A. Cammack (admitted *pro hac vice*)
    WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
    301 Commerce Street, Suite 3500
    Fort Worth, TX 76102
    Telephone: (817) 878-0500
    Facsimile: (817) 878-0501
    DCammack@whitakerchalk.com

By: /s/ Glenn D. Bellamy
    Glenn D. Bellamy (admitted *pro hac vice*)
    WOOD, HERRON & EVANS, LLP
    600 Vine Street, Suite 2800
    Cincinnati, Ohio 45202
    Telephone: (513) 241-2324
    Facsimile: (513) 241-6234
    gbellamy@whe-law.com

By: /s/ Joseph Alan Jackson II
    Joseph Alan Jackson II, B.P.R. No. 030603
    SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
    601 Market Street, Suite 400
    Post Office Box 1749
    Chattanooga, TN 37401 1749
    Telephone: (423) 756-7000
    Facsimile: (423) 756-4801
    jaj@smrw.com

    *Attorneys for Plaintiffs*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By: *<u>/s/ Decker A. Cammack</u>*

Case 1:25-cv-00389-CLC-CHS     Document 64     Filed 04/06/26     Page 27 of 27 PageID #: 1170